## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ARRO CORPORATION, f/k/a ARRO | ) | Case No. 19-35238 |
| PACKAGING COMPANY | ) | |
| | ) | Honorable Janet S. Baer |
| Debtor. | ) | |
| | ) | |
| | ) | |

## DECLARATION OF PATRICK GAUGHAN IN SUPPORT OF CHAPTER 11
## PETITION, FIRST-DAY MOTIONS, AND CERTAIN SECOND TIER MOTIONS

I, Patrick Gaughan, under penalties as provided by law pursuant to 28 U.S.C. § 1746, hereby certify that the following is true and correct to the best of my knowledge, information and belief (the "**Declaration**"):

## I.    GOVERNANCE; AUTHORITY TO COMMENCE CHAPTER 11 CASE; AND PURPOSE OF DECLARATION

### A.    Pre-Petition Governance: Replacement of Director and President, and Exercise of Proxy

1.    I am the former president, former sole director, and putative sole shareholder (indirectly, through a self-settled trust) of Arro Corporation f/k/a/ Arro Packaging Company (the "**Debtor**"). The trust through which I held equity in the Debtor is commonly known as the *Patrick Gaughan Declaration of Trust dated July 15, 1996, as amended and restated by that certain Amendment and Restatement of Patrick Gaughan Declaration of Trust dated May 15, 2008* (the "**Trust**").

2.    In addition, I hold the sole membership interests of: (a) Santa Fe Property, LLC, an Illinois limited liability company which leases to the Debtor certain, but not all, of the real estate from which the Debtor operates; and (b) Arro Protein Solutions, LLC (through the Trust),

an Illinois limited liability company, an affiliate of the Debtor which operates out of one of the Debtor's facilities leased from an unaffiliated third party.

3.      I held the title of president and was the sole director of the Debtor commencing in 1995, when I originally acquired ownership of the equity of the Debtor, until November 27, 2019.

4.      On November 27, 2019, the Debtor's primary secured creditor, BMO Harris Bank, N.A. ("**BMO**") exercised its rights pursuant to that certain *Stock Pledge Agreement* between the Trust and BMO dated June 14, 2017 (the "**Stock Pledge Agreement**"). As set forth in more detail below, the Stock Pledge Agreement was provided as collateral security for the BMO Indebtedness (as defined below).

5.      In exercising its rights, BMO elected to use the proxy of the Trust's voting rights pursuant to the Stock Pledge Agreement and executed shareholder resolutions removing me as the sole director and replacing me with a new director, Mr. Robert Novak ("**Sole Director**").[1] The Sole Director then executed resolutions removing me as president and appointing a new president, Mr. Daniel Dooley ("**President**"). The Sole Director and the President are associated with the consulting firm of Morris Anderson & Associates, Ltd.

6.      BMO did not cite mismanagement, negligence, breach of the duties of care or loyalty, or any malfeasance of any kind or nature in connection with the exercise of its rights under the Stock Pledge Agreement. On information and belief, BMO exercised its rights based upon my hesitancy to commence the Chapter 11 Case (as defined below).

7.      From and after the appointment of Messrs. Novak and Dooley, I have remained an employee of the Debtor and have been working closely with each of them to facilitate transition of governance and management of the Debtor, and otherwise operate the business of

---

[1] The Trust asserts BMO transferred all of the outstanding stock of the Debtor into the name of BMO, but BMO disputes this contention and asserts that the stock of the Debtor remains in the name of the Trust.

1057594_2

2

the Debtor in the ordinary course. In addition, since June of 2019, I have been working with Paul Andrews and Vladimir Kasparov of the consulting firm of Andrews Advisory Group, LLC as financial consultants to the Debtor (the "**Financial Consultants**").

**B.     Authority to Commence Chapter 11 Case**

8.     On December 13, 2019, the Sole Director informed me that he had executed resolutions authorizing the filing of the Chapter 11 Case. I reviewed a copy of the resolutions, and am relying on the authenticity and substance of the resolutions.

9.     On December 13, 2019 (the "**Petition Date**"), the Debtor commenced a voluntary case under chapter 11 of the United States Bankruptcy Code (the "**Chapter 11 Case**") in the above-referenced court (the "**Bankruptcy Court**"). This Declaration is being filed in support of the Chapter 11 Case, the First-Day Motions (as defined below), and certain Second Tier Motions (as defined below).

**C.     Personal Knowledge Despite Removal**

10.     As a result of my twenty-four (24) years in control of the Debtor, I possess personal knowledge of, and am highly familiar with, the Debtor's day-to-day operations, business affairs, and books and records.

11.     I am also familiar with the Debtor's financial difficulties, restructuring efforts, and the events leading to the commencement of the Chapter 11 Case; the existing senior secured indebtedness of BMO; the existing junior secured indebtedness owing to the United States Small Business Administration ("**SBA**"); the proposed debtor-in-possession financing from BMO; the cash management system used by the Debtor; the wages, healthcare and other employee benefits offered by the Debtor to its employees; the Debtor's outsourcing of labor through multiple staffing agencies; and the Debtor's recent marketing and sale efforts, all of which are the subjects of the various first-day motions filed in the Chapter 11 Case (collectively, the "**First-Day**

Motions),[2] or certain motions to be filed in the first several weeks of the Chapter 11 Case (the
"**Second Tier Motions**")[3].

12.     As a result of my familiarity with these matters, as well as my personal experience with the Debtor, I have formed opinions regarding the necessity for the relief sought in the First-Day Motions and Second Tier Motions, especially to the extent that such relief will enable the Debtor to continue to operate in the ordinary course of business as it pursues the sale of all or substantially all of its assets in the Chapter 11 Case.

13.     I have been authorized by the Sole Director and the President, and hereby submit this Declaration in support of, the Chapter 11 Case, the First-Day Motions, and certain of the Second Tier Motions.  Except as otherwise indicated, all statements set forth in this Declaration are based upon my personal knowledge, my review of the relevant documents and records of the Debtor, and/or my opinion based upon my experience and knowledge of the Debtor's operations and financial condition.  If I am called upon to testify, I can and will testify to the facts and matters set forth herein.

## II.     THE BUSINESS OPERATIONS OF THE DEBTOR; OPERATING FACILITIES; EMPLOYEES; OUTSOURCED LABOR; AND WARN ACT NOTICES

### A.     General Description of Debtor's Business

14.     Originally founded in 1985 as Arro Packaging, I acquired the assets of Arro Packaging in 1995 through Arro Packaging Company, renaming the company "Arro Corporation." in 1997.

---

[2] Any capitalized terms not expressly defined herein shall have the meaning ascribed to that term in the relevant First-Day Motion.

[3] The Second Tier Motions are expected to include, without limitation, retention of an investment banker; retention of Chapter 11 counsel; retention of a Chief Restructuring Officer and other professional persons; and a motion to sell all or substantially all assets of the Debtor pursuant to an auction and court approved bid procedures.

