**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ARRO CORPORATION, f/k/a ARRO | ) | Case No. 19-35238 |
| PACKAGING COMPANY | ) | |
| | ) | Honorable Janet S. Baer |
| Debtor. | ) | |
| | ) | |

**SUPPLEMENT TO MOTION FOR ORDER: (I) AUTHORIZING (A)
SECURED POST-PETITION FINANCING ON A SUPER PRIORITY
BASIS PURSUANT TO 11 U.S.C. § 364, (B) USE OF CASH COLLATERAL
PURSUANT TO 11 U.S.C. § 363 AND (C) GRANT OF ADEQUATE
PROTECTION PURSUANT TO 11 U.S.C. §§ 363 AND 364; (II)
SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY
RULE 4001(C); AND (III) SHORTENING NOTICE [Docket No. 17]**



# BMO Harris Bank

Credit Agreement

dated as of June 14, 2017,

between

ARRO CORPORATION,

and

BMO HARRIS BANK N.A.

## Table of Contents

SECTION 1.    DEFINITIONS; INTERPRETATION. ........................................................1

*Section 1.1*    *Definitions.* ........................................................................1
*Section 1.2*    *Interpretation.* ...................................................................20
*Section 1.3*    *Change in Accounting Principles.* ...........................................20

SECTION 2.    THE CREDIT FACILITIES. ...........................................................21

*Section 2.1*    *Term Loan Commitments.* .....................................................21
*Section 2.2*    *Revolving Credit Commitment.* ...............................................21
*Section 2.3*    *Letters of Credit.* ...............................................................22
*Section 2.4*    *Applicable Interest Rates.* .....................................................24
*Section 2.5*    *Minimum Borrowing Amounts; Maximum Eurodollar Loans.* ..................................................................................24
*Section 2.6*    *Manner of Borrowing Loans and Designating Applicable Interest Rates.* ...................................................................24
*Section 2.7*    *Maturity of Loans.* ..............................................................25
*Section 2.8*    *Prepayments.* ....................................................................26
*Section 2.9*    *Default Rate.* .....................................................................29
*Section 2.10*    *Evidence of Indebtedness.* ....................................................29
*Section 2.11*    *Fees.* ..............................................................................30
*Section 2.12*    *Place and Application of Payments.* ........................................30
*Section 2.13*    *Commitment Terminations.* ...................................................31
*Section 2.14*    *Sweep to Loan Arrangement.* .................................................31

SECTION 3.    CHANGE IN CIRCUMSTANCES...................................................32

*Section 3.1*    *Withholding Taxes.* ..............................................................32
*Section 3.2*    *Documentary Taxes.* ............................................................32
*Section 3.3*    *Funding Indemnity.* .............................................................32
*Section 3.4*    *Change of Law.* ..................................................................33
*Section 3.5*    *Unavailability of Deposits or Inability to Ascertain, or Inadequacy of, LIBOR.* ...............................................................33
*Section 3.6*    *Increased Cost and Reduced Return.* ......................................33
*Section 3.7*    *Lending Offices.* .................................................................34
*Section 3.8*    *Discretion of Bank as to Manner of Funding.* .........................35

SECTION 4.    CONDITIONS PRECEDENT. ........................................................35

*Section 4.1*    *Initial Credit Event.* ...........................................................35
*Section 4.2*    *All Credit Events.* ..............................................................37

SECTION 5.    REPRESENTATIONS AND WARRANTIES...........................................38

| | | |
|---|---|---|
| Section 5.1 | Organization and Qualification. | 38 |
| Section 5.2 | Subsidiaries. | 38 |
| Section 5.3 | Authority and Validity of Obligations. | 38 |
| Section 5.4 | Use of Proceeds; Margin Stock. | 39 |
| Section 5.5 | Financial Reports. | 39 |
| Section 5.6 | No Material Adverse Change. | 40 |
| Section 5.7 | Full Disclosure. | 40 |
| Section 5.8 | Trademarks, Franchises, and Licenses. | 40 |
| Section 5.9 | Governmental Authority and Licensing. | 40 |
| Section 5.10 | Good Title. | 40 |
| Section 5.11 | Litigation and Other Controversies. | 41 |
| Section 5.12 | Taxes. | 41 |
| Section 5.13 | Approvals. | 41 |
| Section 5.14 | Affiliate Transactions. | 41 |
| Section 5.15 | Investment Company. | 41 |
| Section 5.16 | ERISA. | 41 |
| Section 5.17 | Compliance with Laws. | 41 |
| Section 5.18 | OFAC. | 42 |
| Section 5.19 | 'Other Agreements. | 43 |
| Section 5.20 | Solvency. | 43 |
| Section 5.21 | No Default. | 43 |
| Section 5.22 | No Broker Fees. | 43 |
| **SECTION 6.** | **AFFIRMATIVE COVENANTS.** | **43** |
| Section 6.1 | Maintenance of Business. | 43 |
| Section 6.2 | Maintenance of Properties. | 43 |
| Section 6.3 | Taxes and Assessments. | 43 |
| Section 6.4 | Insurance. | 44 |
| Section 6.5 | Financial Reports. | 44 |
| Section 6.6 | Inspection. | 46 |
| Section 6.7 | ERISA. | 46 |
| Section 6.8 | Compliance with Laws. | 46 |
| Section 6.9 | Compliance with OFAC Sanctions Programs. | 47 |
| Section 6.10 | Formation of Subsidiaries. | 48 |
| Section 6.11 | Use of Proceeds; Margin Stock. | 48 |
| Section 6.12 | Guaranties and Collateral. | 48 |
| Section 6.13 | Refinance of Santa Fe Property Note. | 49 |
| **SECTION 7.** | **NEGATIVE COVENANTS.** | **49** |
| Section 7.1 | Borrowings and Guaranties. | 49 |
| Section 7.2 | Liens. | 50 |
| Section 7.3 | Investments, Acquisitions, Loans and Advances. | 51 |
| Section 7.4 | Mergers, Consolidations and Sales. | 52 |
| Section 7.5 | Maintenance of Subsidiaries. | 53 |
| Section 7.6 | Dividends and Certain Other Restricted Payments. | 53 |

| | | |
|---|---|---|
| Section 7.7 | Burdensome Contracts With Affiliates. | 53 |
| Section 7.8 | No Changes in Fiscal Year. | 53 |
| Section 7.9 | Change in the Nature of Business. | 53 |
| Section 7.10 | No Restrictions. | 54 |
| Section 7.11 | Subordinated Debt. | 54 |
| Section 7.12 | Financial Covenants. | 54 |
| | | |
| SECTION 8. | EVENTS OF DEFAULT AND REMEDIES. | 54 |
| | | |
| Section 8.1 | Events of Default. | 54 |
| Section 8.2 | Non Bankruptcy Defaults. | 56 |
| Section 8.3 | Bankruptcy Defaults. | 57 |
| | | |
| SECTION 9. | MISCELLANEOUS. | 57 |
| | | |
| Section 9.1 | No Waiver, Cumulative Remedies. | 57 |
| Section 9.2 | Non-Business Days. | 58 |
| Section 9.3 | Survival of Representations. | 58 |
| Section 9.4 | Survival of Indemnity and Certain Other Provisions. | 58 |
| Section 9.5 | Notices. | 58 |
| Section 9.6 | Counterparts/Electronic Signatures. | 59 |
| Section 9.7 | Successors and Assigns. | 59 |
| Section 9.8 | Amendments, etc. | 59 |
| Section 9.9 | Headings. | 59 |
| Section 9.10 | Costs and Expenses; Indemnification. | 59 |
| Section 9.11 | Set off. | 61 |
| Section 9.12 | Entire Agreement. | 61 |
| Section 9.13 | Governing Law. | 61 |
| Section 9.14 | Severability of Provisions | 61 |
| Section 9.15 | Excess Interest | 61 |
| Section 9.16 | Construction. | 62 |
| Section 9.17 | Submission to Jurisdiction; Waiver of Venue; Service of Process. | 62 |
| Section 9.18 | Waiver of Jury Trial. | 63 |
| Section 9.19 | USA Patriot Act. | 63 |
| Section 9.20 | Time is of the Essence. | 63 |
| Section 9.21 | Confidentiality. | 63 |

# CREDIT AGREEMENT

This Credit Agreement is entered into as of June 14, 2017, by and between Arro Corporation, an Illinois corporation (*"Borrower"*), and BMO Harris Bank N.A., a national banking association ("*Bank*"). All capitalized terms used herein without definition shall have the meanings ascribed thereto in <u>Section 1.1</u>.

## PRELIMINARY STATEMENT

Borrower has requested, and Bank has agreed to extend, certain credit facilities on the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the mutual agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## SECTION 1. DEFINITIONS; INTERPRETATION.

*Section 1.1    Definitions.*    The following terms when used herein shall have the following meanings:

*"Account Debtor"* means any Person obligated to make payment on any Receivable.

*"Adjusted LIBOR"* means, for any Borrowing of Eurodollar Loans, a rate per annum determined in accordance with the following formula:

$$\text{Adjusted LIBOR} = \frac{\text{LIBOR}}{1 - \text{Eurodollar Reserve Percentage}}$$

*"Affiliate"* means any Person directly or indirectly controlling or controlled by, or under direct or indirect common control with, another Person. A Person shall be deemed to control another Person for purposes of this definition if such Person possesses, directly or indirectly, the power to direct, or cause the direction of, the management and policies of the other Person, whether through the ownership of voting securities, common directors, trustees or officers, by contract or otherwise; *provided* that, in any event for purposes of this definition, any Person that owns, directly or indirectly, 5% or more of the securities having the ordinary voting power for the election of directors or governing body of a corporation or 5% or more of the partnership or other ownership interest of any other Person (other than as a limited partner of such other Person) will be deemed to control such corporation or other Person.

*"Agreement"* means this Credit Agreement, as the same may be amended, restated, supplemented, or otherwise modified from time to time pursuant to the terms hereof.

*"Applicable Margin"* means, with respect to Loans, Reimbursement Obligations, and the commitment fees, until the first Pricing Date, the rates per annum shown opposite Level III below, and thereafter from one Pricing Date to the next the Applicable Margin means the rates per annum determined in accordance with the following schedule:

| Level | Total Operating Debt/EBITDA Ratio for Such Pricing Date | Applicable Margin for (i) Revolving Loans that are Base Rate Loans and (ii) Reimbursement Obligations shall be: | Applicable Margin for (i) Revolving Loans that are Eurodollar Loans (ii) Daily LIBOR Rate Loans, and (iii) Letter of Credit Fee shall be: | Applicable Margin for Term Loans that are Base Rate Loans shall be: | Applicable Margin for Term Loans that are (i) Eurodollar Loans, and (ii) Daily LIBOR Rate Loans shall be: | Applicable Margin for Commitment Fee shall be: |
|---|---|---|---|---|---|---|
| III | Greater than or equal to 3.0 to 1.0 | 0.25% | 2.75% | 0.25% | 2.75% | 0.25% |
| II | Less than 3.0 to 1.0, but greater than or equal to 2.0 to 1.0 | 0.00% | 2.25% | 0.00% | 2.25% | 0.20% |
| I | Less than 2.0 to 1.0 | -0.25% | 2.00% | -0.25% | 2.00% | 0.15% |

For purposes hereof, the term "Pricing Date" means, for any fiscal quarter of Borrower ending on or after June 30, 2017, the date on which Bank is in receipt of Borrower's most recent financial statements (and, in the case of the year-end financial statements, audit report) for the fiscal quarter then ended, pursuant to Section 6.5. The Applicable Margin shall be established based on the Total Operating Debt/EBITDA Ratio for the most recently completed fiscal quarter and the Applicable Margin established on a Pricing Date shall remain in effect until the next Pricing Date. If Borrower has not delivered its financial statements by the date such financial statements (and, in the case of the year-end financial statements, audit report) are required to be delivered under Section 6.5, until such financial statements and audit report are delivered, the Applicable Margin shall be the highest Applicable Margin (i.e., Level III shall apply). If Borrower subsequently delivers such financial statements before the next Pricing Date, the Applicable Margin established by such late delivered financial statements shall take effect from the date of delivery until the next Pricing Date. In all other circumstances, the Applicable Margin established by such financial statements shall be in effect from the Pricing Date that occurs immediately after the end of the fiscal quarter covered by such financial statements until the next Pricing Date. Each determination of the Applicable Margin made by Bank in accordance with the foregoing shall be conclusive and binding on Borrower absent manifest error.

If, as a result of any restatement of or other adjustment to the financial statements of the Borrower or for any other reason, the Borrower or the Bank determines that (i) the Total Operating Debt/EBITDA Ratio as calculated by the Borrower as of any applicable date was inaccurate and (ii) a proper calculation of the Total Operating Debt/EBITDA Ratio would have resulted in higher pricing for such period, the Borrower shall immediately and retroactively be obligated to pay to Bank, promptly on demand by Bank (or, after the occurrence of any Event of Default described in Section 8.1(j) or (k) with respect to Borrower has occurred and is continuing, automatically and without further action by Bank), an amount equal to the excess of the amount of interest and fees that should have been paid for such period over the amount of

interest and fees actually paid for such period. This paragraph shall not limit the rights of Bank under any other provision of the Loan Documents. The Borrower's obligations under this paragraph shall survive the termination of the Commitments and the repayment of all other Obligations hereunder.

*"Application"* is defined in Section 2.3(b).

*"Authorized Representative"* means those persons shown on the list of officers provided by Borrower pursuant to Section 4.1 or on any update of any such list provided by Borrower to Bank, or any further or different officers of Borrower so named by any Authorized Representative of Borrower in a written notice to Bank.

*"Bank"* is defined in the introductory paragraph of this Agreement.

*"Base Rate"* means, for any day, the rate per annum equal to the greatest of: (a) the rate of interest announced or otherwise established by Bank from time to time as its prime commercial rate as in effect on such day, with any change in the Base Rate resulting from a change in said prime commercial rate to be effective as of the date of the relevant change in said prime commercial rate (it being acknowledged and agreed that such rate may not be Bank's best or lowest rate), (b) the sum of (i) the rate determined by Bank to be the average (rounded upward, if necessary, to the next higher 1/100 of 1%) of the rates per annum quoted to Bank at approximately 10:00 a.m. (or as soon thereafter as is practicable) on such day (or, if such day is not a Business Day, on the immediately preceding Business Day) by two or more Federal funds brokers selected by Bank for sale to Bank at face value of Federal funds in the secondary market in an amount equal or comparable to the principal amount for which such rate is being determined, plus (ii) 1/2 of 1%, and (c) the LIBOR Quoted Rate for such day plus 1.00%. As used herein, the term "LIBOR Quoted Rate" means, for any day, the rate per annum equal to the quotient of (i) the rate per annum (rounded upwards, if necessary, to the next higher one hundred thousandth of a percentage point) for deposits in U.S. Dollars for a one-month interest period as reported on the applicable Bloomberg screen page (or such other commercially available source providing such quotations as may be designated by the Bank from time to time) as of 11:00 a.m. (London, England time) on such day (or, if such day is not a Business Day, on the immediately preceding Business Day) divided by (ii) one (1) minus the Eurodollar Reserve Percentage, provided that in no event shall the "LIBOR Quoted Rate" be less than 0.00%.

*"Base Rate Loan"* means a Loan bearing interest at a rate specified in Section 2.4(a).

*"Borrower"* is defined in the introductory paragraph of this Agreement.

*"Borrowing"* means the total of Loans of a single type advanced, continued for an additional Interest Period, or converted from a different type into such type by Bank on a single date and, in the case of Eurodollar Loans, for a single Interest Period. A Borrowing is "advanced" on the day Bank advances funds comprising such Borrowing to Borrower, is "continued" on the date a new Interest Period for the same type of Loans commences for such Borrowing, and is "converted" when such Borrowing is changed from one type of Loans to the other, all as determined pursuant to Section 2.6.

*"Borrowing Base"* means, as of any time it is to be determined, the sum of:

(a)      85.0% of the then outstanding unpaid amount of Eligible Receivables; <u>plus</u>

(b)      65.0% of the value (computed at the lower of market or cost using the first-in/first-out method of inventory valuation applied in accordance with GAAP) of Eligible Inventory consisting of raw materials and finished goods Inventory; <u>plus</u>

(c)      The lesser of (i) $1,000,000, or (ii) 65.0% of the value (computed at the lower of market or cost using the first-in/first-out method of inventory valuation applied in accordance with GAAP) of Eligible Inventory consisting of work-in-process Inventory; <u>minus</u>

(d)      the amount of reserves imposed from time to time on the Borrowing Base by Bank acting in its reasonable discretion;

*provided* that (i) Bank shall have the right upon five (5) Business Days' notice to Borrower to reduce the advance rates against Eligible Receivables and Eligible Inventory in its reasonable discretion based on results from any field audit or appraisal of the Collateral and (ii) the Borrowing Base shall be computed only as against and on so much of such Collateral as is included on the Borrowing Base Certificates furnished from time to time by Borrower pursuant to this Agreement and, if required by Bank pursuant to any of the terms hereof or any Collateral Document, as verified by such other evidence reasonably required to be furnished to Bank pursuant hereto or pursuant to any such Collateral Document.

*"Borrowing Base Certificate"* means the certificate in the form of <u>Exhibit B</u> hereto, or in such other form acceptable to Bank, to be delivered to Bank pursuant to <u>Sections 4.2</u> and <u>6.5</u>.

*"Bridge Loan"* is defined in <u>Section 2.1(e)</u> and, as so defined, includes a Base Rate Loan, a Daily LIBOR Rate Loan or a Eurodollar Loan, each of which is a "type" of Bridge Loan hereunder.

*"Bridge Loan Commitment"* means the obligation of Bank to make the Bridge Loan on the Closing Date in the principal amount not to exceed $3,695,429.

*"Bridge Loan Maturity Date"* means September 20, 2017.

*"Business Day"* means any day (other than a Saturday or Sunday) on which banks are not authorized or required to close in Chicago, Illinois. If the applicable Business Day relates to the determination of the LIBOR Index Rate or the Daily LIBOR Rate, then Business Day means any day on which banks on which commercial banks are open for general business (including dealings in foreign exchange and foreign currency deposits) in London, England.

*"Capital Expenditures"* means, with respect to any Person for any period, the aggregate amount of all expenditures (whether paid in cash or accrued as a liability) by such Person during that period for the acquisition or leasing (pursuant to a Capital Lease) of fixed or capital assets or additions to property, plant, or equipment (including replacements, capitalized repairs, and

improvements) which should be capitalized on the balance sheet of such Person in accordance with GAAP.

*"Capital Lease"* means any lease of Property which in accordance with GAAP is required to be capitalized on the balance sheet of the lessee.

*"Capitalized Lease Obligation"* means, for any Person, the amount of the liability shown on the balance sheet of such Person in respect of a Capital Lease determined in accordance with GAAP.

*"Cash Collateralize"* means to pledge and deposit with or deliver to Bank, as collateral for L/C Obligations, cash to be held in a Collateral Account, or, if Bank shall agree in its sole discretion, other credit support, in each case pursuant to documentation in form and substance satisfactory to Bank, in an amount equal to 105% of the aggregate L/C Obligations (or such greater amount as Bank may determine is necessary to pay the face amount thereof plus all fees and expenses expected to accrue with respect to all outstanding Letters of Credit through the expiration date of such Letters of Credit).

*"CERCLA"* means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§9601 et seq., and any future amendments.

*"Change in Law"* means the occurrence, after the date of this Agreement, of any of the following: (i) the adoption or taking effect of any law, rule, regulation or treaty, (ii) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (iii) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

*"Change of Control"* means any of: (a) Gaughan shall cease to be actively involved in the senior management of Borrower, (b) 100.0% of the issued and outstanding Voting Stock of Borrower ceases at any time and for any reason (including death or incapacity) to be collectively owned, legally and beneficially, by Gaughan and Gaughan Trust or (c) any "Change of Control", or words of like import, as defined in any agreement or indenture relating to any issue of Indebtedness for Borrowed Money of Borrower or any Subsidiary, shall occur.

*"Closing Date"* means the date of this Agreement or such later Business Day upon which each condition described in Section 4.1 shall be satisfied or waived in a manner acceptable to Bank in its discretion.

*"Code"* means the Internal Revenue Code of 1986, as amended, and any successor statute thereto.

*"Collateral"* means all properties, rights, interests, and privileges from time to time subject to the Liens granted to Bank, or any security trustee therefor, by the Collateral Documents.

*"Collateral Account"* means a separate collateral account maintained with, held in the name of, and subject to the exclusive dominion and control of, Bank for the purpose of holding assets as security for, and for application by Bank (to the extent available) to, the reimbursement of any payment under any Letter of Credit then or thereafter made by Bank, and to the payment of the unpaid balance of other Obligations.

*"Collateral Documents"* means the Mortgages, the Security Agreement, the Pledge Agreement, the SBA/SomerCor Security Agreement and all other mortgages, deeds of trust, security agreements, pledge agreements, assignments, financing statements and other documents as shall from time to time secure or relate to the Obligations or any part thereof.

*"Commitments"* means the Revolving Credit Commitment and the Term Loan Commitments.

*"Controlled Group"* means all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control which, together with Borrower, are treated as a single employer under Section 414 of the Code.

*"Credit Event"* means the advancing of any Loan, or the issuance of, or extension of the expiration date or increase in the amount of, any Letter of Credit.

*"Daily LIBOR Rate"* shall initially be equal to ____% per annum, and thereafter the Daily LIBOR Rate shall be reset on the first day of every month occurring after the date hereof (herein, a *"Change Date"*) based on the rate per annum (rounded upwards, if necessary, to the next higher one hundred Thousandth of a percentage point) for deposits in U.S. Dollars for a period equal to a one-month interest period as reported on the applicable Bloomberg screen page (or such other commercially available source providing such quotations as may be designated by the Bank from time to time) on the relevant Change Date (or, if such Change Date is not a Business Day, on the immediately prior Business Day), unless such rate is no longer available or published, in which case such rate shall be at a comparable index rate selected by the Bank with notice to the Borrower, provided that in no event shall the Daily LIBOR Rate be less than 0.00%.

*"Daily LIBOR Rate Loan"* means a Loan bearing interest at the rate specified in <u>Section 2.4(c)</u>.

*"Default"* means any event or condition the occurrence of which would, with the passage of time or the giving of notice, or both, constitute an Event of Default.

*"Disposition"* means the sale, lease, conveyance or other disposition of Property, other than sales or other dispositions expressly permitted under <u>Sections 7.4(a)</u> or <u>7.4(d)</u>.

*"EBITDA"* means, with reference to any period for any Person, Net Income of such Person for such period plus all amounts deducted in arriving at such Net Income amount in respect of (a) Interest Expense for such period, (b) federal, state, and local income taxes for such period, and (c) depreciation of fixed assets and amortization of intangible assets for such period.

*"ECF Percentage"* shall mean, with respect to any fiscal year, seventy-five percent (75%); provided, however, the ECF Percentage shall be zero percent (0.00%) for a fiscal year if Borrower's Total Operating Debt/EBITDA Ratio is less than 2.75 to 1.00 as of the end of each of the last two consecutive fiscal quarters of that fiscal year, and no Default or Event of Default then exists.

*"Eligible Inventory"* means any raw materials, finished goods or work in progress inventory of Borrower (other than packaging not supported by a customer purchase obligation (provided, however if Lender advises Borrower that such purchase obligation is not satisfactory to Lender, such packaging shall not be Eligible Inventory), crating and supplies inventory), which:

(a)     is an asset of Borrower to which it has good and marketable title, is freely assignable, and is subject to a perfected, first priority Lien in favor of Bank free and clear of any other Liens;

(b)     is located in the United States of America at a Permitted Collateral Location as set forth in (and as defined in) the Security Agreement and, in the case of any Permitted Collateral Location not owned by such Person, which is at all times subject to a lien waiver agreement from such landlord or other third party to the extent required by, and in form and substance satisfactory to, Bank;

(c)     is not so identified to a contract to sell that it constitutes a Receivable;

(d)     is not obsolete or slow moving, and is of good and merchantable quality free from any defects which could be reasonably likely to adversely affect the market value thereof;

(e)     is not covered by a warehouse receipt or similar document;

(f)     in the case of finished goods inventory, was produced pursuant to binding and existing purchase orders therefor;

(g)     it is not (i) product of any kind purchased from CHS Inc. or its successors or assigns ("CHS Product"), or (ii) inventory as to which all or any portion thereof is commingled with CHS Product or otherwise includes any CHS Product; and

(h)     is not otherwise deemed to be ineligible in the reasonable judgment of Bank (it being acknowledged and agreed that with five (5) Business Days prior written notice any inventory or categories thereof of Borrower or any Subsidiary may be deemed ineligible by Bank acting in is reasonable judgment).

For purposes of clarification, under no circumstances will any Inventory owned by any party other than Borrower be included in Eligible Inventory, notwithstanding that such Inventory may be located at Borrower's premises.

*"Eligible Receivables"* means any Receivable of Borrower which:

(a)    arises out of the sale of finished goods inventory delivered to and not rejected by, or out of the rendition of services fully performed and not rejected by, the Account Debtor on such Receivable, does not represent a pre-billed Receivable or a progress billing, and is net of any (i) deposits made by or for the account of the relevant Account Debtor, (ii) rebates earned by the relevant Account Debtor, and (iii) credits over 90 days;

(b)    is payable in U.S. Dollars and the Account Debtor on such Receivable is located within the United States of America;

(c)    is the valid, binding and legally enforceable obligation of the Account Debtor obligated thereon and such Account Debtor is not (i) a Subsidiary or an Affiliate of Borrower, (ii) a shareholder, director, officer or employee of Borrower or any Subsidiary, (iii) the United States of America, or any state or political subdivision thereof, or any department, agency or instrumentality of any of the foregoing, unless the Assignment of Claims Act or any similar state or local statute, as the case may be, is complied with to the satisfaction of Bank, (iv) a debtor under any proceeding under the United States Bankruptcy Code, as amended, or any other comparable bankruptcy or insolvency law, or (v) an assignor for the benefit of creditors;

(d)    is not evidenced by an instrument or chattel paper unless the same has been endorsed and delivered to Bank;

(e)    is an asset of Borrower to which it has good and marketable title, is freely assignable, and is subject to a perfected, first priority Lien in favor of Bank free and clear of any other Liens;

(f)    is not owing from an Account Debtor who is also a creditor or supplier of such Person, and is not subject to any offset, counterclaim or other defense with respect thereto, provided that the only amount excluded under this clause (f) is the amount by which such offset, counterclaim or other defense exceeds the amount owing from such Account Debtor.

(g)    no surety bond was required or given in connection with said Receivable or the contract or purchase order out of which the same arose;

(h)    is evidenced by an invoice to the Account Debtor dated not more than five (5) Business Days subsequent to the shipment date of the relevant inventory or completion of performance of the relevant services and is issued on ordinary trade terms requiring payment within (i) 120 days of invoice date with respect to Kellogg's Company, (ii) 65 days of invoice date with respect to Congra Brands Inc., and (ii) 60 days of invoice date with respect to all other Account Debtors unless otherwise approved by Bank in writing.

(i)      is not unpaid more than 90 days after the original invoice date (or, with respect to Kellogg's Company, more than 120 days after the original invoice date);

(j)      is not owed by an Account Debtor who is obligated on Receivables more than 25% of the aggregate unpaid balance of which have been past due for longer than the relevant period specified in <u>subsection (i)</u> above unless Bank has approved the continued eligibility thereof;

(k)      would not cause the total Eligible Receivables owing from the Account Debtor and its Affiliates to exceed 25% of all Eligible Receivables (excluding Massimo Zanetti Beverage USA, Pillsbury c/o J.M. Smucker LLC, Pinnacle Foods Group and Starbucks, as to which the concentration limit set forth in this clause (k) shall not apply);

(l)      does not arise from a sale on a bill and hold, guaranteed sale, sale or return, sale on approval, consignment or any other repurchase or return basis; and

(m)      is not otherwise deemed to be ineligible in the reasonable judgment of Bank (it being acknowledged and agreed that with five (5) Business Days prior written notice any Receivable of Borrower or any Subsidiary may be deemed ineligible by Bank acting in its reasonable judgment).

