## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| ARRO CORPORATION, f/ka ARRO PACKAGING COMPANY, | Case No. 19-35238 |
| Debtor. | Honorable Janet S. Baer |
|  | Hearing Date: March 5, 2020<br>Hearing Time: 4:00 p.m. |

## ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF INTERESTS INCLUDING LIENS, CLAIMS, AND ENCUMBRANCES; (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF

Upon consideration of the motion (the "Motion")[1] dated January 15, 2020 of the above-captioned debtor and debtor-in-possession (the "Debtor"), for, *inter alia,* entry of an order (this "Order") (A) approving the sale (the "Sale") of substantially all of the Debtor's assets free and clear of all interests including "Liens" (as defined in 11 U.S.C. § 101(37), "Claims" (as defined in 11 U.S.C. § 101(5)), and encumbrances (collectively with all Liens and Claims, the "Interests"), except to the extent set forth in the Asset Purchase Agreement (hereinafter defined), or this Order, pursuant to sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code"), and Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); (B) authorizing the assumption and assignment of certain executory contracts and unexpired leases (the "Assumed Executory Contracts/Leases") identified by the Buyer and more fully described in that certain Asset Purchase

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Sale Procedures Order granting the Motion, or the Asset Purchase Agreement (as each of these term is hereinafter defined), as applicable.

Agreement dated March 3, 2020 attached hereto as <u>Exhibit A</u> and hereby expressly incorporated herein (the "<u>Asset Purchase Agreement</u>") by and between the Debtor as Seller and Mount Franklin Foods, LLC or its Affiliated assignee as Buyer (together with its successors and assigns, the "<u>Buyer</u>") for the purchase of the Sale Property; and (C) granting related relief; and the Debtor, after consultation with the Constituent Parties (as defined in the Sale Procedures Order), having determined that the highest and otherwise best offer for the Sale Property was made by the Buyer in the form of the Asset Purchase Agreement; and a hearing having been held before the Bankruptcy Court on March 5, 2020 (the "<u>Sale Hearing</u>") to approve the Sale and the Asset Purchase Agreement; and the Bankruptcy Court (the "<u>Court</u>") having reviewed and considered (x) the Motion, (y) the objections thereto and resolution of certain of the objections as announced on the record, (z) the arguments of counsel made, and the evidence proffered or adduced at the Sale Hearing; and it appearing that the relief requested in the Motion is in the best interest of the Debtor, its estate and creditors, and other parties in interest; and upon the record of the Sale Hearing and this Bankruptcy Case; and after due deliberation thereon; and good cause appearing therefor,

## IT IS HEREBY FOUND AND DETERMINED THAT:

A.     <u>**Fed. R. Bankr. P. 7052**</u>. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. The Court's findings also shall include any oral findings of fact and conclusions of law made by the Court on the record during or at the conclusion of the Sale Hearing.

**B.** **Jurisdiction and Venue**. The Court has jurisdiction over the Motion pursuant to 28 U.S.C. § 157 and 1334, and this matter is a core proceeding pursuant to, *inter alia*, 28 U.S.C. § 157(b)(2)(A) and § 157(b)(2)(N). Venue of this case and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

**C.** **Statutory Predicates**. The statutory predicates for the relief sought in the Motion are sections 105(a), 363 and 365 of the Bankruptcy Code, and Rules 2002, 6004, 6006 and 9014 of the Bankruptcy Rules.

**D.** **Final Order**. This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rule of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court finds that there is no just reason for delay in the implementation of this Order, and directs entry of judgment as set forth herein. No appeal, motion to reconsider, or similar pleading has been filed with respect to the Sale Procedures Order, and the Sale Procedures Order is a final order of the Court, has not been vacated, withdrawn, rescinded, or amended (except as to an *Amended Order Granting Oral Motion to Continue Sale Hearing, Extend Related Deadlines, and Amend Approved Bidding Procedures* dated March 3, 2020 [Dkt. No. 156]) and remains in full force and effect.

**E.** **Petition Date**. On December 13, 2019 (the "Petition Date"), the Debtor commenced this case by filing a petition for relief under chapter 11 of the Bankruptcy Code.

**F.** **Retention of Investment Banker**. On January 16, 2020, the Court entered that certain *Order Authorizing the Debtor's Retention and Employment of Livingstone Partners, LLC as Investment Bankers* ("Livingstone") pursuant to that certain Engagement Agreement between the Debtor and Livingstone dated as of December 13, 2019 ("Livingstone Engagement

Agreement"), retroactive to December 13, 2019, to market and solicit offers to purchase the Debtor's Business and the Sale Property [Dkt No. 89] (the "Livingstone Retention Order").

G.    **Entry of Sale Procedures Order.**    On January 27, 2020, this Court entered an order (the "Sale Procedures Order") [Dkt. No. 106] (a) establishing bidding and auction procedures (the "Approved Bidding Procedures"); (b) approving a form of asset purchase agreement; (c) scheduling an auction (the "Auction") and sale hearing for the Sale of the Sale Property; (d) establishing procedures for the assumption and assignment of the Assumed Executory Contracts/Leases, and for noticing and determining Cure Costs related thereto; (e) approving the form and matter of notice of all procedures, protections, schedules and agreements; and (f) granting certain related relief.

H.    **Compliance with Sale Procedures Order.**    The Approved Bidding Procedures were substantively and procedurally fair to all parties.  As demonstrated by (a) the testimony and other evidence proffered or adduced at the Sale Hearing, and (b) the representations of counsel made on the record at the Sale Hearing, the Debtor has conducted the sale process in compliance with the Sale Procedures Order and the Approved Bidding Procedures, and the Auction was duly noticed and conducted in a non-collusive, fair and good faith manner.  The Debtor and its professionals have actively marketed the Sale Property and conducted the Sale process in compliance with the Sale Procedures Order, and have afforded potential purchasers a full and fair opportunity to make higher and better offers.

I.    **Notice.**    As evidenced by the affidavits of service previously filed with the Court [Dkt. Nos. 127, 129, 131, 132, 154], and based upon the representations of counsel at the Sale Hearing: (a) proper, timely, adequate and sufficient notice of the Motion, the Sale Hearing (including its prior continuance), the Sale, the assumption and assignment procedures for the

Assumed Executory Contracts/Leases (including the objection deadline with respect to any Cure Costs), and the assumption and assignment of the Assumed Executory Contracts/Leases and Cure Amounts has been provided in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006 and in compliance with the Sale Procedures Order, (b) such notice was good and sufficient, and appropriate under the particular circumstances, and (c) no other or further notice of the Motion, the Sale Hearing, the Sale, or the assumption and assignment of the Assumed Executory Contracts/Leases is or shall be required.

J.    **Auction**. At or prior to the Bid Deadline, the Debtor received six (6) Qualified Bids from five (5) Qualified Bidders and conducted the Auction over a period of three (3) days, culminating in the Asset Purchase Agreement submitted by the Buyer being deemed the Prevailing Bid, and a different asset purchase agreement submitted by Impact Food Manufacturing, LLC being designated as the Back-Up Bid (*See* Docket No. 157).

K.    **Corporate Authority**. The Debtor (a) has full corporate power and authority to execute the Asset Purchase Agreement and all other documents contemplated thereby, and the Sale of the Sale Property by the Debtor has been duly and validly authorized by all necessary corporate action of the Debtor, (b) has all of the corporate power and authority necessary to consummate the transactions contemplated by the Asset Purchase Agreement, (c) has taken all corporate action necessary to authorize and approve the Asset Purchase Agreement and the consummation by the Debtor of the transactions contemplated thereby, and (d) no consents or approvals, other than those expressly provided for in the Asset Purchase Agreement or this Order, are required for the Debtor to consummate such transactions.

L.    **Opportunity to Object**. A fair and reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested

VP/#27489593.2 1074225.4

persons and entities, including: (a) the Office of the United States Trustee for Region 11; (b) counsel for BMO Harris Bank N.A; (c) counsel for the United States Small Business Administration; (d) counsel for the Official Committee of Unsecured Creditors; (e) counsel for the Buyer; (f) all entities reasonably known by the Debtor (or its representatives and retained professionals) to have an interest in the Sale Property; (g) all parties to the Debtor's contracts and leases; (h) the District Director of the Internal Revenue Service for the Northern District of Illinois; (i) the Office of the Attorney General of Illinois; (j) all taxing authorities identified in the Bankruptcy Schedules filed in this proceeding; (k) all equity security holders of the Debtor; and (l) all entities filing notices of appearance or requests for notice under Bankruptcy Rule 2002 in this Bankruptcy Case.

**M.**     **Sale in Best Interest**. Consummation of the Sale of the Sale Property to the Buyer pursuant to the Asset Purchase Agreement is in the best interests of the Debtor, its creditors, its estate and other parties in interest.

**N.**     **Sound Business Justification**. Sound business reasons exist for the Sale. Entry into the Asset Purchase Agreement constitutes the Debtor's exercise of sound business judgment and such act is in the best interests of the Debtor, its estate, and all parties in interest. The Court finds that the Debtor has articulated good and sufficient business reasons justifying the Sale. Such business reasons include, but are not limited to, the following: (a) the Asset Purchase Agreement constitutes the highest and best offer for the Sale Property; (b) the Asset Purchase Agreement and the closing thereon will present the best opportunity to realize the value of the Sale Property on a going concern basis and avoid decline and devaluation of the Sale Property; and (c) under the circumstances of this Bankruptcy Case, the Debtor is unable to propose a plan of reorganization

VP/#27489593.2 1074225.4

that would be confirmable prior to the expiration of debtor-in-possession financing or that would meet the requirements of section 1129 of the Bankruptcy Code.

**O.**   **Arm's-Length Sale**.  The Asset Purchase Agreement was negotiated, proposed and entered into by the Debtor and the Buyer without collusion, in good faith, and from arm's-length bargaining positions.  Neither the Debtor nor the Buyer have engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided under section 363(m) or (n) of the Bankruptcy Code.

**P.**   **Successful Bidder; Highest and Best Value**.  After conclusion of the Auction, the Debtor determined, in accordance with its business judgment and in consultation with the Constituent Parties (as defined in the Approved Bidding Procedures) that the Asset Purchase Agreement was (a) a Qualified Bid and (b) the highest and best bid for the Sale Property made at the Auction.  As a result, the Debtor declared Buyer the Prevailing Bidder (as defined in the Approved Bidding Procedures) for the Sale Property in accordance with the terms of the Sale Procedures Order.  The Debtor conducted a fair and open Sale process.  The Sale process, the Approved Bidding Procedures, and the Auction were non-collusive, duly noticed and provided a full, fair, and reasonable opportunity for any person or entity to make an offer to purchase the Sale Property.  The process conducted by the Debtor pursuant to the Approved Bidding Procedures resulted in the highest or best value for the Sale Property for the Debtor and its estate, and any other transaction would not have yielded as favorable an economic result.

**Q.**   **Good Faith Purchaser**.  The Buyer is a good faith purchaser for value and, as such, is entitled to all of the protections afforded under section 363(m) of the Bankruptcy Code and any other applicable or similar bankruptcy and non-bankruptcy law.  The Buyer has been and will be

acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transactions contemplated by the Asset Purchase Agreement.

**R.**    **Fair Consideration**.  The consideration provided by the Buyer for the Sale Property pursuant to the Asset Purchase Agreement (a) is fair and reasonable, (b) is the highest and best offer for the Sale Property, (c) will provide a greater recovery for the Debtor's creditors than would be provided by any other practical available alternative, and (d) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.

**S.**    **Free and Clear Sale; Buyer's Reliance**.  Except as to the certain assets set forth in paragraph 5 of this Order, the Debtor may sell the Sale Property free and clear of all Interests (other than Permitted Encumbrances) because, with respect to each creditor asserting a lien, claim, encumbrance, or interest, one or more of the standards set forth in Bankruptcy Code § 363(f)(1)-(5) has been satisfied.  Those holders of Interests who did not object or withdrew objections to the Sale are deemed to have consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of Interests who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code.  The Buyer would not have entered into the Asset Purchase Agreement and would not consummate the transactions contemplated thereby if the Sale of the Sale Property were not free and clear of all Interests (other than Permitted Encumbrances), or if the Buyer would, or in the future could, be liable for any such Interests (other than Permitted Encumbrances), including, as applicable, certain liabilities related to the Business that will not be assumed by the Buyer, as described in the Asset Purchase Agreement.  A sale of the Sale Property other than one free and clear of all Interests (other than Permitted Encumbrances) would adversely impact the Debtor, its estate, and its creditors, and would yield substantially less value for the

Debtor's estate, with less certainty than provided under the Sale. The total consideration to be provided under the Asset Purchase Agreement reflects the Buyer's reliance on this Order to provide it, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, with title to and possession of the Sale Property free and clear of all Interests (including, without limitation, any potential derivative, vicarious, transferee, or successor liability Interests or Claims), except as set forth in the Asset Purchase Agreement.

T.    **Assumption of Executory Contracts and Unexpired Leases**. Except as provided in the APA, the (a) transfer of the Sale Property to the Buyer and (b) assignment to the Buyer of the Assumed Executory Contracts/Leases, will not subject the Buyer to any liability whatsoever prior to the Closing Date or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, including, without limitation, any theory of antitrust, successor or transferee liability. The Debtor has demonstrated that it is an exercise of its sound business judgment to assume and assign the Assumed Executory Contracts/Leases to the Buyer in connection with the consummation of the Sale, and the assumption and assignment of the Assumed Executory Contracts/Leases is in the best interests of the Debtor, its estate, and its creditors. The Assumed Executory Contracts/Leases being assigned to the Buyer are an integral part of the Sale Property being purchased by the Buyer and, accordingly, such assumption and assignment of Assumed Executory Contracts/Leases is reasonable, enhances the value of the Debtor's estate, and does not constitute unfair discrimination. The assumption and assignment of the Assumed Executory Contracts/Leases is to occur on, or substantially contemporaneously with, Closing.

U.    **Cure/Adequate Assurance**. Except as to the Assignment Objections (defined in paragraph CC below), Buyer, in accordance with the Asset Purchase Agreement, has or will, either by agreement or otherwise, (a) cured, or have provided adequate assurance of cure, of any default existing prior to the date hereof under any of the Assumed Executory Contracts/Leases, within the meaning of section 365(b)(l)(A) of the Bankruptcy Code, and (b) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assumed Executory Contracts/Leases within the meaning of section 365(b)(l)(B) of the Bankruptcy Code. The Buyer has provided adequate assurance of future performance of and under the Assumed Executory Contracts/Leases within the meaning of section 365(b)(l)(C) of the Bankruptcy Code. Assignment Objections are to be resolved as set forth below in this Order.

V.    **Prompt Consummation**. The Sale of the Sale Property must be approved and consummated promptly in order to preserve the value of the Sale Property. Therefore, time is of the essence in consummating the Sale, and the Debtor and the Buyer intend to close the sale as soon as possible in accordance with the Asset Purchase Agreement.

W.    **No Intentional Fraudulent Transfer**. The Asset Purchase Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession or the District of Columbia.

X.    **Buyer Not an Insider and No Successor Liability**. Buyer was not and is not an "insider" or "affiliate" of the Debtor, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors or stockholders exists between Buyer and the Debtor. Pursuant to the Asset Purchase Agreement, Buyer is not purchasing all of the Debtor's assets

VP/#27489593.2 1074225.4

because Buyer is not purchasing any of the Excluded Assets, and Buyer is not holding itself out to the public as a continuation of the Debtor. The Sale does not amount to a consolidation, merger or de facto merger of Buyer and the Debtor and/or the Debtor's estate, there is not substantial continuity between Buyer and the Debtor, there is no continuity of enterprise between the Debtor and the Buyer, the Buyer is not a mere continuation of the Debtor or the Debtor's estate, and the Buyer does not constitute a successor to the Debtor or the Debtor's estate.

Y. **Legal, Valid Transfer**. As of the Closing and payment of the Purchase Price, the transfer of the Sale Property to Buyer will be a legal, valid, and effective transfer of the Sale Property, and will vest Buyer with all right, title, and interest of the Debtor to the Sale Property free and clear of all Interests, except as set forth in the Asset Purchase Agreement or this Order. The consummation of the Sale is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f) and all of the applicable requirements of such sections have been complied with in respect of the Sale.

Z. **Asset Purchase Agreement Not Modified**. The terms of the Asset Purchase Agreement, including any amendments, supplements, and modifications thereto, are fair and reasonable in all respects, and the terms of this Order shall not modify the terms of the Asset Purchase Agreement unless expressly provided herein.

AA. **No *Sub Rosa* Plan**. The Sale does not constitute a *sub rosa* chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford. The Sale neither impermissibly restructures the rights of the Debtor's creditors, nor impermissibly dictates a liquidating plan of reorganization for the Debtor.

