**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HC OLDCO, INC. | ) | Case No. 19-35238 |
| (f/k/a Arro Corporation), | ) | |
| | ) | Hon. Janet S. Baer |
| Debtor. | ) | |

**DISCLOSURE STATEMENT FOR AGREED PLAN OF LIQUIDATION PROPOSED**
**BY DEBTOR AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

**IMPORTANT DATES**

- Date by which Ballots must be received: July 27, 2020
- Date by which objections to Adequacy of the Disclosure Statement and/or Confirmation of the Plan must be filed and served: July 31, 2020 at 4:00 p.m. (Central Time)
- Hearing on Adequacy of the Disclosure Statement and Confirmation of the Plan: August 5, 2020, at 1:30 p.m. (Central Time)

Counsel for Debtor:

ADAM P. SILVERMAN, ESQ.
ERICH S. BUCK, ESQ.
ADELMAN & GETTLEMAN, LTD.
53 WEST JACKSON BLVD, SUITE 1050
CHICAGO, ILLINOIS 60604
TEL: (312) 435-1050
FAX: (312) 435-1059
EMAIL: asilverman@ag-ltd.com
         ebuck@ag-ltd.com

Counsel for Official Committee of Unsecured Creditors:

THOMAS R. FAWKES, ESQ.
BRIAN J. JACKIW, ESQ.
TUCKER ELLIS LLP
233 SOUTH WACKER DRIVE, SUITE 6950
CHICAGO, ILLINOIS 60606
TEL: (312) 624-6300
FAX: (312) 624-6309
EMAIL: Thomas.Fawkes@tuckerellis.com
         Brian.Jackiw@tuckerellis.com

**I.      PRELIMINARY STATEMENT**

Pursuant to Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"), HC Oldco, Inc., f/k/a Arro Corporation, debtor and debtor in possession (the "**Debtor**"), along with the Official Committee of Unsecured Creditors (the "**Committee**"), hereby submit this disclosure statement (the "**Disclosure Statement**") in support of the *Agreed*

*Plan of Liquidation* proposed in connection herewith (the "**Plan**")[1]. This Disclosure Statement solicits acceptance of the Plan, as required under the Bankruptcy Code. The Debtor and the Committee are hereinafter collectively referred to as the "**Plan Proponents**."

**THE DEBTOR AND THE COMMITTEE, WHICH REPRESENTS THE INTERESTS OF ALL HOLDERS OF GENERAL UNSECURED CLAIMS IN THIS CASE, BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF HOLDERS OF CLAIMS. ACCORDINGLY, CLAIM HOLDERS WHO ARE ENTITLED TO VOTE ARE STRONGLY URGED TO VOTE IN FAVOR OF THE PLAN BY CASTING A BALLOT ACCEPTING THE PLAN PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND ON THE BALLOT.**

## II.    INTRODUCTION AND OVERVIEW

### A.    Introduction

On December 13, 2019 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division (the "**Bankruptcy Court**"), commencing the above-captioned case (the "**Chapter 11 Case**"). The Chapter 11 Case was assigned to the Honorable Janet S. Baer. On December 23, 2019, the Committee was appointed in the Chapter 11 Case. The Debtor has remained in possession of its assets and has continued to operate its business as debtor in possession in accordance with sections 1107(a) and 1108 of the Bankruptcy Code since the Petition Date.

### B.    Brief Overview of the Chapter 11 Process

Chapter 11 of the Bankruptcy Code contains numerous provisions, the general effect of which is to provide a debtor with "breathing space" within which to propose a restructuring of its obligations to third parties. The filing of a Chapter 11 bankruptcy petition creates a bankruptcy estate comprising all of the property interests of the debtor. Unless a trustee is appointed by the bankruptcy court "for cause" (no trustee has been appointed in the Chapter 11 Case), the debtor remains in possession and control of all its assets as a "debtor in possession."

The debtor / debtor in possession may continue to operate its business in the ordinary course on a day-to-day basis without bankruptcy court approval. Bankruptcy court approval is only required for certain types of transactions (such as certain financing transactions) and transactions out of the ordinary course of the debtor's business. The filing of the bankruptcy petition gives rise to what is known as the "automatic stay" which, generally speaking, enjoins creditors from taking any action to collect or recover obligations owed by a debtor prior to the commencement of the Chapter 11 case. The bankruptcy court can grant relief from the automatic stay under certain specified conditions or "for cause."

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan, although not every capitalized term used in the Plan is used herein.

A Chapter 11 debtor may emerge from bankruptcy by successfully confirming a plan of reorganization. Under a plan of reorganization, the debtor typically continues its operations in one form or another, with the business remaining more or less intact. As an alternative to reorganization, the assets of the debtor may be sold and the proceeds distributed to creditors through a plan of liquidation, such as proposed in this Chapter 11 Case through the Plan. A plan may be either consensual or non-consensual and may provide, among other things, for the treatment of the claims of creditors and the interests of equity holders. In order to successfully confirm a plan, a plan proponent must satisfy several statutory requirements, including but not limited to, circulation of a disclosure statement in form and substance approved by the bankruptcy court.

## C.      Purpose of Disclosure Statement

The purpose of this Disclosure Statement is to provide each creditor with "adequate information" to enable it to make an informed judgment whether to "accept" or "reject" the Plan. Generally speaking, adequate information means a plan proponent must provide a creditor with sufficient information necessary to make a meaningful, informed decision about the Plan. In specific terms, section 1125 of the Bankruptcy Code provides, in part, that adequate information means:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan.

11 U.S.C. § 1125(a)(1).

This Disclosure Statement is submitted in accordance with section 1125 of the Bankruptcy Code. It contains information regarding the Plan and is being distributed to you for the purpose of enabling you to make an informed judgment about the Plan. A copy of the Plan accompanies this Disclosure Statement. The Bankruptcy Court in the Chapter 11 Case has not yet conducted a hearing on the Plan itself or conducted a detailed investigation into the contents of this Disclosure Statement. A hearing on these matters has been set for August 5, 2020, at 1:30 p.m. (Central Time), as addressed below in more detail.

The Disclosure Statement describes the Plan and contains information concerning, among other matters: (1) the Debtor's business and events leading to the Chapter 11 Case; (2) the actions taken by the Debtor in the Chapter 11 Case; (3) financial information of the Debtor as of the Petition Date and its most recently filed United States Trustee Operating Report; and (4) a summary of the Plan, including sources and uses of funds to make distributions thereunder. The Plan Proponents strongly urge you to carefully review the contents of this Disclosure Statement and the Plan (including exhibits) before making a decision to accept or reject the Plan. Particular attention should be paid to the provisions affecting or impairing your rights as a creditor.

Your vote on the Plan is important. Absent acceptance of the Plan through affirmative voting, the Chapter 11 Case may need to be converted to Chapter 7 under the Bankruptcy Code, likely causing substantial delays in distributions to holders of claims. In addition, conversion to Chapter 7 would likely not provide for distribution of as much value to those holders of allowed claims as does the Plan. Accordingly, the Plan Proponents urge you to accept the Plan by completing and returning the Bankruptcy Court-approved "Ballot" (as defined below) no later than July 27, 2020.

## D.      **Plan Overview**

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan. The Plan is a plan of liquidation and provides for the distribution of the proceeds from the liquidation of the Debtor's assets, in accordance with the applicable provisions of the Bankruptcy Code and pursuant to the terms of a settlement (described in Section III.C.7 hereof) between the Debtor, the Committee, and the Debtor's prepetition secured lenders, BMO Harris Bank, N.A. ("**BMO**") and the United States Small Business Administration (the "**SBA**", and together with BMO, the "**Secured Lenders**")  The distribution of assets under the Plan would involve, among other things: (1) transferring the "Net Sale Proceeds" from the Debtor's "Asset Sale" (as those terms are defined below) to BMO, which has valid first priority liens and security interests in such assets, coupled with sharing in certain other distributions of the estate and/or the "Creditor Trust" (as defined below), in full satisfaction of its claims against the Debtor and interest in the "Sale Proceeds" (as defined below); (2) transferring a portion of the Sale Proceeds to the SBA, which has valid second priority liens and security interests in certain of those assets, coupled with sharing in certain other distributions of the Creditor Trust, in full satisfaction of its claims against the Debtor and interest in the Sale Proceeds; and (3) transferring cash and other assets of the Debtor (including a portion of the Sale Proceeds), plus a contribution from BMO, to the Creditor Trust for distribution by a "Creditor Trustee" to other creditors pursuant to the terms of the "Creditor Trust Agreement" (as those terms are defined below).

It is presently contemplated that the Debtor will have substantially completed the winding up of its affairs, including liquidating any remaining assets other than pursuing potential litigation claims, prior to the "Confirmation Date" (as defined below). Consequently, on or after the "Effective Date" (as defined below) of the Plan, the Debtor anticipates that substantially all remaining administrative responsibilities under the Plan will transfer to the Creditor Trustee in connection with the establishment of the Creditor Trust. As of the Effective Date, the Creditor Trustee will be tasked with, among other things, (1) the enforcement and prosecution of causes of action, (2) reconciliation and resolution of claims against the Debtor's estate, (3) the filing of any reports and payment of any fees required under 28 U.S.C. § 1930 beginning with the period after the Effective Date, (4) the filing of the Debtor's 2019 and final 2020 tax returns, (5) the termination and wind-up of the Debtor's 401(k) plan, and (6) such other administration of the Plan to the extent not within the express purview of the Debtor. After the Effective Date of the Plan, all assets held in the Creditor Trust shall be distributed in accordance with the terms of the Plan and Creditor Trust Agreement.

The Plan provides for the classification and treatment of claims against and equity interests in the Debtor, and it separates those claims and equity interests into various classes. The classification of claims and equity interests and their treatment under the Plan take into account the differing nature and priority of the various claims and equity interests under the Bankruptcy Code. The Plan contemplates that the Debtor will be dissolved as a legal entity, and all existing equity interests in the Debtor (including all issued and outstanding stock) will be extinguished and canceled.

Each creditor in an impaired class is entitled to vote on acceptance of the Plan. Generally speaking, a class of claims or interests is "impaired" under a plan unless it leaves unaltered the legal, equitable, and contractual rights to which such claims or interests are entitled. In the Chapter 11 Case, Class 1 (BMO Claims), Class 2 (SBA Claims) and Class 5 (General Unsecured Claims) constitute impaired classes entitled to vote on the Plan. A summary of the classification and treatment of claims and equity interests under the Plan is as follows:

| Class | Description | Entitled to Vote | Estimated Claims[2] | Approx. Estimated Recovery | Treatment |
|---|---|---|---|---|---|
| Unclassified | Administrative Claims | N/A | $850,000[3] | 100%, or in the case of Professional Fee Claims, such lesser amounts as may be agreed by professionals consistent with and subject to the Settlement and Plan Budget. | (a) Full satisfaction in cash or cash equivalent paid on the later of (i) on or as soon as practicable after the Effective Date of the Plan, or (ii) allowance by the Bankruptcy Court; or (b) such other treatment as may be agreed upon by the claimant and Debtor/Creditor Trustee. |
| Unclassified | Priority Tax Claims | N/A | $34,493.50 | 100% | Full satisfaction in cash or cash equivalent paid either:  (a) on the later of: (i) within forty-five (45) days of the Effective Date of the Plan; or (ii) |

---

[2] Unless otherwise indicated, estimates based on timely-filed, liquidated claims as of June 11, 2020, or where no claim was timely filed, claims scheduled as liquidated, non-contingent and undisputed. Estimates assume elimination of late- and duplicative-filed claims.

[3] Estimate based on all unpaid administrative expenses as of the date hereof.

| | | | | | allowance by the Bankruptcy Court; or (b) over time in accordance with the section 1129(a)(9)(C)(ii) of the Bankruptcy Code. |
|---|---|---|---|---|---|
| Class 1 | Secured and Unsecured Claims of BMO Harris Bank N.A. (**"BMO Claims"**) | Yes | $27,342,344.70<br><br>Secured: $8,388,309.90, after giving effect to SBA's Secured Claim; and<br><br>Unsecured: $18,954,034.80<br><br>In each case, subject to funding of, or reserve of the Sale Proceeds under, the Plan Budget. | 100% on Secured Claim; Unknown on deficiency Unsecured Claim | On or as soon as practicable after the Effective Date of the Plan, receipt of: (a) the Net Sale Proceeds; (b) the "Preferred Administrative / Priority Claim Refund" (as defined below); (c) the "BMO Additional Trust Recovery" (as defined below) from the Creditor Trust Funds; and (d) mutual releases as between the Debtor, the Committee, BMO and the SBA, and their respective professionals. |
| Class 2 | Secured and Unsecured Claims of the United States Small Business Administration (**"SBA Claims"**) | Yes | $5,363,052<br><br>Secured: $700,000; and<br><br>Unsecured: $4,663,052 | 100% on Secured Claim; Unknown on deficiency Unsecured Claim | On or as soon as practicable the Effective Date of the Plan: (a) transfer of $700,000 in Sale Proceeds, comprising the SBA Agreed Distribution; (b) *pro rata* distribution(s) of the Creditor Trust Funds on its deficiency claim; and (c) mutual general releases as between the Debtor, the Committee, BMO and the SBA, and |

| | | | | | their respective professionals. |
|---|---|---|---|---|---|
| Class 3 | Other Secured Claims | No | $1,292,634.08 | 100% | On or as soon as practicable after the Effective Date of the Plan: (a) surrender of collateral securing such claims; or (b) payment in cash or cash equivalent; or (c) such other treatment as may be agreed upon by the claimant and Debtor/Creditor Trustee. |
| Class 4 | Priority Non-Tax Claims | No | $110,018.26[4] | 100% | (a) Full satisfaction in cash or cash equivalent paid on the later of (i) on or as soon as practicable after the Effective Date of the Plan, or (ii) allowance by the Bankruptcy Court; or (b) such other treatment as may be agreed upon by the claimant and Debtor/Creditor Trustee. |
| Class 5 | General Unsecured Claims | Yes | $27,469,417.78 | Unknown | Distribution(s) of the Net Trust Proceeds, on a *pro rata* basis (including the SBA's deficiency claim), and in accordance with the BMO Additional Trust Recovery, subject to payment in full of any allowed Administrative |

[4] Excludes employee claims arising under section 507(a)(4)-(5) of the Bankruptcy Code, but only to the extent such claims were paid during the Chapter 11 Case pursuant to prior order of the Bankruptcy Court [Docket No. 35]. Amount represents only timely filed claims.

| | | | | | Claims, allowed Priority Tax Claims, allowed Priority Non-Tax Claims, and net of reasonable fees and expenses incurred by the Creditor Trust, in cash or cash equivalent paid on the later of: (a) allowance by the Bankruptcy Court; or (b) such date(s) on which the Creditor Trustee determines there is sufficient Creditor Trust Funds available to make distributions under the Plan, reserving for any disputed claims. |
| Class 6 | Equity Interests | No | Unknown | 0% | Cancellation, with no cash or cash equivalent available for distribution. |

### E.   Voting

Holders of Class 1 BMO Claims and Class 2 SBA Claims, and holders of Class 5 General Unsecured Claims whose claims are deemed allowed for voting purposes, may vote on the Plan by filling out and mailing the court approved ballots ("**Ballots**") for accepting or rejecting the Plan to the Clerk of the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division (the "**Court Clerk**"). In order to be considered by the Bankruptcy Court at the hearing on confirmation of the Plan, your Ballot must be fully completed, executed, and underlined actually received by the Court Clerk at the following address by no later than July 27, 2020 (the "**Voting Deadline**"):

Clerk of the United States Bankruptcy Court
for the Northern District of Illinois, Eastern Division
219 South Dearborn Street, Room 713
Chicago, Illinois 60604

Ballots may be delivered to the Court Clerk by first-class mail; overnight delivery; personal delivery; or, for registered users, through the Bankruptcy Court's Case Management/Electronic Case Filing (CM/ECF) System.

As a creditor your vote is important. In order for a class of claims to be deemed to have accepted the Plan, at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the claims allowed to vote in a particular class, who actually return a Ballot, must vote to accept the Plan.

**THE DEBTOR AND THE COMMITTEE, WHICH REPRESENTS THE INTERESTS OF ALL HOLDERS OF CLASS 5 CLAIMS, BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF SUCH CLAIMANTS. ACCORDINGLY, CLAIM HOLDERS WHO ARE ENTITLED TO VOTE ARE <u>STRONGLY URGED</u> TO VOTE IN FAVOR OF THE PLAN.**

**F.      Confirmation of Plan**

Section 1128(a) of the Bankruptcy Code requires a hearing, after notice, on confirmation of the Plan. Under section 1128(b), any party in interest may object to confirmation of a Chapter 11 plan. The Bankruptcy Court has set **August 5, 2020, at the hour of 1:30 p.m. (Central Time)** for a combined hearing on the adequacy of the Disclosure Statement and the confirmation of the Plan (collectively, the "**Confirmation Hearing**"). As stated above, the Bankruptcy Court has not yet conducted a hearing on the adequacy of the Disclosure Statement or the contents of the Plan.