1057594_2                                                                                          4

15.     A detailed explanation of the Debtor's business is accessible on the Debtor's website, https://arro.com. In summary, however, the Debtor is in the business of manufacturing, packaging, and distributing bake mixes, powdered beverages, ingredients, cereals, trail mix, nuts and other food products. The Debtor provides industry leading processing and packaging services for many well-known consumer-branded foods, including emerging brands, private label, gluten free, organic, and national brands.

16.     The Debtor's customers typically sell products manufactured and/or packaged by the Debtor through buyer clubs, grocery stores, food service industry participants, and discount / value retail establishments. The Debtor also re-packages various food ingredients for distribution to commercial markets.

17.     In addition, the Debtor provides a full suite of research and development ("**R&D**") capabilities for its customers, including an on-site R&D laboratory. The R&D team can match or create product solutions to fulfill customer needs and quickly commercialize these products to bring them to market. The Debtor also assists its customers in obtaining quality certifications, such as AIB gluten free certified, organic, and kosher.

18.     The Debtor's business is comprised of two distinct divisions: (a) contract manufacturing of retail food based products (the "**Food Division**"); and (b) bulk packaging of commodity ingredients and liquid sugar refining for commercial application (the "**Bulk Division**"). The Food Division accounts for approximately ninety percent (94%) of the Debtor's annual revenue, while the Bulk Division accounts for the other six percent (6%).

19.     Based upon customer needs, the Debtor can provide one of two service options. First, the Debtor offers a "turn-key" model, including R&D, testing, product development, commercialization, and vendor and supply chain management (the "**Turn-Key Services**"). With Turn-Key Services, the Customer requires particular quality controlled vendors (collectively, the

"**Mandated Source Vendors**"), and the Debtor procures and owns the inventory and raw materials necessary to process such customer orders. As a result, the Debtor receives additional consideration for procurement services.

20. Second, and in lieu of Turn-Key Services, the Debtor offers a traditional co-packer, or toll, model (the "**Toll Services**"). With Toll Services, the Debtor's customer also dictates the Mandated Source Vendors, but the customer is responsible for the working capital necessary to acquire the inventory and raw materials needed to process the Toll Services customer orders. As a result, the Debtor applies a "toll" fee to process the customer owned inventory.

21. Under both Turn-Key Services and Toll Services, inventory is received, processed, warehoused, and shipped within the Debtor's on-site facilities.

**B.** **Operating Premises**

22. The Debtor operates from five (5) distinct facilities comprising in excess of 770,000 square feet. The Food Division is primarily located at 7440 Santa Fe Drive, Hodgkins, Illinois, 60525, but operates out of other satellite facilities. The Bulk Division is located exclusively in the Debtor's Chicago plant located at 10459 S. Muskegon Ave., Chicago, Illinois 60617.

23. The Debtor leases all of its facilities from un-affiliated, third party lessors with the one exception being 7550 Santa Fe Drive. This property is owned by Santa Fe Property, LLC, of which I am the sole member.

24. The applicable locations from which the Debtor currently operates (both Food Division and Bulk Division) are summarized as follows:

| Property | Use | Ownership | Comments |
|---|---|---|---|
| 7440 Santa Fe Drive, Hodgkins, Illinois | Main facility for food processing; corporate offices | Leased from non-affiliated third party | None |
| 7550 Santa Fe Drive, Hodgkins, Illinois | Food processing; boilers; garbage and recycling; parking lot overflow for 7440 building | Leased from affiliated entity, Santa Fe Properties, LLC | Connected to 7440 building through permanent breezeway |
| 7220 Santa Fe Drive, Hodgkins, Illinois | Former processing facility and warehouse; currently subleasing portion of former space for one processing room | Sub-leased from non-affiliated third party | Original premises surrendered to landlord, but presently subleasing partial premises from current tenant; to be relocated upon expiration of sublease in 2020 to 7225 building |
| 7250 Santa Fe Drive, Hodgkins, Illinois | Warehouse and nut processing | Leased from non-affiliated third party | To be relocated upon expiration of lease on March 31, 2020, to 7225 building |
| 7225 Santa Fe Drive, Hodgkins, Illinois | Warehouse and nut processing | Leased from non-affiliated third party | To replace 7220 building and 7250 building |
| 10459 S. Muskegon Ave., Chicago, Illinois | Bulk Division | Leased from non-affiliated third party | Arro Protein Solutions, LLC, an affiliated entity, also operates from this facility |

25. As set forth in the table above, the Debtor has contemplated relocating from operations in 7220 Santa Fe and 7250 Santa Fe upon the expiration of its leasehold interests, into the 7225 Santa Fe Drive premises

26. Accordingly, the Debtor entered into that certain *Industrial Lease Agreement* dated September 25, 2018 for the 7225 Santa Fe Drive (the "**7225 Lease**"). The 7225 Lease contained a commencement date of January 1, 2019. From and after the commencement date of the 7225 Lease, the Debtor was unable to pay the lessor under the 7225 Lease.

27. On December 9, 2019 the Debtor received via e-mail a *5-Day Notice of Termination of Tenancy* with respect to the 7225 Santa Fe Drive property (the "**5-Day Notice**"). The 5-Day Notice reflected a past due amount of $942,045.39 and was dated Friday, December

6, 2019, but a hard copy was not delivered to the Debtor until the morning of Monday, December 9, 2019, as delivered by UPS. The Debtor believes that under the terms of the 7225 Lease, the 5-Day Notice was not effective until received on December 9, 2019. The Debtor was unable to cure the amount due under the 5-Day Notice, and commenced this case prior to the expiration of the 5-Day Notice.

28.    In addition, the properties located at 7440 Santa Fe Drive and 10459 S. Muskegon are subject to a *Master Lease Agreement* with a single lessor.

### C.    Employment Structure

29.    The Debtor employs approximately 124 people (the "**Employees**"). There are 106 employees working in the Food Division (Hodgkins); 57 of those employees are salaried, and 67 are hourly. There are 18 employees who work in the Bulk Division (Chicago); 9 of those employees are salaried, and 9 are hourly.

30.    In addition to the Debtor's employees, the Debtor engages the services of multiple staffing agencies to obtain the services of approximately 300 to 350 individuals on a daily basis (the "**Outsourced Labor**"). The Debtor is party to certain contracts with Alternative Staffing, Inc. and Onin Group Midwest, LLC, as successor to Labor Temps, II, LLC (collectively, the "**Staffing Agencies**"). The Debtor's ordinary course of business is to contact the Staffing Agencies on a daily basis and communicate: (a) how many individuals comprising the Outsourced Labor the Debtor will be requiring for the next day; and (b) the requisite skill set required of the Outsourced Labor. The contracts with the Staffing Agencies expressly provide that the Outsourced Labor are employees of the Staffing Agencies and not the Debtor.