*"Environmental Claim"* means any investigation, notice, violation, demand, allegation, action, suit, injunction, judgment, order, consent decree, penalty, fine, lien, proceeding or claim (whether administrative, judicial or private in nature) arising (a) pursuant to, or in connection with an actual or alleged violation of, any Environmental Law, (b) in connection with any Hazardous Material, (c) from any abatement, removal, remedial, corrective or response action in connection with a Hazardous Material, Environmental Law or order of a Governmental Authority or (d) from any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment.

*"Environmental Law"* means any current or future Legal Requirement pertaining to (a) the protection of health, safety and the indoor or outdoor environment, (b) the conservation, management or use of natural resources and wildlife, (c) the protection or use of surface water or groundwater, (d) the management, manufacture, possession, presence, use, generation, transportation, treatment, storage, disposal, Release, threatened Release, abatement, removal, remediation or handling of, or exposure to, any Hazardous Material or (e) pollution (including any Release to air, land, surface water or groundwater), and any amendment, rule, regulation, order or directive issued thereunder.

*"ERISA"* means the Employee Retirement Income Security Act of 1974, as amended, or any successor statute thereto.

*"Eurodollar Loan"* means a Loan bearing interest at the rate specified in <u>Section 2.4(b)</u>.

*"Eurodollar Reserve Percentage"* means the maximum reserve percentage, expressed as a decimal, at which reserves (including any emergency, marginal, special, and supplemental reserves) are imposed by the Board of Governors of the Federal Reserve System (or any

successor) on "eurocurrency liabilities", as defined in such Board's Regulation D (or any successor thereto), subject to any amendments of such reserve requirement by such Board or its successor, taking into account any transitional adjustments thereto. For purposes of this definition, the relevant Loans shall be deemed to be "eurocurrency liabilities" as defined in Regulation D without benefit or credit for any prorations, exemptions or offsets under Regulation D. The Eurodollar Reserve Percentage shall be adjusted automatically on and as of the effective date of any change in any such reserve percentage.

*"Event of Default"* means any event or condition identified as such in <u>Section 8.1</u>.

*"Event of Loss"* means, with respect to any Property, any of the following: (a) any loss, destruction or damage of such Property or (b) any condemnation, seizure, or taking, by exercise of the power of eminent domain or otherwise, of such Property, or confiscation of such Property or the requisition of the use of such Property.

*"Excess Cash Flow"* means, with respect to any period, the amount (if any) by which (a) EBITDA (but determined for such purposes without giving effect to any extraordinary gains or losses) during such period exceeds (b) the sum of (i) Interest Expense payable in cash during such period, plus (ii) federal, state and local income taxes payable in cash during such period, plus (iii) the aggregate amount of payments required to be made, and actually made, by Borrower during such period in respect of all principal on all Indebtedness of Borrowed Money (whether at maturity, as a result of mandatory sinking fund redemption, mandatory prepayment, acceleration or otherwise, but excluding payments of Revolving Loans), plus (iv) the aggregate amount of Capital Expenditures made by Borrower during such period to the extent permitted by this Agreement and not financed with proceeds of Indebtedness for Borrowed Money (but excluding credit extended under the Revolving Credit Commitment), plus (v) any increases in non-debt, non-cash working capital of Borrower for such period, minus (vi) any decreases in non-debt, non-cash working capital of Borrower for such period.

*"Federal Funds Rate"* means the fluctuating interest rate per annum described in part (i) of clause (b) of the definition of Base Rate.

*"Fixed Charge Coverage Ratio"*; means for any period for Borrower and its Subsidiaries on a consolidated basis, the ratio of (a) EBITDA for such period, less unfinanced Capital Expenditures incurred during such period (excluding $700,000 of unfinanced Capital Expenditures incurred in the fourth quarter of 2016, and $300,000 of unfinanced Capital Expenditures incurred in the first quarter of 2017), to (b) Fixed Charges for such period, all as determined for Borrower on a trailing twelve (12) month basis in accordance with GAAP. For purposes of clarification, Capital Expenditures paid from the proceeds of the Revolving Loan are deemed unfinanced Capital Expenditures.

*"Fixed Charges"* means, with reference to any period for any Person, the sum of (a) all payments of principal made or scheduled to be made within such trailing 12 month period with respect to Indebtedness for Borrowed Money of such Person (excluding voluntary and mandatory prepayments made to Bank), (b) Interest Expense of such Person for such period, (c) federal, state, and local income taxes paid or payable by such Person during such period, (d) dividends and distributions paid in cash to any Person, and (e) equity interest redemptions and other

Restricted payments paid in cash to any Person. Notwithstanding the foregoing, (i) for the fiscal quarter ending June 30, 2017 only, payments of principal set forth in subclause (a) above with respect to Indebtedness for Borrowed Money of such Person shall be calculated based on all payments of principal due within the 12 consecutive month period beginning June 1, 2017; (ii) for the fiscal quarters ending September 30, 2017, December 31, 2017 and March 31, 2018 only, payments of principal set forth in subclause (a) above with respect to Indebtedness for Borrowed Money of such Person shall be calculated based on all payments of principal made or scheduled to be made for the period beginning July 1, 2017, and ending as of the last day of each such test period multiplied by (x) four for the test period ending September 30, 2017, (y) two for the test period ending December 31, 2017, and (z) 4/3rds for the test period ending March 31, 2018; (iii) for the fiscal quarters ending June 30, 2017, September 30, 2017, December 31, 2017 and March 31, 2018 only, payments of Interest Expense set forth in subclause (b) above shall be based on an annualized amount of Interest Expense calculated on a cumulative basis for the period beginning April 1, 2017, and ending as of the last day of each such test period, as calculated by Bank, in its reasonable discretion; and (iv) the calculation of dividends and distributions made pursuant to subclause (d) above shall exclude the Special Gaughan Dividend.

*"Eurodollar Loans"* means Eurodollar Loans unless the context in which such term is used shall otherwise require.

*"GAAP"* means generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the U.S. accounting profession), which are applicable to the circumstances as of the date of determination.

*"Governmental Authority"* means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

*"Guarantor"* and *"Guarantors"* shall mean, individually and collectively, (a) Patrick Gaughan, an individual (*"Gaughan"*), (b) Patrick Gaughan as Trustee of the Patrick Gaughan Declaration of Trust, dated July 15, 1996, as amended and restated by that certain Amendment and Restatement of Patrick Gaughan Declaration of Trust dated May 15, 2008, as amended (*"Gaughan Trust"*), and (c) each direct and indirect Subsidiary of Borrower.

*"Guaranty"* and *"Guaranties"* each is defined in Section 6.12(a).

*"Hazardous Material"* means any substance, chemical, compound, product, solid, gas, liquid, waste, byproduct, pollutant, contaminant or material which is hazardous or toxic, and includes (a) asbestos, polychlorinated biphenyls and petroleum (including crude oil or any

fraction thereof) and (b) any material classified or regulated as "hazardous" or "toxic" or words of like import pursuant to an Environmental Law.

*"Hazardous Material Activity"* means any activity, event or occurrence involving a Hazardous Material, including the manufacture, possession, presence, use, generation, transportation, treatment, storage, disposal, Release, threatened Release, abatement, removal, remediation, handling of or corrective or response action to any Hazardous Material.

*"Hedging Liability"* means the liability of Borrower to Bank, or any Affiliate of Bank, in respect of any interest rate, foreign currency, and/or commodity swap, exchange, cap, collar, floor, forward, future or option agreement, or any other similar interest rate, currency or commodity hedging arrangement, as Borrower may from time to time enter into with Bank.

*"Indebtedness for Borrowed Money"* means for any Person (without duplication) (a) all indebtedness created, assumed or incurred in any manner by such Person representing money borrowed (including by the issuance of debt securities), (b) all indebtedness for the deferred purchase price of property or services (other than trade accounts payable arising in the ordinary course of business which are not more than seventy-five (75) days past due), (c) all indebtedness secured by any Lien upon Property of such Person, whether or not such Person has assumed or become liable for the payment of such indebtedness, (d) all Capitalized Lease Obligations of such Person, (e) all obligations of such Person on or with respect to letters of credit, bankers' acceptances and other extensions of credit whether or not representing obligations for borrowed money, (f) all obligations of such Person arising out of interest rate and foreign currency hedging agreements, and (g) all obligations of such Person under any leases classified as synthetic leases.

*"Interest Expense"* means, with reference to any period, the sum of all interest charges (including imputed interest charges with respect to Capitalized Lease Obligations and all amortization of debt discount and expense) of Borrower and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP.

*"Interest Payment Date"* means (a) with respect to any Eurodollar Loan, the last day of each Interest Period with respect to such Eurodollar Loan and on the maturity date and, if the applicable Interest Period is longer than (3) three months, on each day occurring every three (3) months after the commencement of such Interest Period, and (b) with respect to any Base Rate Loan or any Daily LIBOR Rate Loan, the last day of every calendar month and on the maturity date.

*"Interest Period"* means, with respect to any Borrowing of Eurodollar Loans, the period commencing on the date such Borrowing of Eurodollar Loans is advanced, continued, or created by conversion and ending 1, 2, 3, or 6 months thereafter as selected by Borrower in its notice as provided herein; *provided* that:

      i.    no Interest Period shall extend beyond the final maturity date of the relevant Loans;

      ii.    no Interest Period with respect to any portion of the Term Loans shall extend beyond a date on which Borrower is required to make a scheduled payment of

principal on the Term Loans unless the sum of (a) the aggregate principal amount of Term Loans that are Base Rate Loans, plus (b) the aggregate principal amount of Term Loans that are Daily LIBOR Rate Loans, plus (c) the aggregate principal amount of Term Loans that are Eurodollar Loans with Interest Periods expiring on or before such date equals or exceeds the principal amount to be paid on the Term Loans on such payment date;

iii.     whenever the last day of any Interest Period would otherwise be a day that is not a Business Day, the last day of such Interest Period shall be extended to the next succeeding Business Day, *provided* that, if such extension would cause the last day of an Interest Period for a Borrowing of Eurodollar Loans to occur in the following calendar month, the last day of such Interest Period shall be the immediately preceding Business Day; and

iv.     for purposes of determining an Interest Period for a Borrowing of Eurodollar Loans, a month means a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month; *provided* that if there is no numerically corresponding day in the month in which such an Interest Period is to end or if such an Interest Period begins on the last Business Day of a calendar month, then such Interest Period shall end on the last Business Day of the calendar month in which such Interest Period is to end.

*"L/C Obligations"* means the aggregate undrawn face amounts of all outstanding Letters of Credit and all unpaid Reimbursement Obligations.

*"L/C Sublimit"* means $2,000,000, as reduced pursuant to the terms hereof.

*"Legal Requirement"* means any treaty, convention, statute, law, regulation, ordinance, license, permit, governmental approval, injunction, judgment, order, consent decree or other requirement of any Governmental Authority, whether federal, state, or local.

*"Letter of Credit"* is defined in Section 2.3(a).

*"LIBOR"* means, for an Interest Period for a Borrowing of Eurodollar Loans, (a) the LIBOR Index Rate for such Interest Period, if such rate is available, and (b) if the LIBOR Index Rate cannot be determined, the arithmetic average of the rates of interest per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) at which deposits in U.S. Dollars in immediately available funds are offered to Bank at 11:00 a.m. (London, England time) two (2) Business Days before the beginning of such Interest Period by three (3) or more major banks in the interbank eurodollar market selected by Bank for delivery on the first day of and for a period equal to such Interest Period and in an amount equal or comparable to the principal amount of the Eurodollar Loan scheduled to be made as part of such Borrowing, provided that in no event shall "LIBOR" be less than 0.00%.

*"LIBOR Index Rate"* means, for any Interest Period, the rate per annum (rounded upwards, if necessary, to the next higher one hundred thousandth of a percentage point) for deposits in U.S. Dollars for a period equal to such Interest Period, as reported on the applicable

Bloomberg screen page (or such other commercially available source providing such quotations as may be designated by the Bank from time to time) as of 11:00 a.m. (London, England time) on the day two (2) Business Days before the commencement of such Interest Period.

*"Lien"* means any mortgage, lien, security interest, pledge, charge or encumbrance of any kind in respect of any Property, including the interests of a vendor or lessor under any conditional sale, Capital Lease or other title retention arrangement.

*"Liquidity"* means, as of any date of determination, the sum of the Revolving Loan Excess Availability plus Borrower's unrestricted cash on deposit with Bank.

*"Loan"* means any Revolving Loan or Term Loan, whether outstanding as a Base Rate Loan, a Daily LIBOR Rate Loan or Eurodollar Loan or otherwise, each of which is a "type" of Loan hereunder.

*"Loan Documents"* means this Agreement, the Notes (if any), the Applications, the Collateral Documents, the Guaranties, and each other instrument or document to be delivered hereunder or thereunder or otherwise in connection therewith.

*"Management Fees"* means all fees, charges and other amounts (including salaries and any other compensation such as bonuses, pensions and profit sharing payments) due and to become due to any of its Affiliates in consideration for, directly or indirectly, management, consulting or similar services.

*"Material Adverse Effect"* means (a) a material adverse change in, or material adverse effect upon, the operations, business, Property, or condition (financial or otherwise) of Borrower or of Borrower and its Subsidiaries taken as a whole, (b) a material impairment of the ability of Borrower or any Subsidiary to perform its material obligations under any Loan Document or (c) a material adverse effect upon (i) the legality, validity, binding effect or enforceability against Borrower or any Subsidiary of any Loan Document or the rights and remedies of Bank thereunder or (ii) the perfection or priority of any Lien granted under any Collateral Document.

*"Moody's"* means Moody's Investors Service, Inc.

*"Mortgages"* means any mortgages or deeds of trust delivered to Bank pursuant to Section 6.12(c), as the same may be amended, restated, supplemented, or otherwise modified from time to time.

*"Net Cash Proceeds"* means, as applicable, (a) with respect to any Disposition by a Person, cash and cash equivalent proceeds received by or for such Person's account, net of (i) reasonable direct costs relating to such Disposition and (ii) sale, use or other transactional taxes paid or payable by such Person as a direct result of such Disposition, (b) with respect to any Event of Loss of a Person, cash and cash equivalent proceeds received by or for such Person's account (whether as a result of payments made under any applicable insurance policy therefor or in connection with condemnation proceedings or otherwise), net of reasonable direct costs incurred in connection with the collection of such proceeds, awards or other payments, and (c) with respect to any offering of equity securities of a Person or the issuance of any Indebtedness

for Borrowed Money by a Person,  cash and cash equivalent proceeds received by or for such Person's account, net of reasonable legal, underwriting, and other fees and expenses incurred as a direct result thereof.

*"Net Income"* means, with reference to any period for any Person, the net income (or net loss) of such Person for such period computed on a consolidated basis in accordance with GAAP; *provided* that there shall be excluded from Net Income (a) the net income (or net loss) of such Person accrued prior to the date it becomes a Subsidiary of, or has merged into or consolidated with, Borrower or another Subsidiary, and (b) the net income (or net loss) of such Person (other than a Subsidiary) in which Borrower or any of its Subsidiaries has an equity interest in, except to the extent of the amount of dividends or other distributions actually paid to Borrower or any of its Subsidiaries during such period.

*"Note"* and *"Notes"* each is defined in <u>Section 2.10(c)</u>.

*"Obligations"* means all obligations of Borrower to pay principal and interest on the Loans, all Reimbursement Obligations owing under the Applications, all Hedging Liability, all fees and charges payable hereunder, and all other payment obligations of Borrower or any of its Subsidiaries arising under or in relation to any Loan Document, in each case whether now existing or hereafter arising, due or to become due, direct or indirect, absolute or contingent, and howsoever evidenced, held or acquired.

*"OFAC"* means the United States Department of Treasury Office of Foreign Assets Control.

*"OFAC Event"* means the event specified in <u>Section 6.9(c)</u>.

*"OFAC Sanctions Programs"* means all laws, regulations, and Executive Orders administered by OFAC, including the Bank Secrecy Act, anti-money laundering laws (including the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. 107-56 (a/k/a the USA Patriot Act)), and all economic and trade sanction programs administered by OFAC, any and all similar United States federal laws, regulations or Executive Orders, and any similar laws, regulators or orders adopted by any State within the United States.

*"OFAC SDN List"* means the list of the Specially Designated Nationals and Blocked Persons maintained by OFAC.

*"PBGC"* means the Pension Benefit Guaranty Corporation or any Person succeeding to any or all of its functions under ERISA.

*"Person"* means an individual, partnership, corporation, limited liability company, association, trust, unincorporated organization or any other entity or organization, including a government or agency or political subdivision thereof.

*"Plan"* means any employee pension benefit plan covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Code that either (a) is

maintained by a member of the Controlled Group for employees of a member of the Controlled Group or (b) is maintained pursuant to a collective bargaining agreement or any other arrangement under which more than one employer makes contributions and to which a member of the Controlled Group is then making or accruing an obligation to make contributions or has within the preceding five plan years made contributions.

*"Pledge Agreement"* means, individually and collectively (a) that certain Stock Pledge Agreement dated the date of this Agreement between Gaughan Trust and Bank, as the same may be amended, modified, supplemented or restated from time to time, and (b) any other pledge agreement, or similarly named document, that may be required by Bank pursuant to this Agreement as such document may be amended or restated from time to time.

*"Premises"* means the real property owned or leased by Borrower or any Subsidiary, including the real property and improvements thereon owned by Borrower or any Subsidiary subject to the Lien of the Mortgages or any other Collateral Documents.

*"Property"* means, as to any Person, all types of real, personal, tangible, intangible or mixed property owned by such Person whether or not included in the most recent balance sheet of such Person and its subsidiaries under GAAP.

*"RCRA"* means the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 and Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq., and any future amendments.

*"Receivables"* means all rights to the payment of a monetary obligation, now or hereafter owing to Borrower evidenced by accounts, instruments, chattel paper, or general intangibles.

*"Reimbursement Obligation"* means the obligation of Borrower to reimburse Bank for all drawings under a Letter of Credit.

*"Release"* means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migration, dumping, or disposing into the indoor or outdoor environment, including the abandonment or discarding of barrels, drums, containers, tanks or other receptacles containing or previously containing any Hazardous Material.

*"Revolving Credit Commitment"* means the obligation of Bank to make Revolving Loans and to issue Letters of Credit hereunder in an aggregate principal or face amount at any one time outstanding not to exceed $13,000,000.00.

*"Revolving Credit Termination Date"* means June 14, 2020, or such earlier date on which the Revolving Credit Commitment is terminated in whole pursuant to Section 2.13, 8.2 or 8.3.

*"Revolving Loan"* is defined in Section 2.2 and, as so defined, includes a Base Rate Loan, a Daily LIBOR Rate Loan or a Eurodollar Loan, each of which is a "type" of Revolving Loan hereunder.

"*Revolving Loan Excess Availability*" means, as of any date of determination, the amount by which the lesser of (i) the Revolving Credit Commitment in effect at such time and (ii) the Borrowing Base as determined based on the most recent Borrowing Base Certificate, exceeds the outstanding aggregate principal amount of Revolving Loans and L/C Obligations.

"*Revolving Note*" is defined in <u>Section 2.10(c)</u>.

"*S&P*" means Standard & Poor's Ratings Services Group, a division of The McGraw Hill Companies, Inc.

"*Santa Fe Property*" means Santa Fe Property, LLC, an Illinois limited liability company.

"*Santa Fe Property Note*" means that certain intercompany promissory note of even date herewith executed and delivered by Santa Fe Property to Borrower in the original principal amount of $527,643.00, as amended or restated from time to time.

"*SBA*" means the United States Small Business Administration.

"*SBA/SomerCor Equipment Security Agreement*" means that certain SBA/SomerCor Equipment Security Agreement dated on or around the date hereof by and between Bank and Borrower, as amended or restated from time to time.

"*SBA Collateral*" means the equipment financed by the SBA and pledged to the SBA by Borrower as security for the SBA Loans, together with the proceeds from the sale or other disposition thereof.

"*SBA Loans*" means the following loans provided to Borrower under the SBA 504 loan program: (a) SBA 504 loan number 52634250-04 provided by SomerCor 504 Inc. to Borrower on September 12, 2012, in the original principal amount of $4,161,000, with a principal balance as of the date of this Agreement of $2,271,188.22, (b) SBA 504 loan number 3927415006 provided by Small Business Growth Corporation to Borrower on November 17, 2010, in the original principal amount of $1,351,000, with a principal balance as of the date of this Agreement of $501,569.88, (c) SBA loan number 92897850-03 to be issued pursuant to SBA approval dated February 16, 2017 in the principal amount of $1,004,000, and (d) SBA loan number 93579850-07 to be issued pursuant to SBA approval dated March 21, 2017 in the principal amount of $3,387,000.

"*SBA Subordination Agreements*" means the subordination agreements, third party lender agreements or other similarly titled documents executed by the SBA (or the applicable certified development company on behalf of the SBA), Bank, Borrower and the guarantors of the applicable SBA Loans, which sets forth, among other things, the relative Lien priority of the SBA and Bank with respect to certain assets of Borrower.

"*Security Agreement*" means that certain General Security Agreement dated the date of this Agreement between Borrower and Bank, as the same may be amended, restated, supplemented, or otherwise modified from time to time.

"***Special Gaughan Dividend***" shall mean a one-time special dividend to the Gaughan Trust in an aggregate amount not to exceed $500,000, provided such dividend is made not later than the one year anniversary of the Closing Date.

"***Subordinated Debt***" means Indebtedness for Borrowed Money which is subordinated in right of payment to the prior payment of the Obligations pursuant to subordination provisions approved in writing by Bank.

"***Subsidiary***" means, as to any particular parent corporation or organization, any other corporation or organization more than 50% of the outstanding Voting Stock of which is at the time directly or indirectly owned by such parent corporation or organization or by any one or more other entities which are themselves subsidiaries of such parent corporation or organization. Unless otherwise expressly noted herein, the term "Subsidiary" means a Subsidiary of Borrower or of any of its direct or indirect Subsidiaries.

"***Sweep to Loan Arrangement***" means a cash management arrangement established by Borrower with Bank, as depositary, pursuant to which Bank is authorized (a) to make advances of Revolving Loans hereunder, the proceeds of which are deposited by Bank into a designated account of Borrower maintained at the Bank, and (b) to accept as prepayments of Revolving Loans hereunder proceeds of excess targeted balances held in such designated account at the Bank, which cash management arrangement is subject to such agreement(s) and on such terms acceptable to Bank.

"***Term A Loan***" is defined in Section 2.1(a) and, as so defined, includes a Base Rate Loan, a Daily LIBOR Rate Loan or a Eurodollar Loan, each of which is a "type" of Term A Loan hereunder.

"***Term A Loan Commitment***" means the obligation of Bank to make the Term A Loan on the Closing Date in the principal amount not to exceed $1,321,153

"***Term A Loan Maturity Date***" means June 14, 2020.

"***Term B Loan***" is defined in Section 2.1(b) and, as so defined, includes a Base Rate Loan, a Daily LIBOR Rate Loan or a Eurodollar Loan, each of which is a "type" of Term B Loan hereunder.

"***Term B Loan Commitment***" means the obligation of Bank to make the Term B Loan on the Closing Date in the principal amount not to exceed $197,619.

"***Term B Loan Maturity Date***" means June 14, 2020.

"***Term C Loan***" is defined in Section 2.1(c) and, as so defined, includes a Base Rate Loan, a Daily LIBOR Rate Loan or a Eurodollar Loan, each of which is a "type" of Term C Loan hereunder.

"***Term C Loan Commitment***" means the obligation of Bank to make the Term C Loan on the Closing Date in the principal amount not to exceed $937,500.

"***Term C Loan Maturity Date***" means June 14, 2024.

"***Term D Loan***" is defined in Section 2.1(d) and, as so defined, includes a Base Rate Loan, a Daily LIBOR Rate Loan or a Eurodollar Loan, each of which is a "type" of Term D Loan hereunder.

"***Term D Loan Commitment***" means the obligation of Bank to make the Term D Loan on the Closing Date in the principal amount not to exceed $3,543,728.

"***Term D Loan Maturity Date***" means June 14, 2024.

"***Term Loan***" or "***Term Loans***" means, individually and collectively, Term A Loan, Term B Loan, Term C Loan, Term D Loan and the Bridge Loan.

"***Term Loan Commitment***" or "***Term Loan Commitments***" means, individually and collectively, the obligation of Bank to make each Term Loan on the Closing Date in the original principal amount not to exceed the Term A Loan Commitment, the Term B Loan Commitment, the Term C Loan Commitment, the Term D Loan Commitment and the Bridge Loan Commitment, respectively.

"***Term Note***" is defined in Section 2.10(c).

"***Total Operating Debt***" means, at any time the same is to be determined for any Person, the sum (but without duplication) of (a) all Indebtedness for Borrowed Money of such Person at such time, excluding the SBA Loans, and (b) all Indebtedness for Borrowed Money of any other Person which is directly or indirectly guaranteed by such Person or which such Person has agreed (contingently or otherwise) to purchase or otherwise acquire or in respect of which such Person has otherwise assured a creditor against loss. Notwithstanding the foregoing, for the test period ending June 30, 2017 only, the definition of Indebtedness for Borrowed Money as used herein shall exclude the Bridge Loan.

"***Total Operating Debt/EBITDA Ratio***" means, as of any date, the ratio of Total Operating Debt of Borrower and its Subsidiaries as of such date to EBITDA of Borrower and its Subsidiaries for the period of four fiscal quarters then ended.

"***Unfunded Vested Liabilities***" means, for any Plan at any time, the amount (if any) by which the present value of all vested nonforfeitable accrued benefits under such Plan exceeds the fair market value of all Plan assets allocable to such benefits, all determined as of the then most recent valuation date for such Plan, but only to the extent that such excess represents a potential liability of a member of the Controlled Group to the PBGC or the Plan under Title IV of ERISA.

"***Unused Revolving Credit Commitment***" means, at any time, the difference between the Revolving Credit Commitment then in effect and the aggregate outstanding principal amount of Revolving Loans and L/C Obligations.

*"U.S. Dollars" and "$"* each means the lawful currency of the United States of America.

*"Voting Stock"* of any Person means capital stock or other equity interests of any class or classes (however designated) having ordinary power for the election of directors or other similar governing body of such Person, other than stock or other equity interests having such power only by reason of the happening of a contingency.

*"Welfare Plan"* means a "welfare plan" as defined in Section 3(1) of ERISA.

*"Wholly-owned Subsidiary"* means a Subsidiary of which all of the issued and outstanding shares of capital stock (other than directors' qualifying shares as required by law) or other equity interests are owned by Borrower and/or one or more Wholly-owned Subsidiaries within the meaning of this definition.

*Section 1.2    Interpretation.*  The foregoing definitions are equally applicable to both the singular and plural forms of the terms defined.   The words "hereof", "herein", and "hereunder" and words of like import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.   The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." All references to time of day herein are references to Chicago, Illinois, time unless otherwise specifically provided.   Where the character or amount of any asset or liability or item of income or expense is required to be determined or any consolidation or other accounting computation is required to be made for the purposes of this Agreement, it shall be done in accordance with GAAP except where such principles are inconsistent with the specific provisions of this Agreement.