VP/#27489593.2 1074225.4

**BB.**   <u>No Liability for Excluded Assets or Excluded Liabilities</u>. By consummating the Sale and the transactions contemplated by the Asset Purchase Agreement, neither the Buyer nor any of the Sale Property will be subject to any claim, liability or obligation arising out of, or relating to, any Excluded Asset or any Excluded Liability, including, without limitation, under the Bankruptcy Code, any environmental law, or any other laws of the United States, any state, territory, possession or the District of Columbia.

**CC.**   <u>Objections</u>. The following objections to the Sale have been filed and are to be addressed as set forth in this Order: (a) as to Cure Amounts or adequate assurance of future performance: (i) Limited Objections of BREIT Industrial Canyon IL1BO3, LLC [Dkt Nos. 97 and 144]; (ii) Objection of Gierczyk, Inc. [Dkt. No. 137]; (iii) Objection of ROSDEV Portfolio IL LLC [Dkt. Nos. 138 and 139]; (iv) Objection of Wells Fargo Financial Leasing, Inc. [Dkt. No. 146]; (v) Objection of HYG Financial Services, Inc. [Dkt. No. 147]; (vi) Objection of Kraft Heinz Company [Dkt. No. 149]; (vii) Objection filed by XTRA Lease, LLC [Dkt. No. 160]; and (viii) Limited Objection of Frito-Lay, Inc., Quaker Manufacturing, LLC, and Golden Grain Company [Dkt. No. 162] (collectively, the "<u>Assignment Objections</u>"); and (b) as to objections to the Sale, generally: (i) Objection of Accord CapX, LLC [Dkt. No. 144]; (ii) the Objection filed by the United States Small Business Administration [Dkt No. 158]; and (iii) the Limited Objection and Reservation of Rights of Official Committee of Unsecured Creditors to Entry of Sale Approval Order [Dkt. No. 161] (collectively, the "<u>Sale Objections</u>").

**DD.**   <u>Legal and Factual Bases</u>. The legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED EFFECTIVE IMMEDIATELY THAT:**

**General Provisions**

1.      The Motion is GRANTED and APPROVED to the extent provided herein.

2.      Excepting the Assignment Objections, and subject to paragraph 42 of this Order, all objections to the Motion or the relief requested therein, including but not limited to the Sale Objections, that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled on the merits and denied with prejudice.

3.      To the extent not resolved during the Sale Hearing, the Assignment Objections are continued for adjudication to Thursday, March 12, 2020 at __10 : 00 a__.m.

**Approval of the Sale of the Sale Property**

4.      The Asset Purchase Agreement including any amendments, supplements and modifications thereto, and all of the terms and conditions therein, is hereby approved in all respects.

5.      Pursuant to 11 U.S.C. § 363(b), the transfer of the Sale Property to the Buyer free and clear of all Interests (except those specifically permitted by the Asset Purchase Agreement), and the transactions contemplated thereby are approved in all respects. Notwithstanding anything contained in this Order or the Asset Purchase Agreement to the contrary, the Sale Property shall specifically exclude the following assets secured by liens in favor of the following parties: (a) two (2) Skyjack Aerial Models 3226, Associated Material Handling Industries (Debtor's Bankruptcy Schedule D, item 2.2); (b) one (1) Enersys model 18-E90-17, Atlas Toyota Material Handling, LLC (Debtor's Bankruptcy Schedule D, item 2.3); and (c) three (3) Enersys models E13-HL-4YE, Atlas Toyota Material Handling, LLC (Debtor's Bankruptcy Schedule D, item 2.4).

6.      Except as otherwise specifically provided in the Asset Purchase Agreement, the Buyer shall not be liable for any claims against the Debtor or any of its predecessors or affiliates

or any other third party whatsoever, and the Buyer shall have no successor or vicarious liabilities of any kind or character (including, without limitation, any products liability claims with respect to any Sale Property, inventory, or other assets sold, shipped or delivered prior to the Closing Date), whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtor or its Business or any obligations of, or claims against, the Debtor or any of its predecessors or affiliates or any other third party whatsoever arising at any time, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the Sale Property prior to the Closing Date.

7.    The transactions contemplated by the Asset Purchase Agreement are undertaken by the Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein by this Order to consummate the Sale shall not affect the validity of the Sale to the Buyer. The Buyer is a purchaser in good faith of the Sale Property, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

8.    As a good faith purchaser of the Sale Property, the Buyer has not entered into an agreement with any other bidders at the Sale, and has not colluded with any of the other bidders, potential bidders or any other parties interested in the Sale Property, and therefore neither the Debtor nor any successor in interest to the Debtor's estate shall be entitled to bring an action against the Buyer, and the Sale may not be avoided pursuant to section 363(n) of the Bankruptcy Code.

**Sale and Transfer of Sale Property**

9.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtor is hereby authorized to transfer the Sale Property to the Buyer and consummate the Sale in accordance with, and subject to the terms and conditions of, the Asset Purchase Agreement and this Order, and to transfer and assign all right, title and interest (including common law rights) to all property, licenses and rights to be conveyed in accordance with, and subject to the terms and conditions of, the Asset Purchase Agreement, and is further authorized and directed to execute and deliver, and are empowered to perform under, consummate and implement, the Asset Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement, including, without limitation, any related documents, exhibits and schedules, and to take all further actions as may be reasonably requested by Buyer for the purposes of assigning, transferring, granting, conveying and conferring to Buyer or reducing to possession, the Sale Property, or as may be necessary or appropriate to the performance of the Debtor's obligations as contemplated by the Asset Purchase Agreement.

10.     Pursuant to sections 363(b) and 363(f) of the Bankruptcy Code and upon payment of the amounts due at Closing under the Asset Purchase Agreement in accordance with this Order, the Sale Property shall be transferred to the Buyer upon the Closing Date free and clear of all Interests (except the Assumed Liabilities and Permitted Encumbrances) of any kind or nature whatsoever including, but not limited to, Interests in respect of the following: (a) any labor agreements; (b) all mortgages, deeds of trust, liens and security interests; (c) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of the Debtor; (d) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim,

including, without limitation, claims that might otherwise arise under or pursuant to (i) the Employee Retirement Income Security Act of 1974, as amended, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the Worker Adjustment and Retraining Act of 1988, (vii) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (viii) the Americans with Disabilities Act of 1990, (ix) the Consolidated Omnibus Budget Reconciliation Act of 1985, (x) the Illinois Worker Adjustment and Retraining Notification Act, (xi) state discrimination laws, (xii) state unemployment compensation laws or any other similar state laws, or (xiii) any other state or federal benefits or claims relating to any employment with the Debtor or any of its affiliates or predecessors; (e) any bulk sales or similar law; (f) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (g) any theories of successor or products liability; and (h) any Environmental Laws. Nothing in this Order shall be construed to: (1) release, nullify, or enjoin a Governmental Authority from enforcing any environmental laws under which a purchaser of property would otherwise be liable as a current owner or operator after the date of purchase, or (2) permit, in any circumstances, a Governmental Authority to obtain from the Buyer penalties arising under Environmental Laws prior to the Closing Date. For purposes of clarification, any employee medical claims which are incurred prior to the Closing (regardless of when such claims are presented for payment) shall be claims against the bankruptcy estate of the Debtor, and not the Buyer, and the Buyer shall be responsible only for such claims which are incurred after the Closing. All such Interests of any kind or nature whatsoever (other than Permitted Encumbrances) shall attach (effective upon the transfer of the Sale Property to the Buyer) to the proceeds of the Purchase Price with the same force, validity, priority and effect, if any, as the Interests formerly had against the Sale Property,

if any, subject to the Debtor's ability to challenge the extent, validity, priority and effect of the Interests unless subject to and as otherwise provided in any other order of this Court in this Bankruptcy Case. Additionally, for the avoidance of doubt, Buyer shall have no liability, obligation, or responsibility whatsoever to the Debtor, Governmental Authority or any other Person with respect to, or in connection with, any Excluded Asset or any Excluded Liability of any kind or character, whether known or unknown, as of the Closing Date, whether fixed or contingent, including, without limitation, any liability or other obligation arising under the Bankruptcy Code, any environmental laws, or any other laws of the United States, any state, territory, possession or the District of Columbia.

11.    On the Closing Date, this Order will be construed and constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Sale Property or a bill of sale transferring good and marketable title in such Sale Property to the Buyer. On the Closing Date, and subject to section 365 of the Bankruptcy Code, this Order also shall be construed and constitute for any and all purposes a complete and general assignment of all right, title and interest of the Debtor to the Buyer in Assumed Executory Contracts/Leases, subject to the Asset Purchase Agreement.

12.    All entities who are presently, or on the Closing Date may be, in possession of some or all of the Sale Property are hereby directed to surrender possession of the Sale Property to the Buyer on the Closing Date.

13.    Except as expressly permitted by the Asset Purchase Agreement or this Order, all Persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade, products liability and other creditors, holding Interests of any kind or nature whatsoever against or in the Debtor or the Sale Property

VP/#27489593.2 1074225.4

(whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated now existing or hereinafter arising), arising under or out of, in connection with, or in any way relating to, the Debtor, the Sale Property, or the transfer of the Sale Property to the Buyer, hereby are forever barred, estopped, and permanently enjoined from asserting against the Buyer, its successors or assigns, its property, or the Sale Property, such persons' or entities' Interests.

14.    On the Closing Date of the Sale, each of the Debtor's creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its Interests in the Sale Property, if any, as such Interests may have been recorded or otherwise exist, except as to Sale Property being transferred subject to Permitted Encumbrances.

15.    Subject to the terms and conditions of this Order and the Asset Purchase Agreement, the transfer of the Sale Property to the Buyer pursuant to the Asset Purchase Agreement constitutes a legal, valid, and effective transfer of the Sale Property, and shall vest the Buyer with all right, title, and interest of the Debtor in and to the Sale Property free and clear of all Interests of any kind or nature whatsoever.

## Assumption and Assignment of Assumed Executory Contracts/Leases

16.    Pursuant to sections 105(a) and 365 of the Bankruptcy Code, as set forth in the Sale Procedures Order and subject to and conditioned upon the terms of the Asset Purchase Agreement and the Closing of the Sale, the Debtor's assumption and assignment to the Buyer, and the Buyer's assumption on the terms set forth in the Asset Purchase Agreement, of the Assumed Executory Contracts/Leases is hereby approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are hereby deemed satisfied, provided however, that any Assumed Executory Contracts/Leases which are subject to the Assignment Objections may not be assumed

VP/#27489593.2 1074225.4

and assigned absent (a) payment of the amount set forth in the applicable Assignment Objection, and to the extent that any counterparty has filed an Assignment Objection based upon adequate assurance of future performance, Buyer and such counter-party have resolved such dispute; (b) consensual resolution of the applicable Assignment Objection, or (c) adjudication by the Court as to the applicable Assignment Objection.

17.    Subject to paragraph 16 of this Order, pursuant to the Asset Purchase Agreement, the Debtor is hereby authorized and directed in accordance with sections 105(a), 363 and 365 of the Bankruptcy Code to (a) assume and assign to the Buyer, effective upon the Closing Date of the Sale, the Assumed Executory Contracts/Leases free and clear of all Interests of any kind or nature whatsoever (other than Permitted Encumbrances) and (b) execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Assumed Executory Contracts/Leases to the Buyer.

18.    The Assumed Executory Contracts/Leases shall be transferred to, and remain in full force and effect for the benefit of, the Buyer in accordance with their respective terms, notwithstanding any provision in any such Assumed Executory Contracts/Leases (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer. Pursuant to section 365(k) of the Bankruptcy Code, the Debtor shall be relieved from any further liability with respect to the Assumed Executory Contracts/Leases after such assignment to and assumption by the Buyer.

19.    All amounts that must be paid and obligations that must be otherwise satisfied, if any, including pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assignment and assumption of the Assumed Executory Contracts/Leases, including Cure Costs and other cure obligations that are required to be cured pursuant to the Bankruptcy Code to

effect the assignment and obtain this Order (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured by the Buyer as provided in the Asset Purchase Agreement at the Closing Date, or as otherwise agreed by the Buyer and counter-party to any such Assumed Executory Contracts/Lease. All defaults or other obligations of the Debtor under the Assumed Executory Contracts/Leases arising or accruing on or after the Petition Date to the Closing Date (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured by the Buyer at the Closing Date, or as otherwise agreed by the Buyer and counter-party to any such Assumed Executory Contracts/Lease, to the extent required by the Bankruptcy Code.  Except as set forth in the Asset Purchase Agreement with respect to the assumed Cure Costs and other cure obligations, the Buyer shall have no liability or obligation to cure executory contracts or unexpired leases other than the Assumed Executory Contracts/Leases defaults accruing prior to the Closing Date.  Notwithstanding any language in this paragraph to the contrary, the Buyer shall not be responsible for any taxes and tax payments related to the Sale Property.

20.    Each non-Debtor party or third party beneficiary to any Assumed Executory Contracts/Leases is hereby forever barred, estopped, and permanently enjoined from asserting against the Debtor or the Buyer, or the property of either of them, any default existing as of the date of the Closing Date of the Sale.

21.    Within ten (10) business days following the Closing Date, the Debtor shall file with the Court a notice setting forth those Assumed Executory Contracts/Leases actually assumed and assigned to Buyer pursuant to the terms of the Asset Purchase Agreement and this Order (the "Final Assumed Executory Contracts/Leases Notice").

Additional Provisions

22.     The consideration provided by the Buyer for the Sale Property under the Asset Purchase Agreement shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia, and the Sale and the transactions consummated in connection therewith are not, and shall not be, avoidable under the Bankruptcy Code or any such laws.

23.     Subject to the terms of this Order and the Asset Purchase Agreement, which is hereby approved in all respects by this Order, the Buyer shall pay to the Debtor at Closing the Purchase Price.   All Interests of any kind or nature whatsoever (other than Permitted Encumbrances) shall attach (effective upon the transfer of the Sale Property to the Buyer) to the proceeds of the Purchase Price with the same force, validity, priority and effect, if any, as the claims, Liens, encumbrances, and interests formerly had against the Sale Property, if any, subject to the Debtor's ability to challenge the extent, validity, priority and effect of the Interests unless subject to and as otherwise provided in any other order of this Court in this Bankruptcy Case.

24.     This Order (a) shall be effective as a determination that upon payment by Buyer of the Purchase Price under the Asset Purchase Agreement in accordance herewith, all Interests of any kind or nature whatsoever existing as to the Debtor or the Sale Property prior to the Closing Date (other than Permitted Encumbrances) have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities, including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and

VP/#27489593.2 1074225.4

local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Sale Property. Each and every federal, state and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement. The Buyer and the Debtor shall take such further steps and execute such further documents, assignments, instruments and papers as shall be reasonably requested by the other to implement and effectuate the transactions contemplated in this paragraph. All Interests of record as of the date of this Order shall be forthwith removed and stricken as against the Sale Property. All entities described in this paragraph are authorized and specifically directed to strike all such recorded Interests against the Sale Property from their records, official and otherwise.

25.    If any person or entity that has filed statements or other documents or agreements evidencing Interests in any of the Sale Property does not deliver to the Debtor or the Buyer prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all interests and other interests that the person or entity has or may assert with respect to any of the Sale Property, the Debtor and/or the Buyer and their respective agents are hereby authorized to execute and file, register, or record such statements, instruments, releases and other documents on behalf of such person or entity with respect to any of the Sale Property.

26.    To the extent provided by section 525 of the Bankruptcy Code, no Governmental Authority may deny, revoke, suspend or refuse to renew any permit, license, or similar grant

relating to the operation of the Sale Property sold, transferred, or conveyed to the Buyer on account of the filing or pendency of this Bankruptcy Case or the consummation of the Sale contemplated by the Asset Purchase Agreement.

27.    As specifically provided in the Asset Purchase Agreement, the Debtor will cooperate with the Buyer and the Buyer will cooperate with the Debtor, to ensure that the transaction contemplated in the Asset Purchase Agreement is consummated, and the Debtor will make such modifications or supplements to any bill of sale or other document executed in connection with the Closing to facilitate such consummation as contemplated by the Asset Purchase Agreement (including, without limitation, adding such specific assets, to such documents, as may be reasonably requested by the Buyer pursuant to the terms of the Asset Purchase Agreement).

28.    The Buyer shall have no liability or responsibility for any liability or other obligation of the Debtor or any third party whatsoever arising under or related to Excluded Assets, Excluded Liabilities or the Sale Property other than for the Assumed Liabilities and the Assumed Executory Contracts/Leases to the extent provided under the Asset Purchase Agreement. Without limiting the generality of the foregoing, and except as otherwise specifically provided in the Asset Purchase Agreement, the Buyer shall not be liable for any claims against the Debtor or any of its predecessors or affiliates or any third party whatsoever, and the Buyer shall have no successor liabilities (including, without limitation, product liability with respect to any assets sold, shipped or delivered prior to the Closing Date) of any kind or character whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtor or any obligations of the Debtor arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, or in

connection with, or in any way relating to the operation of the Business prior to the Closing Date, and all parties are hereby forever barred, estopped and permanently enjoined from asserting any such claims against the Buyer, its successors and assigns or against the Sale Property.