**G.      Objections to Adequacy of Disclosure Statement / Confirmation of Plan**

Objections to confirmation of the Plan are governed by Rule 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), among other Bankruptcy Rules. If an objection to confirmation is not timely filed and served, the Bankruptcy Court may not consider it. The Bankruptcy Court has directed that any objections to the adequacy of the Disclosure Statement or confirmation of the Plan be filed no later than **4:00 p.m. (Central Time) on July 31, 2020** (the "**Objection Deadline**") and, in the event such objections are filed in paper form with the Court Clerk, also delivered in paper form (via prepaid U.S. Mail, overnight delivery, or hand delivery) to the parties at the following addresses, so as to be actually received by each of them by the Objection Deadline:

| Counsel to the Debtor: | Counsel to the Committee: |
|---|---|
| Adelman & Gettleman, Ltd. | Tucker Ellis LLP |
| Attention: Adam P. Silverman and Erich S. Buck | Attention: Thomas R. Fawkes and Brian J. Jackiw |
| 53 W. Jackson Blvd., Suite 1050 | 233 South Wacker Drive, Suite 6950 |
| Chicago, IL 60604 | Chicago, IL  60606 |

| U.S. Trustee: | Counsel to BMO: |
|---|---|
| Office of the U.S. Trustee<br>for the Northern District of Illinois<br>Attn: Jeffrey L. Gansberg<br>219 S. Dearborn St., Room 873<br>Chicago, IL  60604 | Chapman and Cutler LLP<br>Attention: James P. Sullivan<br>111 West Monroe Street<br>Chicago, IL 60603 |
| Counsel to SBA:<br>U.S. Small Business Administration<br>Attention: Kate R. O'Loughlin<br>Special Assistant U.S. Attorney<br>Illinois District Counsel<br>500 W. Madison, Suite 1150<br>Chicago, IL 60661 | |

**H.**   **Disclaimer**

THIS DISCLOSURE STATEMENT PROVIDES A BRIEF SUMMARY OF THE PLAN AND OTHER INFORMATION WITH RESPECT THERETO AND IS NOT INTENDED TO TAKE THE PLACE OF A FULL REVIEW OF THE PLAN. EACH CREDITOR IS URGED TO STUDY THE PLAN IN FULL AND TO CONSULT WITH COUNSEL WITH RESPECT TO THE PLAN AND ITS EFFECT ON THEIR RIGHTS. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN CONTROL.

NO REPRESENTATIONS CONCERNING THE DEBTOR ARE AUTHORIZED, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE WHICH ARE OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR AND FOR THE COMMITTEE USING THE CONTACT INFORMATION SET FORTH IN SECTION II.G OF THIS DISCLOSURE STATEMENT, WHO IN TURN, SHALL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE DEEMED APPROPRIATE.

THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. BECAUSE OF THE COMPLEXITY OF THE DEBTOR'S FINANCIAL MATTERS AND ITS FINANCIAL DIFFICULTIES, THE DEBTOR CANNOT WARRANT OR REPRESENT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY. THE COMMITTEE HAS NO INDEPENDENT KNOWLEDGE AND CANNOT WARRANT OR REPRESENT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY.

ADELMAN & GETTLEMAN, LTD. ("**A&G**") IS GENERAL INSOLVENCY COUNSEL TO THE DEBTOR. A&G HAS RELIED UPON INFORMATION PROVIDED BY THE DEBTOR IN CONNECTION WITH PREPARATION OF THIS DISCLOSURE STATEMENT. ALTHOUGH A&G HAS PERFORMED CERTAIN LIMITED DUE DILIGENCE IN CONNECTION WITH THE PREPARATION OF THIS DISCLOSURE STATEMENT, A&G HAS NOT INDEPENDENTLY VERIFIED ALL OF THE INFORMATION CONTAINED HEREIN.

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS, OR TAX ADVICE. EACH CREDITOR OR INTEREST HOLDER SHOULD CONSULT ITS OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX, AND OTHER MATTERS CONCERNING ITS CLAIM.

### III.     THE CHAPTER 11 CASE

For the reasons more fully described below, the Debtor's business has ceased operating, and substantially all of the Debtor's assets from its business have been sold. The Debtor, with the support of the Committee, has been proceeding with the wind-down of the administration of the Debtor's estate. Such efforts have been or are expected to be substantially completed, resulting in the need for the Debtor to pursue confirmation of the Plan at this time.

### A.     The Debtor's Business

#### 1.     Formation and Business Model

The Debtor was founded in 1985 as Arro Packaging. In 1995, the assets of Arro Packaging were acquired through Arro Packaging Company, and in 1997, the company was renamed "Arro Corporation." As a condition of the Asset Sale, the Debtor was required to change its corporate name, which it did, to "HC Oldco, Inc." The Debtor was in the business of manufacturing, packaging, and distributing bake mixes, powdered beverages, ingredients, cereals, trail mix, nuts and other food products. The Debtor provided industry-leading processing and packaging services for many well-known consumer-branded foods, including emerging brands, private label, gluten free, organic, and national brands.

The Debtor's customers typically sold products manufactured and/or packaged by the Debtor through buyer clubs, grocery stores, food service industry participants, and discount / value retail establishments. The Debtor also re-packaged various food ingredients for distribution to commercial markets. In addition, the Debtor provided a full suite of research and development ("**R&D**") capabilities for its customers, including an on-site R&D laboratory. The Debtor's business consisted of two distinct divisions: (a) contract manufacturing of retail food based products (the "**Food Division**"); and (b) bulk packaging of commodity ingredients and liquid sugar refining for commercial application (the "**Bulk Division**"). The Food Division accounted for approximately ninety percent (94%) of the Debtor's annual revenue, while the Bulk Division accounted for the other six percent (6%).

Based upon customer needs, the Debtor provided one of two service options. First, the Debtor offered a "turn-key" model, including R&D, testing, product development, commercialization, and vendor and supply chain management (the "**Turn-Key Services**"). With Turn-Key Services, the customer required particular quality-controlled vendors (collectively, the "**Mandated Source Vendors**"), and the Debtor procured and owned the inventory and raw materials necessary to process such customer orders. As a result, the Debtor received additional consideration for procurement services. Second, and in lieu of Turn-Key Services, the Debtor offered a traditional co-packer, or toll, model (the "**Toll Services**"). With Toll Services, the Debtor's customer also dictated the Mandated Source Vendors, but the customer was responsible for the working capital necessary to acquire the inventory and raw materials needed to process the Toll Services customer orders. As a result, the Debtor applied a "toll" fee to process the customer-owned inventory. Under both Turn-Key Services and Toll Services, inventory was received, processed, warehoused, and shipped within the Debtor's on-site facilities.

### 2.    Operating Premises

The Debtor operated from five (5) distinct facilities covering more than 770,000 square feet. The Food Division was primarily located at 7440 Santa Fe Drive, Hodgkins, Illinois 60525, but operated out of other satellite facilities. The Bulk Division was located exclusively in the Debtor's Chicago plant located at 10459 S. Muskegon Ave., Chicago, Illinois 60617.

The Debtor leased all of its facilities from unaffiliated third-party lessors, with the one exception being 7550 Santa Fe Drive. This property is owned by Santa Fe Property, LLC, of which Mr. Patrick Gaughan, the former president and former sole director of the Debtor, is the sole member.

### 3.    Employment Structure

The Debtor employed approximately 124 people; 57 of those employees were salaried, and 67 were hourly. There were 106 employees who worked in the Food Division (Hodgkins) and 18 employees who worked in the Bulk Division (Chicago).

In addition to the Debtor's employees, the Debtor engaged the services of multiple staffing agencies to obtain the services of approximately 300 to 350 individuals on a daily basis (the "**Outsourced Labor**"). The Debtor was party to certain contracts with Alternative Staffing, Inc. ("**ASI**") and Onin Group Midwest, LLC, as successor to Labor Temps, II, LLC (together with ASI, the "**Staffing Agencies**"). The Debtor's ordinary course of business was to contact the Staffing Agencies on a daily basis and communicate: (a) how many individuals of Outsourced Labor the Debtor would require for the next day; and (b) the requisite skill set required of the Outsourced Labor. The contracts with the Staffing Agencies expressly provided that the Outsourced Labor were employees of the Staffing Agencies and not the Debtor.

### B.    Events Leading Up to the Filing of the Chapter 11 Case

In the fourth quarter of 2017, the Debtor's projected outlook for 2018 in the Food Division was promising. The Debtor was exploring a large pipeline of new business, which, if

realized, would have increased the Debtor's revenue by approximately fifty percent (50%), to a projected $120 million in 2018. In light of its anticipated new business, the Debtor believed it was entering into a sustainable growth period and began a program to increase its infrastructure to accommodate the expected increase in demand for its products and services. It did so by adding certain equipment and mid-level compliance and quality-control employees, primarily for the purpose of ensuring that new products would comply with the FDA Food Safety Modernization Act, 21 U.S.C. §§ 301 *et seq.*

### 1.  The Debtor's Financial Outlook Takes a Turn for the Worse

Instead, the Debtor faced a series of problems hampering the realization of its projections, described generally as follows:

- *Changes in the Labor Market*: Like many businesses, the Debtor did not fully appreciate the timing, scope, or impact government-mandated increases in the minimum wage would have on the labor market as a whole, nor did it foresee the difficulties in attracting and maintaining quality personnel in an employee-friendly labor market. Instead of insisting on price increases from its existing customer base, the Debtor believed its anticipated growth in new business would more than offset the increase in wages.

- *Delays in the Start of New Business*: While successful in on-boarding much of its anticipated new business, the new business was not commercialized until the fourth quarter of 2018, despite the Debtor's anticipation that much of this business would be effectuated by the end of the second quarter of 2018. This timing exacerbated the increased overhead incurred in early 2018.

- *Private Equity Investment*: In its business judgment, management thought the Debtor could overcome its capital shortfall in 2018 through increased volume, and thereafter, by way of a private equity transaction. In hindsight, it would have been beneficial to secure an equity investment earlier to accommodate increased overhead and bridge the gap in timing of new business and realization of revenue derived therefrom.

- *Operating Inefficiencies*: As a result of the delay in new business, the Debtor found itself in perpetual start-up mode, in which it expended significant time and financial resources to ensure that new product lines were initiated or launched appropriately to the satisfaction of the Debtor's customers. In addition, to accommodate these new product lines, the Debtor had increased its inventory and acquired processing equipment which went underutilized, adding to the Debtor's inability to monetize a return on its investments in infrastructure.

- *Ingredient Delays*: As a result of its financial difficulties, the Debtor moved to a just-in-time receipt system for ingredients, as it did not have the cash flow to stockpile the ingredients necessary to satisfy customer orders. As a result, any delay in the delivery of ingredients resulted in the complete shut-down of the applicable product line until the necessary ingredients arrived. Compounding the problem, the Debtor was unable to simply send its labor force home until the product line could be re-engaged, as the Debtor

feared any reductions in work hours for its employees, even temporary ones, would result in its displaced workforce finding employment elsewhere. Accordingly, the Debtor retained the affected employees but was required to utilize them in non-revenue-generating tasks, such as cleaning and maintenance.

- *Lawsuits*: Further pressure came in the form of numerous lawsuits against the Debtor by vendors and other parties, which led to the expenditure of funds for either settlement or the retention of counsel to defend claims.

Leading up to the Chapter 11 filing, the Debtor was burning cash at an unsustainable rate. In addition to its obligations of approximately $4.8 million and $4.19 million on SBA loans and BMO term loans, respectively, the Debtor owed BMO approximately $21.7 million on a revolving note. The Debtor also had approximately $10 million in past-due trade accounts payable. As a result, the Debtor was not obtaining credit from many of its suppliers, thereby creating a vicious cycle of not having sufficient inventory to generate accounts receivable.

## 2.     <u>BMO Exercises its Proxy Rights</u>

The equity of the Debtor is owned by the Patrick Gaughan Declaration of Trust dated July 15, 1996, as amended and restated by that certain Amendment and Restatement of Patrick Gaughan Declaration of Trust dated May 15, 2008 (the "**Gaughan Trust**"), a self-settled trust through which Patrick Gaughan was the Debtor's sole shareholder.  On November 27, 2019, the Debtor's primary secured creditor, BMO, exercised its rights ("**Proxy Rights**") pursuant to that certain Stock Pledge Agreement between the Gaughan Trust and BMO dated June 14, 2017 (the "**Stock Pledge Agreement**"). The Stock Pledge Agreement was provided as collateral security for BMO's pre-petition loans to the Debtor.  In exercising its rights, BMO elected to use the proxy of the Gaughan Trust's voting rights pursuant to the Stock Pledge Agreement and executed shareholder resolutions removing Mr. Gaughan as the sole director and replacing him with a new director, Mr. Robert Novak (the "**Independent Director**").[5]  The Independent Director then executed resolutions removing Mr. Gaughan as president and appointing a new president, Mr. Daniel Dooley ("**President**"). The Independent Director and the then-President are associated with the consulting firm of Morris Anderson & Associates, Ltd. ("**Morris Anderson**").  BMO did not at that time cite mismanagement, negligence, breach of the duties of care or loyalty, or any malfeasance of any kind or nature in connection with the exercise of its rights under the Stock Pledge Agreement.

## 3.     <u>Management Determines Circumstances Necessitate a Chapter 11 Filing</u>

Following BMO's exercise of its Proxy Rights, the Independent Director and President undertook extensive due diligence to determine the Debtor's options for addressing its immediate liquidity issues as well as its longer-term prospects for sustaining operations.  Ultimately, the Debtor's management, in consultation with the Debtor's legal counsel and financial advisors, determined that the Debtor's only course of action was to proceed with a Chapter 11 filing.

---

[5] The Debtor is aware that, on at least one occasion, the Gaughan Trust has suggested that BMO transferred all of the outstanding stock of the Debtor into the name of BMO, but BMO disputes this contention and asserts that the stock of the Debtor remains in the name of the Gaughan Trust.

**C.**     **Actions Taken by the Debtor in Chapter 11**

As previously stated, the Debtor filed the Chapter 11 Case on December 13, 2019. The case was assigned to the Honorable Janet S. Baer, before whom it is still pending.  The actions taken thus far by the Debtor in the Chapter 11 Case may be summarized as follows:

**1.**     **Administrative and Procedural Matters**

The many tasks needed to advance a complex and eventful Chapter 11 case on a daily basis do not lend themselves to a brief summary. Some of the major administrative and procedural tasks completed by the Debtor in the Chapter 11 Case, however, include the following:

- Preparing and prosecuting several "first day" motions (most of which, despite the use of this term in bankruptcy parlance, were filed not on the first day of the Chapter 11 Case, but instead in its early phases) to allow the Debtor to continue operating with a minimum of disruptions, including motions (a) to maintain the Debtor's existing bank accounts and cash-management practices; (b) to authorize the Debtor to pay employee wage and benefit obligations incurred prior to the Petition Date; and (c) to continue necessary utility services to the Debtor's facilities;

- Filing the Debtor's bankruptcy schedules and statement of financial affairs [Docket Nos. 87 and 88, *amended in part by* Docket Nos. 197 and 209, the "**Schedules and SOFA**"], which provided lengthy and detailed disclosure of the Debtor's assets, liabilities, and other relevant financial data to the Bankruptcy Court and all interested parties, and later amending these documents to the extent necessary to supplement prior disclosures;

- Obtaining the retention, with the Bankruptcy Court's authorization, of professionals, officers, and temporary staff as necessary to enable the Debtor to achieve its goals in the Chapter 11 Case.  The Debtor thus retained Adelman & Gettleman, Ltd., the Debtor's bankruptcy counsel; Andrews Advisory Group, LLC ("**AAG**"), which has provided the services of the Debtor's chief restructuring officer ("**CRO**"), Mr. Vladimir Kasparov, as well as those of other temporary staff; and Livingstone Partners, LLC ("**Livingstone**"), the Debtor's investment bankers;

- Managing Staffing Agency, vendor, and customer relationships, to preserve the Debtor's ongoing business relationships with key suppliers and customers;

- Timely responding to a consistent flow of inquiries by counsel for the United States Trustee (the "**UST**"), respective counsel for the Secured Lenders, counsel to the Committee, and numerous other interested parties; and

- Complying with the Debtor's numerous other duties and obligations as a Chapter 11 debtor and debtor in possession, including the filing and dissemination of required monthly operating reports and quarterly fee statements.

1092707_2                                    15

2.      **DIP Financing and Cash Collateral**

On January 9, 2020, the Bankruptcy Court entered its *Final Order Authorizing (a) Secured Post-Petition Financing on a Super Priority Basis Pursuant to 11 U.S.C. § 364, (b) Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and (c) Grant of Adequate Protection Pursuant to 11 U.S.C. §§ 363 and 364* [Docket No. 65, the "**DIP Financing Order**"], which gave the Debtor (a) access to approximately $3 million in financing by BMO; and (b) consensual use of the Secured Lenders' cash collateral.

As of the Petition Date, the claims of the Secured Lenders totaled approximately $32 million, consisting of: (a) the claims of BMO in the outstanding principal amount of approximately $27 million, plus interest, fees, and charges accrued and accruing thereon; and (b) the claims of the SBA in the outstanding principal amount of approximately $5 million, plus interest, fees, and charges accrued and accruing thereon.