### D.    WARN Notices

31.    On December 9, 2019, the Debtor retained the law firm of Littler Mendelson PC, which specializes in labor law, to prepare certain notices to Employees (the "**WARN Notices**")

under applicable state and federal law pursuant to the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101-2109, and the Illinois Worker Adjustment and Retraining Notification Act, 820 ILCS 65/1.

32.    As set forth below, the Debtor hopes to sell all or substantially all of its assets to a third party who will subsequently employ all or many of the Employees, thereby enhancing the ability of a substantially contemporaneous termination and rehiring of the Employees. As an abundance of caution, however, the Debtor caused WARN Notices to be circulated to the Employees and applicable government agencies on December 13, 2019, prior to the filing of the Chapter 11 Case.

## III. THE DEBTOR'S 2018 PERFORMANCE ISSUES AND FINANCIAL PROBLEMS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASE

### A. New Business Prospects and Delays in Implementation Cause Financial Strain on the Debtor's Pre-Petition Operations

33.    In the fourth quarter of 2017, the Debtor's outlook for 2018 in the Food Division was promising. The Debtor was exploring a large pipeline of new business, which if realized, would have increased the Debtor's revenue by approximately fifty percent (50%), to a projected $120 million in 2018. In light of its anticipated new business, the Debtor believed it was entering into a sustainable growth period and began a program to increase its infrastructure to accommodate the expected increase in demand for its products and services. It did so by adding certain equipment and mid-level compliance and quality-control employees, primarily for the purpose of ensuring that new products would comply with the FDA Food Safety Modernization Act, 21 U.S.C. §301 et seq.

34.    Instead, the Debtor faced a series of problems hampering the realization of its projections, described generally as follows:

- *Changes in the Labor Market*: Like many businesses, the Debtor did not fully appreciate the timing, scope or impact government-mandated increases in minimum wage would have on the labor market as a whole, nor did it foresee the difficulties in attracting and maintaining quality personnel in an employee-friendly labor market. Instead of insisting on price increases from its existing customer base, the Debtor believed its anticipated growth in new business would more than offset the increase in wages.

- *Delays in the Start of New Business*: While successful in on-boarding much of its anticipated new business, the new business was not commercialized until fourth quarter of 2018, despite the Debtor's anticipation that much of this business would be effectuated by the end of the second quarter of 2018. This timing exacerbated the increased overhead incurred in early 2018.

- *Private Equity Investment*: In its business judgment, management thought the Debtor could overcome its capital shortfall in 2018 through increased volume, and thereafter, by way of a private equity transaction. In hindsight, it would have been beneficial to secure an equity investment earlier to accommodate increased overhead and bridge the gap in timing of new business and realization of revenue derived therefrom.

- *Operating Inefficiencies*: As a result of the delay in new business, the Debtor found itself in perpetual start-up mode, in which it expended significant time and financial resources to ensure that new product lines were initiated or launched appropriately to the satisfaction of the Debtor's customers. In addition, to accommodate these new product lines, the Debtor had increased its inventory and acquired processing equipment which went underutilized, adding to the Debtor's inability to monetize a return on its investments in infrastructure.

- *Ingredient Delays*: As a result of its financial difficulties, the Debtor moved to a just-in-time receipt system for ingredients, as it did not have the cash flow to stockpile the ingredients necessary to satisfy customer orders. As a result, any delay in the delivery of ingredients resulted in the complete shut-down of the applicable product line until the necessary ingredients arrived. Compounding the problem, the Debtor was unable to simply send its labor force home until the product line could be re-engaged, as the Debtor feared any reduction in work hours for its employees, even temporary ones, would result in its displaced workforce finding employment elsewhere. Accordingly, the Debtor retained the affected employees but was required to utilize them in non-revenue generating tasks, such as cleaning and maintenance.

35.    Recognizing its financial difficulties, I attempted to obtain an equity infusion or conduct a sale to an interested third-party purchaser. Although no investment banker was retained, I sought out and communicated with dozens of prospective investors or purchasers over

the last two years; obtained between 25 and 30 executed non-disclosure agreements; and conducted 8 to 10 on-site visits.

### B.   Litigation

36.     As a result of the foregoing performance issues, the Debtor's cash flow suffered and the Debtor has been unable to pay creditors on a timely basis. In addition to numerous demands for payment, several of the Debtor's creditors initiated litigation against the Debtor. And, while many of these cases are ongoing, some of the creditors have obtained judgments which the Debtor has been required to satisfy, or enter into installment contracts to satisfy.

37.     As of the date hereof, there are in excess of ten (10) open litigation matters alleging amounts due in excess of $2.5 million.[4] In addition, the Debtor is the subject of an alleged action for violation of privacy relating to biometric security for its personnel. The Debtor does not have the financial resources available to satisfy the claims demanded in the litigation and is likewise unable to continue paying the legal fees necessary to defend these actions.

## IV.   PREPETITION DEBT STRUCTURE[5]

### A.   SBA Loans

38.     The Debtor has historically expanded its product lines and operating facilities through the acquisition of machinery and equipment financed by the SBA through a program commonly referred to as *504 loans* (the "**504 Loan Program**"). Under the 504 Loan Program, the Debtor was able to borrow: (a) up to 40% of the cost of a project through the SBA and SBA approved *Certified Development Companies* ("**CDC's**") approved by the SBA; and (b) up to

---

[4] Nothing contained herein shall be deemed an admission of any kind or nature, including without limitation, the facts alleged to give rise to any claim against the Debtor or the claim itself.
[5] The pre-petition debt structure described herein only addresses existing loans; any loans which are no longer on the Debtor's books and records, whether through refinance or satisfaction, are omitted from this Declaration.

50% of the cost of a project through a third party lender. Thus, the Debtor was only required to self-fund 10% of its expansion projects.

39.     On November 17, 2010, the Debtor entered into a loan facility with the SBA pursuant to a *Note (CDC/504 Loans)* payable to the SBA in the amount of $1,351,000, among other documents ("**SBA Loan No. 1**"). The purpose of SBA Loan No. 1 was the purchase and installation of three new product lines at two of the Debtor's premises. The machinery and equipment constituting the new product lines serve as collateral for SBA Loan No. 1 pursuant to the applicable SBA loan documents. In connection with SBA Loan No. 1, the SBA filed a UCC-1 Financing Statement with the Illinois Secretary of State on October 12, 2010, designated as filing number 15670487, as subsequently amended.

40.     On July 17, 2012, the Debtor entered into a loan facility with the SBA pursuant to a *Note (CDC/504 Loans)* payable to the SBA in the amount of $4,161,000, among other documents ("SBA Loan No. 2"). The purpose of SBA Loan No. 2 was to refinance existing debt with First Midwest Bank and to purchase and install new machinery and equipment for a new processing room. The machinery and equipment used in the new processing room serve as collateral for SBA Loan No. 2 pursuant to the applicable SBA loan documents. In connection with SBA Loan No. 2, the SBA filed a UCC-1 Financing Statement with the Illinois Secretary of State on July 17, 2012, designated as filing number 17448005, as subsequently amended.