*Section 1.3    Change in Accounting Principles.*  If, after the date of this Agreement, there shall occur any change in GAAP from those used in the preparation of the financial statements referred to in Section 5.5 and such change shall result in a change in the method of calculation of any financial covenant, standard or term found in this Agreement, either the Borrower or the Bank may by notice to the other require that the Borrower and the Bank negotiate in good faith to amend such covenants, standards, and terms so as equitably to reflect such change in accounting principles, with the desired result being that the criteria for evaluating the financial condition of the Borrower and its Subsidiaries shall be the same as if such change had not been made.   No delay by the Borrower or the Bank in requiring such negotiation shall limit their right to so require such a negotiation at any time after such a change in accounting principles.   Until any such covenant, standard, or term is amended in accordance with this Section 1.3, financial covenants shall be computed and determined in accordance with GAAP in effect prior to such change in accounting principles.   Without limiting the generality of the foregoing, the Borrower shall neither be deemed to be in compliance with any financial covenant hereunder nor out of compliance with any financial covenant hereunder if such state of compliance or noncompliance, as the case may be, would not exist but for the occurrence of a change in accounting principles after the date hereof.

**SECTION 2.  THE CREDIT FACILITIES.**

*Section 2.1      Term Loan Commitments.*

(a)      Subject to the terms and conditions hereof, Bank agrees to make a loan (the *"Term A Loan"*) in U.S. Dollars to Borrower in the amount of the Term A Loan Commitment. The Term A Loan shall be advanced in a single Borrowing on the Closing Date, at which time the Term A Loan Commitment shall expire.  As provided in <u>Section 2.6</u>, Borrower may elect that the Term A Loan be outstanding as Base Rate Loans, Daily LIBOR Rate Loans or Eurodollar Loans.  No amount repaid or prepaid on the Term A Loan may be borrowed again.

(b)      Subject to the terms and conditions hereof, Bank agrees to make a loan (the *"Term B Loan"*) in U.S. Dollars to Borrower in the amount of the Term B Loan Commitment. The Term B Loan shall be advanced in a single Borrowing on the Closing Date, at which time the Term B Loan Commitment shall expire.  As provided in <u>Section 2.6</u>, Borrower may elect that the Term B Loan be outstanding as Base Rate Loans, Daily LIBOR Rate Loans or Eurodollar Loans.  No amount repaid or prepaid on the Term B Loan may be borrowed again.

(c)      Subject to the terms and conditions hereof, Bank agrees to make a loan (the *"Term C Loan"*) in U.S. Dollars to Borrower in the amount of the Term C Loan Commitment. The Term C Loan shall be advanced in a single Borrowing on the Closing Date, at which time the Term C Loan Commitment shall expire.  As provided in <u>Section 2.6</u>, Borrower may elect that the Term C Loan be outstanding as Base Rate Loans, Daily LIBOR Rate Loans or Eurodollar Loans.  No amount repaid or prepaid on the Term C Loan may be borrowed again.

(d)      Subject to the terms and conditions hereof, Bank agrees to make a loan (the *"Term D Loan"*) in U.S. Dollars to Borrower in the amount of the Term D Loan Commitment. The Term D Loan shall be advanced in a single Borrowing on the Closing Date, at which time the Term D Loan Commitment shall expire.  As provided in <u>Section 2.6</u>, Borrower may elect that the Term D Loan be outstanding as Base Rate Loans, Daily LIBOR Rate Loans or Eurodollar Loans.  No amount repaid or prepaid on the Term D Loan may be borrowed again.

(e)      Subject to the terms and conditions hereof, Bank agrees to make a loan (the *"Bridge Loan"*) in U.S. Dollars to Borrower in the amount of the Bridge Loan Commitment. The Bridge Loan shall be advanced in a single Borrowing on the Closing Date, at which time the Bridge Loan Commitment shall expire.  As provided in <u>Section 2.6</u>, Borrower may elect that the Bridge Loan be outstanding as Base Rate Loans, Daily LIBOR Rate Loans or Eurodollar Loans. No amount repaid or prepaid on the Bridge Loan may be borrowed again.

*Section 2.2      Revolving Credit Commitment.*  Subject to the terms and conditions hereof, Bank agrees to make a loan or loans (individually a *"Revolving Loan"* and collectively the *"Revolving Loans"*) in U.S. Dollars to Borrower from time to time on a revolving basis up to the amount of the Revolving Credit Commitment, subject to any reductions thereof pursuant to the terms hereof, before the Revolving Credit Termination Date.  The sum of the aggregate principal amount of Revolving Loans and L/C Obligations at any time outstanding shall not exceed the lesser of (i) the Revolving Credit Commitment in effect at such time and (ii) the

Borrowing Base as determined based on the most recent Borrowing Base Certificate. As provided in Section 2.6, Borrower may elect that each Borrowing of Revolving Loans be Base Rate Loans, Daily LIBOR Rate Loans or Eurodollar Loans. Revolving Loans may be repaid and the principal amount thereof reborrowed before the Revolving Credit Termination Date, subject to the terms and conditions hereof.

Section 2.3    *Letters of Credit.*

(a)    *General Terms.*  Subject to the terms and conditions hereof, as part of the Revolving Credit Commitment, Bank shall issue standby and commercial letters of credit (each a *"Letter of Credit"*) for the account of Borrower in an aggregate undrawn face amount up to the L/C Sublimit. Each Letter of Credit shall constitute usage of the Revolving Credit Commitment. For purposes of this Agreement, a Letter of Credit shall be deemed outstanding as of any time in an amount equal to the maximum amount which could be drawn thereunder under any circumstances and over any period of time plus any unreimbursed drawings then outstanding with respect thereto. If and to the extent any Letter of Credit expires or otherwise terminates without having been drawn upon, the availability under the Revolving Credit Commitment shall to such extent be reinstated. Each Letter of Credit issued hereunder shall expire not later than 12 months from the date of issuance. Each Letter of Credit issued hereunder shall be payable in U.S. Dollars, conform to the general requirements of Bank for the issuance of a standby or commercial letter of credit, as the case may be, as to form and substance, and be a letter of credit which Bank may lawfully issue.

(b)    *Applications.*  At the time Borrower requests a Letter of Credit to be issued (or prior to the first issuance of a Letter of Credit in the case of a continuing application), Borrower shall execute and deliver to Bank an application for such Letter of Credit in the form then customarily prescribed by Bank (individually an *"Application"* and collectively the *"Applications"*). Subject to the other provisions of this Section, the obligation of Borrower to reimburse Bank for drawings under a Letter of Credit shall be governed by the Application for such Letter of Credit. Notwithstanding anything contained in any Application to the contrary: (i) Borrower shall pay fees in connection with each Letter of Credit as set forth in Section 2.11(b), (ii) unless an Event of Default exists, Bank will not call for the funding by Borrower of any amount under a Letter of Credit before being presented with a drawing thereunder, and (iii) if Bank is not timely reimbursed for the amount of any drawing under a Letter of Credit on the date such drawing is paid, Borrower's obligation to reimburse Bank for the amount of such drawing shall bear interest (which Borrower hereby promises to pay) from and after the date such drawing is paid at a rate per annum equal to the sum of the Applicable Margin plus the Base Rate from time to time in effect (computed on the basis of a year of 360 days and the actual number of days elapsed).

(c)    *Obligations Absolute.*  Borrower's obligation to reimburse L/C Obligations as provided in subsection (b) of this Section shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement and the relevant Application under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit or this Agreement, or any term or provision therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged,

fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by Bank under a Letter of Credit against presentation of a draft or other document that does not strictly comply with the terms of such Letter of Credit, or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of, or provide a right of setoff against, Borrower's obligations hereunder. Bank shall have no liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of Bank; *provided* that the foregoing shall not be construed to excuse Bank from liability to Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by Borrower to the extent permitted by applicable law) suffered by Borrower that are caused by Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof. The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of Bank (as finally determined by a court of competent jurisdiction), Bank shall be deemed to have exercised care in each such determination. In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, Bank may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(d)    *Manner of Requesting a Letter of Credit*. Borrower shall provide at least five (5) Business Days' advance written notice to Bank of each request for the issuance of a Letter of Credit, such notice in each case to be accompanied by an Application for such Letter of Credit properly completed and executed by Borrower and, in the case of an extension or amendment or an increase in the amount of a Letter of Credit, a written request therefor, in a form acceptable to Bank, in each case, together with the fees called for by this Agreement.

(e)    Borrower shall Cash Collateralize all outstanding L/C Obligations on the Revolving Credit Termination Date or upon the occurrence and during the continuation of an Event of Default. Amounts held in such cash collateral account shall be applied by Bank to the payment of drafts drawn under such Letters of Credit, and the unused portion thereof after all such Letters of Credit shall have expired or been fully drawn upon, if any, shall be applied to repay the Obligations, in such order of application as Bank may, in its sole discretion, from time to time elect. After all such Letters of Credit shall have expired or been fully drawn upon, all commitments to make Loans hereunder have terminated and all other Obligations have been indefeasibly satisfied and paid in full in cash, the balance, if any, in such cash collateral account shall be returned to Borrower or such other Person as may be lawfully entitled thereto.

*Section 2.4     Applicable Interest Rates.*

(a)     *Base Rate Loans.*  Each Base Rate Loan shall bear interest (computed on the basis of a year of 360 days and the actual days elapsed) on the unpaid principal amount thereof from the date such Loan is advanced, or created by conversion from a Eurodollar Loan or a Daily LIBOR Rate Loan, until maturity (whether by acceleration or otherwise) at a rate per annum equal to the sum of the Applicable Margin plus the Base Rate from time to time in effect, payable by Borrower on each Interest Payment Date and at maturity (whether by acceleration or otherwise).

(b)     *Eurodollar Loans.*  Each Eurodollar Loan shall bear interest during each Interest Period it is outstanding (computed on the basis of a year of 360 days and actual days elapsed) on the unpaid principal amount thereof from the date such Loan is advanced or continued, or created by conversion from a Base Rate Loan or a Daily LIBOR Rate Loan, until maturity (whether by acceleration or otherwise) at a rate per annum equal to the sum of the Applicable Margin plus the Adjusted LIBOR applicable for such Interest Period, payable by Borrower on each Interest Payment Date and at maturity (whether by acceleration or otherwise).

(c)     Each Daily LIBOR Rate Loan shall bear interest (computed on the basis of a year of 360 days and the actual days elapsed) on the unpaid principal amount thereof from the date such Loan is advanced, or created by conversion from a Eurodollar Loan or a Base Rate Loan, until maturity (whether by acceleration or otherwise) at a rate per annum equal to the sum of the Applicable Margin plus the Daily LIBOR Rate from time to time in effect, payable by Borrower on each Interest Payment Date and at maturity (whether by acceleration or otherwise).

(d)     *Rate Determinations.*  Bank shall determine each interest rate applicable to the Loans and the Reimbursement Obligations hereunder, and its determination thereof shall be conclusive and binding except in the case of manifest error.

*Section 2.5     Minimum Borrowing Amounts; Maximum Eurodollar Loans.*  Each Borrowing of Base Rate Loans shall be in an amount not less than $50,000.  Each Borrowing of Daily LIBOR Rate Loans shall be in an amount not less than $50,000.  Each Borrowing of Eurodollar Loans advanced, continued or converted shall be in an amount equal to $50,000 or such greater amount which is an integral multiple of $50,000.  Without Bank's consent, there shall not be more than six (6) Borrowings of Eurodollar Loans outstanding hereunder at any one time.

*Section 2.6     Manner of Borrowing Loans and Designating Applicable Interest Rates.*

(a) *Notice to Bank.*  Borrower shall give notice to Bank by no later than 10:00 a.m.: (i) at least three (3) Business Days before the date on which Borrower requests Bank to advance a Borrowing of Eurodollar Loans, and (ii) on the date Borrower requests Bank to advance a Borrowing of Base Rate Loans or Daily LIBOR Rate Loans.  The Loans included in each Borrowing shall bear interest initially at the type of rate specified in such notice of a new Borrowing.  Thereafter, subject to the terms and conditions hereof, Borrower may from time to time elect to change or continue the type of interest rate borne by each Borrowing or, subject to

-24-

the minimum amount requirement for each outstanding Borrowing set forth in <u>Section 2.5</u>, a portion thereof, as follows:  (i) if such Borrowing is of Eurodollar Loans, on the last day of the Interest Period applicable thereto, Borrower may continue part or all of such Borrowing as Eurodollar Loans or convert part or all of such Borrowing into Base Rate Loans or into Daily LIBOR Rate Loans, (ii) if such Borrowing is of Base Rate Loans, on any Business Day, Borrower may convert all or part of such Borrowing into Daily LIBOR Rate Loans or into Eurodollar Loans for an Interest Period or Interest Periods specified by Borrower, or (iii) if such Borrowing is of Daily LIBOR Rate Loans, on any Business Day, Borrower may convert all or part of such Borrowing into Base Rate Loans or into Eurodollar Loans for an Interest Period or Interest Periods specified by Borrower.  Borrower shall give all such notices requesting the advance, continuation or conversion of a Borrowing to Bank by telephone, telecopy, or other telecommunication device acceptable to Bank (which notice shall be irrevocable once given and, if by telephone, shall be promptly confirmed in writing), in a form acceptable to Bank.  Notice of the continuation of a Borrowing of Eurodollar Loans for an additional Interest Period or of the conversion of part or all of a Borrowing into Eurodollar Loans must be given by no later than 10:00 a.m. at least three (3) Business Days before the date of the requested continuation or conversion.  All such notices concerning the advance, continuation or conversion of a Borrowing shall specify the date of the requested advance, continuation or conversion of a Borrowing (which shall be a Business Day), the amount of the requested Borrowing to be advanced, continued or converted, the type of Loans to comprise such new, continued or converted Borrowing and, if such Borrowing is to be comprised of Eurodollar Loans, the Interest Period applicable thereto.  No Borrowing of Eurodollar Loans shall be advanced, continued, or created by conversion if any Default or Event of Default then exists.  Borrower agrees that Bank may rely on any such telephonic, telecopy or other telecommunication notice given by any person Bank in good faith believes is an Authorized Representative without the necessity of independent investigation, and in the event any such notice by telephone conflicts with any written confirmation such telephonic notice shall govern if Bank has acted in reliance thereon.

(b) *Borrower's Failure to Notify*.  If Borrower fails to give notice pursuant to <u>Section 2.6(a)</u> above of the continuation or conversion of any outstanding principal amount of a Borrowing of Eurodollar Loans before the last day of its then current Interest Period within the period required by <u>Section 2.6(a)</u> and such Borrowing is not prepaid in accordance with <u>Section 2.8(a)</u>, such Borrowing shall automatically be converted into a Borrowing of Base Rate Loans. In the event Borrower fails to give notice pursuant to <u>Section 2.6(a)</u> above of a Borrowing equal to the amount of a Reimbursement Obligation and has not notified Bank by 12:00 noon on the day such Reimbursement Obligation becomes due that it intends to repay such Reimbursement Obligation through funds not borrowed under this Agreement, Borrower shall be deemed to have requested a Borrowing of Base Rate Loans under the Revolving Credit Commitment on such day in the amount of the Reimbursement Obligation then due, which Borrowing shall be applied to pay the Reimbursement Obligation then due.

Section 2.7    *Maturity of Loans*.

(a)    *Scheduled Payments of Term Loans*.

(i)      Borrower shall make principal payments on the Term A Loans in monthly installments on the last day of each calendar month, commencing with the calendar month ending June 30, 2017, in the amount of $22,019.21 each, it being agreed that a final payment comprised of all principal and interest then outstanding on the Term A Loan shall be due and payable on the Term A Loan Maturity Date.

(ii)      Borrower shall make principal payments on the Term B Loans in monthly installments on the last day of each calendar month, commencing with the calendar month ending June 30, 2017, in the amount of $3,293.65 each, it being agreed that a final payment comprised of all principal and interest then outstanding on the Term B Loan shall be due and payable on the Term B Loan Maturity Date.

(iii)      Borrower shall make principal payments on the Term C Loans in monthly installments on the last day of each calendar month, commencing with the calendar month ending June 30, 2017, in the amount of $11,160.71 each, it being agreed that a final payment comprised of all principal and interest then outstanding on the Term C Loan shall be due and payable on the Term C Loan Maturity Date.

(iv)      Borrower shall make principal payments on the Term D Loans in monthly installments on the last day of each calendar month, commencing with the calendar month ending June 30, 2017, in the amount of $42,187.24 each, it being agreed that a final payment comprised of all principal and interest then outstanding on the Term D Loan shall be due and payable on the Term D Loan Maturity Date.

(v)      Borrower shall make a lump sum payment comprised of all principal and interest then outstanding on the Bridge Loan on the Bridge Loan Maturity Date.

(b)    *Revolving Loans*.    Each Revolving Loan, both for principal and interest then outstanding, shall mature and be due and payable by Borrower on the Revolving Credit Termination Date.

*Section 2.8    Prepayments.*

(a)    *Optional Prepayments*.  Borrower may prepay in whole or in part (but, if in part, then: (i) if such Borrowing is of Base Rate Loans, in an amount not less than $50,000, (ii) if such Borrowing is of Daily LIBOR Rate Loans, in an amount not less than $50,000, (iii) if such Borrowing is of Eurodollar Loans, in an amount not less than $50,000, and (iv) in each case, in an amount such that the minimum amount required for a Borrowing pursuant to Section 2.5 remains outstanding) any Borrowing of Eurodollar Loans at any time upon three (3) Business Days prior notice by Borrower to Bank, and any Borrowing of Base Rate Loans or Daily LIBOR Rate Loans at any time upon notice delivered by Borrower to Bank no later than 10:00 a.m. on the date of prepayment (or, in any case, such shorter period of time then agreed to by Bank), such prepayment, in each case, to be made by the payment of the principal amount to be prepaid and, in the case of any Term Loans or Revolving Loans that are Eurodollar Loans, accrued interest thereon to the date fixed for prepayment plus any amounts due Bank under Section 3.3.

(b)    *Mandatory Prepayments.*

(i)    If Borrower or any Subsidiary shall at any time or from time to time make or agree to make a Disposition or shall suffer an Event of Loss with respect to any Property, then Borrower shall promptly notify Bank of such proposed Disposition or Event of Loss (including the amount of the estimated Net Cash Proceeds to be received by Borrower or such Subsidiary in respect thereof) and, promptly upon receipt by Borrower or such Subsidiary of the Net Cash Proceeds of such Disposition or Event of Loss, Borrower shall prepay the Obligations in an aggregate amount equal to 100% of the amount of all such Net Cash Proceeds; *provided* that (x) so long as no Default or Event of Default then exists, this subsection shall not require any such prepayment with respect to Net Cash Proceeds received on account of an Event of Loss so long as such Net Cash Proceeds are applied to replace or restore the relevant Property in accordance with the relevant Collateral Documents, (y) this subsection shall not require any such prepayment with respect to Net Cash Proceeds received on account of Dispositions during any fiscal year of Borrower not exceeding $250,000 in the aggregate so long as no Default or Event of Default then exists, and (z) in the case of any Disposition not covered by clause (y) above, so long as no Default or Event of Default then exists, if Borrower states in its notice of such event that Borrower or the relevant Subsidiary intends to reinvest, within 180 days of the applicable Disposition, the Net Cash Proceeds thereof in assets similar to the assets which were subject to such Disposition, then Borrower shall not be required to make a mandatory prepayment under this subsection in respect of such Net Cash Proceeds to the extent such Net Cash Proceeds are actually reinvested in such similar assets with such 180 day period.  Promptly after the end of such 180 day period, Borrower shall notify Bank whether Borrower or such Subsidiary has reinvested such Net Cash Proceeds in such similar assets, and, to the extent such Net Cash Proceeds have not been so reinvested, Borrower shall promptly prepay the Obligations in the amount of such Net Cash Proceeds not so reinvested.  The amount of each such prepayment shall be applied first to the outstanding Term Loans until paid in full and then to the Revolving Loans; *provided* that proceeds relating to Eligible Inventory and Eligible Receivables then included in the Borrowing Base shall first be applied to the Revolving Loans.  If Bank so requests, all proceeds of such Disposition or Event of Loss shall be deposited with Bank (or its agent) and held by it in the Collateral Account to be disbursed to or at Borrower's direction for application to or reimbursement for the costs of replacing, rebuilding or restoring such Property.

(ii)    If after the Closing Date Borrower or any Subsidiary shall issue new equity securities (whether common or preferred stock or otherwise), other than equity securities issued in connection with the exercise of employee stock options, Borrower shall promptly notify Bank of the estimated Net Cash Proceeds of such issuance to be received by or for the account of Borrower or such Subsidiary in respect thereof.  Promptly upon receipt by Borrower or such Subsidiary of Net Cash Proceeds of such issuance, Borrower shall prepay the Obligations in an aggregate amount equal to 100% of the amount of such Net Cash Proceeds.  The amount of each such prepayment shall be applied first to the outstanding Term Loans until paid in full and then to the Revolving Loans.  Borrower acknowledges that its performance hereunder shall not limit the rights and remedies of Bank for any

breach of <u>Section 7.5</u> (Maintenance of Subsidiaries) or <u>Section 8.1(i)</u> (Change of Control) hereof or any other terms of the Loan Documents.

(iii)    If after the Closing Date Borrower or any Subsidiary shall issue any Indebtedness for Borrowed Money, other than Indebtedness for Borrowed Money permitted by <u>Section 7.1(a)-(f)</u>, Borrower shall promptly notify Bank of the estimated Net Cash Proceeds of such issuance to be received by or for the account of Borrower or such Subsidiary in respect thereof.  Promptly upon receipt by Borrower or such Subsidiary of Net Cash Proceeds of such issuance, Borrower shall prepay the Obligations in an aggregate amount equal to 100% of the amount of such Net Cash Proceeds.  The amount of each such prepayment shall be applied first to the outstanding Term Loans until paid in full and then to the Revolving Loans.  Borrower acknowledges that its performance hereunder shall not limit the rights and remedies of Bank for any breach of <u>Section 7.1</u> or any other terms of the Loan Documents.

(iv)    [Reserved].

(v)    Within 120 days after the end of each fiscal year of Borrower (commencing with the fiscal year ending December 31, 2017), Borrower shall prepay the Obligations by an amount equal to Borrower's Excess Cash Flow of Borrower and its Subsidiaries for the most recently completed fiscal year of Borrower multiplied by the ECF Percentage (the "*Excess Cash Flow Payment*").  The amount of each such Excess Cash Flow Payment shall be applied first to the outstanding Term Loans until paid in full and then to the Revolving Loans;

(vi)    Borrower shall, on each date the Revolving Credit Commitment is reduced pursuant to <u>Section 2.13</u>, prepay the Revolving Loans and, if necessary, Cash Collateralize the L/C Obligations by the amount, if any, necessary to reduce the sum of the aggregate principal amount of Revolving Loans and L/C Obligations then outstanding to the amount to which the Revolving Credit Commitment has been so reduced.

(vii)    If at any time the sum of the unpaid principal balance of the Revolving Loans and the L/C Obligations then outstanding shall be in excess of the Borrowing Base as determined on the basis of the most recent Borrowing Base Certificate, Borrower shall immediately and without notice or demand pay over the amount of the excess to Bank as and for a mandatory prepayment on such Obligations, with each such prepayment first to be applied to the Revolving Loans until paid in full with any remaining balance to be applied to Cash Collateralize the L/C Obligations.

(viii)    Unless Borrower otherwise directs, prepayments of Loans under this <u>Section 2.8(b)</u> shall be applied first to Borrowings of Base Rate Loans until payment in full thereof, second to Borrowings of Daily LIBOR Rate Loans until payment in full thereof with any balance applied to Borrowings of Eurodollar Loans in the order in which their Interest Periods expire.  Each prepayment of Loans under this <u>Section 2.8(b)</u> shall be made by the payment of the principal amount to be prepaid and, in the case of any Term Loans or

Eurodollar Loans, accrued interest thereon to the date of prepayment together with any amounts due Bank under Section 3.3.

(c)    Except as otherwise expressly provided herein, any amount of Revolving Loans paid or prepaid before the Revolving Credit Termination Date may, subject to the terms and conditions of this Agreement, be borrowed, repaid and borrowed again.  No amount of the Term Loans paid or prepaid may be reborrowed, and, in the case of any partial prepayment, such prepayment shall be applied to the remaining amortization payments on the relevant Loans in the inverse order of maturity.

Section 2.9    *Default Rate.*

(a)    Notwithstanding anything to the contrary contained herein, if any Loan or any part thereof is not paid when due (whether by lapse of time, acceleration, or otherwise), or at the election of Bank upon notice to Borrower during the existence of any other Event of Default, Borrower shall pay interest (after as well as before entry of judgment thereon to the extent permitted by law) on the principal amount of all Loans and Reimbursement Obligations, and letter of credit fees at a rate per annum equal to:

(i)    for any Base Rate Loan or any Daily LIBOR Rate Loan, the sum of 2.0% plus the Applicable Margin plus the Base Rate or the Daily LIBOR Rate from time to time in effect;

(ii)    for any Eurodollar Loan, the sum of 2.0% plus the rate of interest in effect thereon at the time of such default until the end of the Interest Period applicable thereto and, thereafter, at a rate per annum equal to the sum of 2.0% plus the Applicable Margin for Base Rate Loans plus the Base Rate from time to time in effect;

(iii)    for any Reimbursement Obligation, the sum of 2.0% plus the amounts due under Section 2.3 with respect to such Reimbursement Obligation; and

(iv)    for any Letter of Credit, the sum of 2.0% plus the letter of credit fee due under Section 2.11 with respect to such Letter of Credit.

Section 2.10    *Evidence of Indebtedness.*

(a)    Bank shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of Borrower hereunder, including the amounts of principal and interest payable and paid to Bank from time to time hereunder.

(b)    The entries maintained in the account(s) maintained pursuant to paragraph (a) above shall be prima facie evidence of the existence and amounts of the Obligations therein recorded; *provided*, that the failure of Bank to maintain such account(s) or any error therein shall not in any manner affect the obligation of Borrower to repay the Obligations in accordance with their terms.

(c)    Bank may request that the Loans be evidenced by a promissory note or notes in the forms substantially similar to the of <u>Exhibit A-1</u> (in the case of each Term Loan individually, a *"Term Note"*, and collectively referred to herein as a *"Term Notes"*), or <u>Exhibit A-2</u> (in the case of its Revolving Loans and referred to herein as a *"Revolving Note"*), as applicable (the Term Notes and Revolving Notes being hereinafter referred to collectively as the *"Notes"* and individually as a *"Note"*). In such event, Borrower shall execute and deliver to Bank a Note payable to Bank or its registered assigns in the amount of the relevant Term Loan or Revolving Credit Commitment, as applicable.

*Section 2.11    Fees.*

(a)    *Revolving Credit Commitment Fee.* Borrower shall pay to Bank a commitment fee at the rate per annum equal to the Applicable Margin (computed on the basis of a year of 360 days and the actual number of days elapsed) on the average daily Unused Revolving Credit Commitment. Such commitment fee shall be payable quarterly in arrears on the last day of each March, June, September, and December in each year (commencing on the first such date occurring after the date hereof) and on the Revolving Credit Termination Date, unless the Revolving Credit Commitment is terminated in whole on an earlier date, in which event the commitment fee for the period to the date of such termination in whole shall be paid on the date of such termination.

(b)    *Letter of Credit Fees.* On the last day of each month of each year (commencing on the first such date occurring after the date hereof) to and including, and on, the Revolving Credit Termination Date, Borrower shall pay to Bank a letter of credit fee at the rate per annum equal to 1.0% per annum (computed on the basis of a year of 360 days and the actual number of days elapsed) on the daily average face amount of Letters of Credit outstanding during the preceding month. In addition to such letter of credit fee, Borrower further agrees to pay to Bank such issuing, processing, transaction and other fees and charges as Bank from time to time customarily imposes in connection with any issuance, amendment, cancellation, negotiation, and/or payment of letters of credit and drafts drawn thereunder.