29.    Except for the Assumed Liabilities and the Assumed Executory Contracts/Leases as set forth in the Asset Purchase Agreement, under no circumstances whatsoever shall the Buyer be deemed a successor of or to the Debtor for any Interests against or in the Debtor or the Sale Property or the Excluded Assets of any kind or nature whatsoever. Except for the Assumed Liabilities and the Assumed Executory Contracts/Leases as set forth in the Asset Purchase Agreement, the sale, transfer, assignment and delivery of the Sale Property and the Assumed Executory Contracts/Leases shall not be subject to any Interests, and Interests of any kind or nature whatsoever shall remain with, and continue to be obligations of, the Debtor or such other applicable Person. All persons holding Interests against or in the Debtor or the Sale Property of any kind or nature whatsoever shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Interests of any kind or nature whatsoever against the Buyer, its officers, directors, shareholders and professionals, its property, its successors and assigns, or the Sale Property with respect to any Interests of any kind or nature whatsoever (other than Permitted Encumbrances) such person or entity had, has, or may have against or in the Debtor, its estate, officers, directors, shareholders, or the Sale Property. Following the Closing Date, no holder of an Interest in the Debtor shall interfere with the Buyer's title to, or use and enjoyment of, the Sale Property and the Assumed Executory Contracts/Leases based on or related to such Interest, or any actions that the Debtor or any third party may take in the Bankruptcy Case.

VP/#27489593.2 1074225.4

30.     This Court shall retain jurisdiction to enforce and implement the terms and provisions of the Asset Purchase Agreement, all amendments thereto, any waivers and consents thereunder, except as otherwise provided therein, and of each of the agreements executed in connections therewith in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Sale Property to the Buyer free and clear of Interests (other than Permitted Encumbrances), or compel the performance of other obligations owed by the Debtor; (b) compel delivery of the Purchase Price or performance of other obligations owed to the Debtor; (c) resolve any disputes arising under or related to the Asset Purchase Agreement, the Cure Costs, and adequate assurance of future performance of the Assumed Executory Contracts/Leases; (d) interpret, implement, and enforce the provisions of this Order; (e) protect the Buyer against (i) claims made related to any of the Excluded Liabilities, (ii) any claims of successor or products liability related to the Sale Property or Assumed Executory Contracts/Leases or any of the Excluded Assets, or (iii) any claims of Interests (other than Permitted Encumbrances) asserted in the Debtor or the Sale Property, of any kind or nature whatsoever; and (f) to require delivery of any Sale Property or proceeds thereof by the Debtor to Buyer, or of any Excluded Assets or proceeds thereof by Buyer to the Debtor or their designee or successor.

31.     The terms and provisions of the Asset Purchase Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtor and its respective affiliates, successors and assigns, its estate, and its creditors, the Buyer, and its respective affiliates, successors and assigns, and any affected third parties, including, but not limited to, all Persons asserting Interests in the Sale Property to be sold to the Buyer pursuant to the Asset Purchase Agreement, notwithstanding any subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

32.     The failure specifically to include any particular provisions of the Asset Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Asset Purchase Agreement be authorized and approved in its entirety.

33.     The Asset Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtor's estate.

34.     Nothing contained in any order entered in this Bankruptcy Case subsequent to entry of this Order, nor in any chapter 11 plan confirmed in this Bankruptcy Case, shall conflict with or derogate from the provisions of the Asset Purchase Agreement or the terms of this Order.

35.     This Order shall be effective and enforceable immediately upon entry, and any stay of orders provided for in Bankruptcy Rules 6004(h), 6006(d) and any other provision of the Bankruptcy Code or Bankruptcy Rules shall not apply.

36.     The provisions of this Order are nonseverable and mutually dependent.

37.     To the extent applicable, the automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted or otherwise modified with respect to the Debtor to the extent necessary, without further order of the Court (a) to allow Buyer to give the Debtor any notice provided for in the Asset Purchase Agreement, and (b) to allow Buyer to take any and all actions permitted by the Asset Purchase Agreement.

38.     The Sale shall not be subject to any bulk sales laws.

39.    The Debtor and each other Person having duties or responsibilities under the Asset Purchase Agreement or this Order, and their respective agents, representatives, and attorneys, are authorized and empowered to carry out all of the provisions of the Asset Purchase Agreement, to issue, execute, deliver, file and record, as appropriate, the Asset Purchase Agreement, and any related agreements, and to take any action contemplated by the Asset Purchase Agreement or this Order, and to issue, execute, deliver, file and record, as appropriate, such other contracts, instruments, releases, deeds, bills of sale, assignments, or other agreements, and to perform such other acts as are consistent with, and necessary or appropriate to, implement, effectuate and consummate the Asset Purchase Agreement and this Order and the transactions contemplated thereby and hereby, all without further application to, or order of, the Court. Without limiting the generality of the foregoing, this Order shall constitute all approvals and consents, if any, required by applicable business corporation, trust and other laws of applicable governmental units with respect to the implementation and consummation of the Asset Purchase Agreement and this Order and the transactions contemplated thereby and hereby.

40.    Upon Closing, the Debtor is authorized and directed to pay Livingstone, and Livingstone is entitled to receive, on a final allowed basis, a broker commission at Closing pursuant to the Livingstone Engagement Agreement and the Livingstone Retention Order, in an amount to be calculated by the Debtor at Closing after consultation with the Constituent Parties. All other proceeds from the Sale are to be held by BMO Harris Bank N.A., subject to further Order of Court.

41.    The Debtor is authorized to return all security deposits received from bidders other than the Prevailing Bidder and the Back-Up Bidder.

42.    This Order shall have no effect on, and shall not be deemed a termination of, any rights of the Official Committee of Unsecured Creditors or any other party in interest pursuant to paragraph 24 of the Final Order Authorizing (A) Secured Post-Petition Financing on a Super Priority Basis Pursuant to 11 U.S.C. § 364, (B) Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and (C) Grant of Adequate Protection Pursuant to 11 U.S.C. §§ 363 and 364 (Docket No. 65, the "Final DIP Order"), and the Challenge Period Termination Date currently in place, subject to further extension in accordance with the Final DIP Order, shall be unaffected by this Order.

43.    To the extent that any provision of this Order conflicts with the Asset Purchase Agreement, this Order shall control.

44.    The Asset Purchase Agreement of the Back-Up Bid shall remain binding and in full force and effect in accordance with the Sales Procedures Order. In the event the Buyer defaults in the performance of its obligations under the Asset Purchase Agreement then, in such event, in accordance with the Approved Bidding Procedures, the Seller: (a) is authorized to close on the Back-Up Bid without further order of Court, and (b) the Seller shall give notice of the closing on the Back-Up Bid to any party who filed an Assignment Objection. In such event, the terms and conditions of this Order shall apply to such Back-Up Bid and a closing therein shall take place in accordance with the Sales Procedures Order.

Dated:  Chicago, Illinois
      March 5 , 2020

HONORABLE JANET S. BAER
UNITED STATES BANKRUPTCY JUDGE

VP/#27489593.2 1074225.4

Exhibit A

to

Order (A) Approving the Sale of Substantially all of the Debtor's Assets Free and Clear of
Interests Including Liens, Claims, and Encumbrances; (B) Authorizing the Assumption and
Assignment of Executory Contracts and Unexpired Leases; and (C) Granting Related Relief:

**"Asset Purchase Agreement"**

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** is made and entered into this ___ day of March, 2020, by and between ARRO CORPORATION, f/k/a ARRO PACKAGING COMPANY, an Illinois corporation ("**Seller**"), and MOUNT FRANKLIN FOODS, LLC, a Texas limited liability company, or its Affiliated assignee ("**Buyer**").

## W I T N E S S E T H :

A.   **WHEREAS**, Seller is currently engaged in the business of manufacturing, packaging, and distributing bake mixes, powdered beverages, ingredients, cereals, trail mix, nuts and other food products (the "**Business**"). The Business is comprised of two (2) distinct divisions: (a) contract manufacturing, packaging and distribution of retail food based products (the "**Food Division Business**"); and (b) bulk packaging of commodity ingredients and liquid sugar refining for commercial application (the "**Bulk Division Business**");

B.   **WHEREAS**, Seller operates the Business out of the following leased facilities (the "**Leased Real Property**"):

| Property | Use | Lessor |
|---|---|---|
| 7440 Santa Fe Drive, Hodgkins, Illinois | Food Division: main facility for food processing; corporate offices | ROSDEV Portfolio IL, LLC |
| 7550 Santa Fe Drive, Hodgkins, Illinois | Food Division: food processing; boilers; garbage and recycling; parking lot overflow for 7440 building | Santa Fe Property, LLC |
| 7220B Santa Fe Drive, Hodgkins, Illinois | Food Division: former processing facility and warehouse; currently subleasing portion of former space for one processing room | The Paper Tigers, Inc. |
| 7250A Santa Fe Drive, Hodgkins, Illinois | Food Division: warehouse and nut processing | Santa Fe Industrial Investors LLC |
| 7225 Santa Fe Drive, Hodgkins, Illinois | Food Division: warehouse and nut processing | BREIT Industrial Canyon IL1BO3 LLC |
| 10459 S. Muskegon Ave., Chicago, Illinois | Bulk Division | ROSDEV Portfolio IL, LLC |

C.   **WHEREAS**, on the 13th day of December, 2019 (the "**Petition Date**"), Seller filed a voluntary case under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") in the U.S. Bankruptcy Court for the Northern District of Illinois, Eastern Division, as

Case No. 19-35238 ("**Bankruptcy Court**" or "**Bankruptcy Case**", as applicable), and is operating its Business and managing its property under the jurisdiction of the Bankruptcy Court as debtor in possession;

D.   **WHEREAS**, the Bankruptcy Court having entered in the Bankruptcy Case on January 27, 2020, that certain *Order (a) Approving the Sale Process, Including Form of Asset Purchase Agreement, Bid Protection, and Break-Up Fee for the Sale of Substantially All Assets of the Estate; (b) Approving Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases; (c) Approving Form Notices; and (d) Scheduling a Public Auction and a Sale Approval Hearing*, Docket No. 106 ("**Sale Procedures Order**");

E.   *WHEREAS*, pursuant to the terms and conditions of the Sale Procedures Order and Sections 363(b) and 365(a) of the Bankruptcy Code, Seller desires to sell certain of its assets to Buyer, and in connection therewith, assume and assign certain executory Contracts and Leased Real Property to Buyer, and Buyer desires to purchase from Seller said assets and assume such executory Contracts and unexpired leases upon the terms and conditions hereinafter set forth;

F.   *WHEREAS*, the assets of the Seller shall be offered for sale in the following three (3) lots:

Lot 1 – all "**Food Division Property**" (as described in paragraph 1(a) hereof);
Lot 2 – all "**Bulk Division Property**" (as described in paragraph 1(b) hereof).
Lot 3 – all "**Combined Property**" consisting of the Food Division Property and the Bulk Division Property;

G.   *WHEREAS*, Buyer has deposited the sum of Eight Hundred Thousand Dollars ($800,000.00) as an earnest money deposit, to be held by Adelman & Gettleman, Ltd., as counsel to Seller in the Bankruptcy Case, as "escrowee", which sum shall be held, applied or returned in accordance with the Sale Procedures Order and the Approved Bidding Procedures (as defined below); and

H.   *WHEREAS*, certain terms used this Agreement are defined in <u>Appendix A</u> to this Agreement, and cross references to other terms used in this Agreement are set forth in <u>Appendix A</u> to this Agreement, which <u>Appendix A</u> is hereby incorporated into this Agreement by reference and shall be deemed to be a part of this Agreement.

*NOW, THEREFORE*, in consideration of the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the parties do hereby agree as follows:

1.   <u>**Purchase and Sale of Assets**</u>.  Subject to the terms and conditions of this Agreement, and to the requisite approval of the Bankruptcy Court as provided herein, Seller shall sell, assign, convey, transfer and deliver to Buyer, and Buyer shall purchase, acquire and take assignment and delivery from Seller of, at the Closing (as defined below), all of the right, title and interest of Seller in and to the following assets, if any, owned by Seller or in which Seller has rights, wherever owned, held or located, including, without limitation, assets located in the Leased Real Property, and whenever acquired (but not including the Excluded Assets, as defined below),

free and clear of any and all interests including Liens, claims and encumbrances, other than Permitted Encumbrances (as defined below):

(*check box if bid includes this category of property*):

      (a) ☐ <u>Food Division Property</u>. The Food Division Property shall be comprised of the following:

      (i)    All trade and other accounts receivable relating to the Food Division Business, but excluding any notes receivable or negotiable instruments (collectively the "**Food Division Receivables**");

      (ii)    All cash deposits of customers to the Food Division Business held by Seller as security for Food Division Receivables or other obligations;

      (iii)    All inventory utilized in and relating to the Food Division Business (the "**Food Division Inventory**") including, but not limited to, raw materials, work in process, finished goods, packing and shipping materials, supplies, promotional materials, service parts, inventory in transit to Seller, and prepaid inventory, but excluding Customer Inventory (as defined below);

      (iv)    All machinery, equipment, tools, tooling, jigs, dies, parts, accessories, fixtures, conveyor equipment, storage equipment, shelving, signage, displays and display equipment, supplies, computers, computer related equipment, information technology infrastructure, office equipment, furnishings, telephone and fax equipment and systems, and other tangible personal property utilized in and relating to the Food Division Business including, without limitation, those located on in the Food Division Leased Real Property and those set forth in the Assets Detail Listing (10/1/2019 to 10/31/2019) and Loeb appraisal from June 2019, both of which were provided by Seller in the SecureDocs data room, together with all unexpired warranties of manufacturers, vendors or other third parties, if any, relating thereto;

      (v)    All vehicles and other mobile equipment owned and used in connection with the Food Division Business, including, without limitation, those set forth on <u>Schedule 1(a)(v)</u>;

      (vi)    All books, records and documents pertaining to the Food Division Business including, but not limited to, customer files, lists and sales records; supplier files, lists and records; product literature; computer software and data bases; source codes; records of salesman commissions or other compensation; management information systems; enterprise resource planning systems; warehouse management systems; accounting books, ledgers and records, Tax records and Tax Returns; tangible embodiments of the foregoing (in whatever form or medium, including electronic media) (collectively, "**Food Division Books and Records**"); provided that: (A) Food Division Books and Records shall exclude the originals of business organizational documents, corporate minute book, income Tax Returns, corporate seal, stock record books (collectively, the "**Excluded Books**

**and Records**"); and (B) Seller has the right to retain copies of the Food Division Books and Records, as Seller's expense, and Seller shall have reasonable access to the Food Division Books and Records as specified in paragraph 21(a) below;

(vii)    All intangible assets or intellectual property pertaining to the Food Division Business, if any, including without limitation all patents, artwork, trademarks, trade names, service marks, service names, brand names, domain names, websites, symbols, logos, slogans, designs, drawings, formulas and recipes (including, without limitation, the cheddar flavor for Garrett Popcorn but excluding Customer Formulas and Recipes, as defined below), copyrights, specialized knowledge relating to the Food Division Business, trade secrets, technical know-how, manufacturing know-how, processes and sales techniques, to the extent Seller has any interest therein, and all other rights associated with the foregoing; all of Seller's right, title and interest in and to the name "Arro Corporation" and any variants or usage thereof and any tradenames or prior names used by Seller; the rights to use all telephone and fax numbers currently in use utilized in and relating to the Food Division Business; the goodwill associated with the Food Division Business; and any and all other proprietary information, intangible or intellectual property pertaining to the Food Division Business and belonging to or registered in the name of Seller; all rights to sue and all income, royalties, damages and payments due or payable to Seller with respect thereto, including with respect to infringements or misappropriations thereof;

(viii)    License agreements, rights to use licensed software, and all applications and renewal rights therefor, and all other rights associated therewith, but only to the extent such rights are assignable under the applicable governing agreements or applicable Law, including, without limitation, the ProcessPro software license and support agreement;

(ix)    All current and pending estimates, open orders, customer Contracts, customer contacts, and purchase orders to Seller from Food Division Business customers which are outstanding as of the Closing;

(x)    To the maximum extent permitted by the Bankruptcy Code, if assumed by Buyer pursuant to the terms and conditions this Agreement, all right, title and interest of Seller in and to: (A) the unexpired leases applicable to the Food Division Leased Real Property to the extent listed on <u>Schedule 1(a)(x)</u>; and (B) the executory Contracts utilized in and relating to the Food Division Business listed on <u>Schedule 1(a)(x)</u> (collectively, the **"Food Division Executory Contracts/Leases"**), including all security deposits thereunder, all rights of Seller to indemnification, exculpation, advancement or reimbursement of expenses, and all claims and rights to proceeds under insurance policies with respect thereto;

(xi)    All Permits, to the extent they are assignable, including, without limitation, any environmental Permits and any registrations with the Food and Drug Administration utilized in and relating to the Food Division Business;