As is often the situation in a Chapter 11 case, it would not have been possible for the Debtor to operate while in bankruptcy without the use of BMO's cash collateral.  Furthermore (and as discussed above), the Debtor faced a severe liquidity crisis going into the Chapter 11 Case, and the Debtor's only potential source of liquidity was its existing senior secured lender, BMO.  Consequently, the Chapter 11 Case depended on the cooperation of both Secured Lenders.

The DIP Financing Order was the product of intensive and protracted negotiations with BMO. These negotiations began even before the Chapter 11 Case was filed, and first bore fruit in the filing of a motion seeking DIP (or "debtor-in-possession") financing (the "**DIP Motion**"). Between the filing of the DIP Motion and its presentment, the Debtor engaged in further negotiations, not only with the Secured Lenders, but also with the UST, to iron out any impediments to the entry of an order affording the Debtor the relief it needed.

Because some issues remained unresolved at the time of the hearing on the DIP Motion, it was necessary for the Debtor to present hours of supporting testimony from several witnesses. Ultimately, however, the parties were able to reach compromise and consensus on a large number of outstanding issues, and the Bankruptcy Court entered an order granting DIP funding and use of cash collateral on an interim basis (the "**Interim DIP Order**"), subject to the Debtor's compliance with a detailed budget and many other terms and conditions.

Following the entry of the Interim DIP Order, the Debtor continued to work with BMO, the Committee (appointed after entry of the Interim DIP Order), and the UST to ensure that any impediments to the entry of final—as opposed to merely interim—relief were resolved.  After further negotiations and a hearing, the Bankruptcy Court entered the DIP Financing Order. The financing and use of cash collateral permitted by the DIP Financing Order has enabled the Debtor to take all actions required to administer the Chapter 11 Case successfully, including the marketing and sale of the Debtor's assets on a going-concern basis.

3.      **The Committee**

On December 23, 2018, the UST appointed the Committee as an official committee to represent the interests of unsecured creditors pursuant to section 1102 of the Bankruptcy Code. The initial members of the Committee were:

- The Kraft Heinz Company
- Alternative Staffing Inc.
- Onin Group Midwest
- Backhaul Direct LLC
- Royal Box Group LLC
- Graphic Packaging International
- Bluegrass Dairy and Food, Inc.

The Committee retained Goldstein & McClintock LLLP as its initial counsel, and Conway MacKenzie, LLC as its financial advisor. On March 2, 2020, Tucker Ellis LLP was substituted in as the Committee's counsel.

### 4.   **Asset Sale**

The driving factor behind the filing of the Chapter 11 Case—and the purpose for which BMO was willing to provide the Debtor with the necessary DIP Financing—was to effectuate a sale of all or substantially all assets of the Debtor as a going concern (the "**Asset Sale**"). The most challenging components of the Asset Sale involved the Debtor's structure of having two separate divisions – the Food Division and the Bulk Division – serving distinct customers and operating from distinct locations. The Bulk Division, which made up only a small fraction of the Debtor's revenues, was generating negative EBITDA, thereby reducing the financial value and expected purchase price for the Asset Sale. The Debtor believed there was a market for interested parties to bid on each division separately, and if it could sell the Food Division separate and apart from the Bulk Division, the Debtor could realize a higher sale price.

Complicating the matter, however, was the fact that the primary operating facility for the Food Division and the location from which the Bulk Division operated were tied to a master lease agreement, rendering the Debtor powerless to assume or reject the lease for just the Food Division or the Bulk Division absent consent of ROSDEV Portfolio IL, LLC, the landlord under the master lease ("**ROSDEV**"). During the initial stage of designing the Asset Sale process, ROSDEV agreed that if the Debtor could find separate purchasers for the Food Division and the Bulk Division, ROSDEV would likely be willing to bifurcate the master lease into two leases, provided that the prior lease terms for each facility remain substantially the same, as applicable. The facility from which the Bulk Division operated far exceeded its needs, however, thus narrowing the pool of buyers who could grow the Bulk Division into the space it was presently occupying.

In addition to complications presented by the ROSDEV master lease agreement, the Debtor was required to consider other issues that would likely arise from the sale of the Food and Bulk Divisions separately, such as making the Debtor's information systems available to a purchaser of either division for a specified period of time while protecting each purchaser's

newly acquired proprietary information; allocating the Debtor's intangible property, such as the right to use the "Arro" name; and "unwinding" shared services between the divisions. Despite these other issues, the Debtor structured the Asset Sale, and the asset purchase agreement used in conjunction therewith (the "**APA**"), to accommodate the possibility that there would be one purchaser for both divisions, or a different purchaser for each of the two different divisions. The APA allowed a prospective purchaser to "check the box" for the assets and divisions it sought to acquire—the Food Division, the Bulk Division, or the combined divisions.

In preparing the APA, the Debtor sought the input of several of the "Constituent Parties" (as defined in the "Sale Procedures Motion", defined below, but consisting largely of the Secured Lenders, the Debtor, the Committee, and Livingstone), but primarily that of BMO, as BMO's consent to the sale process was essential to consummating the Asset Sale. The Debtor worked cooperatively with BMO, its counsel, its financial advisors, and the Committee, to bridge any differing viewpoints on topics such as the inclusion and breadth of a material adverse change clause allowing a prospective purchaser to terminate the APA without breaching it; the scope of Debtor's representations and warranties; the net working capital adjustment to the purchase price and performance metrics to raise or lower the price between execution of the APA and closing, including any high and low "collars" thereon; payment of post-petition trade payables and cure costs by the ultimate purchaser; mechanisms for carving out customer-owned property; and similar matters.

The Debtor also presented a motion requesting approval of the procedures for the Asset Sale (the "**Sale Procedures Motion**"), including bidding procedures (the "**Bidding Procedures**") and all notices of the Asset Sale, such as notices to assume and assign executory contracts and the cure amounts for same. The Debtor worked with various interested parties to ensure the Sale Procedures Motion, and in doing so made several changes to the proposed notices and procedures. The Bankruptcy Court ultimately approved the Sale Procedures Motion on January 27, 2020.

No stalking horse offer was received by the Debtor by the deadline for such an offer, and so all offers were received on the February 21, 2020 bid deadline as set forth in the Bidding Procedures and the Sale Procedures Motion. Despite contrary requirements in the Bidding Procedures and admonitions by the Debtor's counsel, the APAs submitted by prospective purchasers deviated materially from the form APA submitted with the Sale Procedures Motion. As a result, the Debtor negotiated for several days with the Constituent Parties prior to the auction, trying to reconcile the numerous changes to the form APA and develop a strategy to harmonize the offers.

The auction commenced on February 25, 2020. Due to the diverging APAs, however, the auction could not open bidding at its commencement. Instead, the Debtor spent several hours with counsel for the Constituent Parties and the party submitting the most deviating bid, Mount Franklin Foods, LLC (or its affiliated assignee, "**Mount Franklin Foods**"), conducting an issue-by-issue page turn of the APA it has submitted.  At the conclusion of those discussions, it was believed enough progress was made to warrant: (a) proceeding with the auction for certain lots under which the purchasers largely sought to purchase the Debtor's assets for the Bulk Division but not continue its operations; and (b) continuing the auction for the offers which were going-

concern offers for the Food Division or the combination of the Food Division and the Bulk Division. The auction was then continued to the following day, February 26, 2020.

Prior to day two of the auction, the Debtor was made aware of a discrepancy in its 2018 financial information provided to prospective purchasers, and the Debtor determined it was appropriate to disclaim reliance on all 2018 financial information provided.   Prospective purchasers were therefore made aware of the discrepancy and afforded the opportunity to discontinue participation at the auction.

Also prior to day two of the auction, the Debtor received a revised APA from Mount Franklin Foods. Without enough time to review the APA in full, the auction was required to be continued to Friday, February 28, 2020. Prior to continuing the auction, however, all of the prospective purchasers were required to announce their irrevocable offers on the record to provide certainty and clarity to the process.

Notwithstanding the articulation of all offers on the record, the Debtor still needed to determine how to compare offers that deviated from the form APA, and how to permit each prospective purchaser with the same opportunity to modify its offer in light of ongoing negotiations and discussions with Mount Franklin Foods. To accommodate these issues, the Debtor undertook two definitive actions. First, the Debtor obtained entry of an order from the Bankruptcy Court authorizing the Debtor to, among other things, provide any bidder a complete copy of any APA submitted by any other bidder, and permit any bidder to submit an alternative bid utilizing any APA submitted by other bidders [Docket No. 53].

Second, the Debtor, in conjunction with the Constituent Parties, monetized the conditions to closing contained in the APA submitted by Mount Franklin Foods during a lengthy and comprehensive call on the eve of day 3 of the auction. The purpose of this exercise was to create an "apples to apples" comparison between and among competing APA's.   When the auction resumed on day 3, the prospective purchasers were informed that each condition contained in the Mount Franklin Foods APA would effectively reduce its offer by an amount certain. Thus, the face value of the offer submitted by Mount Franklin Foods was reduced by the aggregate amount of the values ascribed to each condition. If Mount Franklin Foods was inclined to eliminate a particular condition, the reduction in the face value of its offer would be eliminated by the applicable value of its condition. Prior to resuming the auction, the Debtor secured the written consent and approval of all prospective purchasers participating in the Asset Sale to proceed with the auction in this manner.

The auction was finally conducted pursuant to the terms described above, and, following a day-long effort, Mount Franklin Foods was determined to be the highest bid, with Impact Food Manufacturing, LLC the second highest bid. The Debtor advised the Bankruptcy Court of the sale particulars and presented a comprehensively negotiated proposed sale order on March 5, 2020, which was approved by the Bankruptcy Court [Docket No. 169] (the "**Sale Order**"). Thereafter, the Debtor took all necessary steps to consummate the sale to Element Food Solutions, LLC, the nominee of Mount Franklin Foods. The cash purchase price was $9.3 million, plus the assumption of approximately $3.2 million in assumed liabilities.

5.      **Executory Contracts and Unexpired Leases**

Determining whether a given contract is an executory contract or unexpired lease under section 365 of the Bankruptcy Code is a highly fact-intensive and sometimes challenging inquiry, but a necessary one, due to the important legal rights that hinge on this status.  The Debtor was required to review well over one hundred unique contracts reflected in its records to determine the proper legal classification of each, and to extract the information—such as the nature of the contract, the remaining term, relevant notice addresses, and projected cure costs— needed to schedule each contract appropriately and to provide the necessary disclosures for assuming and assigning it.

The assumption and assignment of the Debtor's executory contracts and unexpired leases occurred in tandem with the Asset Sale.  Consequently, the Debtor was required to fulfill the procedural requirements for assumption and assignment on a similarly expedited timeframe.  The pace of the Asset Sale process, in fact, made it necessary for the Debtor to seek authority to assume and assign contracts and leases at a time when the Debtor did not, and could not, know precisely which contracts and leases would ultimately be assumed and assigned.

To compensate for this uncertainty, the Debtor implemented a process by which all known executory contract and lease counterparties were first served with a "preliminary" notice of assumption and assignment, alerting them to the fact that their contracts and leases may potentially be assumed and assigned [*see* Docket No. 129, at Group Ex. A].  This preliminary notice also solicited counterparties' consent to email service of any future notices of assumption and assignment, enabling the counterparties to receive such notices as quickly as possible – while, at the same time, reducing the estate's expenses in effectuating service.  The Debtor later filed a "final" notice of potential assumption and assignment shortly before the commencement of the auction, providing counterparties with updated information [*see* Docket No. 131].

The Debtor's final notice of potential assumption and assignment listed a total of 113 contracts and leases, yet only seven (7) counterparties filed objections to assumption or assignment by the prescribed deadline.  The Debtor engaged these parties in discussions and ultimately achieved consensual resolutions for every one of the objections, paving the way for the consummation of the Asset Sale.

Following the Asset Sale's completion, there remained the need to reject the remaining executory contracts and unexpired leases that had not been not been assumed and assigned.  The Debtor's omnibus motion to reject these contracts and leases [Docket No. 180] drew only a single, narrowly drawn, objection.  That objection was later resolved, so that the motion was granted as to all ninety-four (94) executory contracts and unexpired leases that were rejected [*see* Docket Nos. 204, 227].

6.      **Claims Administration**

Following the filing of the Chapter 11 Case, as is often the situation in Chapter 11, a significant number of the Debtor's approximately 600 creditors filed proofs of claim early in the case, even though no claims bar date had been established. Given the Debtor's focus on its first-

day motions, the Schedules and SOFA, its sale and marketing process, and other matters described in the categories set forth above, the Debtor did not initially have the time or resources necessary to undertake a detailed analysis of such claims.

Following the closing of the Asset Sale, however, the Debtor was able to pivot toward taking those steps necessary to conclude the Chapter 11 Case.  Toward that end, the Debtor filed a motion and related documents to set a bar date for the filing of general unsecured claims and requests for the payment of section 503(b)(9) claims ("**503(b)(9) Requests**"), which is critical in any Chapter 11 case to assess the extent of existing pre-petition claims.

The Debtor filed the relevant motion [Docket No. 181] on March 24, 2020, and obtained Court approval of the Debtor's proposed form of notice by order entered on April 1, 2020[Docket No. 193], setting May 26, 2020, as the last day to file proofs of claim and 503(b)(9) Requests in the Chapter 11 Case, with governmental units provided until June 11, 2020 to file proofs of claim.

215 proofs of claim were filed against the Debtor's estate on or before the applicable "Bar Date" (as defined below).  Of those claims, 9 are asserted as secured (in whole or in part); 38 are asserted as priority unsecured (in whole or in part); and 168 are asserted solely as general unsecured.  Timely filed proofs of claim total approximately $50.1 million, with asserted secured claims of approximately $15.5 million; asserted priority unsecured claims of approximately $300,000; and asserted general unsecured claims of approximately $34.4 million.

Further, there was one 503(b)(9) Request filed on or before the applicable Bar Date [Docket No. 220], in the approximate amount of $98,000.  That request has been deemed allowed pursuant to a consent order entered by the Bankruptcy Court on June 9, 2020 [Docket No. 228].

### 7.    Settlement and Plan

The "statutory goal of every chapter 11 case" is the confirmation of a Chapter 11 plan. *Bank of Am. Nat'l Trust & Savings Ass'n v. 203 N. LaSalle Street P'Ship*, 526 U.S. 434, 466 n.4 (1999) (Thomas, J., dissenting) (citation omitted).  Thus it could be said that all the actions of the Debtor in the Chapter 11 Case were performed with the objective of eventually obtaining confirmation of a Chapter 11 plan that struck a balance among the many competing interests and facilitated a fair distribution to creditors.

The groundwork for the Plan was laid in a settlement among the Debtor, the Committee, BMO, and the SBA (the "**Settlement**").  The Settlement reflects an effort by each of these parties to compromise claims that, if litigated, would consume a great deal of time and money on the parts of the litigants, and might cause enough delay, expense, and uncertainty to doom the Chapter 11 Case even before an adjudication could be reached.  These claims may include, but are not limited to:  (i) claims against BMO for breach of fiduciary duty, recharacterization of debt to equity, equitable subordination, and/or avoidance and recovery of preferences and fraudulent transfers, based on actions it took and payments it received pre-Petition Date, including the exercise of certain rights and remedies under the Stock Pledge Agreement; and (ii)

challenges that may be asserted by the SBA to the amount of Sale Proceeds properly allocable to its equipment collateral, and therefore, the amount of the Sale Proceeds payable to the SBA on account of its secured claims.  The Settlement also evidences the parties' support for the Plan—financial and otherwise—without which it would be unlikely, if not impossible, for any Chapter 11 plan to be confirmed.

The terms of the Settlement, which are incorporated into the Plan, include the following[6]:

- BMO funding Administrative Claims, Priority Tax Claims and Priority Non-Tax Claims in the Chapter 11 Case, subject and limited to an agreed budget (the "**Plan Budget**");

- BMO funding $50,000 in cash for the Creditor Trust (the "**BMO Cash Contribution**");

- A funding recovery mechanism whereby to the extent that allowed Administrative Claims (excluding Professional Fee Claims) and allowed Priority Claims are less than the aggregate amounts budgeted, the savings will be allocated and distributed as follows: (a) the first $25,000 to be paid to BMO (the **Preferred Administrative / Priority Claim Refund**"), and (b) the remainder, if any, to be paid 50% to BMO (the "**BMO Administrative/Priority Savings Split**") and 50% to the Debtor's estate (the "**Estate Administrative/Priority Split**");

- BMO's deficiency unsecured claim is allowed, impaired and classified under the Plan separately as part of its Class 1 Claims, subject to distributions from the Creditor Trust as follows: (i) ten percent of the first $250,000 of Creditor Trust distributions; (ii) fifteen percent of the next $500,000 of Creditor Trust distributions; and (iii) twenty percent of all Creditor Trust distributions over $750,000 (the "**BMO Additional Trust Recovery**");

- BMO shall allocate to the SBA $700,000 from the Sale Proceeds (the "**SBA Agreed Distribution**"), representing a compromise of disputes between BMO and the SBA relating to their respective secured lien rights and the allocation of the Sale Proceeds;

- The SBA's deficiency unsecured claim is allowed, impaired and classified under the Plan separately as part of its Class 2 Claims, subject to distributions from the Creditor Trust on a *pro rata* basis with Class 5 General Unsecured Claims;

- Mutual releases among BMO; the Debtor, the Committee and their respective professionals; and certain former directors and officers of the Debtor, of claims related to: (i) pre-petition acts and omissions of BMO, including exercise of the Proxy Rights; (ii) the filing of the Chapter 11 Case; and (iii) BMO's and SBA's respective interests in the Sale Proceeds (provided, however, that the Plan *shall not* effectuate releases of certain management and insiders of the Debtor, including Mr. Patrick Gaughan); and

---

[6] The following is intended only as a summary, and creditors and other parties in interest are encouraged to review the Plan.  In the event of any discrepancy between this summary and the Plan, the Plan shall control.