41.     On February 16, 2017, the Debtor entered into a loan facility with the SBA pursuant to a *Note (CDC/504 Loans)* payable to the SBA in the amount of $978,760, among other documents ("**SBA Loan No. 3**"). The purpose of SBA Loan No. 3 was to purchase and install three new product lines at two of the Debtor's premises. The machinery and equipment constituting  the new product lines serve as collateral for SBA Loan No. 3 pursuant to the

applicable SBA loan documents. In connection with SBA Loan No. 3, the SBA filed a UCC-1 Financing Statement with the Illinois Secretary of State on September 20, 2017, designated as filing number 22726277, as subsequently amended.

42.    On September 20, 2017, the Debtor entered into a loan facility with the SBA pursuant to a *Note (CDC/504 Loans)* payable to the SBA in the amount of $3,012,000, among other documents ("**SBA Loan No. 4**", and together with SBA Loan 1, SBA Loan 2, SBA Loan 3, the "**SBA Loans**"). The purpose of SBA Loan No. 4 was the refinance of First Midwest Bank, and the purchase and installation of new equipment for a new processing room. The machinery and equipment used in the new processing room serve as collateral for SBA Loan No. 4 pursuant to the applicable SBA loan documents. In connection with SBA Loan No. 4, the SBA filed a UCC-1 Financing Statement with the Illinois Secretary of State on September 20, 2017, designated as filing number 22726285, as subsequently amended.

43.    As of the Petition Date, the Debtor believes the indebtedness owing to the SBA under the SBA Loans aggregates to $4.8 million (the "**SBA Indebtedness**"). As set forth below, however, the SBA Loans are not cross collateralized, and the specific machinery and equipment securing the SBA Loans is the sole source of the SBA's collateral for each corresponding SBA Loan. In addition, the BMO Term Loans (as defined below) are secured by the same machinery and equipment in the same loan-specific fashion, and the BMO Term Loans are likewise not cross collateralized.

44.    Pursuant to a series of Unconditional Guarantees, it is alleged I have personally guaranteed the SBA Loans.

**B.    BMO Loans**

45.    On June 14, 2017, BMO and the Debtor entered into a loan facility pursuant to the following documents and instruments: (a) *Credit Agreement* dated June 14, 2017, between Borrower and BMO (together with all amendments thereto, the "**BMO Credit Agreement**"); (b) *Revolving Note* payable to BMO in the amount of $13 million (together with all amendments thereto, the "**BMO Revolving Note**"); (c) *Term A Note* payable to BMO in the original principal amount of $1,321,153.00 (the "**BMO Term Loan A**"); (d) *Term B Note* payable to BMO in the original principal amount of $197,619.00 (the "**BMO Term Loan B**"); (e) *Term C Note* payable to BMO in the original principal amount of $937,500.00 (the "**BMO Term Loan C**"); (f) *Term D Note* payable to BMO in the original principal amount of $3,543,728.00 (the "**BMO Term Loan D**", together with BMO Term Loan A, BMO Term Loan B, and BMO Term Loan C, the "**BMO Term Loans**"); and (g) General Security Agreement, in which the Debtor granted a lien upon all or substantially all of the Debtor's Assets (the "**BMO Security Agreement**").

46.    In connection with the foregoing, I executed on June 14, 2017: (a) the Stock Pledge Agreement; and (b) a *Guaranty* of the indebtedness owing to BMO under the foregoing documents and instruments in my individual capacity and as trustee of the Trust, with a limitation of liability capped at $2 million in the aggregate, plus interest, advances, and expenses, as more fully set forth therein (the "**BMO Guaranty**").

47.    In connection with the BMO Credit Agreement, the BMO Revolving Note, the BMO Term Loans, and the BMO Security Agreement, BMO filed a UCC-1 Financing Statement with the Illinois Secretary of State on May 30, 2017, designated as filing number 022726277.

48.     As of the Petition Date, the Debtor believes the indebtedness owing to BMO under the BMO Revolving Note and the BMO Term Loans (collectively, the "**BMO Loans**") aggregates to approximately $26.7 million (the "**BMO Indebtedness**").

**C.     Shared Collateral for SBA Loans and BMO Term Loans**

49.     On June 6, 2017 and June 13, 2017, the SBA and BMO entered into two Subordination Agreements (collectively, and together with any subordination provisions or agreements under the applicable SBA Loans and BMO Term Loans, the "**Subordination Agreements**"). The Subordination Agreements provide that: (a) the SBA's liens are junior to the liens of BMO on the machinery and equipment securing the SBA Loans and the BMO Term Loans (the "**Shared Collateral**"); and (b) neither the SBA Loans nor the BMO Term Loans may be cross collateralized. As such, the Shared Collateral secures only the singularly applicable SBA Loan or BMO Term Loan and must be "bucketed" on a loan-by-loan basis.

50.     The SBA Loans and the BMO Term Loans correspond to one another as follows: SBA Loan No. 1 corresponds to BMO Term Loan B; SBA Loan No. 2 corresponds to BMO Term Loan A; SBA Loan No. 3 corresponds to BMO Term Loan C; and SBA Loan No. 4 corresponds to BMO Term Loan D.

51.     Notably, the Shared Collateral as set forth in the applicable loan documents and financing statements is not perfectly ascertainable. By way of example, some of the financing statements contain purchase orders or invoices for the equipment obtained with the SBA Loans, as opposed to a specific list of specific machinery and equipment with serial numbers or other specifying information.

**D.    BMO Credit Agreement Amendments Prior to Notice of Default**

52.    The BMO Credit Agreement was amended pursuant that certain *First Amendment to Credit Agreement* dated September 20, 2017, to extend the Bridge Loan Maturity Date (as defined in the BMO Credit Agreement) from September 20, 2017 to November 20, 2017.

53.    The BMO Credit Agreement was again amended pursuant that certain *Second Amendment to Credit Agreement* dated June 11, 2018 to increase the Revolving Credit Commitment (as defined in the BMO Credit Agreement) from $13,000,000 to $15,500,000, among other things.

54.    The BMO Credit Agreement was again amended pursuant that certain *Third Amendment to Credit Agreement* dated September 11, 2018 to increase the Revolving Credit Commitment (as defined in the BMO Credit Agreement) from $15,500,000 to $18,000,000, among other things.

**E.    Notice of Default issued by BMO**

55.    On March 28, 2019, BMO issued a notice of default to the Debtor for, among other things, the Debtor's "... failure to maintain a Total Operating Debt/EBITDA Ratio of 3.00:1.0 as of December 31, 2018 and a Fixed Charge Coverage Ratio of 1.15:1.0 as of December 31, 2018, as required by Sections 7.12(a) and (b) of the Credit Agreement."