(c)    *Audit Fees.* Borrower shall pay to Bank charges for audits of the Collateral performed by Bank or its agents or representatives in such amounts as Bank may from time to time request (Bank acknowledging and agreeing that such charges shall be computed in the same manner as it at the time customarily uses for the assessment of charges for similar collateral audits); *provided* that in the absence of any Default and Event of Default, Borrower shall not be required to pay Bank for more than one (1) such audit per calendar year.

*Section 2.12    Place and Application of Payments.*

All payments of principal, interest, fees, Hedging Liability and all other Obligations payable under the Loan Documents shall be made to Bank at its office at 111 West Monroe Street, Chicago, Illinois (or at such other place as Bank may specify) no later than 1:00 p.m. on the date any such payment is due and payable. Payments received by Bank after 1:00 p.m. shall be deemed received as of the opening of business on the next Business Day. All such payments shall be made in lawful money of the United States of America, in immediately available funds at

the place of payment, without set-off or counterclaim and without reduction for, and free from, any and all present or future taxes, levies, imposts, duties, fees, charges, deductions, withholdings, restrictions, and conditions of any nature imposed by any government or any political subdivision or taxing authority thereof (but excluding any taxes imposed on or measured by the net income of Bank). All payments shall be applied (i) first, towards payment of interest and fees then due hereunder and under the other Loan Documents, and (ii) second, towards payment of principal. Unless Borrower otherwise directs, principal payments shall be applied first to the relevant Base Rate Loan until payment in full thereof, second to the relevant Daily LIBOR Rate Loan until payment in full thereof, with any balance applied to the relevant Eurodollar Loan in the order in which their Interest Periods expire. Borrower hereby irrevocably authorizes Bank to (a) charge from time to time any of Borrower's deposit accounts with Bank and/or (b) make Revolving Loans from time to time hereunder (and any such Revolving Loan may be made by Bank hereunder without regard to the provisions of Section 4 hereof), in each case for payment of any Obligation then due and payable (whether such Obligation is for interest then due on a Loan, a Reimbursement Obligation or otherwise); provided that Bank shall not be under any obligation to charge any such deposit account or make any such Revolving Loan under this Section, and Bank shall incur no liability to Borrower or any other Person for its failure to do so.

Section 2.13    Commitment Terminations.

(a)      Optional Revolving Credit Terminations.   Borrower shall have the right at any time and from time to time, upon five (5) Business Days prior written notice to Bank (or such shorter period of time agreed to by Bank), to terminate the Revolving Credit Commitment without premium or penalty and in whole or in part, any partial termination to be in an amount not less than $500,000; provided that the Revolving Credit Commitment may not be reduced to an amount less than the sum of the aggregate principal amount of Revolving Loans and L/C Obligations then outstanding. Any termination of the Revolving Credit Commitment below the L/C Sublimit then in effect shall reduce the L/C Sublimit by a like amount.

(b)      Any termination of the Commitments pursuant to this Section 2.13 may not be reinstated.

Section 2.14    Sweep to Loan Arrangement.
So long as a Sweep to Loan Arrangement is in effect, and subject to the terms and conditions thereof, Revolving Loans may be advanced and prepaid hereunder notwithstanding any notice, minimum amount, or funding and payment location requirements hereunder for any advance of Revolving Loans or for any prepayment of any Revolving Loans. The making of any such Revolving Loans shall otherwise be subject to the other terms and conditions of this Agreement. All Revolving Loans advanced or prepaid pursuant to such Sweep to Loan Arrangement shall be Base Rate Loans. Bank shall have the right in its sole discretion to suspend or terminate the making and/or prepayment of Revolving Loans pursuant to such Sweep to Loan Arrangement with notice to Borrower (which may be provided on a same-day basis), whether or not any Default or Event of Default exists. Bank shall not be liable to Borrower or any other Person for any losses directly or indirectly resulting from events beyond Bank's reasonable control, including any interruption of communications or data processing services or legal restriction or

for any special, indirect, consequential or punitive damages in connection with any Sweep to Loan Arrangement.

## SECTION 3.  CHANGE IN CIRCUMSTANCES.

*Section 3.1     Withholding Taxes.*  Except as otherwise required by law, each payment by Borrower under this Agreement or the other Loan Documents shall be made without withholding for or on account of any present or future taxes (other than overall net income taxes on the recipient) imposed by or within the jurisdiction in which Borrower is domiciled, any jurisdiction from which Borrower makes any payment, or (in each case) any political subdivision or taxing authority thereof or therein.  If any such withholding is so required, Borrower shall make the withholding, pay the amount withheld to the appropriate Governmental Authority before penalties attach thereto or interest accrues thereon, and forthwith pay such additional amount as may be necessary to ensure that the net amount actually received by Bank free and clear of such taxes (including such taxes on such additional amount) is equal to the amount that Bank would have received had such withholding not been made.  If Bank pays any amount in respect of any such taxes, penalties or interest, Borrower shall reimburse Bank for that payment on demand in the currency in which such payment was made.  If Borrower pays any such taxes, penalties or interest, it shall deliver official tax receipts evidencing that payment or certified copies thereof to Bank on or before the thirtieth day after payment.

*Section 3.2     Documentary Taxes.*     Borrower agrees to pay on demand any documentary, stamp or similar taxes payable in respect of this Agreement or any other Loan Document, including interest and penalties, in the event any such taxes are assessed, irrespective of when such assessment is made and whether or not any credit is then in use or available hereunder.

*Section 3.3     Funding Indemnity.*  If Bank shall incur any loss, cost or expense (including any loss, cost or expense incurred by reason of the liquidation or re-employment of deposits or other funds acquired by Bank to fund or maintain any Eurodollar Loan or the relending or reinvesting of such deposits or amounts paid or prepaid to Bank) as a result of:

(i)      any payment, prepayment or conversion of a Eurodollar Loan on a date other than the last day of its Interest Period,

(ii)     any failure (because of a failure to meet the conditions of <u>Section 4</u> or otherwise) by Borrower to borrow or continue a Eurodollar Loan, or to convert a Loan into a Eurodollar Loan, on the date specified in a notice given pursuant to <u>Section 2.6(a)</u>,

(iii)    any failure by Borrower to make any payment of principal on any Eurodollar Loan when due (whether by acceleration or otherwise), or

(iv)     any acceleration of the maturity of a Eurodollar Loan as a result of the occurrence of any Event of Default hereunder,

-32-

(v)     then, upon the demand of Bank, Borrower shall pay to Bank such amount as will reimburse Bank for such loss, cost or expense.  If Bank makes such a claim for compensation, it shall provide to Borrower a certificate setting forth the amount of such loss, cost or expense in reasonable detail and the amounts shown on such certificate shall be conclusive and binding on Borrower absent manifest error.

(b)   Reserved.

Section 3.4    *Change of Law*.  Notwithstanding any other provisions of this Agreement or any other Loan Document, if at any time any Change in Law or regulation or in the interpretation thereof makes it unlawful for Bank to make or continue to maintain any Daily LIBOR Rate Loans or Eurodollar Loans or to perform its obligations as contemplated hereby, Bank shall promptly give notice thereof to Borrower and Bank's obligations to make or maintain such Daily LIBOR Rate Loans or Eurodollar Loans under this Agreement shall be suspended until it is no longer unlawful for Bank to make or maintain such Daily LIBOR Rate Loans or such Eurodollar Loans.  Borrower shall prepay on demand the outstanding principal amount of any such affected Daily LIBOR Rate Loans or Eurodollar Loans, together with all interest accrued thereon and all other amounts then due and payable to Bank under this Agreement; *provided*, subject to all of the terms and conditions of this Agreement, Borrower may then elect to borrow the principal amount of the affected Daily LIBOR Rate Loans or Eurodollar Loans by means of Base Rate Loans.

Section 3.5    *Unavailability of Deposits or Inability to Ascertain, or Inadequacy of, LIBOR*.  If on or prior to the first day of any Interest Period for any Borrowing of Eurodollar Loans:

(a)     Bank determines that deposits in U.S. Dollars (in the applicable amounts) are not being offered to it in the interbank eurodollar market for such Interest Period, or that by reason of circumstances affecting the interbank eurodollar market adequate and reasonable means do not exist for ascertaining the applicable LIBOR, or

(b)     Bank determines that (i) LIBOR as determined hereby will not adequately and fairly reflect the cost to Bank of funding their Eurodollar Loans for such Interest Period or (ii) that the making or funding of Eurodollar Loans become impracticable,

then Bank shall forthwith give notice thereof to Borrower, whereupon until Bank notifies Borrower that the circumstances giving rise to such suspension no longer exist, the obligations of Bank to create, continue, or effect by conversion Eurodollar Loans shall be suspended.

Section 3.6    *Increased Cost and Reduced Return*.  If, on or after the date hereof, any Change in Law:

(i)     shall subject Bank (or its lending branch) to any tax, duty or other charge with respect to its Daily LIBOR Rate Loans, Eurodollar Loans, its Notes, its Letter(s) of Credit, any Reimbursement Obligations owed to it or its obligation to make Daily LIBOR Rate Loans, Eurodollar Loans or issue a Letter of Credit, or shall change the basis of

taxation of payments to Bank (or its lending branch) of the principal of or interest on its Daily LIBOR Rate Loans, Eurodollar Loans or Letter(s) of Credit, or any other amounts due under this Agreement or any other Loan Document in respect of its Daily LIBOR Rate Loans, Eurodollar Loans or Letter(s) of Credit, any Reimbursement Obligations owed to it, or its obligation to make Daily LIBOR Rate Loans, Eurodollar Loans, or issue a Letter of Credit (except for changes in the rate of tax on the overall net income of Bank (or its lending branch) imposed by the jurisdiction in which Bank's principal executive office or lending branch is located); or

(ii) shall impose, modify or deem applicable any reserve, special deposit or similar requirement (including any such requirement imposed by the Board of Governors of the Federal Reserve System, but excluding with respect to any Eurodollar Loans any such requirement included in an applicable Eurodollar Reserve Percentage) against assets of, deposits with or for the account of, or credit extended by, Bank (or its lending branch) or shall impose on Bank (or its lending branch) or on the interbank market any other condition affecting its Daily LIBOR Rate Loans, Eurodollar Loans, its Notes, its Letter(s) of Credit, any Reimbursement Obligation owed to it, or its obligation to make Daily LIBOR Rate Loans, Eurodollar Loans, or to issue a Letter of Credit;

and the result of any of the foregoing is to increase the cost to Bank (or its lending branch) of making or maintaining any Daily LIBOR Rate Loans or Eurodollar Loan or issuing or maintaining a Letter of Credit, or to reduce the amount of any sum received or receivable by Bank (or its lending branch) under this Agreement or under any other Loan Document with respect thereto, by an amount deemed by Bank to be material, then, within 15 days after demand by Bank, Borrower shall be obligated to pay to Bank such additional amount or amounts as will compensate Bank for such increased cost or reduction.

(b) If, after the date hereof, Bank shall have determined that any Change in Law has had the effect of reducing the rate of return on Bank's capital as a consequence of its obligations hereunder to a level below that which Bank could have achieved but for such Change in Law (taking into consideration Bank's policies with respect to capital adequacy) by an amount deemed by Bank to be material, then from time to time, within 15 days after demand by Bank, Borrower shall pay to Bank such additional amount or amounts as will compensate Bank for such reduction.

(c) A certificate of Bank claiming compensation under this Section 3.6 and setting forth the additional amount or amounts to be paid to it hereunder shall be conclusive absent manifest error. In determining such amount, Bank may use any reasonable averaging and attribution methods.

Section 3.7    Lending Offices. Bank may, at its option, elect to make its Loans hereunder at the branch, office or affiliate specified on the appropriate signature page hereof for each type of Loan available hereunder or at such other of its branches, offices or affiliates as it may from time to time elect. To the extent reasonably possible, Bank shall designate an alternative branch or funding office with respect to its Eurodollar Loans to reduce any liability of

Borrower to Bank under <u>Section 3.6</u> or to avoid the unavailability of Eurodollar Loans under <u>Section 3.5</u>, so long as such designation is not otherwise disadvantageous to Bank.

    *Section 3.8    Discretion of Bank as to Manner of Funding.* Notwithstanding any other provision of this Agreement, Bank shall be entitled to fund and maintain its funding of all or any part of its Loans in any manner it sees fit, it being understood, however, that for the purposes of this Agreement all determinations hereunder with respect to Eurodollar Loans shall be made as if Bank had actually funded and maintained each Eurodollar Loan through the purchase of deposits in the interbank eurodollar market having a maturity corresponding to such Loan's Interest Period, and, in the case of any Eurodollar Loan, bearing an interest rate equal to LIBOR for such Interest Period.

## SECTION 4. CONDITIONS PRECEDENT.

    *Section 4.1    Initial Credit Event.* The obligation of Bank to participate in any initial Credit Event hereunder is subject to satisfaction or waiver by Bank of the following conditions precedent:

    (a)    Bank shall have received each of the following, in each case (i) duly executed by all applicable parties, (ii) dated a date satisfactory to Bank and (iii) in form and substance satisfactory to Bank:

    (i)    this Agreement duly executed by Borrower and Bank;

    (ii)    duly executed Notes of Borrower dated the date hereof and otherwise in compliance with the provisions of <u>Section 2.10(c)</u>;

    (iii)    the Guaranty, Security Agreement, the Pledge Agreement, and each of the other Collateral Documents required by Bank, together with (i) original stock certificates or other similar instruments or securities representing all of the issued and outstanding shares of capital stock or other equity interests in each of the entities being pledged as of the Closing Date, (ii) stock powers for the Collateral consisting of the stock or other equity interest in each entity being pledged, executed in blank and undated, (iii) UCC financing statements to be filed against Borrower and each Subsidiary, as debtor, in favor of Bank, as secured party, (iv) patent, trademark, and copyright collateral agreements to the extent requested by Bank, and (v) deposit account, securities account, and commodity account control agreements to the extent requested by Bank;

    (iv)    a duly executed (a) Subordination Agreement of even date herewith by and between Gaughan Trust and Bank, together with copies of the subordinated note and any other loan documents executed in connection therewith, and (b) a duly executed third party lender agreement or similarly titled document with respect to the SBA Loans;

    (v)    evidence of all insurance required to be maintained under the Loan Documents;

(vi)        copies of Borrower's and each Subsidiary's articles of incorporation and bylaws (or comparable organizational documents) and any amendments thereto, certified in each instance by its Secretary or Assistant Secretary;

(vii)        copies of resolutions of Borrower's and each Subsidiary's Board of Directors (or similar governing body) authorizing the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party and the consummation of the transactions contemplated hereby and thereby, together with specimen signatures of the persons authorized to execute such documents on Borrower's and each Subsidiary's behalf, all certified in each instance by its Secretary or Assistant Secretary;

(viii)        such documents and certifications as Bank may reasonably require to evidence that Borrower and each Subsidiary is validly existing, in good standing, and qualified to engage in business in its jurisdiction of organization and in any other jurisdiction in which the nature of Borrower's or such Subsidiary's business requires such qualification;

(ix)        a list of Borrower's Authorized Representatives;

(x)        such evaluations and certifications as it may reasonably require in order to satisfy itself as to the value of the Collateral, the financial condition of Borrower and its Subsidiaries, and the lack of material contingent liabilities of Borrower and its Subsidiaries;

(xi)        a Borrowing Base certificate in the form attached hereto as <u>Exhibit B</u> showing the computation of the Borrowing Base in reasonable detail as of the close of business on April 30, 2017;

(xii)        financing statement, tax, and judgment lien search results against the Property of Borrower and each Subsidiary evidencing the absence of Liens on its Property except as permitted by <u>Section 7.2</u>;

(xiii)        pay off and lien release letters from secured creditors of Borrower and each Subsidiary setting forth, among other things, the total amount of indebtedness outstanding and owing to them (or outstanding letters of credit issued for the account of Borrower or any Subsidiary) and containing an undertaking to cause to be delivered to Bank UCC termination statements and any other lien release instruments necessary to release their Liens on the assets of Borrower and each Subsidiary;

(xiv)        evidence reasonably satisfactory to Bank that all indebtedness to creditors referenced in the preceding paragraph has been (or concurrently with the initial Borrowing will be) paid in full, and that all agreements and instruments governing indebtedness and that all Liens securing such indebtedness have been (or concurrently with the initial Borrowing will be) terminated.

(xv)        a favorable written opinion of counsel to Borrower and each Subsidiary;

(xvi)    a fully executed Internal Revenue Service Form W-9 for Borrower; and

(xvii)    such other agreements, instruments, documents, certificates, and opinions as Bank may reasonably request.

(b)    Bank shall have received the initial fees called for by <u>Section 2.11</u>, together with all other fees, costs and expenses required to be paid by Borrower at or before closing;

(c)    the capital and organizational structure of Borrower and its Subsidiaries shall be satisfactory to Bank; and

(d)    Borrower shall provide proof, in form and substance satisfactory to Bank, that EBITDA as of March 31, 2017, calculated on a trailing twelve month basis, is not less than $4,500,000.00

*Section 4.2    All Credit Events.*  The obligation of Bank to participate in any Credit Event (including any initial Credit Event) hereunder is subject to the following conditions precedent:

(a)    each of the representations and warranties set forth herein and in the other Loan Documents shall be and remain true and correct in all respect (or in all material respect if such representation or warranty is not by its terms already qualified as to materiality) as of said time, except to the extent the same expressly relate to an earlier date, in which case such representations and warranties shall be and remain true and correct in all respect (or in all material respect if such representation or warranty is not by its terms already qualified as to materiality) as of such earlier date;

(b)    no Default or Event of Default shall have occurred and be continuing or would occur as a result of such Credit Event;

(c)    in the case of a Borrowing, Bank shall have received the notice required by <u>Section 2.6</u>; in the case of the issuance of any Letter of Credit, Bank shall have received a duly completed Application for such Letter of Credit together with any fees called for by <u>Section 2.11</u>; and, in the case of an extension or increase in the amount of a Letter of Credit, Bank shall have received a written request therefor in a form acceptable to Bank together with fees called for by <u>Section 2.11</u>;

(d)    after giving effect to such Credit Event, the sum of the aggregate principal amount of Revolving Loans and L/C Obligations at any time outstanding shall not exceed the lesser of (i) the Revolving Credit Commitment in effect at such time and (ii) the Borrowing Base; and

(e)    such Credit Event shall not violate any order, judgment or decree of any court or other authority or any provision of law or regulation applicable to Bank (including Regulation U of the Board of Governors of the Federal Reserve System) as then in effect.

Each request for a Borrowing hereunder and each request for the issuance of, increase in the amount of, or extension of the expiration date of, a Letter of Credit shall be deemed to be a representation and warranty by Borrower on the date on such Credit Event as to the facts specified in subsections (a) through (e) of this Section; *provided* that Bank may continue to make advances under the Revolving Credit Commitment, in the sole discretion of Bank, notwithstanding the failure of Borrower to satisfy one or more of the conditions set forth above and any such advances so made shall not be deemed a waiver of any Default or Event of Default or other condition set forth above that may then exist.

## SECTION 5. REPRESENTATIONS AND WARRANTIES.

Borrower represents and warrants to Bank as follows:

*Section 5.1    Organization and Qualification.*   Borrower is (a) validly existing, and in good standing as a corporation under the laws of the State of Illinois, (b) has full and adequate power to own its Property and conduct its business as now conducted, and (c) is duly licensed or qualified and in good standing in each jurisdiction in which the nature of the business conducted by it or the nature of the Property owned or leased by it requires such licensing or qualifying, except, with respect to this clause (c), where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

*Section 5.2    Subsidiaries.*   Each Subsidiary (a) is validly existing, and in good standing under the laws of the jurisdiction in which it is organized, (b) has full and adequate power to own its Property and conduct its business as now conducted, and (c) is duly licensed or qualified and in good standing in each jurisdiction in which the nature of the business conducted by it or the nature of the Property owned or leased by it requires such licensing or qualifying, except, with respect to this clause (c), where the failure to do so could not reasonably be expected to have a Material Adverse Effect. Schedule 5.2 hereto identifies each Subsidiary, the jurisdiction of its organization, the percentage of issued and outstanding shares of each class of its capital stock or other equity interests owned by Borrower and the other Subsidiaries and, if such percentage is not 100% (excluding directors' qualifying shares as required by law), a description of each class of its authorized capital stock and other equity interests and the number of shares of each class issued and outstanding. All of the outstanding shares of capital stock and other equity interests of each Subsidiary are validly issued and outstanding and fully paid and non-assessable and all such shares and other equity interests indicated on Schedule 5.2 as owned by Borrower or another Subsidiary are owned, beneficially and of record, by Borrower or such Subsidiary free and clear of all Liens other than the Liens granted in favor of Bank pursuant to the Collateral Documents or permitted under Section 7.2. There are no outstanding commitments or other obligations of any Subsidiary to issue, and no options, warrants or other rights of any Person to acquire, any shares of any class of capital stock or other equity interests of any Subsidiary.

*Section 5.3    Authority and Validity of Obligations.*   Borrower has full right and authority to enter into this Agreement and the other Loan Documents executed by it, to make the borrowings herein provided for, to grant to Bank the Liens described in the Collateral Documents executed by Borrower, and to perform all of its obligations hereunder and under the other Loan Documents executed by it. Each Subsidiary has full right and authority to enter into the Loan

Documents executed by it, to guarantee the Obligations, to grant to Bank the Liens described in the Collateral Documents executed by such Person, and to perform all of its obligations under the Loan Documents executed by it.   The Loan Documents delivered by Borrower and its Subsidiaries have been duly authorized, executed, and delivered by such Persons and constitute valid and binding obligations of Borrower and its Subsidiaries enforceable against them in accordance with their terms, except as enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance or similar laws affecting creditors' rights generally and general principles of equity (regardless of whether the application of such principles is considered in a proceeding in equity or at law); and this Agreement and the other Loan Documents do not, nor does the performance or observance by Borrower or any Subsidiary of any of the matters and things herein or therein provided for, (a) contravene or constitute a default under any provision of law or any judgment, injunction, order or decree binding upon Borrower or any Subsidiary or any provision of the organizational documents (e.g., charter, certificate or articles of incorporation and bylaws, certificate or articles of association and operating agreement, partnership agreement, or other similar organizational documents) of Borrower or any Subsidiary, (b) conflict with, contravene or constitute a default under any material indenture or agreement of or affecting Borrower or any Subsidiary or any of their Property, or (c) result in the creation or imposition of any Lien on any Property of Borrower or any Subsidiary other than the Liens granted in favor of Bank pursuant to the Collateral Documents.

Section 5.4    *Use of Proceeds; Margin Stock.*   Borrower shall use the proceeds of the Term Loans and a portion of the proceeds of the Revolving Loan to (a) make an intercompany loan to Santa Fe Property on the Closing Date evidenced by the Santa Fe Property Note in an amount not to exceed $527,643 which shall be used concurrently to refinance Santa Fe Property's existing mortgage loan in full, and (b) refinance all existing indebtedness due and owing by Borrower to First Midwest Bank and CAPX FUND IV, L.P., and, (c) subject to the conditions set forth in Section 7.3(f) make a loan to Gaughan in the amount of $600,000 to replace a loan to Gaughan of the same amount that was offset against indebtedness owed by Gaughan to the Borrower, and (d) subject to the conditions set forth in Section 7.6, pay the Special Gaughan Dividend, and (e) make the loan to Santa Fe Property to be evidenced by the Santa Fe Property Note.  Borrower may also use the proceeds of Revolving Loans for its general working capital purposes and for such other general corporate purposes as are consistent with all applicable laws.  Neither Borrower nor any Subsidiary is engaged, principally or as one of its important activities, in the business of purchasing or carrying margin stock or in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System), and no part of the proceeds of any Loan or any other extension of credit made hereunder will be used to purchase or carry any such margin stock or to extend credit to others for the purpose of purchasing or carrying any such margin stock.  Margin stock (as hereinabove defined) constitutes less than 25% of the assets of Borrower and its Subsidiaries which are subject to any limitation on sale, pledge or other restriction hereunder.

Section 5.5    *Financial Reports.*   The consolidated draft balance sheet of Borrower and its Subsidiaries as at December 31, 2016, and the related consolidated draft statements of income, retained earnings and cash flows of Borrower and its Subsidiaries for the fiscal year then ended, and accompanying notes thereto, which financial statements are accompanied by the draft

review report of MPS CPA, independent public accountants, and the unaudited interim consolidated balance sheet of Borrower and its Subsidiaries as at March 31, 2017, and the related consolidated statements of income, retained earnings and cash flows of Borrower and its Subsidiaries for the three (3) months then ended, heretofore furnished to Bank, fairly present in all material respects the consolidated financial condition of Borrower and its Subsidiaries as at said dates and the consolidated results of their operations and cash flows for the periods then ended in conformity with GAAP applied on a consistent basis. Neither Borrower nor any Subsidiary has contingent liabilities which are material to it other than as indicated on such financial statements or, with respect to future periods, on the financial statements furnished pursuant to Section 6.5. As soon as available, but not later than thirty (30) days after the date of this Agreement, Borrower shall deliver to Bank Borrower's final December 31, 2016 reviewed financial statements. If such statements reflect any material and adverse changes, as determined by Bank in its sole discretion, from the draft statements previously delivered to Bank, then Borrower shall be in default hereunder and an Event of Default shall be deemed to have occurred.

Section 5.6  *No Material Adverse Change.*  Since December 31, 2016, there has been no change in the condition (financial or otherwise) or business prospects of Borrower or any Subsidiary except those occurring in the ordinary course of business, none of which individually or in the aggregate could reasonably be expected to have a Material Adverse Effect.

Section 5.7  *Full Disclosure.* The material statements and information furnished to Bank in connection with the negotiation of this Agreement and the other Loan Documents and the commitments by Bank to provide all or part of the financing contemplated hereby do not contain any untrue statements of a material fact or omit a material fact necessary to make the statements contained herein or therein not misleading, Bank acknowledging that as to any projections furnished to Bank, Borrower only represents that the same were prepared on the basis of information and estimates Borrower believed to be reasonable.

Section 5.8  *Trademarks, Franchises, and Licenses.* Borrower and its Subsidiaries own, possess, or have the right to use all necessary patents, licenses, franchises, trademarks, trade names, trade styles, copyrights, trade secrets, know how, and confidential commercial and proprietary information to conduct their businesses as now conducted, in all material respects, without known conflict with any patent, license, franchise, trademark, trade name, trade style, copyright or other proprietary right of any other Person.

Section 5.9  *Governmental Authority and Licensing.* Borrower and its Subsidiaries have received all licenses, permits, and approvals of all Governmental Authorities, if any, necessary to conduct their businesses, in each case except where the failure to obtain or maintain the same could not reasonably be expected to have a Material Adverse Effect. No investigation or proceeding is pending or, to the knowledge of Borrower, threatened, before or by any Governmental Authority that could reasonably be expected to have a Material Adverse Effect.

Section 5.10  *Good Title.* Borrower and its Subsidiaries have good and defensible title (or valid leasehold interests) to their assets as reflected on the most recent consolidated balance sheet of Borrower and its Subsidiaries furnished to Bank (except for sales of assets in the

ordinary course of business), subject to no Liens other than such thereof as are permitted by Section 7.2.