(xii)   All written food safety plans in place which include analysis of hazards and risk-based preventative controls as required by the Food and Drug Administration under the Food Safety Modernization Act;

(xiii)   All deposits of Seller (excluding bidder deposits) as security for rent, electricity, telephone, bonds, other sureties or other obligations (contingent or otherwise) of Seller, and all transferrable prepaid expenses arising in connection with the Food Division Business (collectively, "**Food Division Prepaid Expenses**");

(xiv)   All personnel files for Rehired Employees, except as prohibited by Law; provided, however, that Seller has the right to retain copies at Seller's expense to the extent required by Law;

(xv)   with the exception of claims and causes of action against current or former directors and/or officers of Seller of any kind or nature (the "**D&O Claims**"), commercial tort claims unrelated to the Sale Property or pertaining to the Excluded Assets (the "**Excluded Commercial Tort Claims**"), and claims and causes of action arising under chapter 5 of the Bankruptcy Code (collectively, the "**Chapter 5 Claims**"), all of which shall be part of the Excluded Assets retained by Seller, all express or implied guarantees, warranties, representations, covenants, indemnities, rights, claims, counterclaims, defenses, credits, causes of action or rights of set off against third parties relating to the Food Division Property or Food Division Business (including, for the avoidance of doubt, those arising under, or otherwise relating to the Food Division Executory Contracts/Leases), including the right, title and interest of Seller, if any, in and to the rights under vendors' and manufacturers' warranties, indemnities, and guaranties relating to the Food Division Property or Food Division Business, and all claims and rights to proceeds under insurance policies with respect thereto;

(xvi)   to the maximum extent permitted under the Bankruptcy Code, all intellectual property owned by Seller, or in which Seller has any rights or interest, if any, utilized in and related to the Food Division Business including, without limitation, that listed on Schedule 1(a)(xvii) hereto, and all other rights and goodwill associated with the foregoing;

(xvii)   all customer sales, marketing, advertising, packaging and promotional materials utilized in, or related to the Food Division Property, or the Food Division Business;

(xviii)   the non-exclusive rights under non-disclosure and confidentiality agreements obtained by Livingstone in connection with the sale process in the Bankruptcy Case and entered into between Seller and third parties; and

(xix)   all other or additional rights and interests of Seller utilized in and relating to the Food Division Business of every kind and description including, without limitation (other than any Excluded Assets) (A) those assets and properties

located in the Food Division Leased Real Property and (B) those assets set forth in Schedule A/B filed in the Bankruptcy Case (Docket Item 87) to the extent primarily related to the Food Division. Buyer shall have the right to provide or supplement, as the case may be, the Schedules referred to in paragraph 1 of this Agreement at any time prior to Closing.

*(**check box if bid includes this category of property**)*:

      (b)   ☐ <u>Bulk Division Property</u>. The Bulk Division Property shall be comprised of the following:

      (i)     All trade and other accounts receivable relating to the Bulk Division Business, but excluding any notes receivable or negotiable instruments (collectively the "**Bulk Division Receivables**");

      (ii)    All cash deposits of customers to the Bulk Division Business held by Seller as security for Bulk Division Receivables or other obligations;

      (iii)   All inventory utilized in and relating to the Bulk Division Business (the "**Bulk Division Inventory**") including, but not limited to, raw materials, work in process, finished goods, packing and shipping materials, supplies, promotional materials, service parts, inventory in transit to Seller, and prepaid inventory, but excluding Customer Inventory (as defined below);

      (iv)   All machinery, equipment, tools, tooling, jigs, dies, parts, accessories, fixtures, conveyor equipment, storage equipment, shelving, signage, displays and display equipment, supplies, computers, computer related equipment, information technology infrastructure, office equipment, furnishings, telephone and fax equipment and systems, and other tangible personal property utilized in and relating to the Bulk Division Business including, without limitation, those located on in the Bulk Division Leased Real Property and those set forth in the Assets Detail Listing (10/1/2019 to 10/31/2019) and Loeb appraisal from June 2019, both of which were provided by Seller in the SecureDocs data room, together with all unexpired warranties of manufacturers, vendors or other third parties, if any, relating thereto;

      (v)    All vehicles and other mobile equipment owned and used in connection with the Bulk Division Business, including, without limitation, those set forth on <u>Schedule 1(b)(v)</u>;

      (vi)   All books, records and documents pertaining to the Bulk Division Business including, but not limited to, customer files, lists and sales records; supplier files, lists and records; product literature; computer software and data bases; source codes; records of salesman commissions or other compensation; management information systems; enterprise resource planning systems; warehouse management systems; accounting books, ledgers and records, Tax records and Tax Returns; tangible embodiments of the foregoing (in whatever form or medium, including electronic media) (collectively, "**Bulk Division Books and**

Records"); provided that: (A) Bulk Division Books and Records shall exclude Excluded Books and Records; and (B) Seller has the right to retain copies of the Bulk Division Books and Records, as Seller's expense, and Seller shall have reasonable access to the Bulk Division Books and Records as specified in paragraph 21(a) below;

(vii)    All intangible assets or intellectual property pertaining to the Bulk Division Business, if any, including without limitation all patents, artwork, trademarks, trade names, service marks, service names, brand names, domain names, websites, symbols, logos, slogans, designs, drawings, formulas and recipes (excluding Customer Formulas and Recipes, as defined below), copyrights, specialized knowledge relating to the Bulk Division Business, trade secrets, technical know-how, manufacturing know-how, processes and sales techniques, to the extent Seller has any interest therein, and all other rights associated with the foregoing; the rights to use all telephone and fax numbers currently in use utilized in and relating to the Bulk Division Business; the goodwill associated with the Bulk Division Business; and any and all other proprietary information, intangible or intellectual property pertaining to the Bulk Division Business and belonging to or registered in the name of Seller; all rights to sue and all income, royalties, damages and payments due or payable to Seller with respect thereto, including with respect to infringements or misappropriations thereof;

(viii)    License agreements, rights to use licensed software, and all applications and renewal rights therefor, and all other rights associated therewith, but only to the extent such rights are assignable under the applicable governing agreements or applicable Law;

(ix)    All current and pending estimates, open orders, customer Contracts, customer contacts, and purchase orders to Seller from Bulk Division Business customers which are outstanding as of the Closing;

(x)    To the maximum extent permitted by the Bankruptcy Code, if assumed by Buyer pursuant to the terms and conditions this Agreement, all right, title and interest of Seller in and to: (A) the unexpired leases applicable to the Bulk Division Leased Real Property to the extent listed on Schedule 1(b)(x); and (B) the executory Contracts utilized in and relating to the Bulk Division Business listed on Schedule 1(b)(x) (collectively, the "**Bulk Division Executory Contracts/Leases**"), including all security deposits thereunder, all rights of Seller to indemnification, exculpation, advancement or reimbursement of expenses, and all claims and rights to proceeds under insurance policies with respect thereto;

(xi)    All Permits, to the extent they are assignable, including, without limitation, any environmental Permits and any registrations with the Bulk and Drug Administration utilized in and relating to the Bulk Division Business;

(xii)    All written food safety plans in place which include analysis of hazards and risk-based preventative controls as required by the Food and Drug Administration under the Food Safety Modernization Act;

(xiii)    All deposits of Seller (excluding bidder deposits) as security for rent, electricity, telephone, bonds, other sureties or other obligations (contingent or otherwise) of Seller, and all transferrable prepaid expenses arising in connection with the Bulk Division Business (collectively, "**Bulk Division Prepaid Expenses**");

(xiv)    All personnel files for Rehired Employees, except as prohibited by Law; provided, however, that Seller has the right to retain copies at Seller's expense to the extent required by Law;

(xv)    with the exception of the D&O Claims, Excluded Commercial Tort Claims and the Chapter 5 Claims, all express or implied guarantees, warranties, representations, covenants, indemnities, rights, claims, counterclaims, defenses, credits, causes of action or rights of set off against third parties relating to the Bulk Division Property or Bulk Division Business (including, for the avoidance of doubt, those arising under, or otherwise relating to the Bulk Division Executory Contracts/Leases), including the right, title and interest of Seller, if any, in and to the rights under vendors' and manufacturers' warranties, indemnities, and guaranties relating to the Bulk Division Property or Bulk Division Business, and all claims and rights to proceeds under insurance policies with respect thereto;

(xvi)    to the maximum extent permitted under the Bankruptcy Code, all intellectual property owned by Seller, or in which Seller has any rights or interest, if any, utilized in and related to the Bulk Division Business including, without limitation, that listed on Schedule 1(b)(xvii) hereto, and all other rights and goodwill associated with the foregoing;

(xvii)    all customer sales, marketing, advertising, packaging and promotional materials utilized in, or related to the Bulk Division Property, or the Bulk Division Business;

(xviii)    the non-exclusive rights under non-disclosure and confidentiality agreements obtained by Livingstone in connection with the sale process in the Bankruptcy Case and entered into between Seller and third parties; and

(xix)    all other or additional rights and interests of Seller utilized in and relating to the Bulk Division Business of every kind and description including, without limitation (other than any Excluded Assets) (A) those assets and properties located in the Bulk Division Leased Real Property and (B) those assets set forth in Schedule A/B filed in the Bankruptcy Case (Docket Item 87) to the extent primarily related to the Bulk Division. Buyer shall have the right to provide or supplement, as the case may be, the Schedules referred to in paragraph 1 of this Agreement at any time prior to Closing.

(*check box if bid includes this category of property*):

    (c)    ☒ Combined Property, consisting of the Food Division Property and the Bulk Division Property as set forth in paragraphs 1(a) and 1(b), respectively;

    (d)    For all purposes hereof:

        (i)    The property so designated by Buyer in this paragraph 1 shall be referred to as the "**Sale Property**";

        (ii)    The Food Division Receivables and/or the Bulk Division Receivables so designated by Buyer in this paragraph 1 as part of the Sale Property shall be referred to as the "**Accounts Receivable**";

        (iii)    The Food Division Prepaid Expenses and/or the Bulk Division Prepaid Expenses so designated by Buyer in this paragraph 1 as part of the Sale Property shall be referred to as the "**Prepaid Expenses**";

        (iv)    The Food Division Inventory and/or the Bulk Division Inventory so designated by Buyer in this paragraph 1 as part of the Sale Property shall be referred to as the "**Inventory**";

        (v)    The Food Division Executory Contracts/Leases and/or Bulk Division Executory Contracts/Leases so designated by Buyer as part of the Sale Property in this paragraph 1 and assumed by Buyer in accordance with this Agreement shall be referred to as the "**Assumed Executory Contracts/Leases**";

        (vi)    The Food Division Business (if the Food Division Property is designated by Buyer pursuant to this paragraph 1) and/or the Bulk Division Business (if the Bulk Division Property is designated by Buyer pursuant to this paragraph 1) shall be referred to as the "**Applicable Business**"; and

        (vii)    The Food Division Leased Real Property (if the Food Division Property is designated by Buyer pursuant to this paragraph 1) and/or the Bulk Division Leased Real Property (if the Bulk Division Property is designated by Buyer pursuant to this paragraph 1) shall be referred to as the "**Applicable Leased Real Property**".

    **2.**    **Excluded Assets**. Anything herein to the contrary notwithstanding, Seller shall retain and shall not sell, convey, transfer, assign or deliver to Buyer any interest in the following assets and properties of Seller, and Buyer hereby acknowledges that it does not have nor will it acquire at Closing or thereafter an interest of any kind whatsoever in the following assets and properties of Seller or third parties (collectively, the "**Excluded Assets**"):

    (a)    except for deposits included in the Sale Property, any cash or cash equivalents whatsoever, whether on hand, in banks or elsewhere, including but not limited to all bid deposits submitted by third parties under the terms of the Sale Procedures Order and the Purchase Price (as defined below);

(b)    Customer Inventory (for purposes of this Agreement, "**Customer Inventory**" shall mean any and all inventory in the possession of Seller which is owned by a customer of Seller and is not reflected on the books and records of Seller as Seller-owned inventory);

(c)    Excluded Books and Records;

(d)    the D&O Claims, the Excluded Commercial Tort Claims, and Chapter 5 Claims (collectively, the "**Excluded Causes of Action**");

(e)    all Tax refunds whenever arising, and all rights or other Tax benefits arising from Seller's net operating losses arising prior to the Closing;

(f)    all rights of Seller under executory Contracts and unexpired leases that are not Assumed Executory Contracts/Leases ("**Excluded Executory Contracts/Leases**") and prepaid expenses and deposits related to any of the Excluded Executory Contracts/Leases;

(g)    except for claims, rights and payments under insurance policies with respect to Sale Property or the Applicable Business, any right, title or interest in and to any insurance policies, together with any and all cash surrender values thereunder, and any returns and refunds of premiums paid, and other amounts due back to Seller, with respect to cancelled policies;

(h)    all rights, title or interests arising out of, under or related to the Excluded Assets, including any refunds or credits;

(i)    all Customer Formulas and Recipes (for purposes of this Agreement, "**Customer Formulas and Recipes**" shall mean formulas and recipes owned or controlled by customers of Seller and utilized by Seller for manufacturing, packaging or distributing products for the benefit of such customers);

(j)    all rights of Seller arising under this Agreement and ancillary agreements;

(k)    any and all privileges of Seller with any of its professionals including attorneys, accountants, and other advisors, whether related to attorney-client privilege, attorney work product, or otherwise;

(l)    all bank accounts and lock boxes;

(m)    all of the personal property located in the Bulk Division Leased Real Property or elsewhere as a result of the manufacturing and lease agreement dated April 1, 2010 (the "**CSC Agreement**") between Seller and CSC Sugar LLC ("**CSC**") that is owned by CSC pursuant to the CSC Agreement, including but not limited to boilers, tanks, melters, presses, conveyors, lab equipment, sugar inventory and all other tangible personal property owned by CSC and utilized in the manufacture of sugar products in accordance with the CSC Agreement;

(n)    except as included in the Sale Property above, any and all rights of Seller arising in or related to the Bankruptcy Case, including but not limited to rights under debtor in

possession financing orders, retainers delivered to counsel and other professionals, and other Orders entered in the Bankruptcy Case.

**3.** **Assumed Liabilities**. On the terms and subject to the conditions set forth in this Agreement and the Sale Approval Order (as defined below), effective as of the Closing, Buyer shall assume from Seller (and pay, perform, discharge or otherwise satisfy), only the following liabilities (collectively, the "**Assumed Liabilities**"):

(a)    All liabilities of Seller arising from the ownership and operation of the Sale Property and the Applicable Business, in each case, related to periods after the Closing Date;

(b)    Any (i) cure costs required to be paid pursuant to Section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Assumed Executory Contracts/Leases (including, without limitation, any Assumed Capital Leases) (in each case, as such costs may be reduced pursuant to agreement with the applicable Contract party); and (ii) costs of obtaining necessary consents thereto (to the extent not assignable pursuant to contract or applicable Law) (the foregoing cure costs required to be paid in order to assume and assign the Assumed Executory Contracts/Leases for which Buyer shall be responsible, as such costs may be reduced pursuant to agreement with the applicable Contract party, shall be collectively referred to as the "**Cure Costs**"); and

(c)    Trade accounts payable to third party vendors incurred in the ordinary course of business of the Applicable Business after the Petition Date and only to the extent they are included in the calculation of the Purchase Price Adjustment in paragraph 15 below ("**Post-Petition Trade Payables**"); provided that, "Post-Petition Trade Accounts Payable" shall exclude any liabilities of Seller to the Office of the U.S. Trustee, any fees or expenses for attorneys, accountants, investment bankers, bankers, brokers, finders, consultants and other professionals to Seller or the Official Committee of Unsecured Creditors (for purposes of this Agreement, "**Post-Petition Food Trade Payables**" means Post-Petition Trade Payables incurred by the Food Division Business; and "**Post-Petition Bulk Trade Payables**" means Post-Petition Trade Payables incurred by the Bulk Division Business). For the avoidance of doubt, notwithstanding anything to the contrary herein, the Assumed Liabilities shall not include any liabilities of the type described in paragraphs 4(a)-(o).