- BMO and the SBA agree to support the Plan.

The Plan is intended as the means of implementing the Settlement. To that end, in addition to the terms described above, the Settlement specifies critical agreed-upon components of the Plan, such as the creation of the Creditor Trust, the classification and treatment of claims, and the releases applicable to various parties, all as described in more detail below. Additionally, the Settlement mandates several deadlines to be included in the Plan, such as the deadline to file Administrative Claims.

As negotiations over the Settlement progressed, the Debtor and the Committee moved forward to draft the Plan and this Disclosure Statement. Once initial drafts were complete, they were circulated to BMO and the SBA, as well as the UST, so that any potential issues could be sorted out at the earliest opportunity.

### 8.    Wind-Down Efforts

Since completing the Asset Sale, the Debtor has been winding down its remaining affairs. In connection therewith, the Debtor has sought or anticipates seeking Bankruptcy Court authority for the following:

- Retention of a professional to administer the termination and wind-up of the Debtor's 401(k) plan;

- Retention of a professional(s) for an audit of the 401(k) plan, which is a prerequisite to administer and terminate it; and

- Retention of an accountant to prepare the Debtor's 2019 and 2020 tax returns.

The Debtor anticipates that the foregoing administrative tasks, as well as any additional wind-down down activities not completed before the Effective Date of the Plan, will be transitioned to and completed by the Creditor Trustee, using the professionals retained or to be retained by the Debtor. The fees and expenses attributable to a 401(k) termination and audit, as well as preparation of 2019 and 2020 tax returns, are accounted for in the Plan Budget. All monies allocated under the Plan Budget for payment of allowed Administrative Claims (including Professional Fee Claims), allowed Priority Tax Claims, and allowed Class 3 and 4 Claims, accruing but unpaid as of the Effective Date of the Plan (the "**Reserved Cash**"), shall be transferred to the Creditor Trust upon the Effective Date of the Plan. Disbursements from the Creditor Trust by the Creditor Trustee on account of any such expenses shall be pursuant to the terms of the Plan, the Creditor Trust Agreement and/or further order of the Bankruptcy Court, as applicable.

### IV.    FINANCIAL INFORMATION REGARDING THE DEBTOR AND POST-PETITION OPERATIONS[7]

---

[7] The information set forth herein has not been subject to audit.

## A.    Assets and Liabilities as of Petition Date

The assets and liabilities of the Debtor <u>as of the Petition Date</u>, as disclosed by the Debtor's Bankruptcy Schedules (as amended) on file in the Chapter 11 Case, may be summarized as follows:

| Assets | Liabilities |
|---|---|
| $15,021,969.26 + Unknowns | $52,953,832.10 |

## B.    Assets as of April 30, 2020

The primary assets of the Debtor consist of operating cash, and the balance <u>as of April 30, 2020</u>, as reflected on the Debtor in Possession Operating Reports ("**DIP Operating Reports**") filed by the Debtor in the Chapter 11 Case [Docket No. 234], may be summarized as follows:

| Beginning Balance | Ending Balance |
|---|---|
| $9,353,771.05 | $9,091,733.14 |

## V.    SUMMARY OF THE PLAN

## A.    Liquidating Plan to be Administered under a Creditor Trust

The Plan is a liquidating plan providing for the establishment of a creditor trust (the "**Creditor Trust**") pursuant to a trust agreement attached as Exhibit A to the Plan, and by express reference made a part hereof (the "**Creditor Trust Agreement**"). The Plan contemplates that certain of the remaining tangible and intangible assets of the estate of the Debtor and the BMO Cash Contribution will be transferred to the Creditor Trust for the benefit of creditors on the Effective Date of the Plan. The Plan and the Creditor Trust Agreement further provide for the appointment of a third party, independent trustee (the "**Creditor Trustee**"). The Creditor Trustee's primary responsibilities will be to: (1) complete any remaining wind-down activities of the estate; (2) distribute funds in the Creditor Trust to holders of allowed Administrative Claims (including Professional Fee Claims, UST Fees and 503(b)(9) Claims), allowed Priority Tax Claims and Priority Non-Tax Claims (collectively, "**Priority Claims**"), and allowed General Unsecured Claims pursuant to the terms of the Plan; (3) file, prosecute, settle or dismiss any and all causes of action transferred to the Creditor Trust under the Plan in favor of the estate; (4) review, and if necessary, object to, any claims filed in the Chapter 11 Case; and (5) ensure compliance with all tax filing and other reporting requirements until the Plan is fully consummated and the Chapter 11 Case is closed.

The Plan proposes that John B. Pidcock of Oxford Restructuring Advisors serve as the Creditor Trustee.  Mr. Pidcock is an experienced bankruptcy and turnaround professional with over twenty years of experience in the restructuring industry, and has provided a full range of crisis management services to under-performing companies and their constituencies, including: interim management and debtor advisory; bankruptcy preparation and management; post-merger integration; debt restructuring and refinancing and post-confirmation creditor advisory.  Mr.

Pidcock is also an experienced fiduciary, having served as a creditor trustee in multiple complex Chapter 11 cases, including <u>ASPC Corp. f/k/a AcuSport Corporation</u> (Bankr. S.D. Ohio); <u>Schwab Industries, Inc.</u> (Bankr. N.D. Ohio); and <u>Empire Die Casting Co., Inc. (Bankr. N.D. Ohio)</u>.  While employed by Conway MacKenzie, LLC, Mr. Pidcock served as financial advisor to the Committee.

As stated, upon the Effective Date of the Plan, and pursuant to the Creditor Trust Agreement, the general responsibility for carrying out the terms and conditions of the Plan will pass from the Debtor to the Creditor Trustee. The Creditor Trustee will hold all monies in the estate of the Debtor at the time of the Effective Date. Such funds are comprised of the Reserved Cash.  The Reserved Cash, together with the BMO Cash Contribution (collectively, the "**Creditor Trust Funds**"), shall be deposited by the Creditor Trustee upon receipt into an interest-bearing, segregated trust account(s) to be established by the Creditor Trustee upon the Effective Date. All disbursements of the Creditor Trust Funds shall be strictly in accordance with the terms and conditions of the Plan and the Creditor Trust Agreement.

Simply put, the Plan provides for the distribution of all monies in the Debtor's estate as quickly as possible after confirmation in accordance with the priorities established under the Bankruptcy Code. All distributions under the Plan will be strictly in accordance with the "Absolute Priority Rule" established under the Bankruptcy Code, which provides that no junior class of claims or interests will receive any distribution unless all senior classes are paid in full. For example, the Debtor's Class 6 Equity Interest holder cannot receive any distributions on account of its stock in the Debtor unless all of the Debtor's creditors are paid in full. The Creditor Trustee will be compensated for his services. The Creditor Trustee is authorized under the Plan to retain professionals or other persons as necessary to consummate the Plan.

The Plan is based upon the notion that the Debtor's creditors will receive a more prompt and greater distribution thereunder than they would if the Chapter 11 Case were converted to a Chapter 7 liquidation case, with the attendant delays and costs associated therewith. Under the Plan, the Creditor Trustee has the ability to exercise his reasonable business judgment and discretion and take actions to implement the Plan provisions, largely without need for further order of the Bankruptcy Court. A Chapter 7 trustee, on the other hand, needs bankruptcy court authority for virtually all decisions, and as such, many costs and delays would likely arise therefrom. The end result of a Chapter 7 liquidation is often a diminution and delay in any distribution to unsecured creditors.

**B.**      <u>**Treatment of Claims and Interests**</u>

The Plan provides for the division of creditors and holders of interests into the six (6) classes identified below, in addition to the unclassified claims consisting of Administrative Claims and Priority Tax Claims. With the exception of Administrative Claims and equity interests (the latter of which are not "claims" under the Bankruptcy Code) referenced below, all of the types of claims described below arose against the Debtor <u>before</u> the commencement of the Chapter 11 Case.

Pursuant to an order of the Bankruptcy Court, the last day to file proofs of claims in the Chapter 11 Case for pre-Petition Date claims of non-Governmental Units against the Debtor, as well as motions for allowance of 503(b)(9) Claims, , was May 26, 2020 (**"General Bar Date"**), while the last day to file proofs of claims in the Chapter 11 Case for pre-Petition Date claims of Governmental Units against the Debtor was June 11, 2020 (the "**Governmental Unit Bar Date**," and together with the General Bar Date, the "**Bar Dates**," and each, a "**Bar Date**"). Under the Bankruptcy Code and the Bankruptcy Rules, creditors listed in the Debtor's Schedules in liquidated, non-contingent and undisputed amounts do <u>not</u> have to file proofs of claim before the applicable Bar Date in order to vote on the Plan and receive any distributions under the Plan (subject to an objection by the Creditor Trustee for distribution purposes). Such claims are deemed allowed under the Bankruptcy Code, and the holder of a Class 5 General Unsecured Claim scheduled as such is entitled to vote on the Plan. Similarly, the holder of a Class 5 General Unsecured Claim which has been filed by the applicable Bar Date and has not been adjudicated as disallowed is entitled to vote on the Plan. Eligibility to vote on the Plan is not, however, the same as eligibility for distribution purposes. As previously stated, the Creditor Trustee shall have the obligation of ascertaining the validity of all prepetition claims – except the claims of Class 1 and Class 2 (which are deemed allowed pursuant to the Plan) – by a date certain and determining their eligibility to participate in any distribution from the Creditor Trust. Of the nearly 600 creditors listed in the Schedules, as of June 11, 2020, 225 filed proofs of claim as per the register of all claims filed in the Chapter 11 Case (the "**Claims Register**"), with 215 of those claims having been filed by the applicable Bar Date.

The Plan provides for the following treatment and classes of claims and interests:

**1.    Administrative Expense Claims.**    Administrative expense claims are generally those claims for goods and services incurred by a debtor <u>during</u> the pendency of a Chapter 11 case - from the commencement of the Chapter 11 case through the confirmation of a plan of reorganization. "**Administrative Claims**" are governed by sections 503 and 507(a)(2) of the Bankruptcy Code, and include:  (a) any actual and necessary costs and expenses incurred by the Debtor after the Petition Date with respect to preserving the estate and operating the Debtor's business; (b) any Professional Fee Claims approved by the Bankruptcy Court pursuant to section 330 of the Bankruptcy Code, or in a manner approved by prior order of the Bankruptcy Court, including without limitation fees of the CRO; (c) all UST Fees; and (d) 503(b)(9) Claims.

The Plan provides for the payment of all allowed Administrative Claims in full in cash pursuant to the Plan Budget.  To the extent any allowed Administrative Claims are payable prior to the Effective Date of the Plan, whether in the ordinary course of business or pursuant to order of the Bankruptcy Court, they shall be paid by the Debtor.  Following the Effective Date, the Reserved Cash shall be transferred to the Creditor Trust and distributed by the Creditor Trustee to, among others, holders of Administrative Claims.  Administrative Claims shall be paid: (a) in full, in cash, upon the later of (i) on or as soon as practicable after the Effective Date, or (ii) upon allowance by the Bankruptcy Court; or (b) upon such other terms as may be agreed upon between the holder of such Administrative Claim and the Debtor or the Creditor Trustee (as applicable).

The Debtor has or shall have filed a motion requesting that the Bankruptcy Court establish a bar date of July 27, 2020 (the "**Supplemental Administrative Claims Bar Date**"), for the filing of motions requesting allowance and payment of Administrative Claims other than Professional Fee Claims, 503(b)(9) Claims and UST Fees, accruing through June 30, 2020. Under the Plan, requests for allowance and payment of (a) any Professional Fee Claims arising prior to the Effective Date, and (b) any other Administrative Claims arising after the Supplemental Administrative Claims Bar Date but prior to the Effective Date, must be filed no later than thirty (30) days following the Effective Date of the Plan (the "**Administrative Claims Bar Date**"), unless an earlier date is set by separate Bankruptcy Court order. The Administrative Claims Bar Date does not apply to 503(b)(9) Claims or UST Fees.

The Debtor has fully paid, and continues to pay, all known Administrative Claims as and when they have become due during the Chapter 11 Case in accordance with the provisions of the Bankruptcy Code and various orders of the Bankruptcy Court, with the sole exceptions being the following:

a.    **Professional Fees.**    Pursuant to an order of the Bankruptcy Court entered on January 24, 2020 [Docket No. 102] (the "**Compensation Procedures Order**"), the Debtor has been authorized to pay up to 80% of fees and 100% of expenses incurred with respect to any invoices submitted by the Debtor's counsel and the Committee's counsel and financial advisor for services rendered and expenses incurred in the Chapter 11 Case ("**Professional Fee Claim(s)**"), with the 20% balance of fees being a "holdback" ("**Holdback(s)**") pending final allowance by the Bankruptcy Court.

In addition, Andrews Advisory Group, LLC was retained in the Chapter 11 Case for the purpose of providing the services of the Debtor's CRO, Mr. Vladimir Kasparov, and certain temporary staff to assist him. The Bankruptcy Court approved the retention, retroactive to the Petition Date, by order entered on January 24, 2020 [Docket No. 103]. Pursuant to the terms of the retention order, AAG and Mr. Kasparov are paid pursuant to hourly rate(s), with all such compensation subject to reports filed by the Bankruptcy Court and reviewed by the UST. AAG and Mr. Kasparov are not subject to the Compensation Procedures Order. The retention of AAG and Mr. Kasparov will terminate on the Effective Date of the Plan, at which time all such services will have concluded.

All Professional Fee Claims, including any such claims previously paid, but excluding any fees and expenses of the CRO, are subject to final allowance by the Bankruptcy Court. Professional Fee Claims paid by the Debtor, inclusive of amounts paid to the CRO as of the date hereof total $1,325,405.35. Unpaid Professional Fee Claims through the Effective Date, including any accrued but unpaid Holdback(s), are estimated to total $300,000.

b.    **Morris Anderson.**    As explained above, BMO exercised certain Proxy Rights prior to the Petition Date whereby Patrick Gaughan was removed as sole director of the Debtor and replaced with Mr. Robert Novak as the Independent Director. The Independent Director then executed resolutions removing Mr. Gaughan as president and appointing Mr. Daniel Dooley as the President. The Independent Director and then-President are associated with the consulting firm of Morris Anderson. The services of the Independent Director were not *per*

se restructuring efforts but were more akin to oversight of the Debtor's day-to-day business and governance.

Upon the retention of Mr. Kasparov as CRO, Mr. Dooley resigned as President. However, Mr. Novak remains Independent Director of the Debtor. Under the Plan, Mr. Novak shall be deemed to resign upon the Effective Date. Under Morris Anderson's prepetition retention agreement with the Debtor, the firm was paid a monthly fee of $20,000 for Mr. Dooley's services as President and a monthly fee of $20,000 for Mr. Novak's services as Independent Director. The Debtor discontinued monthly payments to Mr. Dooley upon this resignation on or about January 26, 2020. As of the date hereof, Morris Anderson has received $97,721.64 on account of services rendered and expenses incurred by Messrs. Dooley and Novak during the Chapter 11 Case. Mr. Novak's fees until the Effective Date are estimated to total $20,000.

      **c.**    **Section 503(b)(9) Claims.**  Creditors asserting claims arising under section 503(b)(9) of the Bankruptcy Code ("**503(b)(9) Claims**") are required to file their requests for allowance and payment of such claims on or before the General Bar Date. Under the Bankruptcy Code, 503(b)(9) Claims are those claims for the value of goods which are received by the Debtor within twenty (20) day prior to the Petition Date and were sold to the Debtor in the ordinary course of its business.

Only one request for payment of a 503(b)(9) Claim was filed by the General Bar Date. The claim of Total Sweeteners, Inc. d/b/a Batory Foods ("**Batory Foods**") was allowed in the amount of $98,504.34 pursuant to Bankruptcy Court order. Also pursuant to such order, payment of Batory Foods' 503(b)(9) Claim is estimated to occur on or about the Effective Date of the Plan.

In light of the passing of the General Bar Date, the Debtor does not anticipate the allowance of any additional 503(b)(9) Claims.

      **d.**    **U.S. Trustee Fees.**  Until such time as the Chapter 11 Case is closed, the Debtor and/or the Creditor Trustee remains responsible for the payment of fees due to the UST under 28 U.S.C. § 1930(a)(6) ("**UST Fees**"). The Debtor shall remain responsible for payment of such fees in full through and including the Effective Date of the Plan, including filing any monthly operating reports which are due prior to the Effective Date, and the Creditor Trustee shall assume such responsibility and pay such obligations for any periods after the Effective Date from the monies deposited into the Creditor Trust.