**F.    Certain Post-Default Forbearance Agreements**

56.    On or about July 1, 2019, with an effective date of June 28, 2019, the Debtor, myself as an individual guarantor, the Trust, and the Bank entered into that certain *Forbearance Agreement*, under which, among other things, BMO permitted the Debtor to draw an additional $750,000 under the BMO Revolving Note, notwithstanding that the Debtor was in default and in an over-advance position.

57.    On or about August 26, 2019, with an effective date of August 2, 2019, the Debtor, myself as an individual guarantor, the Trust, and the Bank entered into that certain *Second Forbearance Agreement and Fourth Amendment to Credit Agreement* under which the Revolving Credit Commitment was increased from $18,000,000 to $19,550,000, among other things. A new BMO Revolving Note was executed by the Debtor in connection with this agreement.

58.    On or about September 19, 2019, with an effective date of August 31, 2019, the Debtor, myself as an individual guarantor, the Trust, and the Bank entered into that certain *Third Forbearance Agreement and Fifth Amendment to Credit Agreement* under which the Revolving Credit Commitment was increased from $19,550,000 to $20,850,000, among other things. A new BMO Revolving Note was executed by the Debtor in connection with this agreement.

**G.    Acceleration of Indebtedness**

59.    On November 15, 2019, BMO issued a notice of acceleration of the BMO Indebtedness to the Debtor declaring the BMO Indebtedness immediately due and payable (the **"Acceleration Notice"**).

60.    The Acceleration Notice referenced the expiration of the Standstill Period (as defined in the *Third Forbearance Agreement and Fifth Amendment to Credit Agreement*) effective October 31, 2019. The Acceleration Notice did not require the Debtor to assemble its collateral, nor did it expressly prohibit the Debtor from using the Bank's cash collateral or continuing to operate in the ordinary course.

**H.    Post-Acceleration Forbearance Agreements**

61.    On or about December 6, 2019, with an effective date of November 16, 2019, the Debtor and the Bank (but not myself as an individual guarantor or the Trust), entered into that

certain *Fourth Forbearance Agreement and Sixth Amendment to Credit Agreement* under which the Revolving Credit Commitment was increased from $20,850,000 to $21,500,000, among other things. A new BMO Revolving Note was executed by the Debtor in connection with this agreement. On information and belief, the *Fourth Forbearance Agreement and Sixth Amendment to Credit Agreement* was required to permit BMO to increase the Revolving Credit Commitment despite the Acceleration Notice.

62.    On the Petition Date, with an effective date of December 12, 2019, the Debtor and the Bank (but not myself as an individual guarantor or the Trust) entered into that certain *Fifth Forbearance Agreement and Seventh Amendment to Credit Agreement* under which the Revolving Credit Commitment was increased from $21,500,000 to $21,735,000, among other things. A new BMO Revolving Note was executed by the Debtor in connection with this agreement. On information and belief, the *Fifth Forbearance Agreement and Seventh Amendment to Credit Agreement* was required to permit BMO to increase the Revolving Credit Commitment despite the Acceleration Notice, and to fund professional fee retainers for the Chapter 11 Case.

### I.    Other Secured Creditors

63.    In addition to the SBA and BMO, the Debtor has entered into certain purchase money security interests with unaffiliated third parties, including but not limited to: Quincy Recycle Paper, Inc; Toyota Industries Commercial Finance, Inc; and Hitachi Capital America Corp.

### V.    **FINANCIAL CONDITION OF DEBTOR**

64.    The Debtor is presently burning cash at an unsustainable rate. In addition to its obligations to the SBA and BMO of approximately $4.8 million and $4.19 million on the SBA

Loans and the BMO Term Loans, respectively, Arro owes BMO an additional $21.7 million on the BMO Revolving Note. The Debtor also has approximately $10 million in past-due trade accounts payable. As a result, the Debtor is not obtaining credit from many of its suppliers, thereby creating a vicious cycle of not having sufficient inventory to generate accounts receivable.

65.      As of the filing hereof, the most current completed monthly financial statements of the Debtor are through October 31, 2019. While more current financial information will be provided in the Debtor's Bankruptcy Schedules and Statement of Financial Affairs, the Balance Sheet as of October 31, 2019 reflects that the Debtor had assets of approximately $31,000,000 and liabilities of approximately $50,500,000, and the Debtor's Income Statement reflects year to date net income of ($12,540,000) and EBITDA of ($8,724,000). The Debtor's October 31, 2019 Balance Sheet and Income Statement are summarized below.

**A.      Balance Sheet**

**1.      Assets**

66.      The Debtor's current assets aggregated to approximately $16,400,000, consisting of $260,000 in cash; $7,366,000 in accounts receivable; $8,380,000 in inventories, and $370,000 in prepaid assets and other current assets.

67.      The Debtor's property and equipment, net of depreciation, aggregated to $11,390,000. This figure is inclusive of building improvements, but the Debtor owns no land.

68.      The Debtor's books and records also reflect a due from affiliates in the amount of $2,300,000, and goodwill of $980,000.

### 2. Liabilities

69.    The Debtor's current liabilities aggregated to $22,422,000, consisting of $18,628,000 in accounts payable; $295,000 of accrued payroll; $266,000 of accrued real estate taxes; $1,178,000 of accrued expenses and other liabilities; and $2,053,210 of the current portion of long term debt

70.    The Debtor's long term debt aggregates to $28 million, consisting of $7,240,000 of notes payable (less the current portion) and $20,831,000 on the BMO Revolving Note.

### 3. Stockholders' Equity

71.    The Debtor's total stockholder's equity is ($19,439,000), consisting of $1,000 for common stock; $1,500,000 of additional paid in capital; and $(20,940,000) of retained earnings.

### B.    Income Statement

### 1. Sales

72.    The Debtor's year to date gross sales were $60,867,000. Its cost of sales was $58,059,000, resulting in gross profit of $2,808,000.

### 2. Expenses

73.    The Debtor's year to date to total expenses were $14,015,000, consisting of $9,122,000 in operating expenses; $3,800,000 in general and administrative expenses; and $1,093,000 in depreciation and amortization, resulting in income from operations in the amount of ($11,206,857).

### 3. Other Income

74.    The Debtor's total other income (expenses) aggregated to ($1,333,000), consisting of ($1,279,000) in interest expense and ($54,000) of other, net expense. The Debtor did not have any gain on the sale or disposal of equipment.

## VI.    SALE OF THE DEBTOR'S ASSETS

75.    Although beyond the scope of this Declaration, it is The Debtor's intention to set seek approval of a sale process and procure a purchaser for the sale of all or substantially all assets of the Debtor pursuant to an *Asset Purchase Agreement* (the "**APA**"). Prior to filing, the Debtor had executed a *Letter of Intent* with an unaffiliated third party with the intention of executing an APA, but those discussions ceased prior the Petition Date. As part of the Debtor's agreement to obtain post-petition financing from BMO, the Debtor is required to meet certain milestones in connection with a court approved sale auction and sale process.