Section 5.11   *Litigation and Other Controversies.* There is no litigation or governmental or arbitration proceeding or labor controversy pending, nor to the knowledge of Borrower threatened, against Borrower or any Subsidiary or any of their Property which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 5.12   *Taxes.* All tax returns required to be filed by Borrower or any Subsidiary in any jurisdiction have, in fact, been filed, or valid extensions have been filed, and all material taxes, assessments, fees, and other governmental charges upon Borrower or any Subsidiary or upon any of its Property, income or franchises, which are shown to be due and payable in such returns, have been paid, except such taxes, assessments, fees and governmental charges, if any, as are being contested in good faith and by appropriate proceedings which prevent enforcement of the matter under contest and as to which adequate reserves established in accordance with GAAP have been provided.  Borrower does not know of any proposed additional tax assessment against it or its Subsidiaries for which adequate provisions in accordance with GAAP have not been made on their accounts.  Adequate provisions in accordance with GAAP for taxes on the books of Borrower and each Subsidiary have been made for all open years, and for its current fiscal period.

Section 5.13   *Approvals.* No authorization, consent, license or exemption from, or filing or registration with, any court or Governmental Authority, nor any approval or consent of any other Person, is or will be necessary to the valid execution, delivery or performance by Borrower or any Subsidiary of any Loan Document, except for such approvals which have been obtained prior to the date of this Agreement and remain in full force and effect.

Section 5.14   *Affiliate Transactions.* Except as set forth on Schedule 5.14, neither Borrower nor any Subsidiary is a party to any contracts or agreements with any of its Affiliates on terms and conditions which are less favorable to Borrower or such Subsidiary than would be usual and customary in similar contracts or agreements between Persons not affiliated with each other.

Section 5.15   *Investment Company.* Neither Borrower nor any Subsidiary is an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

Section 5.16   *ERISA.* Borrower and each other member of its Controlled Group has fulfilled its obligations under the minimum funding standards of and is in compliance in all material respects with ERISA and the Code to the extent applicable to it and has not incurred any liability to the PBGC or a Plan under Title IV of ERISA other than a liability to the PBGC for premiums under Section 4007 of ERISA. Neither Borrower nor any Subsidiary has any contingent liabilities with respect to any post-retirement benefits under a Welfare Plan, other than liability for continuation coverage described in article 6 of Title I of ERISA.

Section 5.17   *Compliance with Laws.*

(a)    Borrower and its Subsidiaries are in compliance with the requirements of all federal, state and local laws, rules and regulations applicable to or pertaining to their Property or business operations (including the Occupational Safety and Health Act of 1970, the Americans with Disabilities Act of 1990, and laws and regulations establishing quality criteria and standards for air, water, land and toxic or hazardous wastes and substances), except for any such noncompliance that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(b)    Without limiting the representations and warranties set forth in Section 5.17(a) above, except for such matters, individually or in the aggregate, which could not reasonably be expected to result in a Material Adverse Effect, Borrower represents and warrants that: (i) Borrower and its Subsidiaries, and each of the Premises, comply in all material respects with all applicable Environmental Laws; (ii) Borrower and its Subsidiaries have obtained all governmental approvals required for their operations and each of the Premises by any applicable Environmental Law; (iii) Borrower and its Subsidiaries have not, and Borrower has no knowledge of any other Person who has, caused any Release, threatened Release or disposal of any Hazardous Material at, on, about, or off any of the Premises in any material quantity and, to the knowledge of Borrower, none of the Premises are adversely affected by any Release, threatened Release or disposal of a Hazardous Material originating or emanating from any other property; (iv)· none of the Premises contain and have contained any: (1) underground storage tank, (2) material amounts of asbestos containing building material, (3) landfills or dumps, (4) hazardous waste management facility as defined pursuant to RCRA or any comparable state law, or (5) site on or nominated for the National Priority List promulgated pursuant to CERCLA or any state remedial priority list promulgated or published pursuant to any comparable state law; (v) Borrower and its Subsidiaries have not used a material quantity of any Hazardous Material and have conducted no Hazardous Material Activity at any of the Premises; (vi) Borrower and its Subsidiaries have no material liability for response or corrective action, natural resource damage or other harm pursuant to CERCLA, RCRA or any comparable state law; (vii) Borrower and its Subsidiaries are not subject to, have no notice or knowledge of and are not required to give any notice of any Environmental Claim involving Borrower or any Subsidiary or any of the Premises, and there are no conditions or occurrences at any of the Premises which could reasonably be anticipated to form the basis for an Environmental Claim against Borrower or any Subsidiary or such Premises; (viii) none of the Premises are subject to any, and Borrower has no knowledge of any imminent restriction on the ownership, occupancy, use or transferability of the Premises in connection with any (1) Environmental Law or (2) Release, threatened Release or disposal of a Hazardous Material; and (ix) there are no conditions or circumstances at any of the Premises which pose an unreasonable risk to the environment or the health or safety of Persons.

*Section 5.18    OFAC.*  (a) Borrower is in compliance with the requirements of all OFAC Sanctions Programs applicable to it, (b) each Subsidiary of Borrower is in compliance with the requirements of all OFAC Sanctions Programs applicable to such Subsidiary, (c) Borrower has provided to Bank all information regarding Borrower and its Affiliates and Subsidiaries necessary for Bank to comply with all applicable OFAC Sanctions Programs, and (d) to the best of Borrower's knowledge, neither Borrower nor any of its Affiliates or Subsidiaries is, as of the date hereof, named on the current OFAC SDN List.

*Section 5.19    Other Agreements.*  Neither Borrower nor any Subsidiary is in default under the terms of any covenant, indenture or agreement of or affecting such Person or any of its Property, except for any such default that could not reasonably be expected to have a Material Adverse Effect.

*Section 5.20    Solvency.*  Borrower and its Subsidiaries are solvent, able to pay their debts as they become due, and have sufficient capital to carry on their business and all businesses in which they are about to engage.

*Section 5.21    No Default.*  No Default or Event of Default has occurred and is continuing.

*Section 5.22    No Broker Fees.*  No broker's or finder's fee or commission will be payable with respect hereto or any of the transactions contemplated hereby; and Borrower hereby agrees to indemnify Bank against, and agree that they will hold Bank harmless from, any claim, demand, or liability for any such broker's or finder's fees alleged to have been incurred in connection herewith or therewith and any expenses (including reasonable attorneys' fees) arising in connection with any such claim, demand, or liability.

## SECTION 6.  AFFIRMATIVE COVENANTS.

So long as all or any portion of the Commitments remains outstanding or any Obligations hereunder remain outstanding, Borrower agrees that:

*Section 6.1    Maintenance of Business.*  Borrower shall, and shall cause each Subsidiary to, preserve and maintain its existence.  Borrower shall, and shall cause each Subsidiary to, preserve and keep in force and effect all licenses, permits, franchises, approvals, patents, trademarks, trade names, trade styles, copyrights, and other proprietary rights necessary to the proper conduct of its business, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

*Section 6.2    Maintenance of Properties.*  Borrower shall, and shall cause each Subsidiary to, maintain, preserve, and keep its property, plant, and equipment in good repair, working order and condition (ordinary wear and tear excepted), and shall from time to time make all needful and proper repairs, renewals, replacements, additions, and betterments thereto so that at all times the efficiency thereof shall be fully preserved and maintained, in each case except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

*Section 6.3    Taxes and Assessments.*  Borrower shall duly pay and discharge, and shall cause each Subsidiary to duly pay and discharge, all taxes, rates, assessments, fees, and governmental charges upon or against it or its Property, in each case before the same become delinquent and before penalties accrue thereon, unless and to the extent that the same are being contested in good faith and by appropriate proceedings which prevent enforcement of the matter under contest and adequate reserves are provided therefor.

Section 6.4    *Insurance*.  Borrower shall insure and keep insured, and shall cause each Subsidiary to insure and keep insured, with good and responsible insurance companies, all insurable Property owned by it which is of a character usually insured by Persons similarly situated and operating like Properties against loss or damage from such hazards and risks (including flood insurance with respect to any improvements on real Property consisting of building or parking facilities in an area designated by a governmental body as having special flood hazards), and in such amounts, as are insured by Persons similarly situated and operating like Properties, but in no event at any time in an amount less than the replacement value of the Collateral.  Borrower shall also maintain, and shall cause each Subsidiary to maintain, insurance with respect to the business of Borrower and its Subsidiaries, covering commercial general liability, statutory worker's compensation, and business interruption and such other risks with good and responsible insurance companies, in such amounts and on such terms as Bank shall reasonably request, but in any event as and to the extent usually insured by Persons similarly situated and conducting similar businesses.  Borrower shall in any event maintain insurance on the Collateral to the extent required by the Collateral Documents.  All such policies of insurance shall contain satisfactory lender's loss payable endorsements, naming Bank as a loss payee, assignee or additional insured, as appropriate, as its interest may appear, and showing only such other loss payees, assignees and additional insureds as are satisfactory to Bank.  Each policy of insurance or endorsement shall contain a clause requiring the insurer to give not less than 30 days' prior written notice to Bank in the event of cancellation of the policy for any reason whatsoever and a lender's loss payee endorsement.  Borrower shall deliver to Bank (a) on the date of this Agreement, and at such other times as Bank shall reasonably request, certificates evidencing the maintenance of insurance required hereunder, (b) prior to the termination of any such policies, certificates evidencing the renewal thereof, and (c) promptly following request by Bank, copies of all insurance policies of Borrower and its Subsidiaries.

Section 6.5    *Financial Reports*.  Borrower shall, and shall cause each Subsidiary to, maintain a standard system of accounting in accordance with GAAP and shall furnish to Bank and its duly authorized representatives such information respecting the business and financial condition of Borrower and each Subsidiary as Bank may reasonably request; and without any request, shall furnish, or cause to be furnished, to Bank:

(a)    as soon as available, and in any event no later than 20 days after the last day of each calendar month, a Borrowing Base Certificate showing the computation of the Borrowing Base in reasonable detail as of the close of business on the last day of such month, together with an accounts receivable and accounts payable aging, prepared by Borrower and certified to by its chief financial officer or another officer of Borrower acceptable to Bank;

(b)    as soon as available, and in any event no later than 45 days after the last day of each fiscal quarter of Borrower, including the fiscal quarter ending on the last day of the fiscal year of Borrower, a copy of the consolidated balance sheet of Borrower and its Subsidiaries as of the last day of such period and the consolidated statements of income, retained earnings, and cash flows of Borrower and its Subsidiaries for the fiscal quarter and the fiscal year-to-date period then ended, each in reasonable detail showing in comparative form the figures for the corresponding date and period in the previous fiscal year, prepared by Borrower in accordance with GAAP and certified to by its chief financial officer or such other officer acceptable to Bank;

(c)    (i) as soon as available, and in any event no later than 120 days after the last day of the fiscal year ending December 31, 2017, a copy of the consolidated balance sheet of Borrower and its Subsidiaries as of the close of such period and the consolidated statements of income, retained earnings, and cash flows of Borrower and its Subsidiaries for such period, and accompanying notes thereto, each in reasonable detail showing in comparative form the figures for the previous fiscal year, accompanied by a review letter issued by MPS CPA, independent public accountants ("MPS CPA") in accordance with the Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants; and (ii) as soon as available, and in any event no later than 120 days after the last day of each fiscal year of Borrower commencing with the fiscal year ending December 31, 2018, and each fiscal year thereafter, a copy of the consolidated balance sheet of Borrower and its Subsidiaries as of the close of such period and the consolidated statements of income, retained earnings, and cash flows of Borrower and its Subsidiaries for such period, and accompanying notes thereto, each in reasonable detail showing in comparative form the figures for the previous fiscal year, accompanied by an unqualified audit opinion thereon of MPS CPA or another firm of independent public accountants of recognized standing selected by Borrower and satisfactory to Bank, to the effect that the financial statements have been prepared in accordance with GAAP and present fairly in accordance with GAAP the consolidated financial condition of Borrower and its Subsidiaries as of the close of such fiscal year and the results of their operations and cash flows for the fiscal year then ended and that an examination of such accounts in connection with such financial statements has been made in accordance with generally accepted auditing standards and, accordingly, such examination included such tests of the accounting records and such other auditing procedures as were considered necessary in the circumstances;

(d)    with each of the financial statements delivered pursuant to subsections (b) and (c) above, a written certificate in the form attached hereto as Exhibit C signed by the chief financial officer of Borrower or another officer of Borrower acceptable to Bank to the effect that to the best of such officer's knowledge and belief no Default or Event of Default has occurred during the period covered by such statements or, if any such Default or Event of Default has occurred during such period, setting forth a description of such Default or Event of Default and specifying the action, if any, taken by Borrower or any Subsidiary to remedy the same. Such certificate shall also set forth the calculations supporting such statements in respect of Section 7.12 (Financial Covenants).

(e)    [Reserved]

(f)    as soon as available, and in any event no later than 60 days after the end of each fiscal year of Borrower, a copy of Borrower's operating budget for the current fiscal year, such operating budget to show Borrower's projected revenues, expenses and balance sheet on a quarter by quarter/month by month basis, such operating budget to be in reasonable detail prepared by Borrower and in form satisfactory to Bank (which shall include a summary of all material assumptions made in preparing such operating budget);

(g)    promptly after receipt thereof, any additional written reports, management letters or other detailed information contained in writing concerning significant aspects of Borrower's or

any Subsidiary's operations and financial affairs given to it by its independent public accountants;

(h)    as soon as available but in no event later than sixty (60) days after each calendar year-end, copies of Gaughan's year-end financial statements as of the last day of the prior calendar year.  As soon as available but in no event later than fifteen (15) days after the filing thereof, copies of Gaughan's (and Gaughan Trust's, if any) state and federal tax returns for each year, including all schedules and attachments thereto.

(i)    [Reserved]

(j)    promptly after receipt thereof, a copy of each audit made by any regulatory agency of the books and records of Borrower or any Subsidiary or of notice of any material noncompliance with any applicable law, regulation or guideline relating to Borrower or any Subsidiary, or its business; and

(k)    promptly after knowledge thereof shall have come to the attention of any responsible officer of Borrower, written notice of (i) any threatened or pending litigation or governmental or arbitration proceeding or labor controversy against Borrower or any Subsidiary or any of their Property which, if adversely determined, could reasonably be expected to have a Material Adverse Effect or (ii) the occurrence of any Default or Event of Default hereunder.

Section 6.6    Inspection.  Borrower shall, and shall cause each Subsidiary to, permit Bank and its duly authorized representatives and agents to visit and inspect any of its Property, corporate books, and financial records, to examine and make copies of its books of accounts and other financial records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers, employees and independent public accountants (and by this provision Borrower hereby authorizes such accountants to discuss with Bank the finances and affairs of Borrower and its Subsidiaries) at such reasonable times and intervals as Bank may designate.

Section 6.7    ERISA.  Borrower shall, and shall cause each Subsidiary to, promptly pay and discharge all obligations and liabilities arising under ERISA of a character which if unpaid or unperformed could reasonably be expected to result in the imposition of a Lien against any of its Property.  Borrower shall, and shall cause each Subsidiary to, promptly notify Bank of:  (a) the occurrence of any reportable event (as defined in ERISA) with respect to a Plan, (b) receipt of any notice from the PBGC of its intention to seek termination of any Plan or appointment of a trustee therefor, (c) its intention to terminate or withdraw from any Plan, and (d) the occurrence of any event with respect to any Plan which would result in the incurrence by Borrower or any Subsidiary of any material liability, fine or penalty, or any material increase in the contingent liability of Borrower or any Subsidiary with respect to any post retirement Welfare Plan benefit.

Section 6.8    Compliance with Laws.

(a)    Borrower shall, and shall cause each Subsidiary to, comply in all respects with the requirements of all federal, state, and local laws, rules, regulations, ordinances and orders

applicable to or pertaining to its Property or business operations, except where any such non-compliance, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect or result in a Lien upon any of its Property.

(b)    Without limiting the agreements set forth in Section 6.8(a) above, Borrower shall, and shall cause each Subsidiary to, at all times, do the following to the extent the failure to do so, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect: (i) comply in all material respects with, and maintain each of the Premises in compliance in all material respects with, all applicable Environmental Laws; (ii) require that each tenant and subtenant, if any, of any of the Premises or any part thereof comply in all material respects with all applicable Environmental Laws; (iii) obtain and maintain in full force and effect all material governmental approvals required by any applicable Environmental Law for operations at each of the Premises; (iv) cure any material violation by it or at any of the Premises of applicable Environmental Laws; (v) not allow the presence or operation at any of the Premises of any (1) landfill or dump or (2) hazardous waste management facility or solid waste disposal facility as defined pursuant to RCRA or any comparable state law; (vi) not manufacture, use, generate, transport, treat, store, release, dispose or handle any Hazardous Material at any of the Premises except in the ordinary course of its business in accordance with all applicable laws; (vii) within ten (10) Business Days notify Bank in writing of and provide any reasonably requested documents upon learning of any of the following in connection with Borrower or any Subsidiary or any of the Premises: (1) any material liability for response or corrective action, natural resource damage or other harm pursuant to CERCLA, RCRA or any comparable state law; (2) any material Environmental Claim; (3) any material violation of an Environmental Law or material Release, threatened Release or disposal of a Hazardous Material; (4) any new restriction on the ownership, occupancy, use or transferability arising pursuant to any (x) Release, threatened Release or disposal of a Hazardous Material or (y) Environmental Law; or (5) any environmental, natural resource, health or safety condition, which could reasonably be expected to have a Material Adverse Effect; (viii) conduct at its expense any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any material Release, threatened Release or disposal of a Hazardous Material as required by any applicable Environmental Law, (ix) abide by and observe any material restrictions on the use of the Premises imposed by any Governmental Authority as set forth in a deed or other instrument affecting Borrower's or any Subsidiary's interest therein; (x) promptly provide or otherwise make available to Bank any reasonably requested environmental record concerning the Premises which Borrower or any Subsidiary possesses or can reasonably obtain; and (xi) perform, satisfy, and implement any operation or maintenance actions required by any Governmental Authority or Environmental Law, or included in any no further action letter or covenant not to sue issued by any Governmental Authority under any Environmental Law.

*Section 6.9    Compliance with OFAC Sanctions Programs.*

(a)    Borrower shall at all times comply with the requirements of all OFAC Sanctions Programs applicable to Borrower and shall cause each of its Subsidiaries to comply with the requirements of all OFAC Sanctions Programs applicable to such Subsidiary.

(b)     Borrower shall provide Bank any information regarding Borrower, its Affiliates, and its Subsidiaries necessary for Bank to comply with all applicable OFAC Sanctions Programs; subject however, in the case of Affiliates, to Borrower's ability to provide information applicable to them.

(c)     If Borrower obtains actual knowledge or receives any written notice that Borrower, any Affiliate or any Subsidiary is named on the then current OFAC SDN List (such occurrence, an *"OFAC Event"*), Borrower shall promptly (i) give written notice to Bank of such OFAC Event, and (ii) comply with all applicable laws with respect to such OFAC Event (regardless of whether the party included on the OFAC SDN List is located within the jurisdiction of the United States of America), including the OFAC Sanctions Programs, and Borrower hereby authorizes and consents to Bank taking any and all steps Bank deems necessary, in its sole discretion, to avoid violation of all applicable laws with respect to any such OFAC Event, including the requirements of the OFAC Sanctions Programs (including the freezing and/or blocking of assets and reporting such action to OFAC).

*Section 6.10    Formation of Subsidiaries.* Borrower shall not, nor shall it permit any Subsidiary to, form or acquire any other Subsidiary.

*Section 6.11    Use of Proceeds; Margin Stock.* Borrower shall use the credit extended under this Agreement solely for the purposes set forth in, or otherwise permitted by, <u>Section 5.4</u>. Neither Borrower nor any Subsidiary will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock or in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System), and no part of the proceeds of any Loan or any other extension of credit made hereunder will be used to purchase or carry any such margin stock or to extend credit to others for the purpose of purchasing or carrying any such margin stock.

*Section 6.12    Guaranties and Collateral.* (a)     *Guaranties.*    The payment and performance of the Obligations shall at all times be guaranteed by Guarantors pursuant to one or more guaranty agreements in form and substance acceptable to Bank (as the same may be amended, restated, supplemented, or otherwise modified from time to time individually a *"Guaranty"* and collectively the *"Guaranties"*).

(b)     *Collateral.*    The Obligations shall be secured by valid, perfected, and enforceable Liens on all right, title, and interest of Borrower and each Subsidiary in all of their accounts, chattel paper, instruments, documents, general intangibles, letter of credit rights, supporting obligations, deposit accounts, investment property, inventory, equipment, fixtures, commercial tort claims, real estate and certain other Property, whether now owned or hereafter acquired or arising, and all proceeds thereof.  Borrower acknowledges and agrees that the Liens on the Collateral shall be valid and perfected first priority Liens in each case pursuant to one or more Collateral Documents from such Persons, each in form and substance satisfactory to Bank.

(c)     *Liens on Real Property.*    In the event that Borrower or any Subsidiary owns or hereafter acquires any real property, Borrower shall, or shall cause such Subsidiary to, execute

and deliver to Bank a mortgage or deed of trust acceptable in form and substance to Bank for the purpose of granting to Bank (or a security trustee therefor) a Lien on such real property to secure the Obligations, shall pay all taxes, costs, and expenses incurred by Bank in recording such mortgage or deed of trust, and shall supply to Bank at Borrower's cost and expense a survey, environmental report, hazard insurance policy, appraisal report, and a mortgagee's policy of title insurance from a title insurer acceptable to Bank insuring the validity of such mortgage or deed of trust and its status as a first Lien (subject to Liens expressly permitted by this Agreement) on the real property encumbered thereby and such other instrument, documents, certificates, and opinions reasonably required by Bank in connection therewith.

(d)    *Further Assurances.*    Borrower agrees that it shall, and shall cause each Subsidiary to, from time to time at the request of Bank, execute and deliver such documents and do such acts and things as Bank may reasonably request in order to provide for or perfect or protect Bank's Liens on the Collateral.

Section 6.13    *Refinance of Santa Fe Property Note.*
Borrower covenants and agrees that it shall, or it shall cause, within 120 days after the Closing Date, the existing mortgage indebtedness on the real property owned by Santa Fe Property to be refinanced by a loan from a third party lender, with 100% of the net cash proceeds to be used to repay the Santa Fe Property Note to Borrower together with a corresponding and concurrent payment from Borrower to Bank in an amount not less than $527,643. The failure of Borrower to cause the refinance of the real property owned by Santa Fe Property or to receive the proceeds therefrom to the extent required above within the time frame noted above shall be an Event of Default under this Agreement.

**SECTION 7. NEGATIVE COVENANTS.**

So long as all or any portion of the Commitments remains outstanding or any Obligations hereunder remain outstanding, Borrower agrees that:

Section 7.1    *Borrowings and Guaranties.*    Borrower shall not, nor shall it permit any Subsidiary to, issue, incur, assume, create or have outstanding any Indebtedness for Borrowed Money, or incur liabilities for interest rate, currency, or commodity cap, collar, swap, or similar hedging arrangements, or be or become liable as endorser, guarantor, surety or otherwise for any debt, obligation or undertaking of any other Person, or otherwise agree to provide funds for payment of the obligations of another, or supply funds thereto or invest therein or otherwise assure a creditor of another against loss, or apply for or become liable to the issuer of a letter of credit which supports an obligation of another, or subordinate any claim or demand it may have to the claim or demand of any other Person; *provided* that the foregoing shall not restrict nor operate to prevent:

(a)    the Obligations of Borrower and its Subsidiaries owing to Bank under the Loan Documents and other indebtedness and obligations of such Persons owing to Bank;

(b)      purchase money indebtedness and Capitalized Lease Obligations of Borrower and its Subsidiaries in an amount not to exceed $500,000 in the aggregate at any one time outstanding;

(c)      obligations of Borrower or any Subsidiary arising out of interest rate, foreign currency, and commodity hedging agreements entered into with financial institutions in connection with bona fide hedging activities in the ordinary course of business and not for speculative purposes;

(d)      endorsement of items for deposit or collection of commercial paper received in the ordinary course of business;

(e)      the SBA Loans; and

(f)      an unsecured guaranty by Borrower of a mortgage loan to be provided by a third party lender to Santa Fe Property provided Bank approves the underlying mortgage loan and guaranty documents and the terms of the lease between Santa Fe Property and Borrower.

*Section 7.2      Liens*.  Borrower shall not, nor shall it permit any Subsidiary to, create, incur or permit to exist any Lien of any kind on any Property owned by any such Person; *provided* that the foregoing shall not apply to nor operate to prevent:

(a)      Liens arising by statute in connection with worker's compensation, unemployment insurance, old age benefits, social security obligations, taxes, assessments, statutory obligations or other similar charges (other than Liens arising under ERISA), good faith cash deposits in connection with tenders, contracts or leases to which Borrower or any Subsidiary is a party or other cash deposits required to be made in the ordinary course of business; *provided* in each case that the obligation is not for borrowed money and that the obligation secured is not overdue or, if overdue, is being contested in good faith by appropriate proceedings which prevent enforcement of the matter under contest and adequate reserves have been established therefor;

(b)      mechanics', workmen's, materialmen's, landlords', carriers' or other similar Liens arising in the ordinary course of business with respect to obligations which are not due or which are being contested in good faith by appropriate proceedings which prevent enforcement of the matter under contest;

(c)      judgment liens and judicial attachment liens not constituting an Event of Default under Section 8.1(g) and the pledge of assets for the purpose of securing an appeal, stay or discharge in the course of any legal proceeding;

(d)      Liens on equipment of Borrower or any Subsidiary created solely for the purpose of securing indebtedness permitted by Section 7.1(b), representing or incurred to finance the purchase price of such Property; *provided* that no such Lien shall extend to or cover other Property of Borrower or such Subsidiary other than the respective Property so acquired, and the principal amount of indebtedness secured by any such Lien shall at no time exceed the purchase price of such Property, as reduced by repayments of principal thereon;

(e)      any interest or title of a lessor under any operating lease;

(f)      easements, rights of way, restrictions, and other similar encumbrances against real property incurred in the ordinary course of business which, in the aggregate, are not substantial in amount and which do not materially detract from the value of the Property subject thereto or materially interfere with the ordinary conduct of the business of Borrower or any Subsidiary;

(g)      Liens for taxes not yet due or for taxes that are being contested in good faith by appropriate proceedings and Borrower and each Subsidiary is in compliance with Section 6.3 with respect thereto;

(h)      involuntary Liens (other than for taxes) securing amounts less than $25,000, that are either released within ten (10) days of the creation thereof or for which a bond acceptable to Bank in its reasonable discretion determined in good faith has been posted within ten (10) days of the creation thereof;

(i)      Liens set forth on Schedule 7.2; and

(j)      Liens granted in favor of Bank pursuant to the Collateral Documents.

*Section 7.3    Investments, Acquisitions, Loans and Advances.*  Borrower shall not, nor shall it permit any Subsidiary to, directly or indirectly, make, retain or have outstanding any investments (whether through purchase of stock or obligations or otherwise) in, or loans or advances to (other than for travel advances and other similar cash advances made to employees in the ordinary course of business), any other Person, or acquire all or any substantial part of the assets or business of any other Person or division thereof; *provided* that the foregoing shall not apply to nor operate to prevent:

(a)      investments in direct obligations of the United States of America or of any agency or instrumentality thereof whose obligations constitute full faith and credit obligations of the United States of America, provided that any such obligations shall mature within one year of the date of issuance thereof;

(b)      investments in commercial paper rated at least P-1 by Moody's and at least A-1 by S&P maturing within one year of the date of issuance thereof;

(c)      investments in certificates of deposit issued by Bank or by any United States commercial bank having capital and surplus of not less than $100,000,000 which have a maturity of one year or less;

(d)      investments in repurchase obligations with a term of not more than 7 days for underlying securities of the types described in subsection (a) above entered into with any bank meeting the qualifications specified in subsection (c) above, provided all such agreements require physical delivery of the securities securing such repurchase agreement, except those delivered through the Federal Reserve Book Entry System;

(e)     investments in money market funds that invest solely, and which are restricted by their respective charters to invest solely, in investments of the type described in the immediately preceding subsections (a), (b), (c), and (d) above;

(f)     (i) the existing loan made by Borrower to Gaughan outstanding as of the Closing Date in the principal amount of $700,000, and (ii) a loan to be made by Borrower to Gaughan after the Closing Date in an aggregate amount not to exceed $600,000 provided (u) Borrower's Liquidity is in excess of $2,500,000 after giving effect to such loan, (v) no Event of Default then exists or would be caused thereby on a pro forma basis, (w) the outstanding principal balance of the Term Loans is less than 75% of net orderly liquidation value of Borrower's Equipment that is subject to a first priority Lien in favor of Bank, determined pursuant to an appraisal in form and substance satisfactory to Bank, (x) all of the SBA Loans have funded, (y) the Bridge Loan has been repaid in full, and (z) Borrower has provided written certification to Bank of full compliance with the foregoing in form and substance satisfactory to Bank, including supporting documentation requested by Bank;

(g)     the Santa Fe Property Note, provided the original thereof is delivered to and maintained by Bank as additional collateral for the Obligations; and

(h)     other investments, loans, and advances in addition to those expressly permitted by this Section in an amount not to exceed $250,000 in the aggregate at any one time outstanding.