**4.** **Excluded Liabilities**. Notwithstanding any provision in this Agreement to the contrary, Buyer is assuming only the Assumed Liabilities and is not assuming, and shall not be deemed to have assumed, any other liabilities of Seller of whatever nature (whether arising prior to, at the time of, or subsequent to Closing), whether absolute, accrued, contingent or otherwise, whether due or to become due and whether or not assets, and whether or not known or unknown or currently existing or hereafter arising or matured or unmatured, direct or indirect, and Seller shall be solely and exclusively liable for any and all such liabilities, including, without limitation, any such liabilities set forth below (collectively, the "**Excluded Liabilities**"):

(a)    All liabilities of Seller relating to or otherwise arising, whether before, on or after the Closing, out of, or in connection with, any of the Excluded Assets;

(b)    Any and all liabilities of Seller to its creditors except for the Assumed Executory Contracts/Leases;

(c)    Any and all liabilities for Taxes, including, without limitation:

(i)    Any and all Taxes (irrespective of when asserted) of Seller or any Affiliate for any taxable period (including any such Taxes or related liabilities that may be imposed or asserted against Buyer or any of its Affiliates by reason of Contract, assumption, transferee or successor liability, operation of Law, pursuant to Treasury Regulation Section 1502-6 (or any similar provision of any state or local Law) or otherwise);

(ii)    Any Taxes related to or arising from any of the Sale Property, any of the Assumed Liabilities or the Business, in each case, for any taxable period (or portion thereof) ending on or before the Closing Date;

(iii)    Taxes imposed on any Person that are the responsibility of Seller;

(iv)    Any Transfer Taxes;

(v)    Taxes arising from or in connection with an Excluded Asset; and

(vi)    any Taxes or liabilities arising from the failure to comply with or obtain a certificate under any Bulk Sales Laws (including with respect to the transactions contemplated by this Agreement).

(d)    Any and all liabilities relating to Excluded Executory Contracts/Leases;

(e)    All liabilities with respect to employment or other provision of services, compensation, severance, benefits or payments of any nature owed to any current or former employee, officer, director, member, partner or independent contractor of Seller or any ERISA Affiliate (or any beneficiary or dependent of any such individual), whether or not employed by Buyer or any of its Affiliates after the Closing, including without limitation, any liability that:

(i)    Arises out of or relates to the employment, service provider or other relationship between Seller or ERISA affiliate and any such individual, including but not limited to the termination of such relationship;

(ii)    Arises out of or relates to any Seller Benefit Plan; or

(iii)    Arises out of or relates to events or conditions occurring on or before the Closing;

(f)    Drafts or checks outstanding at the Closing;

(g)    All liabilities related to the WARN Act and the Illinois WARN Act, in each case to the extent applicable, for any action resulting from employees' separation of employment prior to or on the Closing;

(h)    All liabilities related to employees (whether full-time, temporary or otherwise) that are terminated or separated prior to or on the Closing;

(i)    All liabilities of Seller to its equity holders respecting dividends, distributions in liquidation, redemptions of interests, option payments or otherwise;

(j)    All liabilities arising out of or relating to any business or property formerly owned or operated by Seller, any Affiliate or predecessor thereof, but not presently owned and operated by Seller;

(k)    All liabilities relating (i) to claims, actions, suits, arbitrations, litigation matters, Proceedings, investigations or other actions (in each case, whether involving private parties, authorities, or otherwise) involving, against, or affecting any of the Sale Property or the Business, or any assets or properties of Seller, whether commenced, filed, initiated, or threatened before or after the Closing, which was or could have been asserted on or prior to the Closing or to the extent the basis of which arose or accrued on or prior to the Closing or (ii) violations of Law by Seller;

(l)    All obligations of Seller arising or to be performed prior to the Closing arising from or related to the Business, the Sale Property or the Assumed Liabilities, other than as expressly assumed herein;

(m)    All liabilities of Seller or its predecessors arising out of any Contract, agreement, Permit, franchise or claim that is not transferred to Buyer as part of the Sale Property or, is not transferred to Buyer because of any failure to obtain any third-party or governmental consent required for such transfer;

(n)    All liabilities relating to any Employee Benefit Plan or pension plan; or

(o)    All liabilities related to any failure to perform, improper performance, breach of warranty or other breach, default, violation, act or omission by Seller on or prior to the Closing Date, whether under or with respect to any Contract (other than liabilities for the payment of (x) the Cure Costs and other cure obligations under the Assumed Executory Contracts/Leases and (y) the Post-Petition Trade Payables), in tort or otherwise.

5.    **Post-Closing Liabilities**.  Except as provided herein and except for the Excluded Liabilities, Buyer acknowledges that Buyer shall be solely responsible after Closing for all liabilities and obligations relating to Buyer's ownership or use of, or right to use, the Sale Property and the Applicable Business related to periods after the Closing Date (including, without limitation, storage and delivery costs, if any, related to periods after the Closing Date), including Taxes arising out of or related to the Sale Property or the operation of conduct of the Applicable Business, acquired pursuant to this Agreement for all Tax periods beginning after the Closing Date.

6.    **Assumption of Executory Contracts/Leases at Closing**.

(a)    Subject to paragraph 6(e) below, Schedule 1(a)(x) and/or Schedule 1(b)(x), as the case may be, sets forth a list of all executory Contracts and unexpired leases including but not limited to those unexpired leases governing the Leased Real Property comprising the

Assumed Executory Contracts/Leases.    All Contracts of Seller that are not listed on Schedule 1(a)(x) and/or Schedule 1(b)(x), as the case may be, as of the Closing shall not be considered one of the Assumed Executory Contracts/Leases.

(b)    Seller shall take all actions required to assume and assign the Assumed Executory Contracts/Leases to Buyer (excluding payment of Cure Costs), including taking all actions required to facilitate any negotiations with the counterparties to such Contracts and to obtain an Order containing a finding that the proposed assumption and assignment of the Assumed Executory Contracts/Leases to Buyer satisfies all applicable requirements of Section 365 of the Bankruptcy Code.  If any third party consent or waiver is necessary (after giving effect to the Bankruptcy Court's order approving the assumption and assignment of Assumed Executory Contracts/Leases and the provisions of the Bankruptcy Code) to assign any Assumed Executory Contracts/Leases and is not obtained before the Closing, Seller shall use its best efforts after Closing to obtain such consents or waivers and, if requested by Buyer, to enter into any lawful arrangement requested by Seller to provide Buyer the benefits of such Assumed Executory Contracts/Leases.

(c)    Buyer shall be obligated to pay, at the Closing or promptly thereafter as authorized under the Sale Approval Order, all Cure Costs needed to cure any defaults to the extent such defaults are required to be cured and such cure amounts are required to be paid as a condition to assumption and assignment of any such Assumed Executory Contracts/Leases.

(d)    At Closing, (x) Seller shall assume and assign to Buyer each of the Assumed Executory Contracts/Leases that is capable of being assumed and assigned and (y) Buyer shall assume, and perform and discharge when due, the Assumed Liabilities (if any) under the Assumed Executory Contracts/Leases.

(e)    Prior to the Closing Date, Seller shall not reject or alter any executory Contracts or unexpired leases included in the Sale Property or related to the Applicable Business, unless otherwise agreed to in writing by Buyer (collectively, the "**Applicable Contracts**").  Prior to the Closing, Buyer shall have the right to notify Seller in writing of any Applicable Contract it desires to remove from the list of Assumed Executory Contracts/Leases (in which case, such Applicable Contract shall be deemed to be one of the Excluded Executory Contracts/Leases) or of any Applicable Contract that it wishes to add to the list of Assumed Executory Contracts/Leases (in which case, such Applicable Contract shall be deemed to be one of the Assumed Executory Contracts/Leases).  Schedule 1(a)(x) and/or Schedule 1(b)(x), as applicable, shall be deemed amended to reflect any such removal or addition to the list of Assumed Executory Contracts/Leases.

(f)    Seller acknowledges and agrees that (i) Buyer shall have the right to negotiate any amendments or modifications to the terms of the Applicable Contracts including, without limitation, the Cure Costs with the third parties that are party to the Applicable Contracts and (ii) upon the entry of the Sale Approval Order, Buyer may negotiate such amendments and modifications with such third parties.

7. **Deposit and Purchase Price**.

      (a)   **Deposit.** Upon execution hereof, Buyer shall deposit with the escrowee an amount equal Eight Hundred Thousand Dollars ($800,000), by wire transfer, which sum shall be deposited into a non-interest bearing, IOLTA Account under Seller's federal taxpayer identification number representing an earnest money deposit to be held, applied or returned in accordance with the Sale Procedures Order (the "**Deposit**");

      (b)   **Purchase Price.** Subject to the Purchase Price Adjustment (as defined in paragraph 15 below), the purchase price for the Sale Property shall be an amount equal to the sum of (i) Nine Million Three Hundred Thousand Dollars ($9,300,000.00) (the "**Cash Purchase Price**") plus (ii) the Assumed Liabilities (the "**Purchase Price**"). The Cash Purchase Price shall be payable by Buyer to Seller at the Closing by wire transfer (with the Deposit to be credited against such payment). At Closing, the escrowee shall deliver the Deposit to Seller to be applied to the Cash Purchase Price. Buyer reserves the right to increase the Purchase Price at the Auction as provided in the Sale Procedures Order.

8. **Method of Sale; Bankruptcy Court Approval**. Buyer acknowledges that its offer contained herein is made pursuant to the Sale Procedures Order, and subject to Bankruptcy Court approval, and will also be subject to further competitive bidding at the "**Auction**" as described in the "**Approved Bidding Procedures**" attached to the Sale Procedures Order and expressly incorporated herein and made a part hereof. By submitting this offer, each of Buyer and Seller shall be deemed to have consented to the Sale Procedures Order and the Approved Bidding Procedures, and agrees to be bound by the terms and conditions thereof in connection with this Agreement, in each case, as such terms and condition may be amended by Buyer and Seller on the record at the Auction or before the Bankruptcy Court. Capitalized terms not otherwise defined herein shall have the same meanings ascribed in the Approved Bidding Procedures. Notwithstanding the foregoing, in the event of any conflict between the Sales Procedures Order and Approved Bidding Procedures and this Agreement, this Agreement shall prevail.

9. **Closing**.

      (a)   **Closing Date**. In the event that Buyer is the prevailing bidder at the Auction with respect to the Sale Property, and this Agreement is approved as the Prevailing Bid by Order of the Bankruptcy Court at the Sale Hearing in form and substance acceptable to Buyer (the "**Sale Approval Order**"), then subject to the terms and conditions of this Agreement, as may be amended at the Auction, the consummation of the transactions contemplated herein (the "**Closing**"), shall take place at the offices of Seller's counsel, Adelman & Gettleman, Ltd., 53 West Jackson Boulevard, Suite 1050, Chicago, Illinois, 60604 on March 13, 2020, or at such other location, time and date as shall be mutually agreed upon by the parties, but in no event later than thirty-five (35) calendar days following the entry of the Sale Approval Order. The date on which the Closing occurs is sometimes referred to herein as the "**Closing Date**". The time of the Closing shall be deemed to be effective as of 12:01 a.m. (Chicago time) on the Closing Date.

      (b)   **Seller's Deliveries at Closing**. At the Closing, Seller shall execute (as applicable) and deliver or cause to be executed (as applicable) and delivered to Buyer the

following which, in the case of any agreement or other document, shall be in form and substance reasonably satisfactory to Buyer:

(i)　　Unrestricted access to all of the Sale Property capable of passing by delivery with the intent that title in such Sale Property shall pass by and upon delivery, free and clear of any Liens, claims or encumbrances other than Permitted Encumbrances;

(ii)　　Bill of Sale for the Sale Property;

(iii)　　Assignments of the Assumed Executory Contracts/Leases, intangible property, customer purchase orders, Permits (to the extent assignable) and prepaid assets;

(iv)　　Original certificates of title for the vehicles, assigned to Buyer;

(v)　　The Food Division Books and Records and/or Bulk Division Books and Records, as applicable, together with all logins and passwords (as applicable);

(vi)　　A certified copy of the Sale Approval Order;

(vii)　　Originals of the Assumed Executory Contracts/Leases, assigned pursuant to this Agreement and the Sale Approval Order, and if unavailable, true and correct copies thereof;

(viii)　　An affidavit from Seller, sworn under penalty of perjury and dated as of the Closing Date, in form and substance required under the Treasury Regulations issued pursuant to IRC Section 1445, stating that such Seller is not a foreign Person as defined in IRC Section 1445;

(ix)　　A certified resolution of Seller's Board of Directors authorizing the execution, delivery and performance of this Agreement;

(x)　　If requested by Buyer, notices in a form reasonably satisfactory to Buyer executed by Seller's president, or CRO, as the case may be, to each customer or account debtor of Seller of the sale of the Sale Property, and Buyer's right to collect the applicable receivables;

(xi)　　No less than five (5) business days prior to Closing, Seller shall deliver to Buyer complete and correct copies of, as applicable, of the following related to each of the Seller Benefit Plans: the current plan document and summary plan description, the most recent determination letter received from the IRS, and the most recent annual report (Form 5500, with all applicable attachments);

(xii)　　No less than five (5) business days prior to Closing, Seller shall deliver to Buyer the following with respect to insurance maintained by Seller: (A) a true and complete list of all current policies or binders of fire, liability, product liability, umbrella liability, real and personal property, workers' compensation,

vehicular, fiduciary liability and other casualty and property insurance maintained by Seller and relating to the Business, the Sale Property or the Assumed Liabilities (collectively, the **"Insurance Policies"**); and (B) with respect to the Business, the Sale Property or the Assumed Liabilities, a list of all pending claims and the claims history for Seller since December 31, 2017; and

(xiii)   Such other instruments and documents as Buyer shall reasonably request to consummate the transactions contemplated in this Agreement.

(c)   **Buyer's Deliveries at Closing**.   At the Closing, Buyer shall execute and deliver or cause to be executed and delivered to Seller the following:

(i)   The Cash Purchase Price, by cashier's check or wire transfer (with the Deposit to be credited against such payment);

(ii)   A certified resolution of Buyer's Board of Directors (or other organization body) authorizing the execution, delivery and performance of this Agreement; and

(iii)   Such other instruments and documents as Seller shall reasonably request to consummate the transactions contemplated in this Agreement.

10.   **Delivery and Condition of the Sale Property**.

(a)   From time to time prior to and after the Closing, and without further consideration, Seller, upon the reasonable request of Buyer, shall execute and deliver such documents and instruments of conveyance and transfer as Buyer may reasonably request in order to consummate more effectively the purchase and sale of the Sale Property as contemplated hereby, to vest in Buyer title to the Sale Property transferred hereunder and to permit Buyer to perfect, record or protect its interests in the Sale Property, or to otherwise more fully consummate the transactions contemplated by this Agreement.

(b)   Buyer agrees that it is purchasing and shall take possession of the Sale Property, on an **AS IS, WHERE IS** basis, with all faults of any kind or nature, including latent or patent defects, and without other representations and warranties, express, implied or statutory, written or oral, of any kind, nature or description except as expressly provided in this Agreement or in any agreement or instruments executed and delivered by Seller in connection with this Agreement. Buyer acknowledges that it has previously been given the opportunity to and has conducted such investigations and inspections of the Sale Property as Buyer has deemed necessary or appropriate for the purposes of this Agreement.

(c)   Except as expressly provided in this Agreement or in any agreement or instruments executed and delivered by Seller in connection with this Agreement, Buyer acknowledges and agrees that Seller has not made, and hereby does not make or intend to make, any express or implied representations, statements, warranties, or conditions of any kind or nature whatsoever concerning the Sale Property, including without limitation of the generality of the foregoing: the condition, working order, sufficiency, quantity and/or quality of any or all of the Sale Property; the assignability of the permits or any of them; the environmental status and

conditions of the Leased Real Property, roof, heating, central cooling, ventilating, lighting, plumbing and electrical fixtures and systems, basement flooding, leaks, seepage, insect infestation; the ability to use the telephone numbers; Seller's customers, employees, assets, liabilities, operations, profitability or lack thereof, projections, estimates, budgets, forecasts, or any other matters of any kind or nature whatsoever arising out of, under or related to the Business and/or the matters leading up to this Agreement; the completeness or accuracy of Seller's past or present financial statements, books and records and other financial information; or any and all implied warranties of merchantability or fitness for a particular purpose.

11. **Conditions Precedent to the Obligations of Buyer**. All obligations of Buyer hereunder are subject to the fulfillment, at or prior to the Closing, of each of the conditions precedent set forth below or otherwise contained herein.

(a)    The representations and warranties of Seller contained herein shall be true and correct on and as of Closing, with the same force and effect as though made on and as of said date;

(b)    Seller shall have performed all of its obligations and agreements, and complied with all of its covenants herein, to be performed and complied with by Seller, prior to Closing or such earlier date as herein specified. At the Closing, Seller shall deliver possession of the Sale Property to Buyer as set forth herein;

(c)    Seller shall have delivered to Buyer the items set forth in paragraph 9(b);

(d)    Seller shall deliver to Buyer a certificate dated as of the Closing Date, in form and substance satisfactory to Buyer, certifying that the conditions set forth in paragraph 11(a), (b) and (g) have been satisfied;

(e)    The Bankruptcy Court shall have entered the Sale Approval Order:

(i)    Approving the sale, transfer, assignment and assumption, as appropriate, of the Sale Property to Buyer upon the terms and conditions set forth herein, free and clear of any and all interests including but not limited to Liens, claims and encumbrances of any kind or nature whatsoever, but subject to Permitted Encumbrances;

(ii)    Providing that any and all valid interests including but not limited to Liens, claims and encumbrances shall attach to the Cash Purchase Price at Closing;

(iii)    Approving Seller's assumption of the Assumed Executory Contracts/Leases in accordance with Section 365(b) of the Bankruptcy Code, and assignment to Buyer as of Closing; and

(iv)    Containing a finding that Buyer is a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code;

(f)    For the purposes of this Agreement, "**Permitted Encumbrances**" shall mean:

    (i)    Encumbrances for current Taxes not yet due and payable;

    (ii)    Easements, rights of way, restrictive covenants, encroachments and similar matters currently of record affecting real property which do not, individually or in the aggregate, adversely affect the use or occupancy of the Applicable Leased Real Property or the Applicable Business, as the case may be;

    (iii)    With respect to real property, applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law; and

    (iv)    Any security interest in or lien on the equipment that is subject to the capital leases set forth on Schedule 1(a)(x) under the heading "Capital Leases" which are included in the Assumed Executory Contracts/Leases as of the Closing in accordance with paragraph 6 of this Agreement (the "**Assumed Capital Leases**"); provided that, Buyer reserves all rights and defenses under applicable Law with respect to any such security interest or other lien.