      **e.**    **Other Administrative Expenses.**  As explained above, the Debtor has fully paid, and continues to pay, all known Administrative Claims, as and when they have become due during the Chapter 11 Case. Such claims have been paid pursuant to, among other things, the Debtor's budget [Docket No. 65, Ex. B] (as may be amended from time to time, the **DIP Budget**") to the DIP Financing Order. The DIP Budget covered the Debtor's anticipated Administrative Claims from the Petition Date through March 13, 2020, the date on which the Debtor's DIP Financing expired. Additional funding of Administrative Claims after March 13,

2020 has been provided by BMO as part of the Settlement; such funds are provided in accordance with the Plan Budget.

The Debtor does not anticipate any Administrative Claims requiring payment unaccounted for in the Plan Budget not but, upon information and belief, would have sufficient availability under the Plan Budget to address any such claims.  Given that the Supplemental Administrative Claims Bar Date will expire prior to the Confirmation Hearing, the existence of any unanticipated Administrative Claims will be known to the estate prior to the hearing, and confirmation shall be predicated upon, among other things, the estate's ability to pay any such allowed Administrative Claims in full.

To the extent any such claims are allowed, payment shall be made from the Creditor Trust Funds as provided for herein.

**2.** **Priority Tax Claims.** "**Governmental Units**" are defined in section 101(27) of the Bankruptcy Code, and, in general, consist of claims owing the United States, any state, county, or municipality, or any department, agency or instrumentality thereof. The Plan provides for the payment of all allowed Priority Tax Claims of Governmental Units in full in cash or cash equivalent from the Reserved Cash, payable on either:  (a) the later of: (i) within forty-five (45) days of the Effective Date of the Plan; or (ii) allowance by the Bankruptcy Court; or (b) over time in accordance with the section 1129(a)(9)(C)(ii) of the Bankruptcy Code..

The Debtor had largely remained current on all Priority Tax Claims as and when they became due prior to the commencement of the Chapter 11 Case.  Further, since the Debtor is an S-Corporation, most taxes attributable to the Debtor flow through to the Debtor's equity interest holder, the Gaughan Trust.  As such, the Debtor's Schedule E/F reflects no Priority Tax Claims owing as of the filing of the Chapter 11 Case.

The Governmental Unit Bar Date was June 11, 2020. The Claims Register reflects a total of two proofs of claim filed by Governmental Units totaling $34,493.50 in Priority Tax Claims. Debtor is examining the Priority Tax Claims for accuracy, though based on an initial review of its books and records, the Debtor anticipates disputing all or a portion of such claims.

**3.** **Class 1 – BMO Claims.**  This class consists of claims held against the Debtor by BMO partially secured by liens on substantially all of the Debtor's assets. BMO has asserted claims against the Debtor in the amount of $27,342,344.70, of which $8,388,309.90 is secured by the Net Proceeds after giving effect to the secured claim of the SBA in the amount of $700,000, leaving an unsecured deficiency claim in the amount of $18,954,034.80, subject to reductions thereof pursuant to the Plan Budget. Under the DIP Financing Order, the Debtor consented to the validity, priority, and extent of the claims asserted by BMO and the collateral securing such claims.

The claims of BMO are deemed allowed pursuant to the Settlement. On or as soon as practicable after the Effective Date, BMO shall receive: (a) the Net Sale Proceeds; (b) the Preferred Administrative Claim Refund; (c) the BMO Administrative/Priority Savings Split; and (d) the BMO Additional Trust Recovery (in lieu of a *pro rata* allocation on account of its

unsecured claim). In addition to the mutual releases set forth in the Plan, BMO agrees to waive all appeal or other challenge rights related to its and SBA's lien rights, the allocation of the Sale Proceeds, and the Sale Order. BMO shall retain any and all of its claims and causes of action against the Debtor's insiders and management.

4.      **Class 2 – SBA Claims.**  This class consists of claims held against the Debtor by the SBA partially secured by liens on certain machinery and equipment of the Debtor. The SBA has asserted claims against the Debtor in the amount of $5,363,052, of which it asserts the entirety of its claims is secured by the Sale Proceeds. However, BMO has disputed the priority and extent of the SBA's liens.

The claims of the SBA are deemed allowed pursuant to the Settlement. Such claims are treated as secured in the amount of the SBA Agreed Distribution of $700,000. Further as part of the Settlement, the SBA shall have an allowed deficiency unsecured claim in the amount of $4,663,052.

On or soon as practicable after the Effective Date, the SBA shall receive the SBA Agreed Distribution from the Sale Proceeds. The SBA shall also be entitled to distributions of net proceeds from the Creditor Trust on account of its allowed deficiency unsecured claim, which shall be paid *pro rata* with Class 5 General Unsecured Claims. In addition to the mutual releases set forth in the Plan, in consideration for the SBA Agreed Distribution, SBA agrees to waive all appeal or other challenge rights related to its and BMO's lien rights, the allocation of the Sale Proceeds, and the Sale Order.

5.      **Class 3 – Other Secured Claims.**  Other than BMO and the SBA, certain other creditors have asserted claims against the Debtor secured by a lien on property of the Debtor (the "**Other Secured Claims**"), to the extent that the value of the claim does not exceed the value of the property securing such debt (the "**Collateral**"). The Plan provides that as soon as practicable after the Effective Date or the date on which an Other Secured Claim becomes an allowed Other Secured Claim, each holder of an allowed Other Secured Claim shall receive (a) cash in an amount equal to the allowed Other Secured Claim, including, to the extent applicable, postpetition interest under section 506(b) of the Bankruptcy Code, or (b) the collateral securing such allowed Other Secured Claim, or (c) such other treatment as may be agreed to by the holder and the Debtor or Creditor Trustee (as applicable).

In most, if not all instances, Other Secured Claims have been satisfied to the extent such claims are secured by what was property of the Debtor. The Claims Register and/or Schedules reflect that the following claims have been filed and/or scheduled as secured:

a.      **Gierczyk, Inc.** ("**Gierczyk**") has filed a claim against the Debtor in the amount of $2,959,180.10, of which $673,720 is allegedly secured by a mechanic's lien on a leasehold interest of the Debtor in certain real property located at 10459 South Muskegon, Avenue, Chicago, Illinois. Pursuant to order of the Bankruptcy Court approving the Asset Sale, the real estate lease giving rise to the Debtor's leasehold interest was assumed and assigned to Mount Franklin Foods subject to Gierczyk's asserted mechanic's lien claim, with Gierczyk having withdrawn its objection to such assumption and assignment subject to preservation of its

mechanic's lien rights [see Docket No. 178].  Pursuant to the assumption and assignment [see Docket No. 186], the Debtor assigned any interest in the property in which Gierczyk has claimed a security interest. Accordingly, any security interest claimed by Gierczyk is no longer a secured claim against the Debtor's estate, and such Other Secured Claim shall be deemed disallowed as of the Effective Date of the Plan. To the extent Gierczyk has an unsecured or under-secured claim(s), such claim(s) is classified as a Class 5 General Unsecured Claim(s).

      **b.**    **Santa Fe Industrial Lenders LLC** ("**Santa Fe Industrial**") has filed a claim in the amount of $677,811.94 with $125,000 of such claim secured by a security deposit provided by the Debtor.  Pursuant to prior order of the Bankruptcy Court [Docket No. 227], Santa Fe Industrial was granted authority to set off the security deposit against its claims, thereby satisfying the secured portion of its claim in full.  To the extent Santa Fe Industrial has an unsecured or under-secured claim(s), such claim(s) is classified as a Class 5 General Unsecured Claim(s).

      **c.**    **McCauley Mechanical Construction, Inc.** ("**McCauley**") has filed a claim in the amount of $148,974.50, which it contends is fully secured by a mechanic's lien on real property of the Debtor.  The applicable lease, however, was assumed and assigned in connection with the Asset Sale, in which McCauley did not object to the proposed cure amounts or seek adequate protection of its interest(s).  To the extent any mechanic's lien applied, it either remained attached to the assigned property or was extinguished under the Sale Order. Accordingly, any security interest claimed by McCauley is no longer a secured claim against the Debtor's estate, and such Other Secured Claim shall be deemed disallowed as of the Effective Date of the Plan. To the extent McCauley has an unsecured or under-secured claim(s), such claim(s) is classified as a Class 5 General Unsecured Claim(s).

      **d.**    **Valley Fire Protection Systems LLC** ("**Valley Fire**") has filed a claim in the amount of $2,470, which it contends is fully secured by a mechanic's lien on real property of the Debtor.  The applicable lease, however, was assumed and assigned in connection with the Asset Sale, in which Valley Fire did not object to the proposed cure amounts or seek adequate protection of its interest(s).  To the extent any mechanic's lien applied, it either remained attached to the assigned property or was extinguished in the Asset Sale.  Accordingly, any security interest claimed by Valley Fire is no longer a secured claim against the Debtor's estate, and such Other Secured Claim shall be deemed disallowed as of the Effective Date of the Plan. To the extent Valley Fire has an unsecured or under-secured claim(s), such claim(s) is classified as a Class 5 General Unsecured Claim(s).

      **e.**    **XTRA Lease LLC** ("**XTRA Lease**") has filed a claim in the total amount of $18,734.44, of which it contends that $8,774.80 is secured by a right of setoff in unapplied credits for estimated mileage charges.  Any exercise of setoff rights by XTRA Lease remains subject to Bankruptcy Court authorization.  To the extent XTRA Lease has an unsecured or under-secured claim(s), such claim(s) is classified as a Class 5 General Unsecured Claim(s).

      **f.**    **PMSIs.** Several creditors have asserted, or have been scheduled as holding, claims secured by purchase money security interests ("**PMSIs**") in certain equipment. Specifically:

- Ascentium Capital was listed in the Debtor's Schedule D as holding a secured claim in the amount of $7,794.03.[8]

- Raymond Leasing Corporation (as the assignee of Associated Material Handling Industries, Inc.) filed a proof of claim asserting a secured claim in the amount of $15,302.61.

- Atlas Toyota Material Handling, LLC was listed in the Debtor's Schedule D as holding two (2) secured claims, in the amounts of $5,510.80 and $5,281.26, respectively.

- Balboa Capital Corporation was listed in the Debtor's Schedule D as holding a secured claim in the amount of $399,324.56.

- Navitas Credit Corp. filed a proof of claim asserting a secured claim in the amount of $2,238.48.

- TCF National Bank filed an amended proof of claim asserting a secured claim in the amount of $4,373.32.

In each such instance, the Collateral securing such claim(s) has either been: (i) purchased by Mount Franklin Foods as part of the Asset Sale, with (A) the respective secured claim(s) and related obligations expressly assumed by Mount Franklin Foods or (B) the respective secured claim(s) satisfied from the gross proceeds of the Asset Sale; or (ii) expressly excluded from the Asset Sale under the Sale Order and made available for recovery by the secured creditor(s). To the extent any holder of a claim secured by a PMSI has an unsecured or under-secured claim, such claim is classified as a Class 5 General Unsecured Claim.

**6.**      **Class 4 – Priority Non-Tax Claims.** Unsecured claims entitled to priority, as of the commencement of the Chapter 11 Case, are defined in section 507 of the Bankruptcy Code. For purposes of the Plan, Class 4 Claims do not include Priority Tax Claims which are addressed separately as set forth above. The "**Priority Non-Tax Claims**" include any employee claim arising under section 507(a)(4)-(5) of the Bankruptcy Code. The Plan provides that on or as soon as practicable after the Effective Date or the date on which a Priority Non-Tax Claim becomes an allowed Priority Non-Tax Claim or is otherwise payable, each holder of such claim shall receive (a) cash in an amount equal to the unpaid portion of the allowed Priority Non-Tax Claim, or (b) such other treatment as may be agreed to between the holder and the Debtor. As holders of Class 4 Claims are unimpaired, they are presumed to have accepted the Plan and therefore shall not be entitled to vote to accept or reject the Plan.

Pursuant to an order of the Bankruptcy Court entered on December 20, 2019 [Docket No. 35], the Debtor paid in full any claims of employees for accrued but unpaid wages, health

---

[8] This creditor also filed a proof of claim, which, because it was filed after the General Bar Date, is treated as disallowed.

insurance and related obligations entitled to priority under section 507(a)(4)-(5) of the Bankruptcy Code ("**Employee Claims**"). Per the Claims Register, 34 additional Employee Claims were filed as of the General Bar Date based on (a) unpaid 401(k) matching contributions by the Debtor for 2019 ("**401(k) Claims**"), or (b) unpaid accrued vacation for 2019 ("**Vacation Claims**"). One employee, in addition to filing a 401(k) Claim and a Vacation Claim, has filed a proof of claim asserting a priority claim for reimbursement in connection with the Debtor's HRA plan in the amount of $2,500. This claim remains subject to examination, but to the extent it is allowed as a priority claim by the Bankruptcy Court, it shall be entitled to payment in full as provided herein.

The Debtor's Schedule E/F estimated that 72 plan participants held a total of approximately $160,000 in 401(k) Claims, without breaking down the employees on a per-participant basis. Ultimately, however, only 16 employees filed 401(k) Claims prior to the General Bar Date, in the total amount of $40,947.61. Eighteen employees filed Vacation Claims, in the total amount of $66,570.65.

Payment of 401(k) Claims, to the extent allowed, are accounted for in the Plan Budget and shall be paid in full. As for the Vacation Claims, the Debtor disputes the allowance of such claims and expects objections to be filed, either by the Debtor or the Creditor Trustee, on account of such vacation being subject to the Debtor's "use it or lose it" policy. While the Debtor disputes that any Vacation Claims are valid, as Priority Non-Tax Claims or otherwise, under the Bankruptcy Code, to the extent any such claims are ultimately allowed by the Bankruptcy Court, they shall be entitled to payment in full as provided herein.

In addition to the Employee Claims discussed above, one non-employee creditor filed a claim in the amount of $1,045 for "[s]ervices performed for OSHA compliance, hearing conservation," alleging entitlement to priority under section 507(a)(4) of the Bankruptcy Code. The Debtor disputes that this claim is entitled to priority, and has instead included it among the General Unsecured Claims. Nonetheless, as with Vacation Claims, to the extent this claim is ultimately allowed by the Bankruptcy Court as a priority claim, it will be entitled to payment in full.

7.     **Class 5 – General Unsecured Claims.** General Unsecured Claims consist of all allowed claims held against the Debtor as of the Petition Date which are not Administrative Claims, Priority Tax Claims, or claims in Classes 1, 2, 3 or 4 above. General Unsecured Claims include, without limitation, claims arising from the rejection of unexpired leases and other executory contracts to which the Debtor is a party. The Plan serves to reject all unexpired leases and executory contracts as of confirmation that have not previously been assumed or rejected by Bankruptcy Court order. No orders have been entered in the Chapter 11 Case providing for the Debtor's assumption of any unexpired leases or executory contracts, with the exception of the assumption and assignment of certain leases and contracts to Mount Franklin Foods in connection with the Asset Sale. Most of the Debtor's unexpired leases or executory contracts have already been rejected pursuant to prior order of the Bankruptcy Court [Docket No. 204]. Any of the Debtor's remaining unexpired leases and executory contracts listed on the Debtor's Schedule G to its Schedules, if any, will be afforded thirty (30) days after the Effective Date of the Plan to file proofs of claim (the "**Rejection Claims**"). The Debtor believes it has either

caused to be assumed and assigned, or rejected, each and every of the unexpired leases and executory contracts listed on the Debtor's Schedule G to its Schedules. The existence or amount of the Rejection Claims cannot be ascertained at this time.

Allowed Class 5 Claims shall be paid *pro rata* in accordance with the Creditor Trust Agreement and this Plan. All property of the estate remaining as of the Effective Date shall be deposited in the Creditor Trust on or as soon as practicable following the Effective Date. Subject to satisfaction in full of allowed Administrative Claims, allowed Priority Tax Claims, and allowed Class 3 and 4 Claims, the Creditor Trustee shall liquidate the "Creditor Trust Assets" (as defined below), as applicable, and distribute the net proceeds to holders of allowed Class 5 Claims from time to time on dates determined by the Creditor Trustee, within a reasonable time after the creation of appropriate reserves as determined by the Creditor Trustee in an amount that would be sufficient to (a) make a *pro rata* distribution on account of disputed claims that are Class 5 General Unsecured Claims; and (b) pay the "Trustee's Expenses" (as defined below) in full.

The Claims Register reflects that creditors filed approximately 165 General Unsecured Claims by their applicable Bar Dates, totaling approximately $15,550,349.55 (excluding 6 filed claims in the aggregate amount of $683,152.76 which, based upon the Debtor's preliminary review, appear to be duplicative of other filed claims). The foregoing total includes the estimated general unsecured portions of claims filed as secured or priority claims, excluding the BMO Claims and the SBA Claims. The Debtor is examining all filed General Unsecured Claims for accuracy, and while it has attempted to reconcile its books and records against the Claims Register on an ongoing basis, the final review of such claims will be conducted by the Creditor Trustee.

Additionally, the Debtor's Schedule E/F lists approximately 269 creditors holding General Unsecured Claims totaling approximately $11,919,068.23 (exclusive of claims based on the rejection of unexpired leases or executory contracts) which were not (a) superseded by the filing of a proof of claim on account of such General Unsecured Claims, (b) scheduled as disputed, contingent, or unliquidated, or (c) scheduled in an "unknown" amount.

Consequently, in total, the Debtor believes there are approximately 434 creditors holding Class 5 General Unsecured Claims in the aggregate amount of approximately $27,469,417.78.