## VII.    FIRST DAY MOTIONS

76.    A critical element in the Debtor's attempt to maximize the benefit to its creditors is approval of each of the First-Day Motions submitted concurrently herewith. Based on my personal knowledge and the review discussed above, I believe that the relief sought by the Debtor in the First-Day Motions is necessary to enable the bankruptcy estate to be administered effectively and to give the Debtor the best chance to effectuate a sale process that will maximize the value of the estate for the benefit of all creditors

77.    Failure to grant such relief would have a serious negative effect on the Debtor's efforts to continue operating during the Chapter 11 Case. For example, the Debtor must utilize BMO's cash collateral and DIP financing to effectuate and sustain its operations, and to maintain the marketability of the Debtor as a going concern. The inability to access DIP financing and pay ordinary course business expenses will result in substantial and irreparable harm to the value of the Debtor's assets (and its going concern value) and would otherwise not be in the best interests of the estate and the Debtor's creditors.

78.    Factual information in support of the First-Day Motions is provided below and in the corresponding motions filed concurrently herewith

**A.    Cash Collateral and DIP Financing**

79.    By its motion for authority to enter into postpetition secured financing and for use of cash collateral  (the "**DIP Motion**"), the Debtor seeks approval of, among other things: (a) use of the cash collateral of BMO (the "**Cash Collateral**"); and (b) postpetition financing by BMO (the "**DIP Facility**"), the, as set forth in that certain *Senior Secured Super-Priority Debtor in Possession Credit Agreement* (the "**DIP Agreement**").  Under the DIP Agreement, the Debtors will have access to $2,964,545 in the aggregate maximum principal amount, consisting of $2,000,000 on an interim basis and the balance of $964,545 on a final basis; and (b) the consensual use of Cash Collateral. The relief requested in the DIP Motion is critical to ensuring the certainty that the Debtor will have sufficient liquidity throughout the duration of the Chapter 11 Case, subject to certain milestones as more set forth in the DIP Agreement.

80.    Management of the Debtor reviewed and analyzed the anticipated cash needs and prepared a 13-week projection (as updated from time to time in accordance with the terms of the DIP Agreement, the "**Budget**") outlining the Debtor's postpetition cash needs in the initial 13 weeks of the Chapter 11 Case. The Debtor believes that the Budget is an accurate reflection of its funding requirements over the identified period, will allow the Debtor to meet its obligations – including the administrative expenses of the Chapter 11 Case – and is reasonable and appropriate under the circumstances.

81.    Based on this forecast, the Debtor has determined that it will require access to both Cash Collateral and postpetition financing to provide sufficient liquidity to efficiently administer the Debtor's estate during the Chapter 11 Case. Among other things, the Debtor needs

such liquidity to satisfy payroll and make other payments that are essential or appropriate for the efficient administration of the Debtor's estates. The Debtor's ability to continue making such payments during the Chapter 11 Cases is essential to the preservation of its assets during the pendency of these case.

82.    The Debtor requires interim approval of the DIP Facility because it does not have sufficient cash flow to meeting its expenses during the Chapter 11 Case. Moreover, the Debtors' total cash balance is less than $200,000, which is insufficient to satisfy any operating shortfalls during the Chapter 11 Case.

83.    Additionally, approval of the DIP Facility provides certainty concerning the Debtors' potential sale of all or substantially all of its asset. The backdrop of the DIP Facility provides comfort to all parties, including any potential bidders, that the Debtor will have sufficient liquidity to bridge from the Petition Date through the consummation of a sale. Thus, the Debtor believes that failure to obtain interim approval of the DIP Facility could hinder its ability to obtain the highest or otherwise best offer in an asset sale.

84.    Accordingly, without the immediate relief requested in the DIP Motion, I believe that the Debtor will face a material risk of substantial, irreparable, and ongoing harm. Access to Cash Collateral and the DIP Facility will ensure the Debtor has sufficient funds to preserve and maximize the value of its estate, and responsibly administer the Chapter 11 Case

### 1.    The Debtor Does Not Have Readily Available Sources of Alternative Financing.

85.    The Debtor does not have alternative sources of financing readily available. All of the Debtor's assets are encumbered under the SBA Loans and the BMO Loans, which, along with the Debtor's uncertain financial condition restricts the availability of, and options for, postpetition financing. BMO has also made it clear that it would not consent to "priming" DIP

financing provided by a third party. As a result, the Debtors do not believe third-party DIP financing would be reasonably obtainable.

86.    Nevertheless, as described above, the Debtor, solicited proposals for alternative DIP financing. Management reached out to four (4) potential sources of financing outside of BMO to gauge their interest in providing such financing to the Debtor. However, no party provided a proposal for independent postpetition financing due to the size of the facility; the uncertainty surrounding any sale of the Companies' assets; and the unwillingness of the Debtor's secured lenders to subordinate their debt. Accordingly, the Debtors were unable to develop an alternative source of financing with terms better than those of the DIP Facility, and for all of the foregoing reasons, I believe that the DIP Facility is reasonable, appropriate, and provides the best terms presently available to the Debtor.

### 2.    The Fee in Connection with the DIP Facility is Reasonable.

87.    The Debtor has agreed, subject to Bankruptcy Court approval, to pay a loan closing fee of $200,000 and a commitment fee of .5% on any unused portion of the post-petition loans to BMO pursuant to the DIP Agreement. I believe that it is understood and agreed by all parties, including the Debtor, that this fee is an integral component of the overall terms of the DIP Facility, and is required by BMO as consideration for the extension of the postpetition financings

88.    For the foregoing reasons, I believe that the relief requested in the DIP Motion is in the Debtor's best interests and will enable the Debtors to preserve and maximize the value of their estates.

**B.**     **Cash Management**

89.     The Debtor requests the authority to: (a) continue to use, with the same account numbers, all of the bank accounts in its cash management system; (b) continue to use its existing cash management system; (c) treat the bank accounts for all purposes as accounts of the Debtors as debtors in possession; and (d) use, in their present form, all correspondence and business forms (including check stock, letterhead, purchase orders, and invoices) and other documents related to the bank accounts existing immediately before the Petition Date, without reference to the Debtor's status as debtors in possession (the "**Cash Management Motion**").

90.     The Debtor's cash management system is managed by responsible individuals under the direction of the President and Sole Director.    Through utilization of the cash management system, the Debtor is able to facilitate cash forecasting and reporting, monitor collection and disbursement of funds, and maintain control over the administration of the bank accounts required to effect collection, disbursement, and movement of cash.    I believe that the movement of funds through the Debtor's cash management system as described herein and in the Cash Management Motion is accurate.

91.     As part of their cash management system, the Debtors have established a collections account ("**Collections Account**") and a disbursement account ("**Disbursement Account**") in the operation of their business (the "**Bank Accounts**"). The Bank Accounts are maintained at BMO.