In determining the amount of investments, acquisitions, loans, and advances permitted under this Section, investments and acquisitions shall always be taken at the original cost thereof (regardless of any subsequent appreciation or depreciation therein), and loans and advances shall be taken at the principal amount thereof then remaining unpaid.

Section 7.4     Mergers, Consolidations and Sales.  Borrower shall not, nor shall it permit any Subsidiary to, be a party to any merger or consolidation, or sell, transfer, lease or otherwise dispose of all or any part of its Property, including any disposition of Property as part of a sale and leaseback transaction, or in any event sell or discount (with or without recourse) any of its notes or accounts receivable; provided that this Section shall not apply to nor operate to prevent:

(a)     the sale or lease of inventory in the ordinary course of business;

(b)     Reserved;

(c)     Reserved;

(d)     the sale of delinquent notes or accounts receivable in the ordinary course of business for purposes of collection only (and not for the purpose of any bulk sale or securitization transaction);

(e)     the sale, transfer or other disposition of any tangible personal property that, in the reasonable business judgment of Borrower or its Subsidiary, has become obsolete or worn out, and which is disposed of in the ordinary course of business; and

(f)    the sale, transfer, lease or other disposition of Property of Borrower or any Subsidiary (including any disposition of Property as part of a sale and leaseback transaction) aggregating for Borrower and its Subsidiaries not more than $250,000 during any fiscal year of Borrower.

Section 7.5    *Maintenance of Subsidiaries.*  Borrower shall not assign, sell or transfer, nor shall it permit any Subsidiary to issue, assign, sell or transfer, any shares of capital stock or other equity interests of a Subsidiary; *provided* that the foregoing shall not operate to prevent (a) Liens on the capital stock or other equity interests of Subsidiaries granted to Bank pursuant to the Collateral Documents, and (b) the issuance, sale, and transfer to any person of any shares of capital stock of a Subsidiary solely for the purpose of qualifying, and to the extent legally necessary to qualify, such person as a director of such Subsidiary.

Section 7.6    *Dividends and Certain Other Restricted Payments.*  Borrower shall not, nor shall it permit any Subsidiary to, (a) declare or pay any dividends on or make any other distributions in respect of any class or series of its capital stock or other equity interests (other than dividends or distributions payable solely in its capital stock or other equity interests), (b) directly or indirectly purchase, redeem, or otherwise acquire or retire any of its capital stock or other equity interests or any warrants, options, or similar instruments to acquire the same, (c) repay any loan or advance provided to Borrower by any of Borrower's shareholders or their Affiliates, or (d) directly or indirectly pay Management Fees (collectively referred to herein as *"Restricted Payments"*); *provided* that, notwithstanding the foregoing, (i) Borrower's Subsidiaries shall be permitted to make dividends or distributions to Borrower, (ii) so long as no Default or Event of Default then exists or would be created thereby on a pro form basis and so long as the Bridge Loan has been repaid in full in cash, Borrower shall be permitted to make the Special Gaughan Dividend, and (iii) so long as Borrower is a pass through entity disregarded for tax purposes and no Default or Event of Default has occurred, Borrower may pay cash dividends or distributions to its equity owners in an amount equal to any tax liabilities payable by such equity owners with respect to taxable income attributable to Borrower and its Subsidiaries.

Section 7.7    *Burdensome Contracts With Affiliates.*  Borrower shall not, nor shall it permit any Subsidiary to, enter into any contract, agreement or business arrangement with any of its Affiliates on terms and conditions which are less favorable to Borrower or such Subsidiary than would be usual and customary in similar contracts, agreements or business arrangements between Persons not affiliated with each other.

Section 7.8    *No Changes in Fiscal Year.*  The fiscal year of Borrower and its Subsidiaries ends on December 31st of each year; and Borrower shall not, nor shall it permit any Subsidiary to, change its fiscal year from its present basis.

Section 7.9    *Change in the Nature of Business.*  Borrower shall not, nor shall it permit any Subsidiary to, engage in any business or activity if as a result the general nature of the business of Borrower or any Subsidiary would be changed in any material respect from the general nature of the business engaged in by it as of the Closing Date.

*Section 7.10   No Restrictions*.  Except pursuant to this Agreement and the other Loan Documents, Borrower shall not, nor shall it permit any Subsidiary to, directly or indirectly create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of Borrower or any Subsidiary to: (a) pay dividends or make any other distribution on any Subsidiary's capital stock or other equity interests owned by Borrower or any other Subsidiary, (b) pay any indebtedness owed to Borrower or any other Subsidiary, (c) make loans or advances to Borrower or any other Subsidiary, (d) transfer any of its Property to Borrower or any other Subsidiary, or (e) guarantee the Obligations and/or grant Liens on its assets to Bank as required by the Loan Documents.

*Section 7.11   Subordinated Debt*. If Borrower incurs any Subordinated Debt after the date hereof (any such Subordinated Debt is subject to the approval of the Bank), Borrower shall not, nor shall it permit any Subsidiary to, (a) amend or modify any of the terms or conditions relating to Subordinated Debt, (b) make any voluntary prepayment of Subordinated Debt or effect any voluntary redemption thereof, or (c) make any payment on account of Subordinated Debt which is prohibited under the terms of any instrument or agreement subordinating the same to the Obligations.  Notwithstanding the foregoing, Borrower may agree to a decrease in the interest rate applicable thereto or to a deferral of repayment of any of the principal of or interest on the Subordinated Debt beyond the current due dates therefor.

*Section 7.12   Financial Covenants.*

(a)   *Total Operating Debt/EBITDA Ratio*.  As of the last day of each fiscal quarter of Borrower ending during the relevant period set forth below, Borrower shall not permit the Total Operating Debt/EBITDA Ratio to be greater than the corresponding ratio set forth opposite such period:

| Period(s) Ending | Total Operating Debt/EBITDA Ratio shall not be greater than: |
|---|---|
| Fiscal quarters ending on 6/30/2017 and 9/30/2017 | 4.00 to 1.0 |
| Fiscal quarters ending on 12/31/2017 and 3/31/2018 | 3.75 to 1.0 |
| Fiscal quarters ending on 6/30/2018 And 9/30/2018 | 3.50 to 1.0 |
| Fiscal quarters ending on 12/31/2018 and all fiscal quarters thereafter | 3.00 to 1.0 |

(b)   *Fixed Charge Coverage Ratio*.  As of the last day of each fiscal quarter, commending with the fiscal quarter ending June 30, 2017, Borrower shall maintain a Fixed Charge Coverage Ratio of not less than 1.15 to 1.00.

## SECTION 8. EVENTS OF DEFAULT AND REMEDIES.

*Section 8.1   Events of Default*.  Any one or more of the following shall constitute an *"Event of Default"* hereunder:

(a)     default in the payment when due of all or any part of any Obligation payable by Borrower hereunder or under any other Loan Document (whether at the stated maturity thereof or at any other time provided for in this Agreement), or default shall occur in the payment when due of any other indebtedness or obligation (whether direct, contingent or otherwise) of Borrower owing to Bank; provided, however, Borrower shall have a period of two (2) days to cure any payment default other than payment defaults arising from the failure to timely pay principal and interest under the Loans.  For purposes of clarification such two (2) day cure period shall not apply to a payment default arising from the Borrower's failure to immediately comply with Section 2.8(b)(vii);

(b)     default in the observance or performance of any covenant set forth in Sections 6.1, 6.4, 6.5, 6.6, 6.11, 6.13 or 7 or of any provision in any Loan Document dealing with the use, disposition or remittance of the proceeds of Collateral or requiring the maintenance of insurance thereon;

(c)     default in the observance or performance of any other provision hereof or of any other Loan Document which is not remedied within 30 days after the earlier of (i) the date on which such failure shall first become known to any officer of Borrower or (ii) written notice thereof is given to Borrower by Bank;

(d)     any representation or warranty made herein or in any other Loan Document or in any certificate furnished to Bank pursuant hereto or thereto or in connection with any transaction contemplated hereby or thereby proves untrue in any respect (or in any material respect if such representation, warranty, certification or statement is not by its terms already qualified as to materiality) as of the date of the issuance or making or deemed making thereof;

(e)     any event occurs or condition exists (other than those described in subsections (a) through (d) above) which is specified as an event of default under any of the other Loan Documents, or any of the Loan Documents shall for any reason not be or shall cease to be in full force and effect or is declared to be null and void, or any of the Collateral Documents shall for any reason fail to create a valid and perfected first priority Lien in favor of Bank in any Collateral purported to be covered thereby except as expressly permitted by the terms thereof, or any Subsidiary takes any action for the purpose of terminating, repudiating or rescinding any Loan Document executed by it or any of its obligations thereunder;

(f)     default shall occur under (i) any Indebtedness for Borrowed Money issued, assumed or guaranteed by Borrower or any Subsidiary aggregating in excess of $250,000, or under any indenture, agreement or other instrument under which the same may be issued, and such default shall continue for a period of time sufficient to permit the acceleration of the maturity of any such Indebtedness for Borrowed Money (whether or not such maturity is in fact accelerated), or any such Indebtedness for Borrowed Money shall not be paid when due (whether by demand, lapse of time, acceleration or otherwise), or (ii) the SBA Loans;

(g)     any judgment or judgments, writ or writs or warrant or warrants of attachment, or any similar process or processes, shall be entered or filed against Borrower or any Subsidiary, or against any of its Property, in an aggregate amount in excess of $250,000 (except to the extent

fully covered by insurance as to which the insurer has been notified of such judgment and has not denied coverage), and which remains undischarged, unvacated, unbonded or unstayed for a period of 30 days;

(h)      Borrower or any Subsidiary, or any member of its Controlled Group, shall fail to pay when due an amount or amounts aggregating in excess of $100,000 which it shall have become liable to pay to the PBGC or to a Plan under Title IV of ERISA; or notice of intent to terminate a Plan or Plans having aggregate Unfunded Vested Liabilities in excess of $100,000 (collectively, a "Material Plan") shall be filed under Title IV of ERISA by Borrower or any Subsidiary, or any other member of its Controlled Group, any plan administrator or any combination of the foregoing; or the PBGC shall institute proceedings under Title IV of ERISA to terminate or to cause a trustee to be appointed to administer any Material Plan or a proceeding shall be instituted by a fiduciary of any Material Plan against Borrower or any Subsidiary, or any member of its Controlled Group, to enforce Section 515 or 4219(c)(5) of ERISA and such proceeding shall not have been dismissed within 30 days thereafter; or a condition shall exist by reason of which the PBGC would be entitled to obtain a decree adjudicating that any Material Plan must be terminated;

(i)      any Change of Control shall occur;

(j)      Borrower or any Subsidiary shall (i) have entered involuntarily against it an order for relief under the United States Bankruptcy Code, as amended, (ii) not pay, or admit in writing its inability to pay, its debts generally as they become due, (iii) make an assignment for the benefit of creditors, (iv) apply for, seek, consent to or acquiesce in, the appointment of a receiver, custodian, trustee, examiner, liquidator or similar official for it or any substantial part of its Property, (v) institute any proceeding seeking to have entered against it an order for relief under the United States Bankruptcy Code, as amended, to adjudicate it insolvent, or seeking dissolution, winding up, liquidation, reorganization, arrangement, adjustment or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors or fail to file an answer or other pleading denying the material allegations of any such proceeding filed against it, (vi) take any corporate action in furtherance of any matter described in parts (i) through (v) above, or (vii) fail to contest in good faith any appointment or proceeding described in Section 8.1(k); or

(k)      a custodian, receiver, trustee, examiner, liquidator or similar official shall be appointed for Borrower or any Subsidiary, or any substantial part of any of its Property, or a proceeding described in Section 8.1(j)(v) shall be instituted against Borrower or any Subsidiary, and such appointment continues undischarged or such proceeding continues undismissed or unstayed for a period of 60 days.

*Section 8.2    Non Bankruptcy Defaults.*    When any Event of Default (other than those described in Section 8.1(j) or (k) with respect to Borrower) has occurred and is continuing, Bank may, by written notice to Borrower: (a) terminate the remaining Commitments and all other obligations of Bank hereunder on the date stated in such notice (which may be the date thereof); (b) declare the principal of and the accrued interest on all outstanding Loans to be forthwith due and payable and thereupon all outstanding Loans, including both principal and interest thereon, shall be and become immediately due and payable together with all other amounts payable under

the Loan Documents without further demand, presentment, protest or notice of any kind; and (c) demand that Borrower immediately Cash Collateralize the L/C Obligations, and Borrower agrees to immediately make such payment and acknowledges and agrees that Bank would not have an adequate remedy at law for failure by Borrower to honor any such demand and that Bank shall have the right to require Borrower to specifically perform such undertaking whether or not any drawings or other demands for payment have been made under any Letter of Credit.

Section 8.3    *Bankruptcy Defaults*.   When any Event of Default described in <u>Section 8.1(j)</u> or <u>(k)</u> with respect to Borrower has occurred and is continuing, then all outstanding Loans together with all other amounts payable under the Loan Documents shall immediately become due and payable without presentment, demand, protest or notice of any kind, the obligation of Bank to extend further credit pursuant to any of the terms hereof shall immediately terminate and Borrower shall immediately Cash Collateralize the L/C Obligations, Borrower acknowledging and agreeing that Bank would not have an adequate remedy at law for failure by Borrower to honor any such demand and that Bank shall have the right to require Borrower to specifically perform such undertaking whether or not any draws or other demands for payment have been made under any of the Letters of Credit.

Section 8.4    *SBA Issues*.   (a)   The parties hereto acknowledge and agree that Bank's rights and remedies with respect to the Term A Loan, the Term B Loan, the Term C Loan and the Term D Loan are subject to the terms of the applicable SBA Subordination Agreement executed or to be executed in connection with each such Loan.   To the extent the terms of this Agreement or the other Loan Documents contradict or conflict with any such SBA Subordination Agreement, the terms of such SBA Subordination Agreement shall govern and control.   The provisions of the SBA Subordination Agreements are solely for the purposes of defining the relative rights of Bank, on the one hand and the SBA and the applicable SBA certified development company, on the other hand.   The SBA Subordination Agreements do not grant or otherwise provide Borrower or any Guarantor with any rights, remedies, defenses or claims and may not be utilized, asserted or claimed by Borrower or any Guarantor in any manner.

(b)   To the extent any security interest in favor of Bank encumbering all or a portion of the SBA Collateral secures Obligations that are not permitted to be secured by a first priority security interest pursuant to the applicable SBA Subordination Agreement, then (i) Bank shall have a first priority security interest in such SBA Collateral as security for the applicable Loan and other Obligations that are permitted to be secured by such first priority security interest as set forth in the applicable SBA Subordination Agreement, (ii) the SBA or the applicable CDC shall have a second priority security interest in such SBA Collateral securing the applicable SBA Loan, and (iii) Bank shall have a third priority security interest in such SBA Collateral securing all Obligations, other than those described in clause (i) above.

## SECTION 9. MISCELLANEOUS.

Section 9.1    *No Waiver, Cumulative Remedies*.   No delay or failure on the part of Bank in the exercise of any power or right under any Loan Document shall operate as a waiver thereof or as an acquiescence in any default, nor shall any single or partial exercise of any power or right preclude any other or further exercise thereof or the exercise of any other power or right.   The

rights and remedies hereunder of Bank are cumulative to, and not exclusive of, any rights or remedies which Bank would otherwise have.

Section 9.2    *Non-Business Days*.  If any payment hereunder becomes due and payable on a day which is not a Business Day, the due date of such payment shall be extended to the next succeeding Business Day on which date such payment shall be due and payable .  In the case of any payment of principal falling due on a day which is not a Business Day, interest on such principal amount shall continue to accrue during such extension at the rate per annum then in effect, which accrued amount shall be due and payable on the next scheduled date for the payment of interest.

Section 9.3    *Survival of Representations*.   All representations and warranties made herein or in any other Loan Document or in certificates given pursuant hereto or thereto shall survive the execution and delivery of this Agreement and the other Loan Documents, and shall continue in full force and effect with respect to the date as of which they were made as long as any credit is in use or available hereunder.

Section 9.4    *Survival of Indemnity and Certain Other Provisions*.   All indemnity provisions and other provisions relative to reimbursement to Bank of amounts sufficient to protect the yield of Bank with respect to the Loans and Letters of Credit, including, but not limited to, Sections 3.3, 3.6, and 9.10, shall survive the payment and satisfaction of all Obligations and the termination of this Agreement and the other Loan Documents, and shall remain in force beyond the expiration of any applicable statute of limitations and payment or satisfaction in full of any single claim thereunder.  All such indemnity and other provisions shall be binding upon the successors and assigns of Borrower and shall inure to the benefit of each applicable Indemnitee and its successors and assigns.

Section 9.5    *Notices*.  Except as otherwise specified herein, all notices hereunder and under the other Loan Documents shall be in writing (including notice by telecopy) and shall be given to the relevant party at its address or facsimile number set forth below, or such other address or telecopier number as such party may hereafter specify by notice to the other given by courier, by United States certified or registered mail, by telecopy or by other telecommunication device capable of creating a written record of such notice and its receipt.  Notices under the Loan Documents shall be addressed:

to Borrower:                          to Bank:

Arro Corporation                     BMO Harris Bank N.A.
7440 Santa Fe Drive                  111 West Monroe Street
Hodgkins, Illinois 60525             Chicago, Illinois  60603
Attention:    Mr. Patrick Gaughan    Attention:    Ms. Julie Hughes
Telephone:    (708) 352-8200         Telephone:    (312) 461-7395
Facsimile:    (708) 352-5293         Facsimile:    (312) 461-1507

With a copy to:

Dykema
10 South Wacker Drive
Suite 2300
Chicago, IL 60606
Attention:       Stephen D. Sayre, Esq,
Telephone:      (312) 627-2131
Facsimile:      (866) 433-4079

With a copy to:

Thompson Coburn LLP
55 E. Monroe Street, 37th Floor
Chicago, Illinois 60603
Attention:       Victor Des Laurier, Esq.
Telephone:      (312) 580-2246
Facsimile:      (312) 580-2201

Each such notice, request or other communication shall be effective (i) if given by telecopier, when such telecopy is transmitted to the telecopier number specified in this Section and a confirmation of such telecopy has been received by the sender, (ii) if given by mail, 5 days after such communication is deposited in the mail, certified or registered with return receipt requested, addressed as aforesaid or (iii) if given by any other means, when delivered at the addresses specified in this Section; *provided* that any notice given pursuant to Section 2 shall be effective only upon receipt.

Section 9.6    *Counterparts/Electronic Signatures.*  This Agreement may be executed in any number of counterparts, and by the different parties hereto on separate counterpart signature pages, each of which shall constitute an original, and all such counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed counterpart of a signature page of this Agreement or any of the Loan Documents by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement and such other Loan Documents.

Section 9.7    *Successors and Assigns.*  This Agreement shall be binding upon Borrower and its successors and assigns, and shall inure to the benefit of Bank and its successors and assigns, including any subsequent holder of any of the Obligations.  Borrower may not assign any of its rights or obligations under any Loan Document without the written consent of Bank.

Section 9.8    *Amendments, etc.*  No amendment, modification, termination or waiver of any provision of this Agreement or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by Borrower and Bank.  No notice to or demand on Borrower in any case shall entitle Borrower to any other or further notice or demand in similar or other circumstances.

Section 9.9    *Headings.* Article and Section headings used in this Agreement are for reference only and shall not affect the construction of this Agreement.

Section 9.10    *Costs and Expenses; Indemnification.*  Borrower agrees to pay all costs and expenses of Bank in connection with the preparation, negotiation, execution, delivery, and administration of the Loan Documents, including the reasonable fees and disbursements of counsel to Bank, in connection with the preparation and execution of the Loan Documents and in connection with the transactions contemplated hereby or thereby, and any amendment, waiver or

consent related thereto, whether or not the transactions contemplated herein are consummated, together with any fees and charges suffered or incurred by Bank in connection with periodic environmental audits, field exams, fixed asset appraisals, title insurance policies, collateral filing fees and lien searches. Borrower agrees to pay to Bank all costs and expenses incurred or paid by Bank, including reasonable attorneys' fees and disbursements and court costs, in connection with any Default or Event of Default hereunder or in connection with the enforcement of any of the Loan Documents (including all such costs and expenses incurred in connection with any proceeding under the United States Bankruptcy Code involving Borrower or any Subsidiary as a debtor thereunder). Borrower further agrees to indemnify Bank, and any security trustee therefor, their respective Affiliates, and each of their respective directors, officers, employees, agents, advisors, and consultants (each such Person being called an *"Indemnitee"*) against all losses, claims, damages, penalties, judgments, liabilities and expenses (including all reasonable fees and disbursements of counsel for any such Indemnitee and all reasonable expenses of litigation or preparation therefor, whether or not the Indemnitee is a party thereto, or any settlement arrangement arising from or relating to any such litigation) which any of them may pay or incur arising out of or relating to any Loan Document or any of the transactions contemplated thereby or the direct or indirect application or proposed application of the proceeds of any Loan or Letter of Credit, other than those which arise from the gross negligence or willful misconduct of the party claiming indemnification. Borrower, upon demand by Bank at any time, shall reimburse Bank for any legal or other expenses (including all reasonable fees and disbursements of counsel for any such Indemnitee) incurred in connection with investigating or defending against any of the foregoing (including any settlement costs relating to the foregoing) except if the same is directly due to the gross negligence or willful misconduct of the party to be indemnified. To the extent permitted by applicable law, Borrower shall not assert or cause any Subsidiary to assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or the other Loan Documents or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby, any Loan or Letter of Credit or the use of the proceeds thereof. Notwithstanding the foregoing, if no Event of Default then exists, Borrower shall not be required to reimburse Lender for more than one field exam in any Fiscal Year.

(b)      Borrower unconditionally agrees to forever indemnify, defend and hold harmless, and covenants not to sue for any claim for contribution against, each Indemnitee for any damages, costs, loss or expense, including, response, remedial or removal costs and all fees and disbursements of counsel for any such Indemnitee, arising out of any of the following: (i) any presence, release, threatened release or disposal of any hazardous or toxic substance or petroleum by Borrower or any Subsidiary or otherwise occurring on or with respect to its Property (whether owned or leased), (ii) the operation or violation of any Environmental Law, whether federal, state, or local, and any regulations promulgated thereunder, by Borrower or any Subsidiary or otherwise occurring on or with respect to its Property (whether owned or leased), (iii) any claim for personal injury or property damage in connection with Borrower or any Subsidiary or otherwise occurring on or with respect to its Property (whether owned or leased), and (iv) the inaccuracy or breach of any environmental representation, warranty or covenant by Borrower or any Subsidiary made herein or in any other Loan Document evidencing or securing any Obligations or setting forth terms and conditions applicable thereto or otherwise relating thereto,

except for damages arising from the willful misconduct or gross negligence of the relevant Indemnitee.

Section 9.11    Set off.  In addition to any rights now or hereafter granted under the Loan Documents or applicable law and not by way of limitation of any such rights, upon the occurrence of any Event of Default, Bank and each of its affiliates is hereby authorized by Borrower at any time or from time to time, without notice to Borrower, or to any other Person, any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, including, but not limited to, indebtedness evidenced by certificates of deposit, whether matured or unmatured, and in whatever currency denominated, but not including trust accounts) and any other indebtedness at any time held or owing by Bank or that affiliate, to or for the credit or the account of Borrower, whether or not matured, against and on account of the Obligations of Borrower to Bank under the Loan Documents, including, but not limited to, all claims of any nature or description arising out of or connected with the Loan Documents, irrespective of whether or not (a) Bank shall have made any demand hereunder or (b) the principal of or the interest on the Loans and other amounts due hereunder shall have become due and payable pursuant to <u>Section 8</u> and although said obligations and liabilities, or any of them, may be contingent or unmatured.

Section 9.12    Entire    Agreement.    The    Loan    Documents    constitute    the    entire understanding of the parties thereto with respect to the subject matter thereof and any prior agreements, whether written or oral, with respect thereto are superseded hereby.

Section 9.13    Governing Law.  This Agreement and the other Loan Documents (except as otherwise specified therein), and any claim, controversy, dispute or cause of action (whether in contract, tort or otherwise) based upon, arising out of or relating to this Agreement or any Loan Document, and the rights and duties of the parties hereto, shall be governed by and construed and determined in accordance with the internal laws of the State of Illinois.

Section 9.14    Severability of Provisions.  Any provision of any Loan Document that is unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such unenforceability without invalidating the remaining provisions hereof or affecting the enforceability of such provision in any other jurisdiction.  All rights, remedies and powers provided in this Agreement and the other Loan Documents may be exercised only to the extent that the exercise thereof does not violate any applicable mandatory provisions of law, and all the provisions of this Agreement and other Loan Documents are intended to be subject to all applicable mandatory provisions of law which may be controlling and to be limited to the extent necessary so that they will not render this Agreement or the other Loan Documents invalid or unenforceable.

Section 9.15    Excess Interest  Notwithstanding any provision to the contrary contained herein or in any other Loan Document, no such provision shall require the payment or permit the collection of any amount of interest in excess of the maximum amount of interest permitted by applicable law to be charged for the use or detention, or the forbearance in the collection, of all or any portion of the Loans or other obligations outstanding under this Agreement or any other Loan Document (*"Excess Interest"*).  If any Excess Interest is provided for, or is adjudicated to be

provided for, herein or in any other Loan Document, then in such event (a) the provisions of this Section shall govern and control, (b) neither Borrower nor any guarantor or endorser shall be obligated to pay any Excess Interest, (c) any Excess Interest that Bank may have received hereunder shall, at the option of Bank, be (i) applied as a credit against the then outstanding principal amount of Obligations hereunder and accrued and unpaid interest thereon (not to exceed the maximum amount permitted by applicable law), (ii) refunded to Borrower, or (iii) any combination of the foregoing, (d) the interest rate payable hereunder or under any other Loan Document shall be automatically subject to reduction to the maximum lawful contract rate allowed under applicable usury laws (the *"Maximum Rate"*), and this Agreement and the other Loan Documents shall be deemed to have been, and shall be, reformed and modified to reflect such reduction in the relevant interest rate, and (e) neither Borrower nor any guarantor or endorser shall have any action against Bank for any damages whatsoever arising out of the payment or collection of any Excess Interest.  Notwithstanding the foregoing, if for any period of time interest on any of the Obligations is calculated at the Maximum Rate rather than the applicable rate under this Agreement, and thereafter such applicable rate becomes less than the Maximum Rate, the rate of interest payable on the Obligations shall remain at the Maximum Rate until Bank have received the amount of interest which Bank would have received during such period on the Obligations had the rate of interest not been limited to the Maximum Rate during such period.