(g)    There shall have been no Material Adverse Change (as defined below) in the Sale Property or the Applicable Business relating thereto from the date hereof until the Closing except as disclosed, and reasonably acceptable, to Buyer. For the purposes of this Agreement, a "**Material Adverse Change**" shall mean any material change, effect, event, occurrence, or circumstance:

    (i)    Which would reasonably be expected to have a material and adverse effect on the Sale Property or the Applicable Business; or

    (ii)    Would be reasonably expected to prevent or materially delay or impair the ability of Seller to consummate the transactions contemplated by this Agreement;

provided, however, that changes in the Applicable Business, properties, or operations of Seller arising by reason of any of the following shall not constitute a Material Adverse Change under this subparagraph (g):

    (i)    The filing of the Bankruptcy Case;

    (ii)    The effect, directly or indirectly, of the filing of the Bankruptcy Case;

    (iii)    Changes in the economy, market, financial or capital markets or regulatory or political conditions in general, including changes in interest or exchange rates;

    (iv)    Factors generally affecting the industries or markets in which Seller operates;

(v)    Changes in general legal, Tax, regulatory, political or business conditions that, in each case, generally affect the geographic regions or industries in which Seller conducts its Business;

(vi)    Acts of war (whether or not declared), armed hostilities, sabotage or terrorism;

(vii)    Changes in, or required by, applicable Law or GAAP, or the enforcement, implementation, or interpretation thereof;

(viii)    Any natural or man-made disasters or events which could be deemed to be an act of God;

(ix)    Any failure of Seller to meet any internal or published (by Seller or otherwise) forecast, budget, or earnings projections; or

(x)    Any failure of Seller to meet any deadline established in the Bankruptcy Case or pursuant to the Approved Bidding Procedures.

**12.    Conditions Precedent to the Obligations of Seller.** All obligations of Seller hereunder are subject to the fulfillment, at or prior to the Closing, of each of the conditions set forth below or otherwise contained herein.

(a)    The representations and warranties of Buyer herein contained shall be true and correct on and as of the Closing, with the same force and effect as though made on and as of said date, except as affected by the transactions contemplated hereby;

(b)    Buyer shall have performed all of its obligations and agreements, and complied with all of its covenants herein to be performed and complied with by Buyer, prior to the Closing or such earlier date as may be specified herein. At the Closing, Buyer shall take possession of the Sale Property as contemplated herein;

(c)    The Court shall have entered the Sale Approval Order;

(d)    **(If applicable)** If Buyer has reached, or contemplates reaching, an employment or consulting agreement with any former or current officer of Seller, Buyer shall have fully disclosed the terms and conditions of any and all such employment and/or consulting agreements to the Bankruptcy Court prior to the entry of the Sale Approval Order.

**13.    Pre-Closing Covenants.** Between the date hereof and the Closing, Seller and Buyer hereby covenant and agree, as the case may be, as follows:

(a)    Seller shall not sell, lease, transfer, convey, assign or dispose of in any manner whatsoever, any of the Sale Property except for the sale of inventory in the ordinary course of the Applicable Business consistent with past practices;

(b)    Seller agrees to maintain and preserve the Sale Property prior to the Closing in its present state and condition in all material respects, subject only to use in the ordinary course of business and ordinary wear and tear;

(c)    Seller agrees to use commercially reasonable efforts to preserve intact the Applicable Business, to keep available the services of its current employees, independent contractors and agents and to maintain its relations and goodwill with its suppliers, customers, distributors and any others with whom or with which it has business relations;

(d)    Seller agrees to maintain the books and records in a complete and accurate manner on a basis consistent with past bookkeeping and accounting practices of Seller;

(e)    Seller agrees to pay all Taxes, of any kind and nature incurred or arising prior to Closing, as and when due, or as soon thereafter as is practicable, which may in any way affect or relate to the Sale Property, provided, however, Seller shall be obligated to pay such Taxes only to the extent authorized under the Bankruptcy Code;

(f)    Seller agrees to operate its Applicable Business in the ordinary course between the date hereof and Closing consistent with past practices, and maintain all insurance coverage relevant to the Applicable Business in the ordinary course of business;

(g)    Seller agrees that, prior to the Closing Date, (i) Seller shall provide Buyer and its representatives reasonable access during normal business hours to all Applicable Leased Real Property and the Sale Property and shall be entitled to make such reasonable investigation of the properties, businesses and operations of Seller and such examination of the Sale Property as it reasonably requests and to make extracts and copies (at Buyer's expense) of the Food Division Books and Records and/or Bulk Division Books and Records, as applicable, relevant to the Applicable Business and included in the Sale Property and (ii) Seller shall provide Buyer and its representatives reasonable access to its officer, employees, service providers, staffing companies, landlords, vendors and other third parties related to the Applicable Business or Sale Property as Buyer may reasonably request;

(h)    No fewer than three (3) business days prior to the Closing Date, effective as of but contingent upon the occurrence of the Closing, Seller shall terminate the employment of all employees of the Applicable Business to the extent such employees are offered employment with Buyer as set forth in this paragraph 13. No fewer than three (3) business days prior to the Closing Date, effective as of but contingent upon the occurrence of the Closing, Buyer shall offer employment to the employees of the Applicable Business selected by Buyer in its sole discretion (such employees who accept such offer of employment and commence active employment with Buyer, the **"Rehired Employees"**) on terms and conditions of employment (including compensation and benefits) as determined by Buyer in its sole discretion. Nothing contained in this Agreement shall confer upon any Rehired Employee any right to any term or condition of employment or to continuance of employment by Buyer or any of its Affiliates, nor shall anything herein interfere with the right of Buyer or any of its Affiliates to terminate the employment of any employee, including any Rehired Employee, at any time, with or without notice and for any or no reason, or restrict Buyer or any of its Affiliates in modifying any of the terms or conditions of employment of any employee, including any Rehired Employee, after the Closing.  Buyer shall

have no liability to Seller whatsoever under the WARN Act or Illinois Warn Act arising as a result, in whole or in part, of Buyer's actions or omissions occurring before, on or after the Closing Date;

(i) Each party agrees not to knowingly take, or fail to take, any action which by reason of taking or such failure to take would make any representations or warranties of each party herein materially untrue, inaccurate or otherwise misleading; and

(j) Each party agrees to take all corporate and other action necessary to consummate and carry out the transactions contemplated herein, subject to the terms and conditions of this Agreement.

## 14. Post-Closing Covenants.

(a) _Current Monthly Operating Expenses_. Seller and Buyer shall each be responsible for, and pay, on a pro rata basis, all Current Monthly Operating Expenses (defined below) payable in the month of the Closing with respect to the Applicable Business, except as otherwise expressly provided herein. For the purposes of this Agreement, "**Current Monthly Operating Expenses**" shall include current rent and utilities with respect to Applicable Leased Real Property in respect to which Buyer assumes the lease or enters into a new lease, but shall not include Assumed Liabilities. All prorations, if any, shall be made on the basis of a thirty (30) day month, and to the extent reasonably practicable. If the exact amount of the prorations cannot be determined at the Closing, the same shall be adjusted at the Closing based on the parties' good faith estimate and the Purchase Price shall be adjusted accordingly.

(b) _Intentionally Omitted_.

(c) _Intentionally Omitted_.

(d) _Name Change_. By no later than five (5) business days after the Closing Date, Seller shall take all necessary action to change its name to a name that does not include the word "Arro" or any other name or mark included in the Sale Property (including any name set forth on the signature pages to this Agreement) (collectively, the "**Restricted Names**") and shall withdraw all assumed names containing Restricted Names with respect to Seller. Seller shall seek to obtain all required authority for such name change(s) in the Sale Approval Order. Seller shall promptly notify Buyer of such name change(s) and the new name(s) chosen by Seller.

(e) _Receivables_. After the Closing, Seller shall permit, and hereby authorize, Buyer to collect, in the name of Seller, all accounts receivable constituting part of the Sale Property and to endorse with the name of Seller for deposit in Buyer's account any checks or drafts received in payment thereof. Seller shall promptly deliver to Buyer any cash, checks or other property that they may receive after the Closing in respect of any accounts or other asset constituting part of the Sale Property. Buyer shall promptly deliver to Seller any cash, checks or other property that they may receive after the Closing in respect of any asset not related to the Applicable Business.

## 15. Adjustment to Purchase Price. Subject to the Collar Amount (as defined below), the Purchase Price shall be adjusted as set forth below at Closing, if necessary, to determine net

cumulative variances with respect to the balance sheet categories of Accounts Receivable, Inventory, Prepaid Expenses and Post-Petition Trade Payables, as the case may be, in each case with respect to the Applicable Business (collectively, the **"Adjusted Balance Sheet Working Capital Categories"**).

        (a)    For purposes of this Agreement, the baseline book value of the Adjusted Balance Sheet Working Capital Categories shall be set as of February 21, 2020 as follows:

        (i)    Accounts Receivable...........................$6,864,418.35; **plus**:

        (ii)    Inventory.......................................$4,338,610.80; **plus**:

        (iii)    Prepaid Expenses (other than Inventory).......$349,671.57; **minus**:

        (iv)    Post-Petition Trade Payables..................$3,287,619.67;

        (v)    **Total Contract Date Working Capital......$8,265,081.05**

The amount so calculated of the foregoing book value of the Adjusted Balance Sheet Working Capital Categories with respect to the Applicable Business shall be hereinafter collectively referred to as the **"Total Contract Date Working Capital"**). The calculation of the Total Contract Date Working Capital and supporting schedules thereto were posted by Seller in an Excel spreadsheet to the SecureDocs data room prior to the date of this Agreement (the **"Total Contract Date Working Capital Calculation"**).

        (b)    The book value of the Adjusted Balance Sheet Working Capital Categories as of the Closing shall be computed as follows: Seller shall compute the amount of the Adjusted Balance Sheet Working Capital Categories as of such applicable date by rolling forward the books and records of the Seller through date of the Closing, on the same basis, using the same trial balance accounts and subledger accounts and using the same method as used by Seller in computing the Total Contract Date Working Capital as reflected in Total Contract Date Working Capital Calculation. Seller shall provide to Buyer reasonably in advance of Closing (i) a calculation of the Total Closing Date Working Capital calculated in the same manner and with the same supporting schedules as used in the Total Contract Date Working Capital Calculation, and (ii) a schedule reconciling the changes between Total Contract Date Working Capital Calculation and the calculation of Total Closing Date Working Capital. In calculating Total Closing Date Working Capital, no new write-offs or write-downs of any kind or nature shall be taken or applied to the Adjusted Balance Sheet Working Capital Categories except those taken or applied in computing the Total Contract Date Working Capital (including, without limitation, the reserves against Accounts Receivable and Inventory reflected in the calculation Total Contract Date Working Capital);

        (c)    For purposes of determining the Purchase Price at Closing, the Purchase Price shall be increased or decreased, as the case may be, on a dollar-for-dollar basis subject to the Collar Amount based upon the net cumulative changes to the book value, in the Adjusted Balance Sheet Working Capital Categories by calculating in accordance with this paragraph 15 the sum of the following with respect to the Applicable Business:

(i)    An amount equal to the book value of Accounts Receivable as of the Closing; **plus**

(ii)    An amount equal to the book value of Inventory as of the Closing; **plus**

(iii)    An amount equal to the book value of Prepaid Expenses as of the Closing; **minus**

(iv)    An amount equal to the Post-Petition Trade Payables as of the Closing.

**Total Closing Date Working Capital**..............................................$\underline{\hspace{3cm}}$

The amount so calculated for the Applicable Business of the foregoing book value of the Adjusted Balance Sheet Working Capital Categories as of the Closing, as applicable, shall be hereinafter collectively referred to as the **"Total Closing Date Working Capital"**);

(d)    In the event the Total Closing Date Working Capital is greater than the Total Contract Date Working Capital by more than $500,000.00 (the **"Collar Amount"**), then, in such event, the amount so calculated in excess of the Collar Amount shall be referred to as the **"Positive Variance"**, and the Purchase Price shall be increased by an amount equal to Positive Variance, if any. Absent a Positive Variance, no upward adjustment shall be made to the Purchase Price, and the Purchase Price shall be final, binding and conclusive;

(e)    In the event the Total Closing Date Working Capital is less than the Total Contract Date Working Capital by more than $500,000.00, then, in such event, the amount so calculated in excess of the Collar Amount shall be referred to as the **"Negative Variance"**, and the Purchase Price shall be reduced by an amount equal to the Negative Variance, if any. Absent a Negative Variance, no downward adjustment shall be made to the Purchase Price, and the Purchase Price shall be final, binding and conclusive. The Positive Variance or Negative Variance, as the case may be, is sometimes referred to herein as the **"Purchase Price Adjustment"**;

(f)    Seller shall make the books and records relating to the Adjusted Balance Sheet Working Capital Categories available for Buyer's representatives' inspection during normal working hours. Buyer may have its authorized representatives perform such other verification procedures as Buyer deems reasonable and necessary, provided that there is no material disruption of Seller's Business;

(g)    The Seller and the Buyer shall negotiate in good faith with regard to the Purchase Price Adjustment applicable at Closing. In the event the parties are unable to reach an agreement regarding the Purchase Price Adjustment applicable at Closing, then, in such event, the Bankruptcy Court shall determine the Purchase Price Adjustment after notice and a hearing, which determination shall be final, binding and conclusive, in all respects, for all purposes.

**16.    Seller's Representations and Warranties**. Seller, as a material inducement to the execution of this Agreement by Buyer, represents and warrants to Buyer.

(a)     Seller is a debtor in possession in the Bankruptcy Case with substantially all of the rights and powers of a trustee in bankruptcy including, without limitation, the right and power to sell the Sale Property pursuant to Section 363 of the Bankruptcy Code, subject only to the approval of the Bankruptcy Court;

(b)     Seller has good and marketable title to the Sale Property being sold to Buyer and upon the entry of the Sale Approval Order, Buyer will acquire all right, title and interest in the Sale Property, free and clear of all interests including but not limited to Liens, claims and encumbrances, other than the Permitted Encumbrances;

(c)     Seller is not a party to any pension or profit sharing plan;

(d)     Subject only to the approval of the Bankruptcy Court, Seller has full power and authority to execute and perform this Agreement and all documents and instruments to be executed by Seller pursuant to this Agreement. This Agreement, and all documents related hereto, have been or will be duly executed and delivered by duly authorized officers of Seller. Upon the approval of the Bankruptcy Court, this Agreement shall constitute a legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms;

(e)     Subject only to the approval of the Bankruptcy Court, no consent, authorization, Order or approval of, or filing or registration with, any Governmental Authority thereof is required for or in connection with the consummation by Seller of the transactions contemplated by this Agreement;

(f)     Subject only to the approval of the Bankruptcy Court and after giving effect to Bankruptcy Court's order approving the assumption and assignment of the Assumed Executory Contracts/Leases, neither the execution and delivery of this Agreement by Seller, nor the consummation by Seller of the transactions contemplated hereby, will conflict with or result in a breach of or give rise to a right of termination or loss of material benefits under, or result in the creation of a Lien or liability under (i) any of the terms, conditions or provisions of Seller's Certificate of Incorporation or by-laws, (ii) of any Order, writ, injunction, judgment or decree of any court or Governmental Authority or of any arbitration award to which Seller is a party or by which Seller is bound, (iii) applicable Law, or (iv) any of the Assumed Executory Contracts/Leases;

(g)     Seller has made available to Buyer summaries of all material Employee Benefit Plans covering employees, directors or consultants or former employees, directors or consultants in, or related to, the Business;

(h)     Except as set forth on Schedule 16(g) hereto, there are no employment, consulting, severance or indemnification Contracts between Seller and any of its employees. Seller:

(i)     is not party to or bound by any Collective Bargaining Agreement or similar agreement with any labor organization;

(ii)    has no employees that are represented by any labor organization; and

(iii)    has no knowledge of any union organizing activities among the employees of Seller.