8. **Class 6 – Equity Interest of the Gaughan Trust.** As explained above, all equity of the Debtor is owned by the Gaughan Trust, a self-settled trust through which Mr. Patrick Gaughan, the former president and former sole director of the Debtor, was also the Debtor's sole shareholder.[9] There will not be a distribution of any amounts to the Gaughan Trust on account of its equity interest, and all such interests shall be deemed canceled as of the Effective Date of the Plan. Because the holder of Class 6 Equity Interests will not receive any distributions under the Plan, it is deemed to have rejected the Plan.

---

[9] As noted above, the Gaughan Trust asserts BMO transferred all of the outstanding stock of the Debtor into the name of BMO, but BMO disputes this contention and asserts that the stock of the Debtor remains in the name of the Gaughan Trust.

### C.    Allowance of Claims

An "allowed" claim means a claim or any portion thereof (1) that has been allowed by a final and non-appealable order of the Bankruptcy Court, (2) that has been scheduled as a liquidated, non-contingent and undisputed claim in an amount greater than zero in the Schedules for which no conflicting proof of claim has been filed, or (3) that is the subject of a timely filed proof of claim that has been expressly allowed in a liquidated amount (x) in the Plan, (y) by final and non-appealable order of the Bankruptcy Court, or (z) after the Effective Date, by the Creditor Trustee in writing. For purposes of computing distributions under the Plan, a claim that has been deemed "allowed" shall not include interest, fees, costs or charges on such claim from and after the Petition Date, except as required under section 506(b) of the Bankruptcy Code or other applicable bankruptcy law or as otherwise expressly set forth in the Plan.

### D.    Sources and Uses of Funds

As described in Section III.C.7 above, the Debtor, the Committee, BMO and the SBA have negotiated a settlement, compromise and release of claims against one another, arising from: (1) the Committee's challenge rights against BMO under the DIP Financing Order; and (2) the respective claims of the Debtor, Committee, BMO and the SBA to the Sale Proceeds.  The key terms of the Settlement culminated in the Plan, as described in detail herein. All told, subject to confirmation of the Plan, the Settlement provides, among other things, for sufficient cash to pay in full all Administrative Claims, Priority Tax Claims and Priority Non-Tax Claims; and, depending on recoveries from the "Creditor Trust Causes of Action" (as defined, below), anticipates one or more distributions to General Unsecured Creditors. All distributions would, however, adhere to the provisions of the Bankruptcy Code governing priority of claims. The terms of the Plan are intended to execute the relevant provisions of the Settlement.

The following categories of monies comprise the various sources of funds available for payment to holders of allowed Administrative Claims, Secured Claims, Priority Claims and General Unsecured Claims, as well as the intended application of those funds:

#### 1.    Proceeds of Asset Sale

Upon the closing of the Debtor's Asset Sale on March 13, 2020, the Sale Proceeds were transferred to an account at BMO.  The "**Sale Proceeds**" total $9,088,309.90, consisting of the cash purchase price, plus or minus various adjustments, and less the commission to Livingstone, the Debtor's investment bankers (the "**Sale Proceeds**"). The Sale Proceeds are being held in trust by BMO for the benefit of the Debtor, pursuant to the Sale Order.  Further disbursements of the Sale Proceeds, in whole or part, are subject to further order of the Bankruptcy Court.  The Plan contemplates the disbursement of the Sale Proceeds to BMO, the SBA and the Creditor Trust in accordance with the Settlement on the Effective Date, with $700,000 transferred to the SBA, a portion transferred to the Creditor Trust to cover the previously unfunded portion for the Plan Budget and the BMO Cash Contribution, and the remaining balance transferred to BMO (the "**Net Sale Proceeds**").

#### 2.    Other Estate Funds

Under the Settlement and Plan Budget, BMO has funded or, subject to confirmation of the Plan, will have funded sufficient monies to pay remaining Administrative Claims and Priority Claims accruing through the Effective Date.  Funding under the Plan Budget totals up to $1,355,332, allocated as follows:

- Up to $721,642 for Professional Fee Claims (including any Holdbacks) and UST Fees;
- Up to $418,967 for other Administrative Claims;
- Up to $164,723 for Priority Claims; and
- $50,000 for the BMO Cash Contribution[10].

Further, the aforementioned funding is subject to reallocation within the Plan Budget, except for Professional Fee Claims.  By way of example, in the event of any savings on a particular Administrative Claim or Priority Claim under the Plan Budget, such savings may be reallocated to make up a shortfall on payment of any other Administrative Claim or Priority Claim, with the exception of Professional Fee Claims (which are a fixed expense under the Plan Budget, subject to the Estate Administrative/Priority Savings Split).  The Plan Proponents believe the budgeted estimates for Administrative Claims and Priority Claims are as accurate as practicable; nonetheless, the ability to reallocate funding if and as needed provides further assurance in the event of any deviations from the Debtor's estimates.

The Plan Budget has been partially funded by BMO to the Debtor's estate, and to the extent not funded by the Confirmation Date, shall be funded from the Sale Proceeds. With the exception of any allowed Administrative Claims paid prior to the Effective Date of the Plan (either in the ordinary course of business or pursuant to Bankruptcy Court order), the remaining funds of the estate – the Reserved Cash – will be transferred to the Creditor Trust on the Effective Date, with the Creditor Trustee assuming responsibility for distributions to Administrative Claims and Priority Claims in accordance with the Plan, the Creditor Trust Agreement and the Bankruptcy Code.

Pursuant to the Settlement, in the event that after payment of all Administrative Claims and Priority Claims (other than Professional Fee Claims), there remains any savings realized under the Plan Budget, such savings shall be distributed to BMO and the Debtor's estate (or the Creditor Trust, as applicable) as follows:

- A Preferred Administrative Claim Refund of $25,000 shall be paid to BMO; and

- After payment of the Preferred Administrative Claim Refund, any remaining savings shall be split 50/50 between BMO (the BMO Administrative/Priority Savings Split) and the Debtor's estate/Creditor Trust (the Estate Administrative/Priority Savings Split).  The Estate Administrative/Priority Savings Split will also be available to cover any shortfalls in Professional Fee Claims, and, to the extent of any remaining monies after payment of

---

[10] The BMO Cash Contribution does not comprise Estate Funds, but is included herein to provide a full accounting of the Plan Budget.  For further information regarding the BMO Cash Contribution, *see* Section V.D.4 below.

any such claims, shall be available to the Creditor Trust for the Trustee's Expenses and/or the "Creditor Trust Beneficiaries" (as defined below).

The transfer of any remaining monies from the Plan Budget for the Preferred Administrative Claim Refund, the BMO Administrative/Priority Savings Split, and the Estate Administrative/Priority Savings Split will be dependent upon the timing of any realized savings. No distributions shall be made to BMO or the Debtor's estate/Creditor Trust on account of the Preferred Administrative Claim Refund, the BMO Administrative/Priority Savings Split, or the Estate Administrative/Priority Savings Split unless and until all allowed Administrative Claims (other than Professional Fee Claims) and all allowed Priority Claims have been paid in full.

### 3.    Other Estate Assets

Other assets of the Debtor's estate (the "**Other Estate Assets**") are comprised primarily of the following:

- All of the Debtor's right, title and interest in and to any insurance policies, including but not limited to directors & officers insurance;
- The Creditor Trust Causes of Action (as defined below);
- The Debtor's books and records pertaining to the Creditor Trust Causes of Action;
- All attorney-client privileges of the Debtor existing as of the Effective Date of the Plan.

The Other Estate Assets shall be transferred to, and shall vest in, the Creditor Trust upon the Effective Date of the plan.

### 4.    BMO Cash Contribution

On the Effective Date of the Plan, BMO will fund $50,000 to the Creditor Trust.  The BMO Cash Contribution shall be used by the Creditor Trustee for the Trustee's Expenses, including the necessary due diligence in connection with prosecuting claim objections and the Creditor Trust Causes of Action.  While the Plan Proponents do not believe it will prove necessary, the BMO Cash Contribution will be subject to pay any Administrative Claims and Priority Claims in the unlikely event there are insufficient monies otherwise available under the Plan Budget.  As such, the BMO Cash Contribution complies with the Absolute Priority Rule under the Bankruptcy Code.

### 5.    Chapter 5 Claims, Commercial Tort Claims and Claims against Insiders

The Debtor may possess the right to assert: (a) claims and causes of action arising under Chapter 5 of the Bankruptcy Code or their state law analogs, including preference and fraudulent transfer claims; (b) commercial tort claims; (c) claims against Mr. Patrick Gaughan, the indirect owner and former president and sole director of the Debtor, and the Gaughan Trust; and (d) rights and defenses of setoff and recoupment with respect to the foregoing claims and causes of action (all of which exclude those claims and causes of actions released pursuant to the Plan) (collectively, the "**Creditor Trust Causes of Action**"). The value of any Creditor Trust Causes of Action is unknown. However, as provided under questions 3 and 4 of the Debtor's Statement

of Financial Affairs (as amended) filed in the Chapter 11 Case, the Debtor has listed transfers within ninety (90) days of the Petition Date for non-insiders, and transfers within one (1) year for insiders, totaling as follows:

- 90 days (non-insiders) – $10,327,388.43; and

- 1 year (insiders) – $1,869,460.43.

Neither the Debtor nor the Committee has undertaken any meaningful analysis of the potential Chapter 5 causes of action. However, the Plan Proponents believe that the values of such claims against non-insiders or insiders are likely to be less than the face amounts listed in the SOFA, when taking into account statutory and other defenses. With respect to SOFA question 3, upon information and belief, many of the Debtor's purchases within 90 days of the Petition Date were on cash-on-delivery or cash-in-advance terms. Further, as noted below, any Chapter 5 causes of action against insiders should be discounted based on the collectability of insiders. Given the Debtor's limited resources and window until the Confirmation Hearing, the Plan Proponents anticipate that further analysis of Chapter 5 causes of action will be undertaken by the Creditor Trustee following the Effective Date of the Plan.

The value of any non-Chapter 5 causes of action against Mr. Gaughan and the Gaughan Trust are also presently unknown. Neither the Debtor nor the Committee has undertaken an extensive investigation of any potential claims or Mr. Gaughan's financial condition. Any investigation and prosecution will fall within the purview of the Creditor Trustee. That said, the Plan Proponents do have concerns about Mr. Gaughan's collectability, particularly in light of separate claims that may be asserted against Mr. Gaughan by BMO, the SBA, and certain other creditors on whose claims Mr. Gaughan is personally obligated.

The potential Creditor Trust Causes of Action are more fully described in **Exhibit A** hereto. Notwithstanding any otherwise applicable principle of law or equity, including, without limitation, any principle of judicial estoppel, res judicata, collateral estoppel, issue preclusion, or any similar doctrine, the failure to list, disclose, describe, identify, analyze or refer to any Creditor Trust Cause of Action, or potential Creditor Trust Cause of Action, in the Plan, this Disclosure Statement, or any other document filed with the Bankruptcy Court will in no manner waive, eliminate, modify, release, impair or alter the Debtor's, the Committee's or the Creditor Trustee's right to commence, prosecute, defend against, settle, and realize upon any Creditor Trust Cause of Action that the Debtor or its estate have or may have from and after the Effective Date. Unless otherwise provided in the Plan or in the Confirmation Order, to the extent that any filed or to-be-filed actions are not resolved as of the Effective Date, the Creditor Trustee will have the right to prosecute, settle, or otherwise resolve or dispose of Creditor Trust Causes of Action in the Chapter 11 Case.

The discussion regarding litigation and assertion of Creditor Trust Causes of Action contained in this Disclosure Statement is for informational purposes only. Nothing contained herein is intended, nor should be construed, to be any admission or acknowledgement by the Debtor of any matter pertaining to causes of action in the Chapter 11 Case. The Debtor, the

Committee and the Creditor Trustee reserve all of their respective rights and remedies with respect to causes of action asserted or that may be asserted in the Chapter 11 Case.

## E.   Distributions Under the Plan

Under the Plan, the BMO Claims and the SBA Claims will be satisfied from a combination of Sale Proceeds and distributions from the Creditor Trust Assets.  The "**Creditor Trust Assets**" are comprised of (1) the Reserved Cash; (2) the BMO Cash Contribution; (3) the applicable portion of the Sale Proceeds required to fully fund the Plan Budget; (4) the Creditor Trust Causes of Action; and (5) the Other Estate Assets.

Other Secured Claims will be satisfied in full from the Collateral securing such creditor's claims or the Creditor Trust Assets. All allowed Administrative Claims – including Professional Fee Claims, UST Fees and 503(b)(9) Claims – and Priority Claims shall be paid from the Reserved Cash held in trust by the Creditor Trust.  Finally, General Unsecured Claims shall be paid from the Creditor Trust Assets.  All of the foregoing distributions shall occur in accordance with the terms of the Plan, the Creditor Trust Agreement and the Absolute Priority Rule governing payment of such claims.  For example, payment of allowed Priority Claims is subject to payment in full of all allowed Administrative Claims.  Payment of allowed General Unsecured Claims is subject to payment in full of all allowed Priority Claims. Pursuant to the Plan and Creditor Trust Agreement, the Creditor Trustee will review all claims of any kind or nature against the Debtor for validity and accuracy.

Given the complexities and extent of the matters needed to be resolved by the Creditor Trustee, and the unknown amount of litigation which may be required to fully consummate the Plan, including the finalization of all anticipated objections to claims, the Plan Proponents cannot predict the amount of post-Effective Date expenses for completing the required liquidation efforts and distributing all remaining funds to the creditors in the Chapter 11 Case. At this stage of the liquidation process, it is not unreasonable to assume that it could take up to one year or longer to fully consummate the Plan. The Plan Proponents anticipate that, after payment of all Administrative Claims, Priority Tax Claims, Class 1 Claims, Class 2 Claims, Class 3 Claims and Class 4 Claims, there will be sufficient funds on deposit with the Creditor Trust to permit distributions to the holders of General Unsecured Claims.

As set forth herein, deposits of the Creditor Trust Funds to the Creditor Trust will be made upon the Effective Date. After allowance for any applicable reserve(s) against disputed claims, the Creditor Trustee shall make distribution, from time to time in the Creditor Trustee's discretion, in cash or cash equivalents on account of allowed Administrative Claims, allowed Priority Claims, and allowed General Unsecured Claims, excepting distributions of less than $50, which shall be donated to a charitable organization for convenience. To the extent applicable, distributions under the Plan shall be made to the holder of such claims as exist on the Claims Register at the time such distribution is made unless such holder notifies the Creditor Trustee in writing of a different address. After resolution of any disputed claims, the Creditor Trustee shall either pay such disputed claim(s): (1) if allowed, (a) in full to holders of Administrative Claims and Priority Claims, and (b) a *pro rata* share of any distributions to holders of General Unsecured Claims; or (2) if not allowed, reallocate such reserved Creditor Trust Funds to holders

of allowed General Unsecured Claims an additional *pro rata* distribution. Distributions from the Creditor Trust shall not include interest on allowed claims unless otherwise required under applicable bankruptcy law or the Plan.

### F.    Disputed Claims

Except as to a claim which is allowed under the Plan, after the Effective Date, the Creditor Trustee, or any other party in interest with standing, shall be entitled to object to claims. If a timely objection is made with respect to any claim, no payment or distribution under the Plan shall be made on account of such claim unless and until such disputed claim becomes allowed. Unless otherwise provided in the Plan, or by order of the Bankruptcy Court, any claim for which a proof of claim is filed after the applicable Bar Date shall be deemed disallowed and shall not receive any distribution on account of such claim.

### G.    Other Key Plan Provisions

#### 1.    Permanent Injunction

**Section 10.3 of the Plan provides that the order confirming the Plan shall constitute a permanent injunction against all holders of claims against or equity interests in the Debtor, the Debtor's estate, the Creditor Trustee and the Creditor Trust to ensure there are no collateral attacks against the Plan or the administration of the estate. The purpose of the permanent injunction is to avoid the necessity of the Creditor Trust being administered in any manner other than as set forth in the Plan under the jurisdiction of the Bankruptcy Court. Specifically, holders of Administrative Claims, Priority Tax Claims, Class 1 BMO Claims, Class 2 SBA Claims, Class 3 Other Secured Claims, Class 4 Priority Non-Tax Claims, Class 5 General Unsecured Claims, and Class 6 Equity Interests, are prohibited from taking any actions against the Creditor Trustee and the Creditor Trust arising out of anything concerning the Debtor, its estate or the Chapter 11 Case. An important exception is that such permanent injunction does not impair any parties' right to appear or bring an action in the Bankruptcy Court to enforce or assert any right or obligation under the Plan. Further, the Creditor Trustee remains liable for willful misconduct or fraud, or breach of fiduciary duty other than negligence, as provided in Section 9.1 of the Creditor Trust Agreement. Under Section 13.1 of the Plan, the Bankruptcy Court retains jurisdiction of the Chapter 11 Case under the Bankruptcy Code for all matters arising out of, under or related to the Debtor, its estate, the Plan, Creditor Trust, and the Creditor Trustee.**

#### 2.    Limitation of Liability

**Under Section 10.6 of the Plan, the Debtor, its estate, the Committee, and their respective officers, directors, shareholders, members, accountants, attorneys and other professionals (collectively, the "Exculpated Parties," and each, an "Exculpated Party"), will neither have nor incur any liability to any entity for any action in good faith taken or omitted to be taken after the Petition Date in connection with or related to the Chapter 11 Case or the formulation, preparation, dissemination, implementation, confirmation or consummation of the Plan, the Disclosure Statement, or any agreement created or entered**

into in connection with the Plan; provided, however, that this limitation will not affect or modify the obligations created under the Plan, or the rights of any holder of an allowed claim to enforce its rights under the Plan, and shall not release any action (or inaction) constituting willful misconduct or gross negligence (in each case subject to determination of such by final order of a court of competent jurisdiction); provided further that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan. Without limiting the generality of the foregoing, each Exculpated Party shall be entitled to and granted the protections of section 1125(e) of the Bankruptcy Code. Except as specifically set forth in the Plan, no provision of the Plan or the Disclosure Statement shall be deemed to act to or release any claims, litigation claims or rights, or liabilities that the Debtor or its estate may have against any entity or person for any act, omission, or failure to act that occurred prior to the Petition Date, nor shall any provision of the Plan be deemed to act to release any litigation or litigation claims.