92.     I believe that the Bank Accounts constitute an integral component of the Debtor's operations, and that the Debtor should seek a waiver of the U.S. Trustee's requirement that such accounts be closed and that new postpetition bank accounts be opened.    If enforced, I believe the requirement will cause unnecessary disruption to the Debtor's ability to maximize the value of its

estate. If such relief is not granted, the Debtor will suffer significant harm resulting from the termination of the present system and the inherent delay in establishing postpetition systems and procedures governing the use and application of the Debtor's funds.

93.    To protect against inadvertent payment of prepetition claims, the Debtor's personnel and the personnel at BMO with whom the Debtor customarily deals will be instructed how to distinguish readily between prepetition and postpetition obligations without closing existing accounts and opening new ones. To ease the task of distinguishing between prepetition date and postpetition date checks, I believe that the Debtor will be able to: (a) leave a "gap" in check numbers such that check numbers preceding the gap will be readily identifiable as prepetition checks and the check numbers following the gap will be readily identifiable as postpetition checks; or (b) otherwise utilize their existing software to implement a monitoring system which has the same effect.

94.    I believe that due to the nature and scope of the Debtor's business and the numerous vendors, customers and others with whom the Debtor transacts business, the Debtor must also seek authority to continue its use of existing business forms, correspondence and checks without alteration or change. Changing correspondence and business forms would be unnecessary, would be burdensome to the estate, would result in undue expense and would be disruptive to the Debtor's ongoing business operations.

95.    If the Debtor is not permitted to continue to use of its existing business forms, the resulting prejudice will include significant delay in the administration of its business operations and the imposition of an unnecessary cost to the estate to print new business forms.

96.    Similarly, the Debtor must seek authority to continue to use its existing books and records to minimize expense to the estate. I believe that opening new books and records would

be burdensome to the estate and disruptive to the Debtor's business operations. The Debtor has a fully functioning systems that thoroughly and accurately accounts for all cash and tracks the Debtor's financial performance. Changing the current system would be costly and would greatly increase the potential for error.

97.    I believe that the relief requested in the Cash Management Motion is in the best interest of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtors to efficiently administer the estate in chapter 11 without disruptions.

**C.    Prepetition Wages, Benefits and Insurance Coverage**

98.    The Debtor requests authority to (a) pay prepetition wages, salaries, wage-related benefits, other compensation, and reimbursable employee expenses; (b) continue employee benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto; and (c) prepay the Staffing Agencies (the "**Wages/Benefits Motion**").

99.    I understand and believe that the description of the prepetition wage claims, benefits and related employee obligations discussed herein and further set forth in detail in the Wages/Benefits Motion is accurate.

100.    There exists a critical need for the Debtor to immediately pay certain prepetition wage and benefit claims of each of the Debtor's Employees, including outstanding wages and wage-related benefits, all related withholdings and taxes, accrued reimbursable business expenses and prepetition claims arising in connection with the Companies' employee health, disability, and life insurance (collectively, the "**Prepetition Employee Obligations**"). The satisfaction of these Prepetition Employee Obligations is critical to the Debtor's ability to retain qualified employees to continue to operate its business for the benefit of the creditors and other interested parties in the Chapter 11 Case. As noted above, as of the Petition Date, the Company

employs over 125 employees and use the services of temporary staffing agencies for 300 to 350 employees per day.

101.    In total, as of the Petition Date, the Debtor estimates gross payroll of $146,000 in Prepetition Wage Claims, plus approximately $10,000 in employer-side federal, state and local payroll-related taxes relating to the prepetition period, and approximately $10,000 in reimbursable business expenses incurred prepetition for non-insiders. These estimated amounts are included in anticipated disbursements allocated in the Budget, which is an exhibit to the DIP Financing Order.

102.    The Debtor intends to maintain the health, dental, life, disability, and worker's compensation insurance coverage (collectively, the **"Employee Insurance Benefits"**) for its Employees during the pendency of the Chapter 11 Case.  The Debtor believe that, as of the Petition Date, all premiums for Employee Insurance Benefits were fully paid, although there may be checks for such payment still in float, or wire transfers not yet fully processed.  In an abundance of caution, to the extent there are any claims relating to Employee Insurance Benefits which arose prior to the Petition Date and remain unpaid, the Debtor is requesting authority to pay such claims, consistent with and in the ordinary course of their business.

103.    In addition, as of the Petition Date, the Debtor estimates it owes the Staffing Agencies in excess of $2.6 million for services rendered through the Petition Date, as the Staffing Agencies had extended credit to the Debtor prior to commencement of the Chapter 11 Case. So as to continue an uninterrupted flow of the Outsourced Labor, the Debtor intends to work with the Staffing Agencies in a manner which pays for postpetition services on terms agreeable between the Debtor and the Staffing Agencies. I believe it is critical that the Staffing Agencies be paid on a regular basis for all such services.

104.    The Debtor believes that payment of the foregoing sums and working with the Staffing Agencies is critical to retaining its Employees and the Outsourced Labor in order to maintain its going concern value while the Debtor also pursues a sale of all or substantially all of the Debtor's assets.  No Employees shall be paid in excess of the $13,650 limits provided under section 507(a)(4)-(5) of the Bankruptcy Code

## VII.    SECOND TIER MOTIONS

105.    In addition to the First-Day Motions, the Debtor will be requesting other relief shortly following the Petition Date.  Among other things, the Debtor will seek to retain an investment banker; appoint a Chief Restructuring Officer ("**CRO**"); employ bankruptcy counsel; and provide certain utilities used by the Debtor with adequate assurance of future performance. Concurrently therewith, or shortly thereafter, the Debtor will be seeking authority to sell all or substantially all of the Debtor's assets pursuant to court order and the milestones set forth in the DIP Agreement.

### A.    Investment Banker

106.    Prior to the Petition Date, the Debtor retained Livingstone Partners, LLC (the "**Investment Banker**") as its exclusive investment banker in connection with the possible sale of all or substantially all assets of the Debtor pursuant to that certain Engagement Agreement dated as of December 13, 2019.

107.    The Debtor believes Mr. Joseph Greenwood of the Investment Banker has extensive experience in, and an excellent reputation for, providing high quality disposition services in bankruptcy proceedings and other distressed situations.  The Investment Banker's services will include the identification of assets available for sale, the identification of potential

buyers, developing and executing marketing programs for the assets, and negotiating the terms of any sale(s).

108.    I believe that Investment Banker is well qualified to serve as investment banker to the Debtor.  Its extensive experience and resources will enable the Debtor to secure the highest and best sale price for the assets of the Debtor, which will ultimately benefit the Debtor's estate and its creditors.

**B.    Chief Restructuring Officer**

109.    Prior to the Petition Date, the Debtor had engaged the Financial Consultants to assist the Debtor in connection with its financial difficulties.

110.    Now that the Debtor has commenced the Chapter 11 Case, the Debtor will seek to terminate the services of the Financial Consultant but engage Mr. Vladimir Kasparov of the Andrews Advisory Group, LLC (i.e., the Financial Consultants) to be employed by the Debtor as its Chief Restructuring Officer ("**CRO**") to assist the Debtor with the administration of the Chapter 11 Case.