Section 9.16 *Construction.*  The parties acknowledge and agree that the Loan Documents shall not be construed more favorably in favor of any party hereto based upon which party drafted the same, it being acknowledged that all parties hereto contributed substantially to the negotiation of the Loan Documents.  The provisions of this Agreement relating to Subsidiaries shall only apply during such times as Borrower has one or more Subsidiaries.  Nothing contained herein shall be deemed or construed to permit any act or omission which is prohibited by the terms of any Collateral Document, the covenants and agreements contained herein being in addition to and not in substitution for the covenants and agreements contained in the Collateral Documents.

Section 9.17 *Submission to Jurisdiction; Waiver of Venue; Service of Process.*(a) BORROWER IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF ILLINOIS SITTING IN COOK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE NORTHERN DISTRICT OF ILLINOIS, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY

RIGHT THAT BANK MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST BORROWER OR ITS PROPERTY IN THE COURTS OF ANY OTHER JURISDICTION.

(b)    BORROWER IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (a) OF THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(c)    EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 9.5. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

Section 9.18    Waiver of Jury Trial.    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 9.19    USA Patriot Act.    Bank hereby notifies Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107 56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify, and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow Bank to identify Borrower in accordance with the Act.

Section 9.20    Time is of the Essence. Time is of the essence of this Agreement and each of the other Loan Documents.

Section 9.21    Confidentiality. Bank agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its

Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors to the extent any such Person has a need to know such Information (it being understood that the Persons to whom such disclosure is made will first be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (A) any assignee of or participant in, or any prospective assignee of or participant in, any of its rights or obligations under this Agreement or (B) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to Borrower or any Subsidiary and its obligations, (g) with the prior written consent of Borrower, (h) to the extent such Information (A) becomes publicly available other than as a result of a breach of this Section or (B) becomes available to Bank or any of its Affiliates on a non-confidential basis from a source other than Borrower or any Subsidiary or any of their directors, officers, employees or agents, including accountants, legal counsel and other advisors, or (i) to rating agencies if requested or required by such agencies in connection with a rating relating to the Loans or Commitments hereunder; *provided* that only basic information about the pricing and structure of the transaction evidenced hereby may be disclosed pursuant to this <u>subsection (i)</u>. For purposes of this Section, "Information" means all information received from Borrower or any of the Subsidiaries or from any other Person on behalf of Borrower or any Subsidiary relating to Borrower or any Subsidiary or any of their respective businesses, other than any such information that is available to Bank on a non-confidential basis prior to disclosure by Borrower or any of its Subsidiaries or from any other Person on behalf of Borrower or any of the Subsidiaries. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

[Signature Pages to Follow]

This Credit Agreement is entered into between us for the uses and purposes hereinabove set forth as of the date first above written.

*"Borrower"*

**ARRO CORPORATION,**
an Illinois corporation

By: _____

Name: Patrick Gaughan

Title:   President

*"Bank"*

**BMO HARRIS BANK N.A.**

By: _____

Name: _____

Title: _____

*[Signature page to Credit Agreement]*

This Credit Agreement is entered into between us for the uses and purposes hereinabove set forth as of the date first above written.

*"Borrower"*

**ARRO CORPORATION,**
an Illinois corporation


By:_____
Name:  Patrick Gaughan
Title:   President


*"Bank"*

**BMO HARRIS BANK N.A.**

By:_____
Name:_____
Title:_____

*[Signature page to Credit Agreement]*

**Exhibit A-1**

**Term [__] Note**

U.S. [$_____]                                    June 14, 2017

For Value Received, the undersigned, Arro Corporation, an Illinois corporation (*"Borrower"*), hereby promises to pay to BMO Harris Bank N.A. (*"Bank"*) at the principal office of Bank in Chicago, Illinois (or such other location as Bank may designate to Borrower), in immediately available funds, the principal sum of _____ Dollars ($_____) or, if less, the aggregate unpaid principal amount of the Term [__] Loan made or maintained by Bank to Borrower pursuant to the Credit Agreement, in installments in the amounts called for by Section **[2.7(__)]** of the Credit Agreement, commencing on _____, together with interest on the principal amount of such Term Loan from time to time outstanding hereunder at the rates, and payable in the manner and on the dates, specified in the Credit Agreement.

This Note is the Term [__] Note (this *"Note"*) referred to in the Credit Agreement of even date herewith between Borrower and Bank (as amended, restated, supplemented, or otherwise modified from time to time, the *"Credit Agreement"*), and this Note and the holder hereof are entitled to all the benefits and security provided for thereby or referred to therein, to which Credit Agreement reference is hereby made for a statement thereof. All defined terms used in this Note, except terms otherwise defined herein, shall have the same meaning as in the Credit Agreement. This Note shall be governed by and construed in accordance with the internal laws of the State of Illinois.

Voluntary prepayments may be made hereon, certain prepayments are required to be made hereon, and this Note may be declared due prior to the expressed maturity hereof, all in the events, on the terms and in the manner as provided for in the Credit Agreement.

Borrower hereby waives demand, presentment, protest or notice of any kind hereunder.

ARRO CORPORATION,
an Illinois corporation


By _____
    Name_____
    Title_____

**Exhibit A-2**

**Revolving Note**

U.S. $13,000,000.00                                                    June 14, 2017

For Value Received, the undersigned, Arro Corporation, an Illinois corporation (*"Borrower"*), hereby promises to pay to BMO Harris Bank N.A. (*"Bank"*) at the principal office of Bank in Chicago, Illinois (or such other location as Bank may designate to Borrower), in immediately available funds, the principal sum of Thirteen Million and no/100 Dollars ($13,000,000.00) or, if less, the aggregate unpaid principal amount of all Revolving Loans made by Bank to Borrower pursuant to the Credit Agreement, together with interest on the principal amount of each Revolving Loan from time to time outstanding hereunder at the rates, and payable in the manner and on the dates, specified in the Credit Agreement.

This Revolving Note (this *"Note"*) is one of the Revolving Notes referred to in the Credit Agreement of even date herewith between Borrower and Bank (as extended, renewed, amended or restated from time to time, the *"Credit Agreement"*), and this Note and the holder hereof are entitled to all the benefits and security provided for thereby or referred to therein, to which Credit Agreement reference is hereby made for a statement thereof. All defined terms used in this Note, except terms otherwise defined herein, shall have the same meaning as in the Credit Agreement. This Note shall be governed by and construed in accordance with the internal laws of the State of Illinois.

Voluntary prepayments may be made hereon, certain prepayments are required to be made hereon, and this Note may be declared due prior to the expressed maturity hereof, all in the events, on the terms and in the manner as provided for in the Credit Agreement.

Borrower hereby waives demand, presentment, protest or notice of any kind hereunder.

ARRO CORPORATION,
an Illinois corporation


By _____
   Name _____
   Title _____

**Exhibit B**

**Arro Corporation**

**Borrowing Base Certificate**

See attached

**Arro Corporation**

**Borrowing Base Certificate**

**Date: _____**


To: BMO HARRIS BANK N.A.

   Pursuant to the terms of the Credit Agreement dated as of June xx, 2017, between Arro Corporation, an Illinois corporation ("Borrower") and you (the "Credit Agreement"), we submit this Borrowing Base Certificate to you and certify that the information set forth below and on any attachments to this certificate is true, correct and complete as of the date of this certificate.

**I. Borrowing Base**

**A. Accounts in Borrowing Base**
    1. Gross Accounts
    2. Less
        a. Ineligible Sales ( Not within US )

        b. Owed by Subsidiary or Affiliate

        c. Owed by an account debtor who is in an
    insolvency or reorganization proceeding

        d. Unpaid more than 90 days (or 120 days for Kellogg's)

        e. Ineligible because of 25% concentration factor*

        f. Credits over 90 days

        g. 25% Cross Age

        h. Contra

        i. Otherwise ineligible

        Total Deductions

    3. Eligible Accounts
    4. Eligible Accounts in Borrowing Base at 85%
    *subject to exceptions noted in subsection (k) of Eligible Receivable defintion

**B. Inventory in Borrowing Base**

    1.   Gross Inventory of Finished Goods and Raw Materials,

    2. Less (with respect to Finished Goods and Raw Materials)
        a. Inventory not located at approved locations
        b. Obsolete, slow moving, or not merchantable
        c. CHS, Inc. Product or inventory commingled with CHS,
        d. Otherwise ineligible

Total Deductions with respect to B.1. Inventory

3. Gross Inventory of Work in Progress

4. Less (with respect to Work in Progress)
    a. Inventory not located at approved locations
    b. Obsolete, slow moving, or not merchantable
    c. CHS, Inc. Product or inventory commingled with CHS, Inc. product
    d. Otherwise ineligible

    Total Deductions with respect to B.3. Inventory

5. Eligible Finished Goods and Raw Material Inventory (B.1 less B.2)

6. Eligible WIP Inventory (B.3. less B.4.)

7. Eligible Inventory in B.5. above at 65%

8. Lesser of (a) $1,000,000 or (b) Eligible Inventory in B.6 above at 65%

**C. Less Reserves**

**D. Total Borrowing Base**

**E. Revolving Credit Advances**

1. Revolving Loans

2. Letters of Credit

    Total Revolving Credit Outstanding

**F. Unused Availability**

**II. Accounts Receivable Rollforward and A/R Aging**

| A/R Rollforward | |
|---|---|
| A/R Balance as of | |
| Sales | |
| Credit Memos | |
| Cash Receipts | |
| Discounts | |
| A/R Balance as of | |

| A/R Aging as of _____ |
|---|

0-30 Days

31-60 Days

61-90 Days

Over 90 Days

Total

## III. Accounts Payable Aging

A/P Aging as of _____

0-30 Days

31-60 Days

61-90 Days

Over 90 Days

Total

## IV. Withholding Taxes have been paid through   _____

Dated as of _____.

Arro Corporation,
an Illinois corporation

By      _____

Name    Jeffery Hedman
Title   CFO

# Accounts Receivable Ineligibles

**Ineligible Sales Not Within US**

    Glanbia

    Total

**Unpaid More Than 90 Days**

    91-120 Days (exluding Kellogg's Company)
    Over 120 Days

    Total

**Credits Over 90 Days/Account Debtor Deposits/Earned Rebates**

    Inventive Private Label
    Pinnacle Foods Group
    Tate & Lyle North America
    Account Debtor Deposits
    Earned Rebates

    Total

**25% Cross Age**

    Sams Club

    Total

**Contra**

| | A/R | A/P |
|---|---|---|
| Ardent Mills | | |
| CHS, Inc. | | |
| ConAgra Food Ingredients | | |
| Danisco USA, Inc. | | |
| Industrias Marino S.A. de C.V. | | |
| Ingredion, Inc. | | |
| Innophos, Inc. | | |
| National Sugar Marketing LLC | | |
| Pinnacle Foods Group | | |
| Roquette America, Inc. | | |
| Tate & Lyle North America | | |
| Westrock Corporation | | |
| Total | | |

**Exhibit C**

**Arro Corporation**

**Compliance Certificate**

To:    BMO HARRIS BANK N.A.

This Compliance Certificate is furnished to BMO Harris Bank N.A. (*"Bank"*) pursuant to that certain Credit Agreement dated as of June 14, 2017, between Arro Corporation, an Illinois corporation ("*Borrower*"), and Bank (the *"Credit Agreement"*).    Unless otherwise defined herein, the terms used in this Compliance Certificate have the meanings ascribed thereto in the Credit Agreement.

THE UNDERSIGNED HEREBY CERTIFIES THAT:

1.    I am the duly elected _____ of Borrower;

2.    I have reviewed the terms of the Credit Agreement and I have made, or have caused to be made under my supervision, a detailed review of the transactions and conditions of Borrower and its Subsidiaries during the accounting period covered by the attached financial statements;

3.    The examinations described in paragraph 2 did not disclose, and I have no knowledge of, the existence of any condition or the occurrence of any event which constitutes a Default or Event of Default during or at the end of the accounting period covered by the attached financial statements or as of the date of this Certificate, except as set forth below;

4.    The financial statements required by Section 6.5 of the Credit Agreement and being furnished to you concurrently with this certificate are, to the best of my knowledge, true, correct and complete as of the dates and for the periods covered thereby; and

5.    The Attachment hereto sets forth financial data and computations evidencing Borrower's compliance with certain covenants of the Credit Agreement, all of which data and computations are, to the best of my knowledge, true, complete and correct and have been made in accordance with the relevant Sections of the Credit Agreement.

Described below are the exceptions, if any, to paragraph 3 by listing, in detail, the nature of the condition or event, the period during which it has existed and the action which Borrower has taken, is taking, or proposes to take with respect to each such condition or event:

_____

_____

_____

_____

     The foregoing certifications, together with the computations set forth in the Attachment hereto and the financial statements delivered with this Certificate in support hereof, are made and delivered this _____ day of _____, ___.

**ARRO CORPORATION,**
an Illinois corporation

By _____

   Name _____

   Title _____

**Schedule I**
**to Compliance Certificate**

**Arro Corporation**

**Compliance Calculations**
**for Credit Agreement dated as of June 14, 2017**

Calculations as of _____, _____

---

A.   Total Operating Debt/EBITDA Ratio (Section 7.12(a))

   1.    Total Operating Debt*                      $_____

   2.    Line A1 (Total Operating Debt)     _____

   3.    Net Income for past 4 quarters     _____

   4.    Interest Expense     _____

   5.    Income taxes for past 4 quarters     _____

   6.    Depreciation and Amortization Expense for past 4 quarters     _____

   7.    Sum of Lines A3, A4, A5, and A6 (*"EBITDA"*)     _____

   8.    Ratio of Line A2 to A7     ____:1.0

   9.    Line A8 ratio must not exceed     ____:1.0

   10.    Borrower is in compliance (circle yes or no)     yes/no

*adjusted for Bridge Loan

B.   Fixed Charge Coverage Ratio (Section 7.12(b))

   1.    Net Income for past 4 quarters     $_____

   2.    Interest Expense for past 4 quarters     $_____

   3.    Income taxes for past 4 quarters     $_____

   4.    Depreciation and Amortization Expense for past 4 quarters     $_____

   5.    Sum of lines B1, B2, B3, and B4 (*"EBITDA"*)     $_____

   6.    Principal payments     $_____

   7.    Interest Expense [for past 4 quarters][annualized]     $_____

   8.    Income taxes for past 4 quarters     $_____

   9.    Dividend, Distributions and other Restricted Payments**     $_____

   10.    Sum of Lines B6, B7, B8, and B9     $_____

| 11. | Ratio of Line B5 to Line B10 | ____:1.0 |
| 12. | Line B11 ratio must not be less than | 1.15:1.0 |
| 13. | Borrower is in compliance (circle yes or no) | yes/no |

**excluding Special Gaughan Dividend

## Schedule 5.2

Subsidiaries

None

## Schedule 5.9

### Governmental Authority and Licensing

None

## Schedule 5.11

Litigation and Other Controversies

None

## Schedule 5.14

Affiliate Transactions

Arro Corporation leases the property at 7550 Santa Fe Drive, Hodgkins, IL 60525 from Santa Fe Property, LLC, which is 100% owned by Patrick Gaughan.

On May 31, 2017, Santa Fe Property, LLC issued Arro Corporation a Promissory Note.  The principal amount of the note is $527,643.41.

### Schedule 7.2

Permitted Liens

1. Arro Corporation granted United States Small Business Administration a lien on all collateral described on that certain UCC financing statement filed on October 12, 2010, as document number 15670487.
2. Arro Corporation granted United States Small Business Administration a lien on all collateral described on that certain UCC financing statement filed on July 17, 2012, as document number 17448005, as amended by UCC amendment filed on June 13, 2017, as document number 09484741.
3. Arro Corporation granted Toyota Motor Credit Corporation a lien on all collateral described on that certain UCC financing statement filed on November 13, 2012, as document number 17756095.
4. Arro Corporation granted Toyota Motor Credit Corporation a lien on all collateral described on that certain UCC financing statement filed on January 22, 2013, as document number 17942379.
5. Arro Corporation granted TCF Equipment Finance, Inc. a lien on all collateral described on that certain UCC financing statement filed on July 3, 2013, as document number 18402491.
6. Arro Corporation granted Advantage Group a lien on all the collateral described on that certain UCC financing statement filed on February 26, 2014, as document number 19039765.
7. Arro Corporation granted RLC Funding, a division of Navitas Leas Corp. ISAOA, a lien on all the collateral described on that certain UCC financing statement filed on March 10, 2015, as document number 20116382.
8. Arro Corporation granted RLC Funding, a division of Navitas Leas Corp. ISAOA, a lien on all the collateral described on that certain UCC financing statement filed on March 12, 2015, as document number 20120959.
9. Arro Corporation granted TCF Equipment Finance a lien on all collateral described on that certain UCC financing statement filed on March 30, 2015, as document number 20173866.
10. Arro Corporation granted Ascentium Capital, LLC a lien on all collateral described on that certain UCC financing statement filed on April 13, 2015, as document number 20216654.

## Revolving Note

U.S. $13,000,000.00                                               June 14, 2017

For Value Received, the undersigned, Arro Corporation, an Illinois corporation (*"Borrower"*), hereby promises to pay to BMO Harris Bank N.A. (*"Bank"*) at the principal office of Bank in Chicago, Illinois (or such other location as Bank may designate to Borrower), in immediately available funds, the principal sum of Thirteen Million and no/100 Dollars ($13,000,000.00) or, if less, the aggregate unpaid principal amount of all Revolving Loans made by Bank to Borrower pursuant to the Credit Agreement, together with interest on the principal amount of each Revolving Loan from time to time outstanding hereunder at the rates, and payable in the manner and on the dates, specified in the Credit Agreement.

This Revolving Note (this *"Note"*) is one of the Revolving Notes referred to in the Credit Agreement of even date herewith between Borrower and Bank (as extended, renewed, amended or restated from time to time, the *"Credit Agreement"*), and this Note and the holder hereof are entitled to all the benefits and security provided for thereby or referred to therein, to which Credit Agreement reference is hereby made for a statement thereof. All defined terms used in this Note, except terms otherwise defined herein, shall have the same meaning as in the Credit Agreement. This Note shall be governed by and construed in accordance with the internal laws of the State of Illinois.

Voluntary prepayments may be made hereon, certain prepayments are required to be made hereon, and this Note may be declared due prior to the expressed maturity hereof, all in the events, on the terms and in the manner as provided for in the Credit Agreement.

[signature page follows]

Borrower hereby waives demand, presentment, protest or notice of any kind hereunder.

**ARRO CORPORATION**,
an Illinois corporation

By: _____
Name:  Patrick Gaughan
Title:   President

*[Signature page to Revolving Note]*

## Term A Note

U.S. $1,321,153.00                                                                                      June 14, 2017

For Value Received, the undersigned, Arro Corporation, an Illinois corporation (*"Borrower"*), hereby promises to pay to BMO Harris Bank N.A. (*"Bank"*) at the principal office of Bank in Chicago, Illinois (or such other location as Bank may designate to Borrower), in immediately available funds, the principal sum of One Million Three Hundred Twenty-One Thousand One Hundred Fifty Three and no/100 Dollars ($1,321,153.00) or, if less, the aggregate unpaid principal amount of the Term A Loan made or maintained by Bank to Borrower pursuant to the Credit Agreement, in installments in the amounts called for by Section 2.7(a)(i) of the Credit Agreement, commencing on July 31, 2017, together with interest on the principal amount of such Term Loan from time to time outstanding hereunder at the rates, and payable in the manner and on the dates, specified in the Credit Agreement.

This Note is the Term A Note (this *"Note"*) referred to in the Credit Agreement of even date herewith between Borrower and Bank (as amended, restated, supplemented, or otherwise modified from time to time, the *"Credit Agreement"*), and this Note and the holder hereof are entitled to all the benefits and security provided for thereby or referred to therein, to which Credit Agreement reference is hereby made for a statement thereof. All defined terms used in this Note, except terms otherwise defined herein, shall have the same meaning as in the Credit Agreement. This Note shall be governed by and construed in accordance with the internal laws of the State of Illinois.

Voluntary prepayments may be made hereon, certain prepayments are required to be made hereon, and this Note may be declared due prior to the expressed maturity hereof, all in the events, on the terms and in the manner as provided for in the Credit Agreement.

[signature page follows]

Borrower hereby waives demand, presentment, protest or notice of any kind hereunder.

ARRO CORPORATION,
an Illinois corporation

By: _____
Name:  Patrick Gaughan
Title:  President

*[Signature page to Term A Note]*

## Term B Note

U.S. $197,619.00                                                                 June 14, 2017

For Value Received, the undersigned, Arro Corporation, an Illinois corporation (*"Borrower"*), hereby promises to pay to BMO Harris Bank N.A. (*"Bank"*) at the principal office of Bank in Chicago, Illinois (or such other location as Bank may designate to Borrower), in immediately available funds, the principal sum of One Hundred Ninety-Seven Thousand Six Hundred Nineteen and no/100 Dollars ($197,619.00) or, if less, the aggregate unpaid principal amount of the Term B Loan made or maintained by Bank to Borrower pursuant to the Credit Agreement, in installments in the amounts called for by Section 2.7(a)(ii) of the Credit Agreement, commencing on July 31, 2017, together with interest on the principal amount of such Term Loan from time to time outstanding hereunder at the rates, and payable in the manner and on the dates, specified in the Credit Agreement.

This Note is the Term B Note (this *"Note"*) referred to in the Credit Agreement of even date herewith between Borrower and Bank (as amended, restated, supplemented, or otherwise modified from time to time, the *"Credit Agreement"*), and this Note and the holder hereof are entitled to all the benefits and security provided for thereby or referred to therein, to which Credit Agreement reference is hereby made for a statement thereof. All defined terms used in this Note, except terms otherwise defined herein, shall have the same meaning as in the Credit Agreement. This Note shall be governed by and construed in accordance with the internal laws of the State of Illinois.

Voluntary prepayments may be made hereon, certain prepayments are required to be made hereon, and this Note may be declared due prior to the expressed maturity hereof, all in the events, on the terms and in the manner as provided for in the Credit Agreement.

[signature page follows]

Borrower hereby waives demand, presentment, protest or notice of any kind hereunder.

**ARRO CORPORATION,**
an Illinois corporation

By: _____
Name:  Patrick Gaughan
Title:   President

*[Signature page to Term B Note]*

## Term C Note

U.S. $937,500.00                                                    June 14, 2017

For Value Received, the undersigned, Arro Corporation, an Illinois corporation (*"Borrower"*), hereby promises to pay to BMO Harris Bank N.A. (*"Bank"*) at the principal office of Bank in Chicago, Illinois (or such other location as Bank may designate to Borrower), in immediately available funds, the principal sum of Nine Hundred Thirty-Seven Thousand Five Hundred and no/100 Dollars ($937,500.00) or, if less, the aggregate unpaid principal amount of the Term C Loan made or maintained by Bank to Borrower pursuant to the Credit Agreement, in installments in the amounts called for by Section 2.7(a)(iii) of the Credit Agreement, commencing on July 31, 2017, together with interest on the principal amount of such Term Loan from time to time outstanding hereunder at the rates, and payable in the manner and on the dates, specified in the Credit Agreement.

This Note is the Term C Note (this *"Note"*) referred to in the Credit Agreement of even date herewith between Borrower and Bank (as amended, restated, supplemented, or otherwise modified from time to time, the *"Credit Agreement"*), and this Note and the holder hereof are entitled to all the benefits and security provided for thereby or referred to therein, to which Credit Agreement reference is hereby made for a statement thereof. All defined terms used in this Note, except terms otherwise defined herein, shall have the same meaning as in the Credit Agreement. This Note shall be governed by and construed in accordance with the internal laws of the State of Illinois.

Voluntary prepayments may be made hereon, certain prepayments are required to be made hereon, and this Note may be declared due prior to the expressed maturity hereof, all in the events, on the terms and in the manner as provided for in the Credit Agreement.

[signature page follows]

Borrower hereby waives demand, presentment, protest or notice of any kind hereunder.

**ARRO CORPORATION,**
an Illinois corporation


By: _____
Name:   Patrick Gaughan
Title:    President

*[Signature page to Term C Note]*

## Term D Note

U.S. $3,543,728.00                                                                                  June 14, 2017

For Value Received, the undersigned, Arro Corporation, an Illinois corporation (*"Borrower"*), hereby promises to pay to BMO Harris Bank N.A. (*"Bank"*) at the principal office of Bank in Chicago, Illinois (or such other location as Bank may designate to Borrower), in immediately available funds, the principal sum of Three Million Five Hundred Forty-Three Thousand Seven Hundred Twenty-Eight no/100 Dollars ($3,543,728.00) or, if less, the aggregate unpaid principal amount of the Term D  Loan made or maintained by Bank to Borrower pursuant to the Credit Agreement, in installments in the amounts called for by Section 2.7(a)(iv) of the Credit Agreement, commencing on July 31, 2017, together with interest on the principal amount of such Term Loan from time to time outstanding hereunder at the rates, and payable in the manner and on the dates, specified in the Credit Agreement.

This Note is the Term D Note (this *"Note"*) referred to in the Credit Agreement of even date herewith between Borrower and Bank (as amended, restated, supplemented, or otherwise modified from time to time, the *"Credit Agreement"*), and this Note and the holder hereof are entitled to all the benefits and security provided for thereby or referred to therein, to which Credit Agreement reference is hereby made for a statement thereof.  All defined terms used in this Note, except terms otherwise defined herein, shall have the same meaning as in the Credit Agreement.  This Note shall be governed by and construed in accordance with the internal laws of the State of Illinois.

Voluntary prepayments may be made hereon, certain prepayments are required to be made hereon, and this Note may be declared due prior to the expressed maturity hereof, all in the events, on the terms and in the manner as provided for in the Credit Agreement.

[signature page follows]

Borrower hereby waives demand, presentment, protest or notice of any kind hereunder.

ARRO CORPORATION,
an Illinois corporation

By: _____
Name:  Patrick Gaughan
Title:   President

*[Signature page to Term D Note]*

# FIRST AMENDMENT TO CREDIT AGREEMENT

THIS FIRST AMENDMENT TO CREDIT AGREEMENT dated as of September 20, 2017 (this "First Amendment") is entered into by and between ARRO CORPORATION, an Illinois corporation ("Borrower"), and BMO HARRIS BANK N.A., a national banking association (the "Bank").

## W I T N E S S E T H :

WHEREAS, prior hereto, the Bank provided certain loans, extensions of credit and other financial accommodations to Borrower pursuant to (a) that Credit Agreement dated as of June 14, 2017, by and between the Bank and Borrower (the "Credit Agreement"), and (b) the other documents, agreements and instruments referenced in the Credit Agreement or executed and delivered pursuant thereto;

WHEREAS, Borrower desires the Bank to, among other things, extend the Bridge Loan Maturity Date from September 20, 2017, to November 20, 2017 (the "Additional Financial Accommodations"); and

WHEREAS, the Bank is willing to provide the Additional Financial Accommodations, but solely on the terms and subject to the provisions set forth in this First Amendment and the other agreements, documents and instruments referenced herein or executed and delivered pursuant hereto.

NOW, THEREFORE, in consideration of the foregoing, the mutual promises and understandings of the parties hereto set forth herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Bank and Borrower hereby agree as set forth in this First Amendment.

I.    **Definitions:**

A.    Use of Defined Terms. Except as expressly set forth in this First Amendment, all terms which have an initial capital letter where not required by the rules of grammar are defined in the Credit Agreement, as amended hereby.

B.    Amended Definition. Effective as of the date of this First Amendment, Section 1.1 of the Credit Agreement is hereby amended by deleting the definition of "Bridge Loan Maturity Date" contained therein in its entirety and substituting therefor the following:

"***Bridge Loan Maturity Date***" means November 20, 2017.