(i)    To the best of Seller's knowledge, information and belief, Seller is and at all times has been in compliance in all respects with all Permits applicable to it, or applicable to the conduct and operations of the Applicable Business, or relating to or affecting the Sale Property, except for such failures to comply that would not, individually or in the aggregate, have or be reasonably expected to have a material adverse effect.  Seller has not received any written notice from any governmental body specifically alleging:

(i)    any actual, alleged, possible or potential material violation of, or failure to comply with, any such Permits; or

(ii)    any actual, alleged, possible or potential revocation, withdrawal, suspension, cancellation or termination of, or any modification to, any Permit.

(j)    Schedule 16(i) sets forth the names of the twenty (20) largest customers of the Seller measured by revenue for the twelve (12) calendar months ended December 31, 2019.  Unless otherwise set forth in Schedule 16(i), none of the customers listed on Schedule 16(i) has notified the Seller in writing that it is, and to the best of Seller's knowledge, information and belief, no such customer is:

(i)    canceling or terminating its relationship with the Seller; or

(ii)    considering or intends, anticipates or otherwise expects to stop, materially decrease the volume of, or materially change, adjust, alter or otherwise modify any of the terms (whether related to payment, price or otherwise) with respect to purchasing materials, products or services from the Seller.

(k)    In the event the Sale Property includes the Food Division Property, such property includes all of the tangible and intangible personal property necessary to operate the Food Division Business in the ordinary course.

(l)    In the event the Sale Property includes the Bulk Division Property, such property includes all of the tangible and intangible personal property necessary to operate the Bulk Division Business in the ordinary course.

**17.    Buyer's Representations and Warranties.**  Buyer, as a material inducement to the execution of this Agreement by Seller, represents and warrants to Seller:

(a)    Buyer is a limited liability company duly organized and validly existing under the laws of the State of Texas;

(b)    Subject only to the prior approval of the Bankruptcy Court, Buyer has full power and authority to execute and perform this Agreement and all documents and instruments

to be executed by Buyer pursuant to this Agreement. This Agreement, and all documents related hereto, have been, or will be, executed and delivered by duly authorized President and Chief Executive Officer of Buyer. Upon the approval of the Bankruptcy Court, this Agreement shall constitute a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms;

(c)     Except for the approval of the Bankruptcy Court, no consent, authorization, Order or approval of, or filing or registration with, any governmental commission, board or other regulatory body of the United States or any state or political subdivision thereof is required for or in connection with the consummation by Buyer of the transactions contemplated by this Agreement; and

(d)     Neither the execution and delivery of this Agreement by Buyer, nor the consummation by Buyer of the transactions contemplated hereby, will conflict with or result in a breach of any of the terms, conditions or provisions of Buyer's organizational documents, or of any statute or administrative regulation, or of any Order, writ, injunction, judgment or decree of any court or Governmental Authority or of any arbitration award to which Buyer is a party or by which Buyer is bound.

**18.     Termination and Remedies.** This Agreement and the transactions contemplated herein may be terminated prior to Closing pursuant to any of the following:

(a)     By the mutual written consent of Seller and Buyer, in which case, this Agreement shall be null and void and of no legal effect whatsoever upon Seller's return of the Deposit, and each party hereto shall suffer their own losses, costs, expenses or damages arising out of, or related to this Agreement;

(b)     Upon Seller's acceptance of the Prevailing Bid submitted at the Auction by a third party(ies), and approval of the Bankruptcy Court at the Sale Hearing, provided that Buyer is not in default hereunder, and the Prevailing Bid closes, then subject to the terms and conditions of the Approved Bidding Procedures concerning the Back-Up Bid, this Agreement shall be null and void and of no legal effect whatsoever upon Seller's return of the Deposit, and each party hereto shall otherwise suffer their own losses, costs, expenses or damages arising out of, or related to this Agreement; or

(c)     By either of the parties hereto if the other party materially defaults under this Agreement (and such default has not been cured within ten (10) business days following written notice to the defaulting party) or if the Closing shall not have occurred at or before 5:00 p.m. on the thirty-fifth (35th) day (or such longer date as may be agreed by the parties) after the Sale Approval Order has been entered; provided, however, that the right to terminate this Agreement under this subparagraph shall not be available to any party whose material failure to fulfill any of its obligations under this Agreement has been the cause of or resulted in the failure of the Closing to occur on or prior to the aforesaid date, provided however, that:

(i)     If Buyer is not in material default hereunder and Seller fails to make the required deliveries at the Closing or materially defaults under this Agreement with no material fault of Buyer, then Buyer shall have the right to:

(A)    terminate this Agreement and thereupon this Agreement shall be null and void and of no legal effect whatsoever upon Seller's return of the Deposit to Buyer;

(B)    pursue the remedy of specific performance of this Agreement in the Bankruptcy Court, in which case, if successful, Buyer shall be entitled to offset from the Cash Purchase Price at Closing all of its reasonable costs and expenses incurred in connection therewith (including, without limitation, reasonable attorneys' fees); or

(C)    waive or agree to modify the occurrences causing Seller's inability to consummate the transactions contemplated herein, after which Buyer shall be required to consummate the transactions contemplated herein; and

(ii)    If Seller is not in material default hereunder, and Buyer in material default hereunder fails to pay the balance of the Cash Purchase Price at the Closing as set forth above, or refuses to close for any reason, then Seller, as its sole remedy, shall be entitled to retain the Deposit as liquidated damages for Buyer's default.

19.    **Brokers**.    Excluding Livingstone (whose fees and expenses shall be the responsibility of Seller), the parties hereto warrant to each other that they have not engaged, consented to, or authorized any other broker, investment banker, or other third party to act on their behalf, directly or indirectly, as a broker or finder in connection with the transactions contemplated by this Agreement, and that no such other third party is entitled to any fee or compensation in connection with this Agreement or the transactions contemplated hereby by reason of any action of it. Seller and Buyer shall indemnify, defend and hold harmless the other from any and all claims of any broker, investment banker, or other broker or finder, arising by, through or under either of them in connection with this transaction. Buyer shall not be responsible for any fees or expenses of Andrews Advisory Group, LLC, Conway MacKenzie, Inc. or any attorneys, accountants, advisors, brokers or other professionals employed by or retained by the Seller or the Official Committee of Unsecured Creditors.

20.    **Risk of Loss**.    Legal title to, and all risk of loss for, the Sale Property shall be transferred to Buyer effective upon the Closing.

21.    **Further Assurances; Post-Closing Obligations**.

(a)    Seller and Buyer shall each make their respective books and records (including work papers in the possession of their respective accountants) with respect to the Sale Property available for inspection by the other party, or by its duly accredited representatives, for reasonable business purposes at all reasonable times during normal business hours, for two hundred seventy (270) days after the Closing, with respect to all transactions of Seller occurring prior to and relating to the Closing, and the historical financial condition, assets, liabilities, operations, and cash flows of Seller prior to Closing (the "**Pre-Closing Information**"). As used in this section, the right of inspection includes the right to make extracts or copies. Notwithstanding the foregoing, in no event shall Buyer be required to (i) share with Seller

confidential information or information that is privileged or subject to the work product doctrine or (ii) provide Seller with access to the computer systems, servers or information technology systems of Buyer including, without limitation, those included in the Sale Property; provided that, Buyer shall make the Pre-Closing Information reasonably requested by Seller during such period available by download or other reasonable means.

(b)   For a period of sixty (60) days after the Closing, Buyer shall make Rehired Employees reasonably available to Seller, at no cost to Seller, to assist Seller in completing the administration of Seller's estate in the Bankruptcy Case, provided, however, such assistance shall not exceed five (5) hours per week per individual or forty (40) hours per week for all such individuals taken together.

(c)   From and after the Closing, the parties shall execute such further documents, and perform such further acts, as may be necessary to transfer and convey the Sale Property to Buyer on the terms herein contained and to otherwise comply with the terms of this Agreement and consummate the transactions contemplated hereby.

22.   **Entire Agreement**. This Agreement, including those documents identified herein or to be appended hereto as Appendices, Schedules and Exhibits constitutes the entire contract between the parties relating to the subject matter hereof and is the final and complete expression of their intent. No prior or contemporaneous negotiations, promises, agreements, covenants, or representations of any kind or nature, whether made orally or in writing, have been made or relied upon by the parties, or any of them, in negotiations leading to this Agreement or relating to the subject matter hereof, which are not expressly contained herein, or which have not become merged and finally integrated into this Agreement; it being the intention of the parties hereto that in the event of any subsequent litigation, controversy, or dispute concerning the terms and provisions of this Agreement, no party shall be permitted to offer to introduce oral or extrinsic evidence concerning the terms and conditions hereof that are not included or referred to herein and not reflected in writing. This Agreement can be changed, modified or amended only by a writing executed by the parties. No conditions of any kind or nature exist to the legal effectiveness of this Agreement which shall be in full force and effect immediately upon execution and delivery by the parties hereto, subject to entry of the Sale Approval Order and as otherwise required under the Bankruptcy Code.

23.   **Survival of Representations and Warranties**. The warranties and representations of the parties hereto as expressed herein shall expire as of the Closing.

24.   **Notices**. All notices required or permitted to be given hereunder shall be in writing and may be delivered by hand, by facsimile, by nationally recognized private courier, or by United States mail. Notices delivered by mail shall be deemed given five (5) business days after being deposited in the United States mail, postage prepaid, registered or certified mail. Notices delivered by hand, by facsimile, or by nationally recognized private courier shall be deemed given on the first business day following receipt; provided, however, that a notice delivered by facsimile shall only be effective if such notice is also delivered by hand, or deposited in the United States mail, postage prepaid, registered or certified mail, on or before two (2) business days after its delivery by facsimile. All notices shall be addressed as follows (or to such other address as any party shall have advised the others in writing):

If to Seller addressed to:

  Arro Corporation
  7440 Santa Fe Drive
  Hodgkins, Illinois
  Attn: Robert Novak, Patrick Gaughan, and Vladimir Kasparov

  With copies to:

  Howard L. Adelman, Esq.
  Adam P. Silverman, Esq.
  Alexander F. Brougham, Esq.
  Adelman & Gettleman, Ltd.
  53 West Jackson Boulevard, suite 1050
  Chicago, Illinois  60604

If to Buyer addressed to:

  c/o Mount Franklin Foods, LLC
  1800 Northwestern Drive,
  El Paso, Texas 79912
  Attention: Enrique Grajeda, President and CEO

  With a copy to:

  Vedder Price P.C.
  222 N. LaSalle Street, Suite 2400
  Chicago, Illinois 60601
  Attention: Guy E. Snyder

and/or to such other respective addresses and/or addressees as may be designated by notice given in accordance with the provisions of this paragraph 24.

  **25.**   **No Contract until Execution.**  This Agreement shall become valid and binding only after it is executed and delivered by the parties.  Until execution hereof, it is the intention of the parties that

    (a)  no agreement, Contract, offer of agreement or proposal arises; and

    (b)  no estoppel is created by the submission of any draft hereof or any other conduct of the parties.

  **26.**   **Expenses.**  Each party hereto shall bear all fees and expenses incurred by such party in connection with, relating to or arising out of the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, including, without limitation, attorneys', accountants' and other professional fees and expenses.

27.    **Non-Waiver**. The failure in any one or more instances of a party to insist upon performance of any of the terms, covenants or conditions of this Agreement, to exercise any right or privilege in this Agreement conferred, or the waiver by said party of any breach of any of the terms, covenants or conditions of this Agreement, shall not be construed as a subsequent waiver of any such terms, covenants, conditions, rights or privileges, but the same shall continue and remain in full force and effect as if no such forbearance or waiver had occurred. No waiver shall be effective unless it is in writing and signed by an authorized representative of the waiving party.

28.    **Binding Effect**. This Agreement shall inure to the benefit of and be binding upon the parties hereto, and their successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to convey on any Person other than the parties hereto, and their respective successors and permitted assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, including, without limitation, third party beneficiary rights.

29.    **Assignability**. This Agreement is not assignable by either party without the prior written consent of the other party, which consent shall not be unreasonably withheld; provided that, Buyer may assign (a) this Agreement and any of its rights or obligations under this Agreement to any Affiliate of Buyer, provided that, in the event of any such assignment, Mount Franklin Foods, LLC, shall remain liable for the payment of the Cash Purchase Price on the Closing, and (b) Buyer or such Affiliate, as applicable, may assign its rights under this Agreement to the lender to Buyer or such Affiliate, as applicable, as collateral security.

30.    **Jurisdiction**. The parties acknowledge and agree that the Bankruptcy Court shall have exclusive jurisdiction to enforce each and every term and condition of this Agreement, including but not limited to hearing and determining claims or disputes among the parties hereto arising as a result of this Agreement or arising as a result of any claimed breach of this Agreement, whether at Law or in equity; provided, however, that if the Bankruptcy Court is unwilling or unable to hear any such dispute, the courts of the state of Illinois and the federal courts of the United States of America located in Illinois will have sole jurisdiction over any and all disputes between or among the parties, whether at Law or in equity, arising out of or relating to this Agreement or any agreement contemplated hereby. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

31.    **Applicable Law**. This Agreement shall be governed and controlled as to validity, enforcement, interpretation, construction, effect and in all other respects by the internal Laws of the State of Illinois applicable to contracts made in that State.

32.    **Severability**. If any provision of this Agreement shall be judicially determined to be unenforceable or invalid, the remainder of this Agreement shall be unaffected to the greatest extent possible.

33.    **Headings**. The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.

34.    **Time of Essence**. Time is of the essence to this Agreement.

**35.** <u>**Counterparts**</u>. This Agreement may be executed in counterparts. All counterparts hereof shall collectively constitute a single agreement. This Agreement may be executed and delivered by means of a facsimile machine or by .pdf, .tif, .gif, .jpeg, or similar attachment to electronic mail (any such delivery, an "**Electronic Delivery**"), each of which shall be deemed an original and shall be treated in all manner and respects as an original executed counterpart and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in Person. At the request of any party, each other party shall re-execute the original form of this Agreement and deliver such form to all other parties. No party shall raise the use of Electronic Delivery to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of Electronic Delivery as a defense to the formation of a contract, and each party unconditionally, absolutely and irrevocably forever waives any such defense.

**36.** <u>**Construction of Terms**</u>. This Agreement has been drafted jointly by the parties in full consultation with their respective attorneys, and no ambiguity in this Agreement shall be interpreted or construed against any of the parties.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first above written.

**SELLER:**

ARRO CORPORATION

By_____
Its: President / CRO

**BUYER:**

MOUNT FRANKLIN FOODS, LLC

By_____
Its: President and Chief Executive Officer

## Appendix A

## Definitions and Cross References

As used in the attached Asset Purchase Agreement, the following terms shall have the following meanings:

"**Affiliate**" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether by Contract, through the ownership of voting securities or otherwise.

"**Agreement**" means this Asset Purchase Agreement, including all of the Exhibits and the Schedules hereto, as the same may be amended from time to time in accordance with its terms.

"**Bulk Sales Laws**" means (i) the bulk-transfer provisions of the Uniform Commercial Code or any similar laws in jurisdictions in which the Seller conducts the Business or owns any related assets and (ii) any Tax-related Laws, or requirements of any jurisdiction relating to bulk sales, or requiring similar notification, certification or withholding requirements, in respect of a sale or transfer of assets, which Laws are applicable to the sale of the Sale Property or the Seller.

"**Collective Bargaining Agreement**" means any Contract or other binding agreement or arrangement (written or oral) with any labor union, works council or other labor organization.

"**Contract**" means any binding agreement, license, contract, commitment, Collective Bargaining Agreement or other binding arrangement or understanding, and with respect to any Contract to which any Seller is a party, such contract which such Seller is permitted under the Bankruptcy Code to assume and assign other than an Employee Benefit Plan.

"**Employee Benefit Plan**" means any "employee benefit plan" (as defined in Section 3(3) of ERISA) and any other benefit or compensation plan, program, agreement or arrangement.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and all Laws issued thereunder.

"**GAAP**" means, at a given time, United States generally accepted accounting principles, consistently applied.

"**Governmental Authority**" means any federal, state, local, municipal, foreign, supranational or other governmental or quasi-governmental authority (including any governmental agency, branch, bureau, commission, department, official or entity and any court or other tribunal), or any administrative, executive, judicial, legislative, regulatory or Taxing authority, or arbitral body.

"**Illinois WARN Act**" means the Illinois Worker Adjustment and Retraining Notification Act, 820 ILCS 65/1 et. seq.

"**IRC**" means the United States Internal Revenue Code of 1986, as amended.

"**IRS**" means the United States Internal Revenue Service.

"**Law**" means any law, statute, regulation, code, constitution, ordinance, treaty, rule of common law, or Order of any Governmental Authority.

"**Lien**" or "**Liens**" has the meaning given to that term in the Bankruptcy Code.

"**Order**" means any award, decision, decree, settlement, order, injunction, ruling, judgment, or consent of or entered, issued, made or rendered by any Governmental Authority.

"**Permits**" means licenses, permits, approvals, franchises, bonds, accreditations, certificates of occupancy, authorizations, operating permits, registrations, plans and the like.