3.    <u>Mutual Releases</u>

Section 10.8 of the Plan provides for mutual releases by and between (a) the Debtor, its Estate, and its Professionals; (b) the Pre-Petition Professionals; (c) Dan Dooley and Rob Novak in their capacity as the president and independent director of the Debtor, respectively; (d) the Committee, its individual members, and its Professionals; (e) the Creditor Trust, the Creditor Trustee, and the Creditor Trustee's Professionals; (f) BMO, its affiliates, subsidiaries, representatives, attorneys, agents, and professional advisors; and (g) SBA, its representatives, attorneys, agents, and its professional advisors (collectively, the Released Parties"), essentially in connection with any and all causes of action held with respect to (i) the Debtor or the Estate; (ii) the conduct of the Debtor's business; (iii) the conduct of the Released Parties, and in all instances, including but not limited to: the formulation, preparation, solicitation, dissemination, negotiation, or filing of the Plan and Disclosure Statement, or any contract, instrument, release, or other agreement or document created or entered into in connection with or pursuant to the Plan or the Disclosure Statement; the filing and prosecution of the Case; the pursuit of confirmation of the Plan;  the pursuit of consummation of the Plan; the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan; the business or contractual arrangements between the Debtor or the Estate, on the one hand, and any Released Party, on the other hand; or any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date, including prior to the Petition Date.

Notwithstanding the foregoing, the releases in the Plan shall not operate to waive or release:  (y) any Causes of Action expressly set forth in and preserved by the Plan; (x) any Causes of Action against any person or entity that is not a Released Party; or (z) the right of the Debtor or the Creditor Trustee to enforce the Plan and the contracts, instruments, releases, and other agreements or documents delivered under or in connection with the Plan or assumed pursuant to the Plan or assumed pursuant to a Final Order.

4.    <u>2019 and 2020 Tax Returns of the Debtor</u>

The Debtor intends to seek Bankruptcy Court authority to retain Mueller & Co., LLP or another qualified and experienced accountant to prepare the Debtor's 2019 and 2020 tax returns. The Debtor anticipates that preparation of the tax returns will commence prior to the Effective Date of the Plan but conclude thereafter.  Funding for the services of an accountant is included in the Plan Budget, and will be paid in accordance with the terms of the accountant's retention and Bankruptcy Court order.  Upon the Effective Date of the Plan, the Debtor's existing management – its CRO and Independent Director – will be deemed to have resigned their positions.  As such, any authorizations or tasks that would otherwise be required by or of the Debtor's management in connection with the tax returns shall, post-Effective Date, be assumed by the Creditor Trustee.

### 5.      401(k) Plan Termination and Wind-Up

The Debtor intends to seek Bankruptcy Court authority to retain one or more professionals to handle any and all tasks required to terminate and wind-up the Debtor's 401(k) plan, including: (a) a final 401(k) audit; (b) preparation of 5500 statements; and (c) termination of the 401(k) plan and distributions to plan participants (collectively, the "**401(k) Duties**").  The Debtor anticipates the 401(k) Duties will commence prior to the Effective Date of the Plan but conclude thereafter.  Funding for the services of the necessary professionals is included in the Plan Budget, and will be paid in accordance with the terms of such professionals' retention and Bankruptcy Court order.  Upon the Effective Date of the Plan, any authorizations or tasks that would otherwise be required by or of the Debtor's management in connection with the 401(k) Duties shall, post-Effective Date, be assumed by the Creditor Trustee.

## VI.      CONDITIONS PRECEDENT TO EFFECTIVE DATE OF PLAN

### A.      Conditions to Confirmation of Plan

Confirmation of the Plan shall not occur, and an order approving the Disclosure Statement and confirming the Plan under the Bankruptcy Code (the "**Confirmation Order**") shall not be entered, until each of the following conditions precedent have been satisfied:

1.      The Confirmation Order shall be in a form and substance satisfactory to the Debtor, the Committee and the Secured Lenders; and

2.      The Creditor Trust Agreement shall be in a form and substance acceptable to the Debtor, the Committee and the Secured Lenders.

### B.      Effective Date of Plan and Conditions Thereto

The occurrence of the Effective Date and the consummation of the Plan are subject to satisfaction of the following conditions precedent:

- Confirmation Order: The Confirmation Order as entered by the Bankruptcy Court shall be a final and non-appealable order in full force and effect.

- <u>Creditor Trust Agreement</u>: The Creditor Trust Agreement shall have been executed by the Debtor, the Committee and the Creditor Trustee.

- <u>UST Fees</u>: All UST Fees owed to the UST through the Effective Date shall either have been paid in their entirety, or cash sufficient to pay such UST Fees shall have been reserved and transferred to the Creditor Trust.

## C.     **Effect of Failure of Conditions; Reservation of Rights**

If the foregoing conditions have not been satisfied, then: (1) the Confirmation Order shall be of no further force or effect; (2) no distributions under the Plan shall be made; (3) the Debtor, the Creditor Trustee, and all holders of claims against and equity interests in the Debtor shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; (4) all of the Debtor's and the Creditor Trustee's obligations with respect to claims and equity interests shall remain unaffected by the Plan; (5) nothing contained in the Plan shall be deemed to constitute a waiver or release of any claims by or against the Debtor or the Creditor Trustee or any other person or to prejudice in any manner the rights of the Debtor or the Creditor Trustee, or any person in any further proceedings involving the Debtor or the Creditor Trustee; and (6) the Plan shall be deemed withdrawn. Upon such occurrence, the Debtor shall file a written notification with the Bankruptcy Court and serve it on the parties receiving CM/ECF notices in the Chapter 11 Case.

The Plan shall have no force or effect unless and until the Effective Date occurs. Prior to the Effective Date, none of the filing of the Plan, any statement or provision contained in the Plan, or action taken by the Debtor, the Creditor Trustee, or the Committee with respect to the Plan shall be, or shall be deemed to be, an admission or waiver of any rights of any of the Debtor, the Creditor Trustee, or the Committee, or any other party with respect to any claims or equity interests or any other matter.

## VII.    **MODIFICATION OR REVOCATION OF THE PLAN; SEVERABILITY**

## A.     **Modification Before Confirmation**

Modifications of the Plan may be proposed in writing by the Plan Proponents at any time before entry of the order confirming the Plan, provided that such Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Plan Proponents shall have complied with the provisions of section 1125 of the Bankruptcy Code to the extent such provisions are applicable.

## B.     **Modification After Confirmation**

The Plan may be modified by the Plan Proponents at any time after entry of the Confirmation Order and before its "substantial consummation," provided that: (1) such Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code; and (2) the Bankruptcy Court, after notice and a hearing, confirms such Plan, as modified, under section 1129 of the Bankruptcy Code.

**C.      Acceptance/Rejection of Plan Modification**

A holder of a claim or equity interest that has accepted or rejected the Plan shall be deemed to have accepted or rejected, as the case may be, the Plan, as modified, unless within the time fixed by the Bankruptcy Court, such holder changes such holder's previous acceptance or rejection.

## VIII.    IMPLEMENTATION OF PLAN

**A.      General**

On the Effective Date, the Creditor Trust shall be established for the benefit of holders of BMO Claims and SBA Claims (and to the extent of their respective deficiency, or treatment, as unsecured claims), Administrative Claims, Priority Claims, and General Unsecured Claims as set forth in the Plan. The Plan contemplates that the Creditor Trust Assets, including the Reserved Cash and the BMO Cash Contribution, will be transferred on the Effective Date from the Debtor's estate or BMO, as the case may be, to the Creditor Trust. Thereafter, the Creditor Trustee will liquidate and distribute the Creditor Trust Assets as provided in the Plan and the Creditor Trust Agreement.

**B.      Cancellation of Equity Interests**

Upon the Effective Date, the Debtor's equity interests shall be deemed canceled and terminated and of no further force or effect, and the obligations of the Debtor thereunder, if any, shall be deemed satisfied in full and discharged.

**C.      Termination of Committee**

The Committee shall terminate automatically upon the acceptance by the Creditor Trustee of his appointment in accordance with this Plan and the Creditor Trust Agreement following the Confirmation Date.  Upon termination of the Committee, the Committee shall be dissolved and its members shall be deemed released of their duties and responsibilities in connection with the Case or the Plan and its implementation, and the retention or employment of the Committee's counsel shall terminate, except for ministerial duties or any duties imposed pursuant to the Plan (including, without limitation, filing applications for allowance and payment of Professional Fee Claims).

**D.      Restructuring and Other Corporation Actions and Transactions**

**1.      Dissolution of the Debtor**

Upon the Effective Date, the Creditor Trustee shall be authorized and empowered, in his reasonable discretion, to file a certificate of dissolution or other documents, if any, memorializing the Debtor's dissolution with the office of the secretary of state of Illinois, or may allow the secretary of state to involuntarily dissolve the Debtor.  In the event of a dissolution

(whether voluntary or involuntary), the Creditor Trustee shall thereafter have and retain standing to assert claims or pursue matters on behalf of the Debtor to the extent necessary to preserve, protect and liquidate the Creditor Trust Assets or otherwise necessary to administer the Creditor Trust.

### 2.    General Corporate Actions

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects. Such authorizations and approvals shall be effective notwithstanding any requirements under non-bankruptcy law.

### 3.    Officer and Director of the Debtor

Upon the Effective Date, the CRO and Independent Director of the Debtor shall be automatically deemed to have resigned from such positions from the Debtor without further notice, act or deed.

## E.    The Creditor Trust

### 1.    Creation and Governance of the Creditor Trust

On or before the Effective Date, the Debtor and the Creditor Trustee shall execute the Creditor Trust Agreement and shall take all steps necessary to establish the Creditor Trust in accordance with the Plan and the beneficial interests therein, which shall be for the benefit of the holders of BMO Claims and SBA Claims (to the extent of their respective deficiency unsecured claims), Administrative Claims (including Professional Fee Claims and 503(b)(9) Claims), Other Secured Claims, Priority Claims, and General Unsecured Claims (collectively, the "**Creditor Trust Beneficiaries**"). Additionally, on the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Creditor Trust all of its rights, title, and interest in and to all of the Creditor Trust Assets; and in accordance with section 1141 of the Bankruptcy Code, except as specifically provided in the Plan or the Confirmation Order, the Creditor Trust Assets shall automatically vest in the Creditor Trust free and clear of all claims, liens, encumbrances, or interests subject only to the "Creditor Trust Interests" (as defined below) and the Trustee's Expenses, as provided for in the Plan and the Creditor Trust Agreement; and such transfer shall be exempt from any stamp, real estate transfer, other transfer, mortgage reporting, sales, use, or other similar tax. The Creditor Trustee shall be the exclusive trustee of the Creditor Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Debtor's estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code. The Creditor Trust shall be governed by the Creditor Trust Agreement and administered by the Creditor Trustee. The powers, rights, and responsibilities of the Creditor Trustee shall be specified in the Creditor Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this Section E. The Creditor Trust shall hold and distribute the Creditor Trust Assets in accordance with the provisions of the Plan and the Creditor Trust Agreement. Other rights and duties of the Creditor Trustee and the Creditor Trust Beneficiaries shall be as set forth in the Creditor Trust Agreement. For the avoidance of doubt, after the Effective Date, other than with respect to the Reserved Cash, which

shall be used solely as allocated under the Plan and Plan Budget, the Debtor and its estate shall have no interest in the Creditor Trust Assets, the transfer of the Creditor Trust Assets to the Creditor Trust is absolute, and the Creditor Trust Assets shall not be held or deemed to be held in trust by the Creditor Trustee on behalf of any of the Debtor or its estate.

## 2.    Purpose of the Creditor Trust

The Creditor Trust shall be established for the purpose of pursuing or liquidating the Creditor Trust Assets, reconciling and objecting to claims, as provided for in the Plan, and making distributions to the Creditor Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

## 3.    Creditor Trustee and Creditor Trust Agreement

a.    The Creditor Trust Agreement generally will provide for, among other things:

i.      the payment of the Trustee's Expenses;

ii.     the payment of other reasonable expenses of the Creditor Trust;

iii.    oversight and administration of any duties required for termination and wind-up of the Debtor's 401(k) plan;

iv.    oversight and administration of any duties required for preparation and filing of the Debtor's 2019 and 2020 tax returns;

v.     the retention of counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation;

vi.    the investment of cash by the Creditor Trustee within certain limitations, including those specified in the Plan;

vii.   the orderly liquidation and distribution of the Creditor Trust Assets to the Creditor Trust Beneficiaries;

viii.  litigation of any Creditor Trust Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Creditor Trust Causes of Action;

ix.    the prosecution and resolution of objections to applicable claims; and

x.     the establishment of such reserve(s) for disputed claims ("**Disputed Claim Reserve(s)**") as the Creditor Trustee deems appropriate.

b.    Except as otherwise ordered by the Bankruptcy Court, the Trustee's Expenses shall be paid from the Creditor Trust Assets (other than Reserved Cash) in accordance with the Plan and Creditor Trust Agreement.  Under no circumstances shall the Trustee's Expenses be paid from the Reserved Cash. The Creditor Trustee shall establish a reserve for the payment of the Trustee's Expenses and shall periodically replenish such reserve, as necessary.

c.      The Creditor Trustee, on behalf of the Creditor Trust, may employ, without further order of the Bankruptcy Court, professionals (including those previously retained in this case) to assist in carrying out its duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further order of the Bankruptcy Court from the Creditor Trust Assets (other than Reserved Cash) in accordance with the Plan and the Creditor Trust Agreement.

d.      The Creditor Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Creditor Trust in favor of the Creditor Trustee. Any such indemnification shall be the sole responsibility of the Creditor Trust and payable solely from the Creditor Trust Assets (other than Reserved Cash).

e.      In furtherance of and consistent with the purpose of the Creditor Trust and the Plan, the Creditor Trustee, for the benefit of the Creditor Trust, shall: (i) hold the Creditor Trust Assets, including the Reserved Cash, for the benefit of the Creditor Trust Beneficiaries, (ii) make distributions to the Creditor Trust Beneficiaries as provided in the Plan and in the Creditor Trust Agreement, and (iii) have the sole power and authority to prosecute and resolve any Creditor Trust Causes of Action and objections to claims, without approval of the Bankruptcy Court. The Creditor Trustee shall be responsible for all decisions and duties with respect to the Creditor Trust and the Creditor Trust Assets (other than Reserved Cash), except as otherwise provided in the Plan and the Creditor Trust Agreement. In all circumstances, the Creditor Trustee shall act in the best interests of the Creditor Trust Beneficiaries pursuant to the terms of the Plan and the Creditor Trust Agreement.

### 4.      Compensation and Duties of Creditor Trustee

The salient terms of the Creditor Trustee's employment, including the Creditor Trustee's duties and compensation shall be set forth in the Creditor Trust Agreement. The Creditor Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

### 5.      United States Federal Income Tax Treatment of the Creditor Trust

a.      For all United States federal income tax purposes, the parties shall treat the transfer of the Creditor Trust Assets, other than the Reserved Cash, to the Creditor Trust as (i) a transfer of the Creditor Trust Assets directly to the applicable Creditor Trust Beneficiaries, followed by (ii) the transfer by the Creditor Trust Beneficiaries to the Creditor Trust of such Creditor Trust Assets in exchange for the non-transferable interests in the Creditor Trust that are issued to Creditor Trust Beneficiaries pursuant to the Plan (the "**Creditor Trust Interests**"). Accordingly, the applicable Creditor Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Creditor Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

b.      The Plan permits the Creditor Trustee to establish Disputed Claim reserves. The Creditor Trustee may, at the Creditor Trustee's sole discretion, file a tax election to

treat any such Disputed Claim reserve as a "disputed ownership fund" within the meaning of Treasury Regulation section 1.468B-9 (the "**Disputed Ownership Fund**") or other taxable entity rather than as a part of the Creditor Trust for federal income tax purposes. If such election is made, the Creditor Trust shall comply with all tax reporting and tax compliance requirements applicable to the Disputed Ownership Fund or other taxable entity, including, but not limited to, the filing of separate income tax returns for the Disputed Ownership Fund or other taxable entity and the payment of any federal, state or local income tax due.