111.    The Debtor believes Mr. Kasparov has extensive experience in, and an excellent reputation for, providing high quality disposition services in bankruptcy proceedings and other distressed situations.  Mr. Kasparov has served as CRO in numerous other matters.

**C.    Chapter 11 Counsel**

112.    The Debtor has selected the law firm of Adelman & Gettleman, Ltd. as its insolvency and restructuring counsel in the Chapter 11 Case.  Prior to commencement of the Chapter 11 Case, the Debtor retained Adelman & Gettleman to assist the Debtor in analyzing its alternatives and effectuating a course of action to address the Debtor's financial difficulties.  I believe the continued representation of the Debtor by Adelman & Gettleman is critical to the

success of the Chapter 11 Case because, among other things, the firm is familiar with the Debtor's business and legal affairs leading into the Chapter 11 Case.

113.    The Debtor also selected Adelman & Gettleman as its attorneys because of the firm's extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code, and now-comprehensive experience with and knowledge of the Debtor, its business, and its goals in the Chapter 11 Case. Accordingly, I believe the Debtor should seek to retain Adelman & Gettleman for its professional counseling and legal services in connection with the Chapter 11 Cases

**D.    Utilities**

114.    The Debtor will request the entry an order authorizing payment of deposits as adequate assurance of payments for utility services, and prohibiting the utility companies from altering, refusing to provide, or discontinuing the utility services, or discriminating against the Debtor solely on the basis of the commencement of the Chapter 11 Case or on account of any unpaid invoice for services provided prior to the Petition Date (the "**Utilities Motion**"). During the time it takes the Debtor to wind down remaining operations and sell its assets, it is important that utilities services continue uninterrupted. I believe that the Debtor's proposed procedures governing the utility companies' requests for adequate assurance are appropriate in the Chapter 11 Cases. I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtor to continue to efficiently administer the Chapter 11 Case without disruption.

**VII.    CONCLUSION**

115.    In order to minimize any loss to the value of the Debtor's assets and to maximize the benefit to the Debtor's estate and creditors, the Debtor's immediate objective is to stabilize

its operations and undertake to sell all or substantially all of its assets. I believe that if the Court grants the relief requested in each of the First-Day Motions and Second Tier Motions to follow, the prospect of achieving such objectives, and thus maximizing the recovery for the Debtor's estate and creditors, will be significantly enhanced.

Dated: December 16, 2019

_____
PATRICK GAUGHAN

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ARRO CORPORATION, f/k/a ARRO | ) | Case No. 19-35238 |
| PACKAGING COMPANY | ) | |
| | ) | Honorable Janet S. Baer |
| Debtor. | ) | |
| | ) | |

## APPENDIX A
## DECLARATION OF PATRICK GAUGHAN IN SUPPORT OF CHAPTER 11
## PETITION, FIRST-DAY MOTIONS, AND CERTAIN SECOND TIER MOTIONS

| SBA Loan No. & Loan Date | Project | Collateral | Indebtedness |
|---|---|---|---|
| **39274150-06**<br><br>Nov. 17, 2010<br><br>"SBA Loan No. 1"<br><br>Corresponding BMO Loan:<br><br>"BMO Term Loan B" | Purchase and installation of three new product lines at two plants.<br><br>Two of the product lines are still functioning; the third was decommissioned and redeployed as parts in other Arro work centers in or around 2014. | Equipment acquired with loan or project proceeds, including all replacements and substitutions, wherever located (pursuant to that certain Amendment to Security Agreement dated June 10, 2014).<br><br>No specific equipment list is attached to the original loan documents; instead, there is a list of various vendors and installers pursuant to draws on loan, provided, however, that the SBA and First Midwest Bank entered into a *Third Party Lender Agreement* on May 22, 2014 under which the SBA subordinated its rights to First Midwest Bank and listed certain machinery and equipment as collateral. | Total project cost: $3,350,000.<br><br>Original SBA loan amount (40% of project): $1,340,000 (excluding servicer fees).<br><br>Original loan from Old Second Bank (50% of project): $1,660,000.<br><br>Original amount contributed by Arro (10% of project): $350,000.<br><br>Current estimated debt to SBA: $207,000.<br><br>Current estimated debt to BMO: $121,865. |

| SBA Loan No. & Loan Date | Project | Collateral | Indebtedness |
|---|---|---|---|
| **52634250-04**<br><br>July 17, 2012<br><br>"SBA Loan No. 2"<br><br>Corresponding BMO Loan:<br><br>"BMO Term Loan A" | Refinance of existing debt with First Midwest Bank; purchase and installation of new equipment and processing room.<br><br>Equipment and processing room are still in operation. | Equipment described in Loeb appraisal dated May 17, 2012, attached to financing statement under column heading "Term 1 FMV 2012", designating fair market value - in place. | Total project cost: $10,123,675.<br><br>Original SBA loan amount (40% of project): $4,049,470 (excluding servicer fees).<br><br>Original loan from First Midwest Bank (40% of project): $4,049,470.<br><br>Original amount contributed by Arro (20% of project): $2,024,735.<br><br>Current estimated debt to the SBA: $1,398,668.<br><br>Current estimated debt to BMO: $814,711. |
| **92897850-03**<br><br>February 16, 2017<br><br>"SBA Loan No. 3"<br><br>Corresponding BMO Loan:<br><br>"BMO Term Loan C" | Purchase and installation of three new product lines at two plants.<br><br>Equipment and processing room are still in operation. | No specific equipment list attached to loan documents; various invoices from vendors and installers. | Total project cost: $2,446,901.<br><br>Original SBA loan amount (40% of project): $978,760.<br><br>Original loan from BMO (50% of project): $1,223,450 (excluding servicer fees).<br><br>Original amount contributed by Arro (10% of project): $244,690.<br><br>Current estimated debt to the SBA: $624,220<br><br>Current estimated debt to BMO: $680,804 |
| **93579850-07**<br><br>September 20, 2017<br><br>"SBA Loan No. | Refinance of First Midwest Bank debt through BMO (i.e., BMO); purchase and installation of new equipment and processing room. | Equipment as listed on exhibit to security agreement | Total project cost: $8,128,100.<br><br>Original SBA loan amount (36.25% of project): $2,945,429 (excluding |

| SBA Loan No. & Loan Date | Project | Collateral | Indebtedness |
|---|---|---|---|
| 4"<br><br>Corresponding BMO Loan:<br><br>"BMO Term Loan D" | Equipment portion of Project was $677,132; refinance portion was $7,450,968.<br><br>Equipment and processing room are still in operation. | | servicer fees).<br><br>Original loan from BMO (43.6% of project): $3,543,728.<br><br>Original amount contributed by Arro (20.15% of project): $1,638,943.<br><br>Current estimated debt to SBA: $2,579,081<br><br>Current estimated debt to BMO: $2,573,421 |