II.    **Conditions Precedent**. The Bank's obligation to provide the Additional Financial Accommodations to Borrower is subject to the full and timely performance of the following conditions precedent:

A.    Borrower executing and delivering, or causing to be executed and delivered to the Bank, the following documents, each of which shall be in form and substance acceptable to the Bank:

(i)    a fully executed original of this First Amendment; and

(ii)    such other agreements, documents and instruments as the Bank may reasonably request.

B.     No Event of Default or Default exists under the Credit Agreement, as amended by this First Amendment, or the other Loan Documents;

C.     No claims, litigation, arbitration proceedings or governmental proceedings not disclosed in writing to the Bank prior to the date of hereof shall be pending or known to be threatened against Borrower and no known material development not so disclosed shall have occurred in any claims, litigation, arbitration proceedings or governmental proceedings so disclosed which in the opinion of the Bank is likely to materially or adversely affect the financial position or business of Borrower or the capability of Borrower to pay its obligations and liabilities to the Bank; and

D.     There shall have been no material or adverse change in the business, financial condition or results of operations since the date of Borrower's most recently delivered financial statements to the Bank.

IV.     **Organizational Information**.  The Borrower hereby represents and warrants to the Bank that (a) the organizational documents of Borrower attached to the Corporate Resolutions Certificate dated June 14, 2017, executed and delivered by Borrower to the Bank  (the "Certificate") have not been modified or altered in any way, (b) the officers for Borrower set forth in the Certificate that are authorized to execute documents on behalf of Borrower remain duly authorized officers of Borrower, (c) the resolutions attached to the Certificate have not been modified, rescinded or altered in any way and are sufficient to authorize the execution and delivery of this First Amendment and the other agreements, documents and instruments executed and delivered in connection herewith, and (d) Borrower is and continues to be in good standing in the state of its formation and in all other states where it is required to be authorized to do business where the failure to do so could reasonably be expected to have a Material Adverse Effect.

V.     **Conflict**.  If, and to the extent, the terms and provisions of this First Amendment contradict or conflict with the terms and provisions of the Credit Agreement, the terms and provisions of this First Amendment shall govern and control; provided, however, to the extent the terms and provisions of this First Amendment do not contradict or conflict with the terms and provisions of the Credit Agreement, the Credit Agreement, as amended by this First Amendment, shall remain in and have its intended full force and effect, and the Bank and Borrower hereby affirm, confirm and ratify the same.

VI.     **Severability.**  Wherever possible, each provision of this First Amendment shall be interpreted in such manner as to be valid and enforceable under applicable law, but if any provision of this First Amendment is held to be invalid or unenforceable by a court of competent jurisdiction, such provision shall be severed herefrom and such invalidity or unenforceability shall not affect any other provision of this First Amendment, the balance of which shall remain in and have its intended full force and effect.  Provided, however, if such provision may be modified so as to be valid and enforceable as a matter of law, such provision shall be deemed to be modified so as to be valid and enforceable to the maximum extent permitted by law.

VII.     **Reaffirmation**.  Borrower hereby reaffirms and remakes all of their representations, warranties, covenants, duties, obligations and liabilities contained in the Credit Agreement, as amended hereby.

VIII.     **Fees, Costs and Expenses**.  Borrower agrees to pay, upon demand, all fees, costs and expenses of the Bank, including, but not limited to, reasonable attorneys' fees, in connection with the preparation, execution, delivery and administration of this First Amendment and the other agreements, documents and instruments executed and delivered in connection herewith or pursuant hereto.

IX.     **Choice of Law**.  This First Amendment has been delivered and accepted in Chicago, Illinois, and shall be governed by and construed in accordance with the laws of the State of Illinois, regardless of the laws that might otherwise govern under applicable principles of conflicts of law as to all matters, including matters of validity, construction, effect, performance and remedies.

X.      **Counterpart**.  This First Amendment may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.  A facsimile or email transmitted executed counterpart to this First Amendment and the other agreements, documents and instruments executed in connection herewith will be deemed an acceptable original for purposes of consummating this First Amendment and such other agreements, documents and instruments; provided, however, Borrower shall be required to deliver to the Bank original executed signature pages in substitution for said facsimile or email transmitted signature pages upon the Bank's request therefor.

XI.     **Waiver of Jury Trial**.  BORROWER AND THE BANK EACH HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS FIRST AMENDMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY.

[signature pages follow]

This First Amendment is entered into between the parties hereto for the uses and purposes hereinabove set forth as of the date first above written.

*"BORROWER"*

**ARRO CORPORATION,**
an Illinois corporation

By: _____
Name: Patrick Gaughan
Title: President

*"BANK"*

BMO HARRIS BANK N.A.

By: _____
Name: _____
Title: _____

*[Signature page to First Amendment Credit Agreement]*

This First Amendment is entered into between the parties hereto for the uses and purposes hereinabove set forth as of the date first above written.

"BORROWER"

**ARRO CORPORATION**,
an Illinois corporation


By: _____
Name:  Patrick Gaughan
Title:    President


"BANK"

BMO HARRIS BANK N.A.


By: _____
Name: _____
Title: _____

## SECOND AMENDMENT TO CREDIT AGREEMENT

THIS SECOND AMENDMENT TO CREDIT AGREEMENT dated as of June 11, 2018 (this "Second Amendment") is entered into by and between ARRO CORPORATION, an Illinois corporation ("Borrower"), and BMO HARRIS BANK N.A., a national banking association (the "Bank").

## WITNESSETH:

**WHEREAS,** prior hereto, the Bank provided certain loans, extensions of credit and other financial accommodations to Borrower pursuant to (a) that Credit Agreement dated as of June 14, 2017, as amended by that certain First Amendment to Credit Agreement dated as of September 20, 2017, each by and between the Bank and Borrower (collectively, the "Credit Agreement"), and (b) the other documents, agreements and instruments referenced in the Credit Agreement or executed and delivered pursuant thereto;

**WHEREAS,** Borrower desires the Bank to, among other things, (i) increase the Revolving Credit Commitment, (ii) amend the Financial Covenant in Section 7.12(a) of the Credit Agreement, and (iii) amend the Applicable Margin (collectively, the "Additional Financial Accommodations"); and

**WHEREAS,** the Bank is willing to provide the Additional Financial Accommodations, but solely on the terms and subject to the provisions set forth in this Second Amendment and the other agreements, documents and instruments referenced herein or executed and delivered pursuant hereto.

**NOW, THEREFORE,** in consideration of the foregoing, the mutual promises and understandings of the parties hereto set forth herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Bank and Borrower hereby agree as set forth in this Second Amendment.

## I.   **Definitions:**

A.   <u>Use of Defined Terms</u>.  Except as expressly set forth in this Second Amendment, all terms which have an initial capital letter where not required by the rules of grammar are defined in the Credit Agreement, as amended hereby.

B.   <u>Amended Definition</u>. Effective as of the date of this Second Amendment, Section 1.1 of the Credit Agreement is hereby amended by deleting the definitions of "Applicable Margin" and "Revolving Credit Commitment" contained therein in their entirety and substituting therefor the following:

*"Applicable Margin"* means, with respect to Loans, Reimbursement Obligations, and the commitment fees, as of the Second Amendment Effective Date until the first Pricing Date, the rates per annum shown opposite Level III below, and thereafter from one Pricing Date to the next the Applicable Margin means the rates per annum determined in accordance with the following schedule:

| Level | Total Operating Debt/EBITDA Ratio for Such Pricing Date | Applicable Margin for (i) Revolving Loans that are Base Rate Loans and (ii) Reimbursement Obligations shall be: | Applicable Margin for (i) Revolving Loans that are Eurodollar Loans (ii) Daily LIBOR Rate Loans, and (iii) Letter of Credit Fee shall be: | Applicable Margin for Term Loans that are Base Rate Loans shall be: | Applicable Margin for Term Loans that are (i) Eurodollar Loans, and (ii) Daily LIBOR Rate Loans shall be: | Applicable Margin for Commitment Fee shall be: |
|---|---|---|---|---|---|---|
| IV | Greater than or equal to 3.75 to 1.0 | 0.50% | 3.25% | 0.50% | 3.25% | 0.30% |
| III | Less than 3.75 to 1.0 but greater than or equal to 3.0 to 1.0 | 0.25% | 2.75% | 0.25% | 2.75% | 0.25% |
| II | Less than 3.0 to 1.0, but greater than or equal to 2.0 to 1.0 | 0.00% | 2.25% | 0.00% | 2.25% | 0.20% |
| I | Less than 2.0 to 1.0 | -0.25% | 2.00% | -0.25% | 2.00% | 0.15% |

For purposes hereof, the term "Pricing Date" means, for any fiscal quarter of Borrower ending on or after June 30, 2018, the date on which Bank is in receipt of Borrower's most recent financial statements (and, in the case of the year-end financial statements, audit report) for the fiscal quarter then ended, pursuant to Section 6.5. The Applicable Margin shall be established based on the Total Operating Debt/EBITDA Ratio for the most recently completed fiscal quarter and the Applicable Margin established on a Pricing Date shall remain in effect until the next Pricing Date. If Borrower has not delivered its financial statements by the date such financial statements (and, in the case of the year-end financial statements, audit report) are required to be delivered under Section 6.5, until such financial statements and audit report are delivered, the Applicable Margin shall be the highest Applicable Margin (i.e., Level IV shall apply). If Borrower subsequently delivers such financial statements before the next Pricing Date, the Applicable Margin established by such late delivered financial statements shall take effect from the date of delivery until the next Pricing Date. In all other circumstances, the Applicable Margin established by such financial statements shall be in effect from the Pricing Date that occurs immediately after the end of the fiscal quarter covered by such financial statements until the next Pricing Date. Each determination of the Applicable Margin made by Bank in accordance with the foregoing shall be conclusive and binding on Borrower absent manifest error.

If, as a result of any restatement of or other adjustment to the financial statements of the Borrower or for any other reason, the Borrower or the Bank determines that (i) the Total Operating Debt/EBITDA Ratio as calculated by the Borrower as of any applicable date was inaccurate and (ii) a proper calculation of the Total Operating Debt/EBITDA Ratio would have resulted in higher pricing for such period, the Borrower shall immediately and retroactively be obligated to pay to Bank, promptly on demand by Bank (or, after the occurrence of any Event of Default described in Section 8.1(j) or (k) with respect to Borrower has occurred and is continuing, automatically and without further action by Bank), an amount equal to the excess of the amount of interest and fees that should have been paid for such period over the amount of interest and fees actually paid for such period. This paragraph shall not limit the rights of Bank under any other provision of the Loan

Documents. The Borrower's obligations under this paragraph shall survive the termination of the Commitments and the repayment of all other Obligations hereunder.

*"Revolving Credit Commitment"* means the obligation of Bank to make Revolving Loans and to issue Letters of Credit hereunder in an aggregate principal or face amount at any one time outstanding not to exceed $15,500,000.00.

C.    New Definition. Effective as of the date of this Second Amendment, Section 1.1 of the Credit Agreement is hereby amended by adding the following definition thereto in the appropriate alphabetical order:

*"Second Amendment Effective Date"* means June 11, 2018.

II.    **Amendment to Credit Agreement.** Effective as of the date of this Second Amendment, the Credit Agreement is hereby amended by deleting Section 7.12(a) in its entirety and substituting therefor the following:

*Section 7.12    Financial Covenants.*

(a)    *Total Operating Debt/EBITDA Ratio.* As of the last day of each fiscal quarter of Borrower ending during the relevant period set forth below, Borrower shall not permit the Total Operating Debt/EBITDA Ratio to be greater than the corresponding ratio set forth opposite such period:

| Period(s) Ending | Total Operating Debt/EBITDA Ratio shall not be greater than: |
| --- | --- |
| Fiscal quarters ending on 6/30/2018 And 9/30/2018 | 4.25 to 1.0 |
| Fiscal quarter ending on 12/31/2018 | 3.75 to 1.0 |
| Fiscal quarter ending on 3/31/2019 | 3.50 to 1.0 |
| Fiscal quarter ending on 6/30/2019 | 3.25 to 1.0 |
| Fiscal quarters ending on 9/30/2019 and all fiscal quarters thereafter | 3.0 to 1.0 |

III.    **Conditions Precedent**. The Bank's obligation to provide the Additional Financial Accommodations to Borrower is subject to the full and timely performance of the following conditions precedent:

A.    Borrower executing and delivering, or causing to be executed and delivered to the Bank, the following documents, each of which shall be in form and substance acceptable to the Bank:

(i)    a fully executed original of this Second Amendment;

(ii)    a fully executed original Corporate Resolutions Certificate;

(iii)    a fully executed original Revolving Loan Note; and

(iv)    such other agreements, documents and instruments as the Bank may reasonably request.

B.      No Event of Default or Default exists under the Credit Agreement, as amended by this Second Amendment, or the other Loan Documents;

C.      No claims, litigation, arbitration proceedings or governmental proceedings not disclosed in writing to the Bank prior to the date of hereof shall be pending or known to be threatened against Borrower and no known material development not so disclosed shall have occurred in any claims, litigation, arbitration proceedings or governmental proceedings so disclosed which in the opinion of the Bank is likely to materially or adversely affect the financial position or business of Borrower or the capability of Borrower to pay its obligations and liabilities to the Bank; and

D.      There shall have been no material or adverse change in the business, financial condition or results of operations since the date of Borrower's most recently delivered financial statements to the Bank.

IV.     **Conflict**.  If, and to the extent, the terms and provisions of this Second Amendment contradict or conflict with the terms and provisions of the Credit Agreement, the terms and provisions of this Second Amendment shall govern and control; provided, however, to the extent the terms and provisions of this Second Amendment do not contradict or conflict with the terms and provisions of the Credit Agreement, the Credit Agreement, as amended by this Second Amendment, shall remain in and have its intended full force and effect, and the Bank and Borrower hereby affirm, confirm and ratify the same.

V.      **Severability.**  Wherever possible, each provision of this Second Amendment shall be interpreted in such manner as to be valid and enforceable under applicable law, but if any provision of this Second Amendment is held to be invalid or unenforceable by a court of competent jurisdiction, such provision shall be severed herefrom and such invalidity or unenforceability shall not affect any other provision of this Second Amendment, the balance of which shall remain in and have its intended full force and effect. Provided, however, if such provision may be modified so as to be valid and enforceable as a matter of law, such provision shall be deemed to be modified so as to be valid and enforceable to the maximum extent permitted by law.

VI.     **Reaffirmation**.  Borrower hereby reaffirms and remakes all of their representations, warranties, covenants, duties, obligations and liabilities contained in the Credit Agreement, as amended hereby.

VII.    **Fees, Costs and Expenses**.  Borrower agrees to pay, upon demand, all fees, costs and expenses of the Bank, including, but not limited to, reasonable attorneys' fees, in connection with the preparation, execution, delivery and administration of this Second Amendment and the other agreements, documents and instruments executed and delivered in connection herewith or pursuant hereto.

VIII.   **Choice of Law**.  This Second Amendment has been delivered and accepted in Chicago, Illinois, and shall be governed by and construed in accordance with the laws of the State of Illinois, regardless of the laws that might otherwise govern under applicable principles of conflicts of law as to all matters, including matters of validity, construction, effect, performance and remedies.

IX.     **Counterpart**.  This Second Amendment may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. A facsimile or email transmitted executed counterpart to this Second Amendment and the other agreements,

documents and instruments executed in connection herewith will be deemed an acceptable original for purposes of consummating this Second Amendment and such other agreements, documents and instruments; provided, however, Borrower shall be required to deliver to the Bank original executed signature pages in substitution for said facsimile or email transmitted signature pages upon the Bank's request therefor.

X.      **Waiver of Jury Trial**.  BORROWER AND THE BANK EACH HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS SECOND AMENDMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY.

[signature pages follow]

This Second Amendment is entered into between the parties hereto for the uses and purposes hereinabove set forth as of the date first above written.

"BORROWER"

**ARRO CORPORATION,**
an Illinois corporation

By: _____
Name:  Patrick Gaughan
Title:    President

"BANK"

BMO HARRIS BANK N.A.

By: _____
Name: _____
Title: _____

*[Signature page to Second Amendment Credit Agreement]*

This Second Amendment is entered into between the parties hereto for the uses and purposes hereinabove set forth as of the date first above written.

*"BORROWER"*

**ARRO CORPORATION,**
an Illinois corporation

By: _____
Name:  Patrick Gaughan
Title:   President

*"BANK"*

BMO HARRIS BANK N.A.

By: _____
Name: *Julie Hughes*
Title: *Vice President*

*[Signature page to Second Amendment Credit Agreement]*

## THIRD AMENDMENT TO CREDIT AGREEMENT

THIS THIRD AMENDMENT TO CREDIT AGREEMENT dated as of September 11, 2018 (this "Third Amendment") is entered into by and between ARRO CORPORATION, an Illinois corporation ("Borrower"), and BMO HARRIS BANK N.A., a national banking association (the "Bank").

### W I T N E S S E T H :

**WHEREAS,** prior hereto, the Bank provided certain loans, extensions of credit and other financial accommodations to Borrower pursuant to (a) that Credit Agreement dated as of June 14, 2017, as amended by that certain First Amendment to Credit Agreement dated as of September 20, 2017, and that certain Second Amendment to Credit Agreement dated as of June 11, 2018, each by and between the Bank and Borrower (collectively, the "Credit Agreement"), and (b) the other documents, agreements and instruments referenced in the Credit Agreement or executed and delivered pursuant thereto;

**WHEREAS,** Borrower desires the Bank to, among other things, (a) increase the Revolving Credit Commitment from $15,500,000 to $18,000,000, and (b) modify certain financial covenants (the "Additional Financial Accommodations"); and

**WHEREAS,** the Bank is willing to provide the Additional Financial Accommodations, but solely on the terms and subject to the provisions set forth in this Third Amendment and the other agreements, documents and instruments referenced herein or executed and delivered pursuant hereto.

**NOW, THEREFORE,** in consideration of the foregoing, the mutual promises and understandings of the parties hereto set forth herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Bank and Borrower hereby agree as set forth in this Third Amendment.

I.   **Definitions:**

A.   <u>Use of Defined Terms</u>.  Except as expressly set forth in this Third Amendment, all terms which have an initial capital letter where not required by the rules of grammar are defined in the Credit Agreement, as amended hereby.

B.   <u>Amended Definitions</u>. Effective as of the Third Amendment Effective Date (as hereinafter defined), Section 1.1 of the Credit Agreement is hereby amended by deleting the definitions of "Revolving Credit Commitment" and "Total Operating Debt" contained therein in their entirety and substituting therefor the following, respectively:

*"**Revolving Credit Commitment**"* means the obligation of Bank to make Revolving Loans and to issue Letters of Credit hereunder in an aggregate principal or face amount at any one time outstanding not to exceed $18,000,000.00.

*"**Total Operating Debt**"* means, at any time the same is to be determined for any Person, the sum (but without duplication) of (a) all Indebtedness for Borrowed Money of such Person at such time, excluding the SBA Loans, and (b) all Indebtedness for Borrowed Money of any other Person which is directly or indirectly guaranteed by such Person or which such Person has agreed (contingently or otherwise) to purchase or otherwise acquire or in respect of which such Person has otherwise assured a creditor against loss. Notwithstanding the foregoing, for the test period ending

September 30, 2018 only, the definition of Indebtedness for Borrowed Money as used herein shall exclude the ExWorks Bridge Loan.

C.     New Definitions. Effective as of the Third Amendment Effective Date, Section 1.1 of the Credit Agreement is hereby amended by adding the following definitions thereto in the appropriate alphabetical order:

> "**ExWorks Bridge Loan**" means that certain bridge loan made by ExWorks Capital Fund, I, L.P., a Delaware limited Partnership, to Arro Ingredient Group LLC, an Illinois limited liability company, on or around July 12, 2018 in the principal amount of $3,000,000

> "**Third Amendment Effective Date**" means September 11, 2018.

II.     **Amendment to Credit Agreement.** Effective as of the Third Amendment Effective Date, Exhibit "A-2" attached to the Credit Agreement is hereby amended by deleting such Exhibit in its entirety and substituting therefor Exhibit "A-2" attached to this Third Amendment.

III.     **Conditions Precedent**. The Bank's obligation to provide the Additional Financial Accommodations to Borrower is subject to the full and timely performance of the following conditions precedent:

A.     Borrower executing and delivering, or causing to be executed and delivered to the Bank, the following documents, each of which shall be in form and substance acceptable to the Bank:

> (i)     a fully executed original of this Third Amendment;

> (ii)     a fully executed original Corporate Resolutions Certificate;

> (iii)     a fully executed original Revolving Note;

> (iv)     a fully executed Reaffirmation of Guaranty executed and delivered by Guarantors to Bank, and

> (v)     such other agreements, documents and instruments as the Bank may reasonably request.

B.     No Event of Default or Default exists under the Credit Agreement, as amended by this Third Amendment, or the other Loan Documents;

C.     No claims, litigation, arbitration proceedings or governmental proceedings not disclosed in writing to the Bank prior to the date of hereof shall be pending or known to be threatened against Borrower and no known material development not so disclosed shall have occurred in any claims, litigation, arbitration proceedings or governmental proceedings so disclosed which in the opinion of the Bank is likely to materially or adversely affect the financial position or business of Borrower or the capability of Borrower to pay its obligations and liabilities to the Bank; and

D.     There shall have been no material or adverse change in the business, financial condition or results of operations since the date of Borrower's most recently delivered financial statements to the Bank.

IV.    **Conflict**.  If, and to the extent, the terms and provisions of this Third Amendment contradict or conflict with the terms and provisions of the Credit Agreement, the terms and provisions of this Third Amendment shall govern and control; provided, however, to the extent the terms and provisions of this Third Amendment do not contradict or conflict with the terms and provisions of the Credit Agreement, the Credit Agreement, as amended by this Third Amendment, shall remain in and have its intended full force and effect, and the Bank and Borrower hereby affirm, confirm and ratify the same.

V.    **ExWorks Bridge Loan Repayment Terms**.  Prior to the Third Amendment Effective Date, Bank consented to certain intercompany transactions between Borrower and Arro Ingredient Group LLC, an Illinois limited liability company ("AIG"), pursuant to that certain consent letter dated as of July 12, 2018, delivered by Bank and acknowledged and agreed to by Borrower and the other parties thereto (the "Consent Letter"), including, but not limited to consenting to the ExWorks Bridge Loan. Provided the conditions precedent set forth in Section III above are fully and timely satisfied, Bank hereby consents to the extension of the repayment period of the ExWorks Bridge Loan, as set forth in Section 4 on page two of the Consent Letter, from October 12, 2018, to November 30, 2018. Notwithstanding any terms in the Consent Letter to the contrary, Bank hereby consents, and Borrower hereby covenants and agrees, that if the ExWorks Bridge Loan is not repaid by November 30, 2018, then, not later than November 30, 2018, Borrower and AIG shall enter into a management services agreement, cost sharing agreement and sublease agreement providing for the payment by AIG to Borrower of certain amounts in consideration of AIG's use of Borrower's facilities, employees and resources, each upon arm's length terms satisfactory to Bank in its sole discretion.

VI.    **Severability.**  Wherever possible, each provision of this Third Amendment shall be interpreted in such manner as to be valid and enforceable under applicable law, but if any provision of this Third Amendment is held to be invalid or unenforceable by a court of competent jurisdiction, such provision shall be severed herefrom and such invalidity or unenforceability shall not affect any other provision of this Third Amendment, the balance of which shall remain in and have its intended full force and effect.  Provided, however, if such provision may be modified so as to be valid and enforceable as a matter of law, such provision shall be deemed to be modified so as to be valid and enforceable to the maximum extent permitted by law.

VII.    **Reaffirmation**.  Borrower hereby reaffirms and remakes all of their representations, warranties, covenants, duties, obligations and liabilities contained in the Credit Agreement, as amended hereby.

VIII.    **Fees, Costs and Expenses**.  Borrower agrees to pay, upon demand, all fees, costs and expenses of the Bank, including, but not limited to, reasonable attorneys' fees, in connection with the preparation, execution, delivery and administration of this Third Amendment and the other agreements, documents and instruments executed and delivered in connection herewith or pursuant hereto.

IX.    **Choice of Law**.  This Third Amendment has been delivered and accepted in Chicago, Illinois, and shall be governed by and construed in accordance with the laws of the State of Illinois, regardless of the laws that might otherwise govern under applicable principles of conflicts of law as to all matters, including matters of validity, construction, effect, performance and remedies.

X.    **Counterpart**.  This Third Amendment may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.  A facsimile or email transmitted executed counterpart to this Third Amendment and the other agreements, documents and instruments executed in connection herewith will be deemed an acceptable original for purposes of consummating this Third Amendment and such other agreements, documents and instruments; provided, however, Borrower shall be required to deliver to the Bank original executed signature pages in

substitution for said facsimile or email transmitted signature pages upon the Bank's request therefor.

XI. **Waiver of Jury Trial**. BORROWER AND THE BANK EACH HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS THIRD AMENDMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY.

[signature pages follow]

This Third Amendment is entered into between the parties hereto for the uses and purposes hereinabove set forth as of the date first above written.

*"BORROWER"*

**ARRO CORPORATION,**
an Illinois corporation

By: _____
Name: Patrick Gaughan
Title:   President

*"BANK"*

**BMO HARRIS BANK N.A.**

By: _____
Name: _____
Title: _____

*[Signature Page to Third Amendment Credit Agreement]*

## Revolving Note

U.S. $18,000,000.00                                              September 11, 2018

For Value Received, the undersigned, Arro Corporation, an Illinois corporation (*"Borrower"*), hereby promises to pay to BMO Harris Bank N.A. (*"Bank"*) at the principal office of Bank in Chicago, Illinois (or such other location as Bank may designate to Borrower), in immediately available funds, the principal sum of Eighteen Million and no/100 Dollars ($18,000,000.00) or, if less, the aggregate unpaid principal amount of all Revolving Loans made by Bank to Borrower pursuant to the Credit Agreement, together with interest on the principal amount of each Revolving Loan from time to time outstanding hereunder at the rates, and payable in the manner and on the dates, specified in the Credit Agreement.

This Revolving Note (this *"Note"*) is one of the Revolving Notes referred to in the Credit Agreement dated as of June 14, 2017, as amended by that certain First Amendment to Credit Agreement dated as of September 20, 2017, that certain Second Amendment to Credit Agreement dated as of June 11, 2018, and that certain Third Amendment to Credit Agreement of even date herewith, each by and between Borrower and Bank (as may be further extended, renewed, amended or restated from time to time, collectively the *"Credit Agreement"*), and this Note and the holder hereof are entitled to all the benefits and security provided for thereby or referred to therein, to which Credit Agreement reference is hereby made for a statement thereof. All defined terms used in this Note, except terms otherwise defined herein, shall have the same meaning as in the Credit Agreement. This Note shall be governed by and construed in accordance with the internal laws of the State of Illinois.

Voluntary prepayments may be made hereon, certain prepayments are required to be made hereon, and this Note may be declared due prior to the expressed maturity hereof, all in the events, on the terms and in the manner as provided for in the Credit Agreement.

This Note is a renewal, amendment and substitution, and not a discharge, novation or in satisfaction, of that certain Revolving Note dated as of June 11, 2018, executed and delivered by Borrower to the Bank, in a maximum aggregate principal amount not to exceed Fifteen Million Five Hundred Thousand and no/100 Dollars ($15,500,000.00).

[signature page follows]

Borrower hereby waives demand, presentment, protest or notice of any kind hereunder.

**ARRO CORPORATION,**
an Illinois corporation

By _____
Name: Patrick Gaughan
Title: President

*[Signature Page to Revolving Note]*