"**Person**" means any corporation, partnership (including any limited partnership and any limited liability partnership), joint venture, limited liability company, organization, trust, entity, authority or natural person.

"**Proceeding**" means any action, claim, charge, demand, action, litigation, arbitration, liability, damage, suit in equity or at Law, administrative, regulatory or quasi-judicial proceeding.

"**Seller Benefit Plan**" means an Employee Benefit Plan that is sponsored, maintained or contributed to by Sellers for or on behalf of any current or former employees, directors, officers or individual independent contractors of the Business.

"**Tax**" and, with correlative meaning, "**Taxes**" mean with respect to any Person (i) all federal, state, local, county, foreign and other taxes, assessments or other similar government charges, including any income, alternative or add-on minimum tax, estimated, gross income, gross receipts, sales, use, ad valorem, value added, transfer, capital stock, franchise, profits, license, registration, recording, documentary, intangibles, conveyancing, gains, employee or other withholding, payroll, employment, social security (or similar), unemployment, disability, excise, severance, escheat, unclaimed property, stamp, occupation, premium, property (real or personal), environmental or windfall profit tax, customs, duty or other tax, similar governmental fee or other like assessment, charge or tax of any kind whatsoever, together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority (domestic or foreign) responsible for the imposition of any such tax, whether such tax is disputed or not.

"**Tax Return**" means any report, return, declaration, claim for refund or other information or statement supplied or required to be supplied by any Person relating to Taxes, including any schedules or attachments thereto and any amendments thereof.

"**Transfer Taxes**" means any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, registration, use or other Taxes and recording charges, and all conveyance fees and other fees and charges (including any penalties and interest) due and which may be payable by reason of the sale of the Sale Property or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated in this Agreement.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1988, and any similar Law.

## Cross References

| Term | Paragraph |
|---|---|
| Accounts Receivable | paragraph 1(d)(ii) |
| Adjusted Balance Sheet Working Capital Categories | paragraph 15 |
| Applicable Business | paragraph 1(d)(vi) |
| Applicable Contracts | paragraph 6(e) |
| Applicable Leased Real Property | paragraph 1(d)(vii) |
| Approved Bidding Procedures | paragraph 8 |
| Assumed Capital Leases | paragraph 11(f)(iv) |
| Assumed Executory Contracts/Leases | paragraph 1(d)(v) |
| Assumed Liabilities | paragraph 3 |
| Auction | paragraph 8 |
| Bankruptcy Case | Recital C |
| Bankruptcy Code | Recital C |
| Bankruptcy Court | Recital C |
| Bulk Division | paragraph 14(b) |
| Bulk Division Books and Records | paragraph 1(b)(vi) |
| Bulk Division Business | Recital A |
| Bulk Division Executory Contracts/Leases | paragraph 1(b)(x)(B) |
| Bulk Division Inventory | paragraph 1(b)(iii) |
| Bulk Division Prepaid Expenses | paragraph 1(b)(xiii) |
| Bulk Division Property | Recital F |
| Bulk Division Receivables | paragraph 1(b)(i) |
| Business | Recital A |
| Buyer | Introductory Paragraph |
| Cash Purchase Price | paragraph 7(b) |
| Chapter 5 Claims | paragraph 1(a)(xv) |
| Closing | paragraph 9(a) |
| Closing Date | paragraph 9(a) |
| Collar Amount | paragraph 15(d) |
| Combined Property | Recital F |
| CSC | paragraph 2(m) |
| CSC Agreement | paragraph 2(m) |
| Cure Costs | paragraph 3(b) |
| Current Monthly Operating Expenses | paragraph 14(a) |
| Customer Formulas and Recipes | paragraph 2(i) |
| Customer Inventory | paragraph 2(b) |
| D&O Claims | paragraph 1(a)(xv) |
| Deposit | paragraph 7(a) |
| Excluded Assets | paragraph 2 |
| Excluded Books and Records | paragraph 1(a)(vi) |
| Excluded Causes of Action | paragraph 2(d) |
| Excluded Commercial Tort Claims | paragraph 1(a)(xv) |
| Excluded Executory Contracts/Leases | paragraph 2(f) |

Excluded Liabilities                                    paragraph 4
Food Division Books and Records                         paragraph 1(a)(vi)
Food Division Business                                  Recital A
Food Division Executory Contracts/Leases               paragraph 1(a)(x)
Food Division Inventory                                 paragraph 1(a)(iii)
Food Division Prepaid Expenses                          paragraph 1(a)(xiii)
Food Division Property                                  Recital F
Food Division Receivables                               paragraph 1(a)(i)
Inventory                                               paragraph 1(d)(iv)
Insurance Policies                                      paragraph 9(b)(xii)
Leased Real Property                                    Recital B
Material Adverse Change                                 paragraph 11(g)
Negative Variance                                       paragraph 15(e)
Permitted Encumbrances                                  paragraph 11(f)
Petition Date                                           Recital C
Positive Variance                                       paragraph 15(d)
Post-Petition Bulk Trade Payables                       paragraph 3(c)
Post-Petition Food Trade Payables                       paragraph 3(c)
Post-Petition Trade Payables                            paragraph 3(c)
Pre-Closing Information                                 paragraph 21(a)
Prepaid Expenses                                        paragraph 1(d)(iii)
Purchase Price                                          paragraph 7(b)
Purchase Price Adjustment                               paragraph 15(e)
Rehired Employee                                        paragraph 13(h)
Restricted Names                                        paragraph 14(d)
Sale Approval Order                                     paragraph 9(a)
Sale Procedures Order                                   Recital D
Sale Property                                           paragraph 1(d)(i)
Seller                                                  Introductory Paragraph
Total Closing Date Working Capital                      paragraph 15(c)
Total Contract Date Working Capital                     paragraph 15(a)
Total Contract Date Working Capital                     paragraph 15(a)
Calculation

## SCHEDULE 1(a)(x)

## FOOD DIVISION - ASSUMED EXECUTORY CONTRACTS/LEASES[1]

| Number | Party Name / Address | Contract Description | Debtor's Preliminary Projected Cure Amount[2] |
|---|---|---|---|
| 2 | **Alternative Staffing, Inc.** c/o Aaron L. Hammer 500 W. Madison Suite 3700 Chicago, IL 60661 cc: National Union Fire Insurance Co. of Pittsburgh, PA c/o Adam L. Rosen PLLC 2-8 Haven Avenue, Ste. 220 Port Washington, NY 11050 Attn: Adam L. Rosen | Staffing Agreement: Counterparty to supply qualified personnel; Debtor to pay agreed-upon rates. | $1,585,373.90 |
| 8 | **AT&T Corp.** 440 S. Executive Dr. Brookfield, WI 53005- 5000 | Master Agreement Contract: Internet Service for Debtor. | $2,994.85 for assumption/assignment of this contract and No. 9 below. |
| 9 | **AT&T Corp.** 440 S. Executive Dr. Brookfield, WI 53005- 5000 | AT&T Network on Demand Contract: Internet Service for Debtor. | See No. 8 above. |
| 15 | **Blue Diamond Growers** Attn: Office of the General Counsel 1802 C Street Sacramento, CA 95811 | Amended and Restated Co- Manufacturing Agreement: Debtor to perform co- packing services; counterparty to pay agreed- upon prices. | $0.00 |
| 16 | **Blue Diamond Growers** Attn: Office of the General Counsel 1802 C Street Sacramento, CA 95811 | Nondisclosure Agreement: Both parties agree not to disclose confidential information. | $0.00 |

---

[1] Prior to the Closing, Buyer shall have the right to notify Seller in writing of any Applicable Contract it desires to remove from the list of Assumed Executory Contracts/Leases or of any Applicable Contract that it wishes to add to the list of Assumed Executory Contracts/Leases.

[2] Buyer has not agreed to pay the Cure Costs set forth herein, which Cure Costs remain subject to further negotiation and/or reduction prior to Closing.

| Number | Party Name / Address | Contract Description | Debtor's Preliminary Projected Cure Amount[2] |
|---|---|---|---|
| 17 | **BREIT Industrial Canyon IL1B03 LLC** c/o Stream Realty - Chicago, LLC Attn: Property Management 6250 N. River Road, Suite 6025 Rosemont, IL 60018 | Industrial Lease Agreement: Lease of 7225 Santa Fe Drive, Hodgkins, Illinois, with Debtor as lessee. | $867,661.25 |
| 26 | **Frito-Lay, Inc.; Golden Grain Company; and Quaker Manufacturing, LLC** 7701 Legacy Drive Attn: VP, Contract Manufacturing Cc: Law Department Plano, TX 75024-0000 | Contract Manufacturing Agreement: Debtor to manufacture, process, and package products for sale to counterparties; counterparties to pay agreed-upon prices. | $0.00 |
| 45 | **Kodiak Cakes, LLC** P.O. Box 980992 Attn: Darren Smith Park City, UT 84098 | Manufacturing Agreement: Debtor to manufacture and supply products; counterparty to pay agreed-upon price. | $0.00 |
| 46 | **Kraft Heinz Foods Company** 200 East Randolph Street Suite 7600 Attn: Brandon Petesch Chicago, IL 60601 | External Manufacturing Master Agreement and External Manufacturing Project Agreement: Debtor to sell and deliver products to counterparty; counterparty to purchase and receive products from Debtor. | $2,186,259.15[3] |
| 47 | **Massimo Zanetti Beverage USA, Inc.** 1370 Progress Road Suffolk, VA 23434 | Manufacturing Agreement: Debtor to produce and package products; counterparty to pay agreed-upon prices. | $1,841,264.49[4] |
| 49 | **Nalco Crossbow Water, LLC** 320 West 194th Street Glenwood, IL 60674 | DI Express Quotation: Equipment rental and services related to water-treatment system. | $16,190.65 for assumption/assignment of this contract and Nos. 50 and 51 below.[5] |
| 50 | **Nalco Crossbow Water, LLC** 320 West 194th Street Glenwood, IL 60674 | Equipment rental and services related to water-treatment system. | See No. 49 above. |

---

[3] Creditor has indicated that this cure amount may be reduced due to the application of a recoupment claim.
[4] Creditor has indicated that this cure amount may be reduced due to the application of a recoupment claim.
[5] Possibly subject to downward adjustment to remove amounts owed for unrelated transactions.

| Number | Party Name / Address | Contract Description | Debtor's Preliminary Projected Cure Amount[2] |
|---|---|---|---|
| 51 | **Nalco Water**<br>1601 W. Diehl Road<br>Naperville, IL 60563-1198 | Proposal:  Maintenance services for water-treatment system. | See No. 49 above. |
| 52 | **Onin Group Midwest, LLC**<br>c/o Taft Stettinus & Hollister LLP<br>111 East Wacker, Suite 2800<br>Attn:  Michael P. O'Neil<br>Chicago, IL 60601 | Client Service Agreement:  Counterparty to supply qualified personnel; Debtor to pay agreed-upon rates. | $1,028,670.03 |
| 62 | **REF Leasing Co.**<br>245 E North Ave<br>Carol Stream, IL 60188 | Equipment Rental Agreement:  Lease of cartoner with purchase option, with Debtor as lessee. | $29,700.00 |
| 63 | **REF Leasing Co.**<br>245 E North Ave<br>Carol Stream, IL 60188 | Equipment Rental Agreement:  Lease of cartoner with purchase option, with Debtor as lessee. | $20,700.00 |
| 64 | **ROSDEV Portfolio IL, LLC**<br>7077 Ave Du Parc, Ste. 600<br>Montreal, QC H3N 1X7<br>CANADA | Master Lease Agreement:  Lease of 7440 Santa Fe Drive, Hodgkins, Illinois and 10459 S. Muskegon Ave., Chicago, Illinois, with Debtor as lessee. | $0.00 |
| 65 | **Santa Fe Industrial Investors LLC**<br>c/o J. Raymond Frazier<br>UBS Realty Investors LLC<br>12001 North Central Expressway #650<br>Dallas, TX 75243-3735 | Lease Agreement:  Lease of Suites 7250-A and 7250-B, Santa Fe Drive, Hodgkins, Illinois, with Debtor as lessee. | $585,818.40 |
| 66 | **Santa Fe Property LLC**<br>7440 Santa Fe Drive<br>Hodgkins, IL 60525-0000 | Commercial and Industrial Lease Agreement:  Lease of 7550 Santa Fe Drive, Hodgkins, Illinois. | $0.00 |
| 67 | **Sentinel Technologies, Inc.**<br>2550 Warrenville Road<br>Downers Grove, IL 60515 | Licenses and services related to computer network. | $34,885.87 for assumption/assignment of this contract and Nos. 68 and 69 below. |
| 68 | **Sentinel Technologies, Inc.**<br>2550 Warrenville Road<br>Downers Grove, IL 60515 | Licenses and services related to computer network. | See No. 67 above. |
| 69 | **Sentinel Technologies, Inc.**<br>2550 Warrenville Road<br>Downers Grove, IL 60515 | Licenses and services related to computer network. | See No. 67 above. |

| Number | Party Name / Address | Contract Description | Debtor's Preliminary Projected Cure Amount[2] |
|---|---|---|---|
| 70 | **Simple Mills, Inc.** 435 N. LaSalle Dr., 2nd Fl. Chicago, IL 60654-0000 | Manufacturing Agreement: Debtor to manufacture and deliver products to counterparty; counterparty to pay agreed-upon prices. | $0.00 |
| 72 | **The King Arthur Flour Company, Inc.** 135 Route 5 South Norwich, VT 05055 | Manufacturing Agreement: Debtor to manufacture and package products; counterparty to pay agreed-upon fees. | $0.00 |
| 91 | **VersaFleet, Inc.** 1415 W. 22nd Street Tower Floor Oak Brook, IL 60523 | Equipment Rental Agreement: Lease of Unit No. 6480102 reefer trailer, with Debtor as lessee. | See No. 90 above. |
| 94 | **WIN** Attn: Correspondence Division 301 Main St. Greenville, SC 29601 | Proposal: Counterparty to provide Ethernet internet services. | $5,659.44 |

## CAPITAL LEASES

| | | |
|---|---|---|
| | **Balboa Capital Corporation** 735 E. Green St. P.O. Box 80 Bensenville, IL 60106 | Master Lease Agreement CCAN: 138061 |
| | **Ascentium Capital Lease** (originally Alliance Funding) | |
| | **TCF Equipment Finance Lease** (originally Alliance Funding) | Master Equipment Lease Agreement #001-0640709 |
| | **RLC Funding Lease** (originally Alliance Funding) | |

## SCHEDULE 1(b)(x)

## BULK DIVISION – ASSUMED EXECUTORY CONTRACTS/LEASES[1]

| Number | Party Name / Address | Contract Description | Preliminary Projected Cure Amount[2] |
|---|---|---|---|
| 3 | **Arro Ingredient Group d/b/a Arro Protein Solutions**<br>Attn: Patrick Gaughan<br>7440 Santa Fe Drive<br>Hodgkins, IL 60525 | Lease and Services Agreement: Allocation of costs and services between Debtor and counterparty, and lease of plant space with Debtor as lessor. | $0.00 |
| 20 | **Chicago Rail Link, LLC**<br>252 Clayton Street, 4th Floor<br>Attn: Real Estate Manager<br>Denver, CO 80206 | Industry Track Agreement, Agreement No. 407730: Counterparty to provide rail service to Debtor; Debtor to maintain railroad track. | $16,147.44 |
| 21 | **Chicago Rail Link, LLC**<br>27728 East 104th Street<br>Attn: Assistant General Manager<br>Chicago, IL 60617 | Railcar Storage Agreement: Counterparty to provide storage for Debtor's railcars; Debtor to pay applicable charges. | $28,000.00 |
| 24 | **CSC Sugar LLC**<br>36 Grove Street<br>New Canaan, CT 06840 | Manufacturing and Lease Agreement: Debtor to lease space and to provide services; Debtor entitled to reimbursement of costs and a percentage of profits. | $0.00 |
| 33 | **Ingredion Incorporated**<br>5 Westbrook Corp Center<br>Attn: General Counsel<br>Westchester, IL 60154 | Toll Manufacturing and Supply Agreement: Debtor to produce products for counterparty; counterparty to pay Debtor. | $0.00 |
| 71 | **Tate & Lyle America's LLC**<br>2200 East Eldorado Street<br>Attn: Global Procurement Logistics<br>Cc: Warehouse Manager<br>Decatur, IL 62525 | Toll Processing Agreement: Debtor to convert raw materials into finished products; counterparty to pay toll processing fee. | $42,668.79 |

[1] Prior to the Closing, Buyer shall have the right to notify Seller in writing of any Applicable Contract it desires to remove from the list of Assumed Executory Contracts/Leases or of any Applicable Contract that it wishes to add to the list of Assumed Executory Contracts/Leases.
[2] Buyer has not agreed to pay the Cure Costs set forth herein, which Cure Costs remain subject to further negotiation and/or reduction prior to Closing.