6. <u>**Tax Reporting**</u>

a.      The Creditor Trustee shall file tax returns for the Creditor Trust treating the Creditor Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a).

b.      The Creditor Trustee shall be responsible for payment, out of the Creditor Trust Assets (excepting the Reserved Cash), of any taxes imposed on the Creditor Trust or its assets.

c.      The Creditor Trustee shall distribute such notices to the applicable Creditor Trust Beneficiaries as the Creditor Trustee determines are necessary or desirable.

7. <u>**Creditor Trust Causes of Action**</u>

The Creditor Trustee shall have the exclusive right, on behalf of the Creditor Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Creditor Trust Causes of Action without any further order of the Bankruptcy Court, except as otherwise provided in the Plan or the Creditor Trust Agreement. From and after the Effective Date, the Creditor Trustee, in accordance with section 1123(b)(3) of the Bankruptcy Code, and on behalf of the Creditor Trust, shall serve as a representative of the estate with respect to any and all Creditor Trust Causes of Action and shall retain and possess the right to commence, pursue, settle, compromise, or abandon, as appropriate, any and all Creditor Trust Causes of Action in any court or other tribunal.

8. <u>**Creditor Trust Expenses**</u>

From and after the Effective Date, the Creditor Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable fees and expenses incurred by the Creditor Trust and any professionals retained by the Creditor Trustee from the Creditor Trust Assets (other than Reserved Cash) as well as any other Administrative Claims and costs of the Creditor Trust, including bank fees, accountants, and UST Fees (the "**Trustee's Expenses**").

9. <u>**Distributions by Creditor Trustee**</u>

The Creditor Trustee, in its discretion, may make distributions at any time following the Effective Date, provided that such distributions are otherwise permitted under, and not inconsistent with, the terms of the Plan, the Creditor Trust Agreement, and applicable law.

### 10.    Cash Investments

The Creditor Trustee may invest cash (including any earnings thereon or proceeds therefrom); provided, however, that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

### 11.    Dissolution of the Creditor Trust

The Creditor Trust shall be dissolved at such time as:  (a) the Creditor Trustee determines that the pursuit of additional Creditor Trust Causes of Action is not likely to yield sufficient additional proceeds to justify further pursuit of such Creditor Trust Causes of Action, (b) all objections to disputed claims are fully resolved, and (c) all distributions required to be made by the Creditor Trust have been made, but in no event shall the Creditor Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Creditor Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Creditor Trust Assets. Upon dissolution of the Creditor Trust, any remaining Creditor Trust Assets that exceed the amounts required to be paid under the Plan may be transferred by the Creditor Trustee to a non-profit charitable 501(c)(3) organization.

### 12.    Control Provisions

To the extent there is any inconsistency between the Plan as it relates to the Creditor Trust and the Creditor Trust Agreement, the Plan shall control.

### IX.    RETENTION OF BANKRUPTCY COURT JURISDICTION

The Bankruptcy Court shall retain jurisdiction of the Chapter 11 Case pursuant to and for the purposes set forth in sections 1127(b) and 1141 of the Bankruptcy Code, and:

a.    to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan;

b.    to determine any and all motions, adversary proceedings, applications and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Creditor Trustee after the Effective Date; provided, however, that the Creditor Trustee shall reserve the right to commence collection actions and actions to recover receivables (to the extent not sold as part of the Asset Sale), adversary proceedings against any holder of a

claim, and other similar actions in all appropriate jurisdictions, and the jurisdiction of the Bankruptcy Court over such matters shall be nonexclusive;

c.   to hear and determine any timely objections to Administrative Claims, Priority Tax Claims, Other Secured Claims, Priority Non-Tax Claims, General Unsecured Claims, or to proofs of claim and equity interests filed, both before and after the Confirmation Date, including any objections to the classification of any claim or equity interest, and to allow, disallow, determine, liquidate, classify, estimate or establish the priority of or secured or unsecured status of any claim, in whole or in part;

d.   to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed or vacated;

e.   to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

f.   to consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

g.   to hear and determine all applications for awards of compensation for services rendered and reimbursement of expenses filed by professionals;

h.   to hear and determine disputes arising in connection with or relating to the Plan or the interpretation, implementation, or enforcement of the Plan, or the extent of any person's obligations incurred in connection with or released or exculpated under the Plan;

i.   to issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any person with consummation or enforcement of the Plan;

j.   to determine any other matters that may arise in connection with or are related to the Plan, the Disclosure Statement, the Confirmation Order, the Creditor Trust Agreement, or any other contract, instrument, release or other agreement or document created in connection with the Plan or the Disclosure Statement to be executed in connection with the Plan;

k.   to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

l.   to hear any other matter or for any purpose specified in the Confirmation Order that is not inconsistent with the Bankruptcy Code; and

m.   to enter a Final Decree closing the Chapter 11 Case.

## X.   LIQUIDATION ANALYSIS

Pursuant to section 1129(a)(7) of the Bankruptcy Code, unless there is a unanimous acceptance of a Chapter 11 plan by an impaired class, a debtor must demonstrate, and a bankruptcy court must determine, that with respect to such class, each holder of a claim will receive property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive if the debtor was liquidated under Chapter 7 of the Bankruptcy Code on the effective date of the plan. This requirement is commonly referred to as the "best interests of creditors test."

The Plan satisfies this test. The Plan provides greater recovery to the holders of Class 5 General Unsecured Claims than such holders would receive in a liquidation under Chapter 7 for several reasons. First, while both a Chapter 7 trustee and the Creditor Trustee would incur expenses attributable to the administration of the Chapter 7 estate or the Creditor Trust, respectively, the Chapter 7 trustee would incur the additional expense and delay of obtaining Bankruptcy Court authority for virtually all decisions. In contrast, under the Plan, the Creditor Trustee has the ability to exercise his reasonable judgment and discretion and take actions to implement the provisions of the Plan, largely without the need for further order of the Bankruptcy Court.

Second, in Chapter 7, the Chapter 7 trustee would also be entitled to seek a sliding scale commission based upon the funds distributed by such trustee, even though the Debtor has already accumulated most of the funds and have already incurred many of the expenses associated with generating those funds. Almost all of the Debtor's assets have been liquidated and converted to cash. Accordingly, the primary consequence of liquidating the Debtor's assets under Chapter 7 of the Bankruptcy Code would be to incur additional administrative expenses and reduce the amounts payable to holders of allowed General Unsecured Claims. The Debtor believes that there is a reasonable likelihood that creditors would "pay again" for the funds accumulated by the Debtor, since the Chapter 7 trustee would be entitled to receive a commission in some amount for all funds distributed, including possibly the funds handed over to the Creditor Trust by the Debtor.

Third, this Plan is premised upon a Settlement that results in BMO waiving the right to a substantial percentages of distributions that it otherwise would be entitled to receive on account of its deficiency claim, which is in the amount of approximately $20 million. In a Chapter 7, BMO would be entitled to assert its entire deficiency claim, therefore substantially diluting distributions to other holders of General Unsecured Claims.

Fourth, the Plan Budget, which is funded entirely by BMO, permits payment of various Administrative Claims and Priority Claims, and provides for the ABMO Cash Contribution. Absent Confirmation and funding of the Plan Budget, claims senior in priority to General Unsecured Claims would need to be paid in Chapter 7, thereby likely consuming the Avoidance Actions, which are arguably the source of greatest recovery for Class 5.

Finally, it is also anticipated that Chapter 7 liquidations of the Debtor would result in delay in the distributions to creditors. Among other things, a Chapter 7 would trigger a new bar date for filing claims that would be more than ninety (90) days following conversion of the Chapter 11 Case to Chapter 7. Fed. R. Bankr. P. 3002(c). Hence, a Chapter 7 liquidation would not only delay distributions but raise the prospect of additional claims that were not asserted in the Chapter 11 Case. Based on the foregoing, the Plan provides an opportunity to bring the greatest return to creditors.

## XI.    <u>TAX CONSEQUENCES OF PLAN</u>

In connection with the Plan, the Creditor Trustee shall comply with all applicable withholding and reporting requirements imposed by federal, state, local and foreign taxing authorities, and all distributions under the Plan shall be subject to those withholding and reporting requirements. Creditors may be required to provide certain tax information as a condition to receiving distributions pursuant to the Plan, such as W-9 forms. Notwithstanding any other provision of the Plan, each person receiving a distribution thereunder will have sole, exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations, on account of that distribution.

The federal income tax consequences to any particular holder of a claim may also be affected by matters not discussed herein. For example, to the extent that a creditor previously deducted a loss with respect to its claim, the receipt of money under the Plan may require such creditor to recognize income. Furthermore, certain claim holders, including foreign persons, life insurance companies, and tax-exempt organizations, may be subject to special rules not addressed herein. There also may be state, local, or foreign tax considerations applicable to each claimant. **ACCORDINGLY, EACH CLAIM HOLDER IS URGED TO CONSULT ITS OWN TAX ADVISOR AS TO THE CONSEQUENCES OF THE PLAN UNDER FEDERAL AND APPLICABLE STATE, LOCAL, AND FOREIGN TAX LAWS.**

Notwithstanding the foregoing, the Creditor Trustee may withhold from any assets or property distributed under the Plan, any assets or property which must be withheld for foreign, federal, state and local taxes payable with respect thereto or payable by the person entitled to such assets to the extent required by applicable law.

## XII.    <u>FINAL CAVEAT</u>

THE FOREGOING IS A SUMMARY OF THE PLAN AND SHOULD NOT BE RELIED ON FOR VOTING PURPOSES. CREDITORS ARE URGED TO READ THE PLAN IN FULL. CREDITORS ARE FURTHER URGED TO CONSULT WITH COUNSEL, OR WITH EACH OTHER, IN ORDER TO FULLY UNDERSTAND THE PLAN. THE PLAN IS COMPLEX INASMUCH AS IT REPRESENTS A PROPOSED LEGALLY BINDING AGREEMENT BY THE PLAN PROPONENTS AND AN INTELLIGENT JUDGMENT CONCERNING SUCH PLAN CANNOT BE MADE WITHOUT UNDERSTANDING IT.

## XIII.    <u>CONCLUSION</u>

The Debtor and the Committee believe that the confirmation of the Plan, and the liquidation and administration of the Debtor's assets and affairs pursuant to the Creditor Trust Agreement under the direction of the Creditor Trustee, is in the best interests of the Debtor's creditors and other interested parties in the Chapter 11 Case.

Respectfully Submitted,

| | |
|---|---|
| HC HOLDCO, INC., F/K/A<br>ARRO CORPORATION | OFFICIAL COMMITTEE OF UNSECURED<br>CREDITORS |
| | |
| By: /s/ Erich S. Buck | By: /s/ Thomas R. Fawkes |
|     One of its attorneys |     One of its attorneys |

| | |
|---|---|
| **PLAN PROPONENT** | **PLAN PROPONENT** |
| | |
| Counsel for Debtor: | Counsel for Official Committee of Unsecured<br>Creditors: |
| | |
| ADAM P. SILVERMAN, ESQ. | THOMAS R. FAWKES, ESQ. |
| ERICH S. BUCK, ESQ. | BRIAN J. JACKIW, ESQ. |
| ADELMAN & GETTLEMAN, LTD. | TUCKER ELLIS LLP |
| 53 WEST JACKSON BLVD, SUITE 1050 | 233 SOUTH WACKER DRIVE, SUITE 6950 |
| CHICAGO, ILLINOIS 60604 | CHICAGO, ILLINOIS  60606 |
| TEL: (312) 435-1050 | TEL: (312) 624-6300 |
| FAX: (312) 435-1059 | FAX: (312) 624-6309 |
| EMAIL: asilverman@ag-ltd.com | EMAIL: Thomas.Fawkes@tuckerellis.com |
|         ebuck@ag-ltd.com |         Brian.Jackiw@tuckerellis.com |

## Exhibit A

## Preserved Causes of Action

This Exhibit A remains subject to further revision. The Plan Proponents expressly reserve the right to alter, modify, amend, remove, augment or supplement the following list at any time prior to the Confirmation Date (as defined in the Plan[1] (defined below)).

Article 8.9.3 of the *Agreed Plan of Liquidation of Debtor and Official Committee of Unsecured Creditors* (the "*Plan*") provides as follows:

**Preservation of Causes of Action.**  Unless any Causes of Action against a Person are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, or by a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Creditor Trust: (i) shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtor or the Debtor's Estate, whether arising before or after the Petition Date, including, but not limited to, any Causes of Action specifically enumerated in Appendix C to the Disclosure Statement, and the Creditor Trust's right to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date; and (ii) expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation of the Plan or the occurrence of the Effective Date. The Creditor Trust may pursue Causes of Action, as appropriate, in accordance with the best interests of the Creditor Trust.  No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against such Entity as any indication that the Creditor Trust will not pursue any and all available Causes of Action against such Person.  The Creditor Trust expressly reserves all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan or in a Bankruptcy Court order.  For the avoidance of doubt, the Plan does not release any Causes of Action that the Plan Proponents or the Creditor Trust have or may have now or in the future against any Person.

---

[1]  All capitalized terms undefined herein shall have the meanings ascribed to them in the Plan.

Except as otherwise provided in the Plan or in a Final Order, the Creditor Trust reserves and shall retain Causes of Action notwithstanding the assumption or rejection of any Executory Contract during the Case or pursuant to the Plan to the fullest extent permitted by law.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtor may hold against any Person that is not released under the Plan or a separate settlement approved by Final Order shall vest in the Creditor Trust, which shall retain and may exclusively enforce any and all such Causes of Action.  The Creditor Trust has the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

Notwithstanding and without limiting the generality of Article 8.9.3 of the Plan, the Debtor has identified below certain specific potential Causes of Action, including: (a) Commercial Tort Claims; (b) Insider Causes of Action; and (c) Avoidance Actions. These categories, however, shall not be deemed limiting and any specific Cause of Action listed in one category shall be viewed as if listed in all.

Failure to include any Person in this Exhibit A shall not constitute a release of such Person and shall not indicate that Causes of Action against such Person have not been preserved. Moreover, failure to attribute any specific Cause of Action to a particular Person in this Exhibit A shall not mean that such Cause of Action is not preserved against such Person. All possible Causes of Action, including Causes of Action not listed on this Exhibit A, are retained against all Persons not expressly released pursuant to the Plan or a Final Order.

### Commercial Tort Claims

Unless otherwise released by the Plan, the Debtor expressly preserves all Causes of Action related to any commercial tort claim unrelated to the assets sold to Mount Franklin Foods, LLC or its affiliated assignee, Element Food Solutions, LLC ("*Buyer*"), or otherwise preserved by the Debtor or excluded from the Debtor's sale to Buyer, whether or not such claim is listed on Schedule A of the Debtor's *Schedules of Assets and Liabilities* (as amended, the "*Schedules*") or on the Debtor's *Statement of Financial Affairs* ("*SOFA*"). [2]

### Insider Causes of Action

The Debtor may have claims and Causes of Action against current and former Insiders of Debtor that are not being released, and are therefore expressly preserved, under the Plan. These Causes of Action may be for, *inter alia*, the following: (i) preferential transfers pursuant to

---

[2] The SOFA and Schedules are expressly incorporated herein by reference.

section 547 of the Bankruptcy Code; (ii) fraudulent transfers under section 548 of the Bankruptcy Code and applicable non-bankruptcy law; (iii) other avoidance claims under Chapter 5 of the Bankruptcy Code; (iv) breaches of fiduciary duties, including breaches of the duty of care and loyalty; (v) improper distributions under applicable non-bankruptcy law; (vi) common law fraud under applicable non-bankruptcy law; and (vii) equitable subordination pursuant to section 510 of the Bankruptcy Code. Among other things, Insiders of Debtor may be the subject of Causes of Action to avoid and recover any transfers received by them as set forth in the SOFA (including those set forth in the Rider to Questions 4 and 30), or such other transfers that are discovered after further investigation, or to reduce, disallow, subordinate, or recharacterize any claims identified in Schedule E or F of the Debtor's Schedules or as set forth in a proof of claim.

Current and former Insiders of the Debtor that may be subject to one or more of the aforementioned Causes of Action include:

- Patrick Gaughan
- Patrick Gaughan Declaration of Trust Dated July 15, 1996
- Santa Fe Property, LLC
- Arro Protein Solutions, LLC
- Jeffery Hedman

## Avoidance Actions

The Debtor may have claims and Causes of Action, arising under sections 502, 510, 541, 542, 544, 545, 547 through 551 and 553 of the Bankruptcy Code, or under related state or federal statutes and common law, including fraudulent transfer laws, against creditors, vendors, suppliers and other Persons to avoid and recover transfers of cash or other property from Debtor in applicable periods prior to the Petition Date.

Each Person listed on the Rider to SOFA Question 3 received transfers from Debtor in the 90-day period prior to the Petition Date, and is therefore a potential subject of an Avoidance Action that is expressly preserved under the Plan. Causes of Action related to any transfers set forth in the SOFA, as well as any other or further transfers discovered by the Debtor or the Creditor Trustee, are expressly preserved. Finally, any other Person (whether listed on the SOFA or Schedules or not) that received transfers of cash or property from Debtor in the four-year period prior to the Petition Date may have received transfers avoidable under Chapter 5 of the Bankruptcy Code or applicable non-bankruptcy law, and such claims are expressly preserved.